UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS LIBERTY PAC, a political action committee registered with the Illinois State Board of Elections, and EDGAR BACHRACH, | ) ) ) ) | 12 C 5811 |
| Plaintiffs, | ) ) | Judge Feinerman |
| vs. | ) ) ) | |
| LISA M. MADIGAN, Attorney General of Illinois, WILLIAM McGUFFAGE, Chairman of the Illinois State Board of Elections, JESSE R. SMART, Vice-Chairman of the Illinois State Board of Elections, HAROLD D. BYERS, Member of the Illinois State Board of Elections, BETTY J. COFFRIN, Member of the Illinois State Board of Elections, ERNEST L. GOWEN, Member of the Illinois State Board of Elections, JUDITH C. RICE, Member of the Illinois State Board of Elections, BRYAN A. SCHNEIDER, Member of the Illinois State Board of Elections, and CHARLES W. SCHOLZ, Member of the Illinois State Board of Elections, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**M<small>EMORANDUM</small> O<small>PINION AND</small> O<small>RDER</small>**

Plaintiff Illinois Liberty PAC brought this official capacity suit under 42 U.S.C. § 1983

against the Attorney General of Illinois and the Chairman, Vice-Chairman, and members of the

Illinois State Board of Elections, alleging that certain contribution limits imposed by the Illinois

Election Code violate the First Amendment and the Fourteenth Amendment's Equal Protection

Clause. Doc. 1. The provisions challenged by the original complaint limit the amount that

political action committees ("PACs") may contribute to a candidate; those provisions do not limit

PAC contributions to independent expenditure committees or independent expenditures by PACs

themselves. Illinois Liberty moved for a preliminary injunction, Doc. 6, and the court set an

-1-

expedited briefing schedule and a hearing date of August 27, 2012, Doc. 14. On August 24,

three days before the hearing date, Illinois Liberty and a second plaintiff, Edgar Bachrach, filed

an amended complaint, which adds a challenge to provisions of the Illinois Election Code

limiting the amount that individuals may contribute to candidates and PACs; like the provisions

challenged by the original complaint, these additional provisions do not limit an individual's

contributions to independent expenditure committees or independent expenditures by individuals

themselves. Doc. 27. On the hearing date itself, Illinois Liberty filed a motion to withdraw its

preliminary injunction motion. Doc. 28. The court granted the motion to withdraw and, at

Plaintiffs' request, set an expedited briefing schedule for a new preliminary injunction motion.

Doc. 31. Plaintiffs filed their motion three days later. Doc. 32. Briefing on the motion closed on

September 19, 2012. Doc. 42. The motion is denied.

## Background

The provisions challenged here were enacted in 2009 as part of the Illinois Disclosure and

Regulation of Campaign Contributions and Expenditures Act, Ill. Pub. Act 96-832, as amended

in 2012, Ill. Pub. Act 97-766. The provisions recognize three classes of political contributors: (1)

individuals; (2) political committees; and (3) corporations, labor unions, or other associations.

10 ILCS 5/9-8.5(b). There are several different types of political committees, including

candidate political committees, political party committees, PACs, and independent expenditure

committees. 10 ILCS 5/9-1.8(a). A candidate political committee is the candidate himself or any

group that accepts contributions or makes expenditures on his behalf. 10 ILCS 5/9-1.8(b).

Because a candidate can have only one candidate political committee, 10 ILCS 5/9-2(b), the

candidate and her political committee are practically indistinguishable and will be referred to together as the "candidate."

A political party committee is the state, county, or ward/township committee of a political party. 10 ILCS 5/9-1.8(c). Any group whose candidate received over five percent of the total vote cast in the State or a subdivision thereof in the previous general election is recognized as a political party in the next election in the corresponding geographical area. 10 ILCS 5/7-2. A party can have only one political party committee in any geographical area. 10 ILCS 5/9-2(c). For example, there can be only one Republican party committee for Illinois, one for Cook County, and one for each ward/township within Cook County. For ease of reference, the term "political party" will refer to a political party and its affiliated committees.

A legislative caucus committee—defined as a "committee established for the purpose of electing candidates to the General Assembly"—is a type of political party committee. 10 ILCS 5/9-1.8(c). Legislative caucus committees may be formed by the majority and minority leaders of the House and Senate, or by a committee of five state senators or ten state representatives. *Ibid*. An example of a legislative caucus committee is the Democratic Majority, a committee whose purpose is to elect Democratic candidates to the Illinois House. Doc. 7-4 at 7. A legislative candidate may not accept contributions from more than one legislative caucus committee. 10 ILCS 5/9-8.5(b). If that prohibition were not in place, numerous legislative caucus committees could be set up to accept outside contributions and to channel those contributions to candidates, effectively evading the limitations on contributions to candidates, which are outlined below.

A PAC is a group of people or an organization (except candidates and political party committees) that accepts contributions, makes expenditures, and/or makes electioneering communications that relate to a political race and exceed $3000 in a twelve-month period. 10 ILCS 5/9-1.8(d). A given group or organization may form only one PAC. 10 ILCS 5/9-2(d). Illinois Liberty is a PAC. Doc. 27 at ¶ 5; Doc. 34-2 at ¶ 4. Independent expenditure committees are similar to PACs, except they can make only independent expenditures and not contributions. 10 ILCS 5/9-1.8(f). Illinois law does not prohibit a given group or organization from forming multiple independent expenditure committees.

The Act limits the amounts that certain contributors may contribute to a candidate: an individual may give $5000; a corporation, labor union, or other association may give $10,000; and a PAC or other candidate may give $50,000. 10 ILCS 5/9-8.5(b). Political parties may contribute unlimited amounts to a candidate during a general election. 10 ILCS 5/9-8.5(b). During a primary election, political parties are subject to a $200,000 limit for contributions to a candidate for statewide office; a $125,000 limit for state senate elections, some judicial elections, and some county elections; a $75,000 limit for state representative elections, some judicial elections, and some county elections; and a $50,000 limit for all other elections. *Ibid*. All contribution limits are lifted for a race if a self-funding candidate, individual, or independent expenditure committee spends over a designated threshold, which is $250,000 for statewide races and $100,000 for other races. 10 ILCS 5/9-8.5(h) & (h-5). When the limits are lifted for a race, all candidates in that race may accept unlimited contributions from any source. *Ibid*.

The Act imposes limits on contributions to political parties. During an election cycle, a political party may accept only $10,000 from an individual, $50,000 from a PAC, and $20,000

from a corporation, labor organization, or association.  10 ILCS 5/9-8.5(c).  A political party may accept only $50,000 from another political party committee or a candidate during the primary election; that restriction is set to expire on July 1, 2013, when political party committees will be able to accept unlimited contributions from candidates and other political party committees.  10 ILCS 5/9-8.5(c-5).  Contributions to PACs are limited as well.  During an election cycle, a PAC may accept $10,000 from an individual, $50,000 from another PAC or a candidate, and $20,000 from a corporation, labor union, association, or political party.  10 ILCS 5/9-8.5(d).

The Act imposes no limits on contributions to independent expenditure committees.  10 ILCS 5/9-8.5(e-5).  In *Personal PAC v. McGuffage*, __ F. Supp. 2d __, 2012 WL 850744 (N.D. Ill. Mar. 13, 2012), the court invalidated the Act to the extent that it limited contributions to PACs that make only independent expenditures.  That decision was not appealed.  Illinois Liberty is not a PAC that makes only independent expenditures.  Doc. 27 at ¶ 5 ("Plaintiff Illinois Liberty PAC exercises its rights to free speech and association by donating funds … to the state candidates it supports.").

A political committee that receives a prohibited contribution is subject to a civil penalty of up to 150% of the contribution, 10 ILCS 5/9-8.5(j), and a civil fine of up to $5000 or $10,000 depending on who committed the violation, 10 ILCS 5/9-23.  It is a Class A misdemeanor for a candidate or the treasurer of a political committee to accept a contribution exceeding the applicable limit.  10 ILCS 5/9-25.2.

## Discussion

Although Plaintiffs' papers reference several of the Act's provisions, they directly challenge only the limits on the amounts that individuals and PACs can contribute to a candidate

and the amounts individuals can contribute to a PAC. Plaintiffs claim that if the limits were not

in place, Illinois Liberty and Bachrach would contribute more to particular candidates than the

allowable limits ($50,000 and $5,000, respectively), and Bachrach would contribute more to

Illinois Liberty than the allowable limit ($10,000).

The law governing consideration of preliminary injunction motions is as follows:

> To obtain a preliminary injunction, the moving party must show that its case
> has "some likelihood of success on the merits" and that it has "no adequate
> remedy at law and will suffer irreparable harm if a preliminary injunction is
> denied." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). If the
> moving party meets these threshold requirements, the district court "must
> consider the irreparable harm that the nonmoving party will suffer if
> preliminary relief is granted, balancing such harm against the irreparable
> harm the moving party will suffer if relief is denied." *Ty, Inc. v. Jones
> Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). The district court must also
> consider the public interest in granting or denying an injunction. *Id.* In this
> balancing of harms conducted by the district court, the court weighs these
> factors against one another "in a sliding scale analysis." *Christian Legal
> Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). "The sliding scale
> approach is not mathematical in nature, rather 'it is more properly
> characterized as subjective and intuitive, one which permits district courts to
> weigh the competing considerations and mold appropriate relief.'" *Ty, Inc.*,
> 237 F.3d at 895-96 (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d
> 6, 12 (7th Cir. 1992)). Stated another way, the district court "sit[s] as would
> a chancellor in equity" and weighs all the factors, "seeking at all times to
> 'minimize the costs of being mistaken.'" *Abbott Labs.*, 971 F.2d at 12
> (quoting *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 593
> (7th Cir. 1986)).

*Stuller, Inc. v. Steak N Shake Enters., Inc.*, __ F.3d __, 2012 WL 3631632, at *2 (7th Cir. Aug.

24, 2012). "[I]n First Amendment cases, the likelihood of success on the merits will often be the

determinative factor." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (internal

quotation marks omitted). "This is because the 'loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury,' and the quantification of

injury is difficult and damages are therefore not an adequate remedy." *Ibid.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)) (some quotation marks omitted).

## I.      Likelihood of Success on the Merits

As noted above, Plaintiffs submit that the challenged contribution limits violate the First Amendment and the Equal Protection Clause.

### A.      First Amendment

The First Amendment principles governing this case are settled. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of our system of government.  As a result, the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2816-17 (2011) (internal quotation marks and citation omitted). "Ever since *Buckley* [*v. Valeo*, 424 U.S. 1 (1976),] however, the Supreme Court has drawn a distinction between restrictions on *expenditures* for political speech and restrictions on *contributions* to candidates." *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 152 (7th Cir. 2011) ("*WRTL*"); *see also Ariz. Free Enter.*, 131 S. Ct. at 2817.  Restrictions on expenditures "represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech," *Buckley*, 424 U.S. at 19, and thus are subject to strict scrutiny, *see Ariz. Free Enter.*, 131 S. Ct. at 2817; *WRTL*, 664 F.3d at 153.  By contrast, "a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication," *Buckley*, 424 U.S. at 20, and thus is subject to a "relatively complaisant [standard of] review," *FEC v. Beaumont*, 539 U.S. 146, 161 (2003).  The standard provides that contribution limits are

"generally permissible if the government can establish that they are 'closely drawn' to serve a 'sufficiently important interest.'" *WRTL*, 664 F.3d at 152 (quoting *Buckley*, 424 U.S. at 25); *see also Ariz. Free Enter.*, 131 S. Ct. at 2817; *Davis v. FEC*, 554 U.S. 724, 737 (2008). Applying that more lenient level of scrutiny, the Supreme Court has upheld "government-imposed limits on contributions to candidates, caps on coordinated party expenditures, and requirements that political funding sources disclose their identities." *Ariz. Free Enter.*, 131 S. Ct. at 2817 (internal citations omitted).

The Supreme Court has identified only one "sufficiently important interest" that can justify contribution limits—the prevention of *quid pro quo* corruption or the appearance thereof. *See Citizens United v. FEC*, 130 S. Ct. 876, 903-11 (2010); *WRTL*, 664 F.3d at 152; *Green Party of Conn. v. Garfield*, 616 F.3d 189, 199 (2d Cir. 2010). The so-called "anti-circumvention" principle provides that this interest may be advanced by prophylactic measures designed to halt the evasion of valid contribution limits. *See FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 (2001) ("*Colorado II*") ("all Members of the Court agree that circumvention is a valid theory of corruption"); *United States v. Danielczyk*, 683 F.3d 611, 618 (4th Cir. 2012) (observing that *Citizens United* did not abrogate the anti-circumvention rationale); *Ognibene v. Parkes*, 671 F.3d 174, 195 n.21 (2d Cir. 2011) (same); *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1125 (9th Cir. 2011) (same); *Green Party of Conn.*, 616 F.3d at 199 (same). For instance, the government may prevent an individual who already contributed the maximum amount to a particular candidate from channeling additional funds to that candidate through entities like PACs. *See Beaumont*, 539 U.S. at 155 ("recent cases have recognized that restricting contributions by various organizations hedges against their use as conduits for circumvention of

valid contribution limits") (internal quotation marks and alterations omitted); *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 203 (1981) (Blackmun, J., concurring) ("contributions to [PACs] may be limited … as a means of preventing evasion of the limitations on contributions to a candidate").

### 1. The Challenged Limits Considered in Isolation

Plaintiffs take pains to make clear that they are not arguing that the contribution limits on individuals and PACs, standing alone, are too low. Doc. 42 at 4-5. That said, and to place Plaintiffs' actual arguments in context, it is helpful to examine whether the challenged limits, considered in isolation, are likely to survive First Amendment scrutiny.

The Act's $5,000 limit on an individual's contributions to a candidate and the $50,000 limit on a PAC's contributions to a candidate are typical, higher than some and lower than others, of the limits imposed by other States. *See* National Conference of State Legislators, State Limits on Contributions to Candidates, 2011-12 election cycle ("State Contribution Limits Survey") (Sept. 30, 2011), *available at* www.ncsl.org/Portals/1/documents/legismgt/Limits_to_ Candidates_2011-2012.pdf (last visited Oct. 5, 2012). Those limits are routine campaign finance regulations of the sort that the Supreme Court regularly upholds. *See Beaumont*, 539 U.S. at 163 (holding that a complete ban on contributions to federal candidates by corporations may, consistent with the First Amendment, be applied to nonprofit advocacy corporations); *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 395-97 (2000) (upholding a $1,075 limit on individual and PAC contributions to candidates for statewide office in Missouri); *Buckley*, 424 U.S. at 23-29 (upholding a $1,000 limit on individual and PAC contributions to candidates for federal office); *see also Thalheimer*, 645 F.3d at 1124 (holding that *Citizens United* did not implicitly overrule *Beaumont*). The same holds for the Act's $10,000 limit on an individual's contributions to a

PAC.  *See Cal. Med. Ass'n*, 453 U.S. at 195-99 (upholding a $5,000 limit on individual

contributions to federal multicandidate political committees, which are PACs that receive

contributions from fifty or more individuals and contribute to five or more candidates).

In *Randall v. Sorrell*, 548 U.S. 230 (2006), the Court struck down Vermont's extremely

low limits on what individuals, PACs, and political parties could contribute to candidates—$400

for candidates for statewide office, $300 for state senate candidates, and $200 for state house

candidates.  The contribution limits challenged here well exceed the limits invalidated in

*Randall*, and even exceed the limits upheld in *Shrink*, *California Medical Association*,

*Beaumont*, and *Buckley*.  Based on the markers set down by the Supreme Court, it is highly likely

that the Act's contribution limits, standing alone, would survive First Amendment scrutiny.

## 2. Whether Exempting Political Parties from the Limits on Contributions to Candidates Renders Them Invalid

Plaintiffs contend that the Act violates the First Amendment by exempting political

parties, but not individuals and PACs, from the limits on contributions to candidates.  Plaintiffs'

submission is not foreclosed by the fact that the Act's contribution limits on individuals and

PACs, standing alone, are likely valid.  Speech restrictions that are valid when considered in

isolation may nonetheless be found unconstitutional if they impermissibly disfavor certain

content, viewpoints, or speakers.  *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 383-86

(1992).  "Premised on mistrust of governmental power, the First Amendment stands against

attempts to disfavor certain subjects or viewpoints.  Prohibited, too, are restrictions

distinguishing among different speakers, allowing speech by some but not others.  As

instruments to censor, these categories are interrelated: Speech restrictions based on the identity

-10-

of the speaker are all too often simply a means to control content." *Citizens United*, 130 S. Ct. at 898-99 (citations omitted); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 659 (1994) ("Regulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns."). Moreover, exemptions from a speech restriction can render it fatally underinclusive and can cast doubt on the government's justification therefor. *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2740 (2011); *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002); *City of Ladue v. Gilleo*, 512 U.S. 43, 51-53 (1994).

The question here is whether the First Amendment prohibits campaign finance laws that favor political parties over individuals and PACs. To support their affirmative answer to the question, Plaintiffs cite *Colorado II*, *supra*, which upheld a federal law limiting a political party's coordinated expenditures—deemed to be the functional equivalent of direct contributions to a candidate, *see* 533 U.S. at 445-56—with its candidates for the United States Senate. The Court held that the limits were justified by what the government contended were the risks of corruption posed by unlimited party contributions to candidates. *See id*. at 445-65. From the premise that the government's concern about party-related corruption can provide a sufficient justification under the First Amendment for limits on party contributions to candidates, Plaintiffs conclude that the First Amendment *requires* that parties be subject to the same limits as individuals and PACs.

Plaintiffs' conclusion does not follow from its premise and cannot be reconciled with prevailing campaign finance precedents. It must be remembered that in *Colorado II*, the limits on a party's coordinated expenditures in Senate campaigns—anywhere between $67,560 and

$1,636,438, depending on state population, *see id*. at 439 n.3—dwarfed the limits on individual

and PAC contributions to Senate candidates, *see id*. at 442 n.7 (noting that the law imposed a

$1,000 limit on individual contributions and a $5,000 limit on PAC contributions to a federal

candidate during an election cycle). The fact that the Court upheld a campaign finance scheme

whose contribution limits on parties were orders of magnitude higher than its limits on

individuals and PACs undermines Plaintiffs' submission that the First Amendment prohibits

such a scheme.

Any doubt would be dispelled by examining the views of the Justices who decided

*Colorado II*. The four dissenters were Chief Justice Rehnquist and Justices Scalia, Kennedy, and

Thomas. Adopting the assumption (with which they disagreed) that coordinated expenditures

equal direct contributions and that *Buckley*'s "closely drawn" test is the appropriate standard, the

dissenters expressed the view that the First Amendment prohibits any coordinated spending

limits on political parties. *Id*. at 474-82 (Thomas, J., dissenting). The dissenters justified their

view by pointing to "the unique relationship between a political party and its candidates," and by

noting that "[t]he very aim of a political party is to influence its candidate's stance on issues and,

if the candidate takes office or is reelected, his votes." *Id*. at 476 (Thomas, J., dissenting)

(internal quotation marks omitted); *see also id*. at 477 (Thomas, J., dissenting) ("[A party's

influence with candidates] is simply the essence of our Nation's party system of government.

One can speak of an individual citizen or a political action committee corrupting or coercing a

candidate, but what could it mean for a party to 'corrupt' its candidate or to exercise 'coercive'

influence over him?"). The five Justices in the *Colorado II* majority—Justices Stevens,

O'Connor, Souter, Ginsburg and Breyer—did not *expressly* say in their opinion that campaign

finance schemes may treat parties more favorably than individuals and PACs, though the scheme

they upheld did exactly that. But two years later, those five Justices did make that allowance in

the course of rejecting an argument that a federal statute violated the Constitution by treating

political parties more favorably than "special interest groups such as the National Rifle

Association, American Civil Liberties Union, and Sierra Club." *McConnell v. FEC*, 540 U.S. 93,

187 (2003), *overruled in part on other grounds*, *Citizens United v. FEC*, *supra*. The Justices

explained as follows:

> As an initial matter, we note that BCRA [the Bipartisan Campaign Reform Act of 2002] actually favors political parties in many ways. Most obviously, party committees are entitled to receive individual contributions that substantially exceed FECA's [the Federal Election Campaign Act of 1971] limits on contributions to nonparty political committees; individuals can give $25,000 to political party committees whereas they can give a maximum of $5,000 to nonparty political committees. In addition, party committees are entitled in effect to contribute to candidates by making coordinated expenditures, and those expenditures may greatly exceed the contribution limits that apply to other donors. See 2 U.S.C. § 441a(d) (Supp. II).

> More importantly, however, *Congress is fully entitled to consider the real-world differences between political parties and interest groups when crafting a system of campaign finance regulation*. See [*FEC v.*] *National Right to Work*, 459 U.S. [197], 210 [(1982)]. Interest groups do not select slates of candidates for elections. Interest groups do not determine who will serve on legislative committees, elect congressional leadership, or organize legislative caucuses. Political parties have influence and power in the Legislature that vastly exceeds that of any interest group. As a result, it is hardly surprising that party affiliation is the primary way by which voters identify candidates, or that parties in turn have special access to and relationships with federal officeholders. *Congress' efforts at campaign finance regulation may account for these salient differences*.

*Id*. at 188 (emphasis added). *McConnell* drew a dissent from the four *Colorado II* dissenters, but

the dissenters did not take issue with the *McConnell* majority's recognition of the special place of

political parties in our political system. And given that the *Citizens United* majority includes the three *Colorado II* dissenters who remained on the Court as of 2010, it cannot be doubted that the foregoing passage from *McConnell* remains good law to this day. *See also Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 630 (1996) ("*Colorado I*") (Kennedy, J., concurring in part and dissenting in part) ("We have a constitutional tradition of political parties and their candidates engaging in joint First Amendment activity; we also have a practical identity of interests between the two entities during an election.").

Also instructive is *Randall v. Sorrell*, *supra*, which invalidated the extremely low candidate contribution limits that Vermont imposed on individuals, PACs, and political parties alike. In a plurality opinion joined by Chief Justice Roberts and in relevant part by Justice Alito, Justice Breyer explained that the provisions were invalid under the First Amendment because, among other reasons, they placed "identical limits" on party and individual contributions to candidates. 548 U.S. at 259. This "special party-related harm[]," the plurality reasoned, "would reduce the voice of political parties in Vermont to a whisper." *Ibid.* (internal quotation marks omitted). The plurality contrasted the limits invalidated in *Randall* with the coordinated spending limits on parties upheld in *Colorado II*, which the plurality emphasized were "much higher than the federal limits on contributions from individuals to candidates, thereby reflecting an effort by Congress to balance (1) the need to allow individuals to participate in the political process by contributing to political parties that help elect candidates with (2) the need to prevent the use of political parties to circumvent contribution limits that apply to individuals." *Id.* at 258 (internal quotation marks omitted).

As far as the decided cases reveal, there are at most two schools of thought on the Supreme Court. The predominant school, reflecting the view of at least six sitting Justices (Chief Justice Roberts and Justices Scalia, Kennedy, Thomas, Breyer, and Alito), is that in jurisdictions that impose contribution limits, the First Amendment *requires* that political parties be treated more favorably than non-party contributors; and we know from *Colorado II* that Justices Scalia, Kennedy, and Thomas would invalidate any limits on party contributions. The minority view, if in fact any Justice holds the view at all, is that the First Amendment *allows but does not require* jurisdictions with contribution limits to treat parties more favorably than non-party contributors. No Justice has espoused the view pressed here by Plaintiffs, that the First Amendment *prohibits* jurisdictions with contribution limits from treating parties more favorably than not-parties. It therefore is highly unlikely that the Act violates the First Amendment by exempting political parties from the contribution limits imposed on individuals and PACs.

Plaintiffs suggest that the First Amendment analysis should take account of what they believe to be the special dangers of political party corruption in Illinois, as demonstrated by the State's history and its contemporary political culture and practice. But the First Amendment's campaign finance principles are uniform across the Nation. Just over three months ago, in *American Traditional Partnership, Inc. v. Bullock*, 132 S. Ct. 2490 (2012), the Supreme Court summarily rejected an argument that Montana's special history and circumstances warranted an exception from generally applicable First Amendment standards. There is no reason to believe that the Supreme Court would hold that a practice generally required or allowed in jurisdictions with contribution limits (treating parties more favorably than non-parties) is prohibited in Illinois.

Plaintiffs cite passages from the legislative debates to support their view that the Act's contribution limits are unconstitutional. What individual legislators said in those debates are not pertinent to the Act's constitutionality. *See United States v. O'Brien*, 391 U.S. 367, 383 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."); *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Tp.*, 980 F.2d 437, 443 (7th Cir. 1992) (upholding a state Pledge of Allegiance statute against a First Amendment challenge even though a senator opposing passage argued that the bill was invalid under *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), and even though one senator supporting the bill's passage said, "it amazes me that these people get up and read that kind of garbage that Jackson [Justice Robert Jackson, author of the majority opinion in *Barnette*] had there, his advise [sic] from the Supreme Court, I rate just about as highly as I do the advise [sic] from Congress," and another supporter said, "Maybe we ought to abolish the Supreme Court and have a dictatorship like in Russia because in Russia at least they say a pledge of allegiance to their own flag") (internal quotation marks omitted, alterations in original).

### 3.    Whether the Waiver Provision Renders Invalid the Limits on Contributions to Individual Candidates

Plaintiffs next contend that any conceivably legitimate interest that could justify the limits on individual and PAC contributions to candidates is fatally undermined by the Act's underinclusiveness, as evidenced by the waiver provisions that lift contribution limits in races where a self-funding candidate, an individual, or an independent expenditure committee spends over a particular threshold. 10 ILCS 5/9-8.5(h) & (h-5). Relatedly, Plaintiffs contend that it

violates the First Amendment to condition the volume of their speech, as expressed by their contributions to candidates, on the speech activities of others.

Plaintiffs' submissions are foreclosed by *Davis v. FEC*, *supra*. At issue in *Davis* was the so-called "Millionaire's Amendment," which tripled the contribution limit for a federal candidate and lifted the coordinated party expenditure limit if her opponent's self-funded expenditures plus half the contributions received in the year preceding the election exceeded a certain threshold. 554 U.S. at 729 n.5. The Supreme Court held that the statute's *asymmetric* waiver of contribution limits "impose[d] an unprecedented penalty on any candidate who robustly exercises [the] First Amendment right [to spend personal funds on an election]" and thus violated the First Amendment. *Id.* at 738-40. In so holding, however, the Court made clear that the statute would have survived had it raised the contribution limits for *all* candidates when a self-funding candidate exceeded the spending threshold:

> If [the Millionaire's Amendment] simply raised the contribution limits for all candidates, Davis' argument would plainly fail. This Court has previously sustained the facial constitutionality of limits on discrete and aggregate individual contributions and on coordinated party expenditures. At the same time, the Court has recognized that such limits implicate First Amendment interests and that they cannot stand unless they are closely drawn to serve a sufficiently important interest, such as preventing corruption and the appearance of corruption. When contribution limits are challenged as too restrictive, we have extended a measure of deference to the judgment of the legislative body that enacted the law. But we have held that limits that are too low cannot stand.
>
> There is, however, no constitutional basis for attacking contribution limits on the ground that they are too high. Congress has no constitutional obligation to limit contributions at all; and if Congress concludes that allowing contributions of a certain amount does not create an undue risk of corruption or the appearance of corruption, a candidate who wishes to restrict an opponent's fundraising cannot argue that the Constitution demands that contributions be regulated more strictly. Consequently, if [the

> Millionaire's Amendment's] elevated contribution limits applied across the
> board, Davis would not have any basis for challenging those limits.

*Id*. at 737 (internal quotations marks and citations omitted).

The Act's waiver provisions are materially identical to the hypothetical version of the

Millionaire's Amendment that the Supreme Court said it would uphold—a version that raises the

contribution limits for all candidates when a certain spending threshold is exceeded. If the

hypothetical statute rendered the otherwise applicable contribution limits fatally underinclusive

or impermissibly conditioned one candidate's speech on the choices made by others, *Davis*

would not have approved it. It follows that the Act's waiver provisions do not render

constitutionally infirm the limits that the Act imposes on individual and PAC contributions to

candidates.

   **4.**  **Whether the Limits on Individual Contributions to
PACs are Rendered Invalid by the Higher Limit
Imposed on Corporations, Labor Unions and Other
Organizations**

Finally, Plaintiffs contend that the Act violates the First Amendment rights of individuals

by permitting corporations, labor unions, and other organizations to contribute twice as much as

individuals to PACs ($10,000 vs. $5,000). The contention has no merit. In *Buckley*, the

Supreme Court approved the imposition of lower contribution limits on individuals than on

entities. *See* 424 U.S. at 35-36 (upholding provisions that imposed a $1,000 contribution limit

on individuals and a $5,000 limit on PACs). Plaintiffs provide no basis to conclude that this

component of *Buckley* is no longer good law. *See Green Party of Conn.*, 616 F.3d at 199

(holding that *Citizens United* did not undermine the Supreme Court's precedents regarding the

validity of contribution limits under the First Amendment).

### B. Equal Protection Clause

Plaintiffs claim that the challenged provisions violate the Equal Protection Clause because they impermissibly discriminate (1) against individuals and PACs by exempting political parties from the limits on contributions to a candidate and (2) against individuals by allowing corporations, labor unions, and other associations to contribute twice as much to a PAC. Plaintiffs' equal protection challenge rests on the grounds they unsuccessfully advanced under the First Amendment. The question here is whether those grounds fare any better when presented in the guise of an equal protection challenge.

Plaintiffs answer in the affirmative, arguing that equal protection challenges to disparate contribution limits are governed by strict scrutiny, not by the more relaxed "closely drawn" scrutiny applied under the First Amendment. The argument is without merit. The First Amendment encompasses a strong equality principle, one that provides the standard for evaluating the constitutional validity of government action that treats different classes of speakers and speech differently. Some Justices have urged that the "closely drawn" test be jettisoned and that contribution limits instead be subjected to strict scrutiny. *See*, *e.g.*, *Randall*, 548 U.S. at 266-67 (Thomas, J., concurring); *Colorado II*, 533 U.S. at 465-66 (Thomas, J., dissenting); *Shrink*, 528 U.S. at 410 (Thomas, J., dissenting). If that goal could be accomplished simply by switching analysis from the First Amendment to the Equal Protection Clause, surely those Justices would have proposed that course. They do not appear to have done so, and even if they had, the proposal would not be viable in light of the Supreme Court's adherence to the "closely drawn" standard in measuring the validity of contribution limits.

Plaintiffs have not cited any case where a litigant who lost a First Amendment challenge to contribution limits proceeded to prevail by re-framing the challenge under the Equal Protection Clause. This is not surprising in light of precedent holding that it makes no difference whether a challenge to the disparate treatment of speakers or speech is framed under the First Amendment or the Equal Protection Clause. *See Ark. Writers' Project v. Ragland*, 481 U.S. 221, 227 n.3 (1987) ("Appellant's First Amendment claims [challenging a state sales tax that taxed different publications differently] are obviously intertwined with interests arising under the Equal Protection Clause. However, since Arkansas' sales tax system directly implicates freedom of the press, we analyze it primarily in First Amendment terms.") (citations omitted); *Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 55 n.4 (1986) ("Respondents argue, as an 'alternative basis' for affirming the decision of the Court of Appeals, that the Renton ordinance violates their rights under the Equal Protection Clause of the Fourteenth Amendment. As should be apparent from our preceding discussion, respondents can fare no better under the Equal Protection Clause than under the First Amendment itself."); *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 n.7 (1983) ("Justice Rehnquist's dissent analyzes this case solely as a problem of equal protection, applying the familiar tiers of scrutiny. We, however, view the problem as one arising directly under the First Amendment, for, as our discussion shows, the Framers perceived singling out the press for taxation as a means of abridging the freedom of the press. The appropriate method of analysis thus is to balance the burden implicit in singling out the press against the interest asserted by the State. Under a long line of precedent, the regulation can survive only if the governmental interest outweighs the burden and cannot be achieved by means that do not infringe First Amendment rights as significantly.") (citations omitted);

*Ognibene*, 671 F.3d at 193 n.19 (summarily rejecting an equal protection challenge to a contribution limit because the court had already held that the limit did not effect impermissible viewpoint discrimination under the First Amendment); *Kucharek v. Hanaway*, 902 F.2d 513, 517 (7th Cir. 1990) ("The state is permitted to suppress obscenity but it is not permitted to distort the marketplace of erotic discourse by suppressing only that obscenity which conveys a disfavored message. It makes no difference whether this conclusion is premised on the equal protection clause as informed by policies drawn from the free-speech and free-press clauses or on the speech and press clauses themselves.") (internal citations omitted); *see also Wagner v. FEC*, 854 F. Supp. 2d. 83, 95 (D.D.C. 2012) (applying the "closely drawn" standard to resolve an equal protection challenge to disparate contribution limits avoids "the anomalous result that a statutory provision could survive closely drawn scrutiny under the First Amendment, but nevertheless be found to violate equal-protection guarantees because of its impingement upon the very same rights").

Because the applicable standards are the same, Plaintiffs' equal protection challenge to the Act's contribution limits fails for the same reasons as their First Amendment challenge.

## II. Other Preliminary Injunction Factors

Plaintiffs' negligible likelihood of success is reason enough to deny their preliminary injunction motion. Consideration of the balance of harms and the public interest, which are two other components of the preliminary injunction calculus, confirm that preliminary relief should be denied. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 132 S. Ct. __, 2012 WL 3064878, at *2 (July 30, 2012) (Roberts, C.J., in chambers) (quoting *New*

*Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, C.J., in

chambers)); *see also Aid for Women v. Foulston*, 441 F.3d 1101, 1119 (10th Cir. 2006) (same);

*Coalition for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) (same).  If a preliminary

injunction were granted, there would be no contribution limits for individuals and PACs in the

weeks leading up to the 2012 Illinois state elections.  This would create a manifest possibility of

actual or apparent corruption, an irreparable harm to Illinois, its citizens, and the public interest.

That harm far outweighs any irreparable harm that the challenged provisions might impose upon

individuals and PACs, who may contribute up to $5,000 or $50,000, respectively, to any given

candidate, and who may make their voices heard by devoting unlimited sums to their own

independent expenditures or by contributing unlimited sums to independent expenditure

committees or to PACs that make only independent expenditures.  *See WRTL*, 664 F.3d at 153-

54; *Personal PAC*, 2012 WL 850744, at *6.

### Conclusion

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is denied.

October 5, 2012

_____
United States District Judge