IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **Illinois Liberty PAC** | ) | |
|     **Plaintiff,** | ) | **No. 12 C 5811** |
| | ) | |
| v. | ) | |
| | ) | **Hon. Judge Feinerman** |
| **Lisa Madigan,** *et al.*, | ) | |
|     **Defendants.** | ) | |

**DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT**

Defendants, LISA MADIGAN, Illinois Attorney General, and the Members of the Illinois State Board of Elections (collectively, "Defendants"), by their attorney and pursuant to Rule 702 of the Federal Rules of Evidence, hereby move to strike the report and bar the testimony of Plaintiffs' named expert, Dr. Marcus Osborn. In support thereof, Defendants state as follows:

### I. INTRODUCTION

The only issue that survived the pleading stage of this case is whether it is constitutionally permissible to treat legislative caucus committees the same as political parties for the purpose of Illinois' campaign finance law. Plaintiffs' purported expert report claims to assist this Court in that inquiry. Dr. Osborn's deposition established that he has no previous experience with Illinois' legislative caucus committees, nor does he have any relevant background or qualifications that would support him being deemed an expert witness on the issue of how legislative caucus committees operate in Illinois. Dr. Osborn was not even aware of how many legislative caucus committees *exist* in Illinois, let alone how they operate. Osborn's report is based on incomplete data; a closed universe of information that does not even compare data of the entities at issue in the case; irrelevant literature and is not of the intellectual rigor that would be employed by experts dealing with election data of this kind. Osborn is not qualified to

testify on this issue and did not employ reliable methodologies in his report. The report and Osborn's proffered testimony do not pass muster under Rule 702 and should be excluded.

## II. BACKGROUND

On October 5, 2012, this Court denied the motion for preliminary injunction filed by Plaintiffs Illinois Liberty PAC and Edgar Bachrach, finding that Plaintiffs had only a "negligible likelihood of success" on the merits of their claims challenging the constitutionality of the campaign contribution limits in the Disclosure and Regulation of Campaign Contribution and Expenditures Act, 10 ILCS 5/9-1, *et seq.* (the "Act"). *See* Memorandum Opinion and Order, Doc. 44 at 21-22. The U.S. Court of Appeals for the Seventh Circuit summarily affirmed the October 5, 2012 Order. *Illinois Liberty PAC v. Madigan*, No. 12–3305, 2012 WL 5259036 (7th Cir. Oct. 24, 2012). On May 10, 2013, a Second Amended Complaint ("Complaint") was filed which, among other changes, added an additional plaintiff, Illinois State Senator Kyle McCarter (collectively, "Plaintiffs"). *See* Doc. 65. As an exhibit to the Complaint, Plaintiffs attached the purported expert report of Dr. Marcus Osborn. *See* Doc. 65-6.

Defendants filed a motion to dismiss for failure to state a claim that was granted in part and denied in part by this Court on March 3, 2014. *See* Memorandum Opinion and Order, Doc. 96. Specifically, the Court granted the motion with regard to all challenges except Plaintiffs' challenge to the Act's treatment of legislative caucus committees. *Id*. The Court narrowed the issue to whether or not legislative caucus committees are sufficiently similar to political party committees making the Act's treatment of them constitutionally permissible, noting that the Court "strongly suspects that legislative caucus committees are sufficiently similar to political party committees for purposes of constitutional analysis[.]" *Id*. at 9.

Dr. Osborn supplemented his report on July 18, 2014 ("the report") when Plaintiffs disclosed him as their expert. *See* Plaintiff's Rule 26 (a)(2) Disclosure, attached hereto as Exhibit A. Dr. Osborn's report sets out to "describe how [the legislative caucus committee system] works and why it runs counter to anti-corruption underpinnings," opining in the process that legislative caucus committees in Illinois operate more like leadership PACs than political parties. The report's reasoning is that while political parties focus on expansion, legislative caucus committees have the additional goal of the betterment of their organizers. Dr. Osborn was deposed by Defendants' attorneys on September 15, 2014. *See* Deposition of Dr. Marcus Osborn, attached hereto as Exhibit B.

### III.  STANDARD

Rule 702 of the Federal Rules of Evidence governs admissibility of expert testimony as does the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm. Inc*. 509 U.S. 579 (1993); *see also*, Fed. R. Evid. 702. "A party challenging the admissibility of expert testimony can take issue with both the qualifications and the methodology of the proposed expert." *Lewis v. CITGO Petroleum Corp*., 561 F.3d 698, 705 (7th Cir. 2009). An expert witness is defined as a person "who possesses '***specialized knowledge***' due to his 'skill, experience, training or education' that 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Obrycka v. City of Chicago,* 792 F. Supp.2d 1013, 1018 (N.D. Ill. 2011) *quoting Banister v. Burton*, 636 F.3d 828, 831 (7th Cir. 2011) (emphasis added). Rule 702 additionally requires that 1) the testimony be based on sufficient facts or data; 2) the testimony be the product of a reliable method; and 3) the expert has reliably applied that methodology and associated principles to the facts of the present case.  Fed. R. Evid. 702. *See also Obrycka*, 792 F.Supp.2d at 1018.

Acting as the gatekeeper, the district court has a duty to ensure that the proffered testimony is both relevant and reliable. *Jenkins v. Bartlett,* 487 F.3d 482, 488-489 (7th Cir. 2007). In doing so, district courts must employ a three-part analysis before admitting expert testimony: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. *Obrycka*, 792 F.Supp.2d at 1018. *Daubert* set out to "assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett,* 487 F.3d at 489 (citations omitted). The "framework for assessing expert testimony is applicable to social science experts, just as it applies to experts in the hard sciences." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Ultimately, the party proffering the expert bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard. *Lewis*, 561 F.3d at 705. In all cases, the district court "must ensure that it is dealing with an expert, not just a hired gun." *Tyus*, 102 F.3d at 263.

With regard to the only remaining issue in this case -- whether or not legislative caucus committees are sufficiently similar to political party committees -- Dr. Marcus Osborn's report falls woefully short of Rule 702's standard and should not be considered by this Court.

### IV. ARGUMENT

#### A. Dr. Osborn's Methodology is Unreliable.

Even if this Court found Dr. Osborn to be qualified to provide testimony in this case, qualifications alone do not suffice. *Lewis*, 561 F.3d at 705. The proffered opinions must be grounded in a reliable methodology rather than "merely [] subjective belief or unsupported conjecture." *Id*. In *Daubert*, the Supreme Court enumerated several non-exclusive factors to aid

4

courts in determining whether an expert opinion was scientifically reliable, including whether the proffered theory can or has been tested, whether the theory has been subjected to peer review, the known or potential error rate of the theory and whether the theory has been accepted by the scientific community. *Obrycka*, 792 F.Supp.2d at 1018. Further, the 2000 Advisory Committee Notes to Rule 702 provide additional factors for assessing an expert's reliability, including whether: (1) the report relates to matters growing naturally out of research conducted independently from the litigation; (2) the report extrapolates from an accepted premise to an unfounded conclusion; (3) the purported expert has adequately accounted for alternative explanations; (4) the expert is as careful as he or she would be in his or her regular professional work outside of paid litigation consulting; and (5) whether the expert's field of expertise is known to reach reliable results for the type of opinion the expert is giving. *Obrycka*, 792 F.Supp.2d at 1019. The test of reliability is flexible and must be adapted to the specific circumstances of each case. *Obrycka*, 792 F.Supp.2d at 1024. Taking these factors together as applicable to this case, Dr. Osborn's report simply does not pass muster as sufficiently reliable.

### i. Dr. Osborn relied upon incomplete data.

Notably, Dr. Osborn's report does not contain a section on the methodology he employed. Throughout the report, Dr. Osborn cites to snippets of data that he claims support his assertions. In doing so, Dr. Osborn limits the data analyzed to a scope so narrow that he: does not consider any data outside of the 2012 election; collected data on only two of the six legislative caucus committees in Illinois in 2012; and arbitrarily selected only a handful of data to actually analyze in his report. Of the limited data he did collect, Dr. Osborn completed no statistical analyses to provide an objective perspective. The report's reliance on such an insufficient amount of data alone renders it unreliable.

Dr. Osborn's report did not grow out of any research conducted independently from this litigation. Indeed, Dr. Osborn relied blindly upon the data provided by Plaintiff's counsel. Ex. B, 51:25-52:4. The report focused exclusively on data from the 2012 election, though Osborn admitted in his deposition that some of the patterns of behavior he sought out to explore may require reviewing a span of many years. Ex. B, 35:19-23; 45:3-6; 49:20-50:8. At the time of the 2012 election, there were six legislative caucus committees established in Illinois. Dr. Osborn's report only includes data from two of them: Senate Victory Fund and Democratic Majority, both headed up by members of the Democratic Party. Ex. B, 33:8-35:4; 42:19-24; 52:5-11. The report does not analyze or rely upon any data from the four other legislative caucus committees despite the fact that this data is publicly available.

To be clear, Dr. Osborn analyzed the data of just two legislative caucus committees, omitting two thirds of the available data from his report. Ex. B, 33:8-34:25. Dr. Osborn conceded that this omission was in part to skew the data because, the "patterns within the minority party are more likely to be more purely expansionist" – meaning, more in line with the behavior of a political party, which would have refuted Plaintiff's desired thesis. Ex. B, 33:24-25. This is sampling bias in its most egregious form. Osborn goes even further to say that outside of the four party leaders, a legislative caucus committee may be established but only by "a sub-group of legislators with significant legislative power[.]" Osborn never provides any support for this statement and never collected data from such caucus committees (and was unaware that two existed in 2012). *See* Ex. A at 9; Ex. B, 33:4-7. Instead, the report is based on select data which fits the partisan narrative of Dr. Osborn's clients.

Further, of the two caucuses for which he reviewed data, he focuses on only a handful of contributions, never doing a quantitative analysis of *all* contributions made by each respective

caucus committee in 2012 for the primary and general election though this data was available to him. Instead, Osborn's report zooms in on only six of the general election contributions made by Senate Victory Fund; five contributions made by Democratic Majority Committee in the primary; and five contributions made by Democratic Majority Committee in the general election. Ex. A at 6-7. Dr. Osborn provides no justification or explanation for why this is an appropriate sample size. Yet, even the limited data cited by Osborn undermines his argument. He admits that "[t]he Democratic Victory Fund (Senate) and House Majority Committee (House) appear to have taken divergent approaches in their contribution strategies." Ex. A at 6. The report admits that the Democratic Victory Fund's approach "appear[s] to be reflective of a caucus expansion strategy[,]" though noting that the contributions were made in races which were not competitive. *Id*. Dr. Osborn considers only one variable in determining whether a race was competitive: the ultimate margin of victory which may or may not have been foreseeable at the time of the contributions. Osborn also provides no authority or justification for the assumption that only spending in competitive races is indicative of an expansion strategy. Quite the opposite: one would assume that election consultants make money because some kind of nuanced expertise is required beyond picking up the latest polling numbers. Nonetheless, alternative explanations for financial participation in the cited races were not considered. Ex. B, 37:17-23. Moreover, of the six races cited by Osborn pertaining to the Democratic Victory Fund, three were decided by a margin of victory less than 7%. This hardly validates Dr. Osborn's theory; instead, it lends credence that the Democratic Victory Fund employed an expansion strategy akin to that of a political party in the 2012 election. At the very least, it makes clear that a larger sampling of data was required to reach any reliable conclusion to the contrary.

The report did not purport to set out to look at how one subset of legislative caucus committees operate: it set out to opine as to why legislative caucus committees generally are more similar to Leadership PACs than political parties without mention of party affiliation. The report is a product of nothing more than cherry-picked, incomplete data and should be stricken.

### ii. Dr. Osborn relied upon a closed universe of information.

Dr. Osborn's report also relies upon a closed universe of information that does not provide any of the data or information necessary to draw reliable conclusions concerning the comparisons that the report sought out to make.

Perhaps most fatal to the report, Dr. Osborn never analyzed *any* data concerning political party activity in the 2012 election cycle. The report opines that political parties have a goal of expansion while legislative caucus committees have the additional goal of the betterment of their organizers, operating more like a leadership PAC as a result. Ex. A at 4. Dr. Osborn cites to several facets of the 2012 election cycle, claiming that the behavior of the two legislative caucus committees he analyzes supports this notion. In each piece of this analysis, he *never* compares the behavior of the legislative caucus committee to the behavior of the political parties in that same context: a necessary component for his report to have any reliability as to how these two types of organizations compare. Ex. B, 35:5-18; 43:16-44:2; 49:7-50:4. He also never collected data comparing the policy goals of any legislative caucus committee as compared to that of its associated political party, but admits that he "anticipate[s] they would be highly aligned." Ex. B., 31:6-32:8. Significantly, he concedes that he inexplicably reviewed the legislative caucus committee data "in isolation of other activities[.]" Ex. B, 43:24-44:2. At no point in his report or deposition, did Dr. Osborn provide any justification (nor can he) for viewing the legislative caucus committee data "in isolation."

8

For instance, the report looked at the participation of the Democratic Majority Committee in the primary election. Though the report indicates that the committee participated in 52 primary elections, it focuses on two specific contributions to what Dr. Osborn deemed "safe" seats for the Democratic Party in the general election, in his opinion refuting any claim that the contributions furthered an expansionist agenda as would be seen from a political party. Dr. Osborn does not cite any source validating this assertion. The only variable considered in determining that the seat was "safe" was the ultimate margin of victory in the general election. Ex. B, 38:18-23. Dr. Osborn did not examine whether either political party financially participated in either of these races at the primary or general election. Ex. B, 39:12-40:6. Alternative explanations for these contributions were never considered and Osborn concludes generally without citing to any source that contributions in primary elections are "designed to curry favor with candidates/legislators to support the organizational positions of the Speaker of House and Senate President." Ex. A at 5; Ex. B, 38:24-39:2. The report, in this same section, notes the Democratic Majority Committee's support for one independent candidate in the general election but again did not consider whether the Democratic Party also contributed to that candidate in the general election, nor did he consider whether there were other instances of political parties financially backing independent candidates in 2012. Ex. B, 41:13-24. Additionally, the report examined legislative caucus committee use of in-kind contributions but did not compare to data regarding party use of in-kind contributions. Ex. B, 44:7-14. Inexplicably Dr. Osborn concedes that such a comparison likely would have yielded a showing of *similar* behavior, contradicting his own thesis. Ex. B, 44:7-14. Without this comparison data, Osborn's conclusions as to how legislative caucus committees operate in comparison with parties and PACs is wholly unreliable.

Moreover, the report fails to explore other avenues that would help reveal the true function of legislative caucus committees. Plaintiffs did not conduct a single deposition of anyone from the Illinois State Board of Elections, so no such review of transcripts was available to assist Dr. Osborn in familiarizing himself with Illinois' system. Yet, Dr. Osborn did not conduct a single interview in the course of preparing his report. Ex. B, 42:25-43:3; 52:12-16. Dr. Osborn, though asserting that legislative caucus committees "institutionally tie[] legislative decision making with fundraising," also did not review any legislative voting records to explore whether there appeared to be a correlation between any contribution strategy and voting behavior within the legislature. Ex. A at 11, Ex. B, 46:7-9. Osborn cannot simply take what he believes or knows to be true about leadership PACs generally and infer that the same is true of legislative caucus committees in Illinois. *See Obrycka*, 792 F.Supp.2d at 1025 (noting that a Court cannot credit an expert for specific conclusions from the expert's purported general knowledge).

Though claiming that legislative caucus committees function more like leadership PACs, Dr. Osborn did not collect *any* data concerning campaign financial participation at the federal level or in other states where he claims such entities exist. Ex. B, 28:2-29:11; 53:12-18. Osborn's report also did not explore how legislative caucus committees function in other states or how those systems compare with Illinois. Ex. B, 26:15-27:18. Though his report makes generalized statements concerning legislative caucus committee operations in "legislative bodies across the United States," he provides no citations to support these assertions and testified in his deposition that he did not look at specific state legislative caucus structures. Ex. A at 2; Ex. B, 26:15-27:18. Also noticeably absent from the report is any consideration to alternative explanations for the legislative caucus committee behavior cited: insisting that such behavior must be in furtherance of the betterment of its organizer.

Thus, throughout the report, Osborn relies on a closed universe of information that results in baseless comparisons and unreliable conclusions. As such, the report should be stricken.

### iii. Dr. Osborn relied upon literature that has limited relevance.

Dr. Osborn has no prior experience or knowledge as to Illinois' legislative caucus committee system and he did not conduct any interviews in the course of writing his report, leaving the literature he reviewed as his primary source for understanding Illinois' legislative caucus committees outside of Plaintiffs' counsel. Yet, the articles relied upon have little relevance to the primary contentions of the report. Several of the articles relied upon in the report are quite dated, and all of them were prior to the 2010 enactment of legislative caucus committees in Illinois. Ex. B, 54:13-66:24. In his deposition, Dr. Osborn was unaware for at least some of the articles what campaign finance laws (if any) were in effect at the time or how they compared with Illinois' system. Ex. B, 54:13-66:24. Most surprising, not a single article addressed Illinois' system. Ex. B, 66:21-24. His report claims that "it is useful to look at the literature related to Leadership PACs to understand the influencers of Caucus Committee operations[,]" without ever actually providing anything authoritative that discusses why these two groups should be considered similar. Ex. A at 4. Thus, in addition to the report's incomplete data, Dr. Osborn has no independent knowledge of Illinois' system and the literature upon which he relied in proffering opinions as to Illinois' system had minimal applicability. His proffered testimony is based on nothing more than *ipse dixit*, which does not pass scrutiny under Rule 702. *See*, *Obrycka*, 792 F.Supp.2d at 1025, *quoting General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing [ ] requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

11

### iv. The literature relied upon by Dr. Osborn, while irrelevant, discredits the reliability of his methodology.

Dr. Osborn's methodology simply does not measure up to his professional standards. Dr. Osborn has a background in statistics including his dissertation which he represented was a quantitative analysis. Ex. B, 72:12-18. Certainly based on his background, Dr. Osborn could have run various numerical/quantitative analyses of the data collected here, but he did not. 72:12-18. The report discusses the significance of the two Democratic caucus committees receiving many donations from interest groups, but not only does he not compare this to such contributions received by political parties, he fails to explain what the data collected yielded statistically and he concedes that no numerical analysis was run to determine what percentage of contributions received came from any particular source. Ex. B, 46:21-50:4. As discussed above, no analysis was run on contributions made by the two committees either, but rather only a handful of the contributions were discussed in the report. *Supra,* at 7; Ex. A at 6-7. To be sure, despite Osborn's background in statistics, the report is devoid of any statistical model.

Moreover, it is clear that the report is not of the same intellectual rigor as literature cited which dealt with data. For instance, as discussed in Osborn's deposition, one of the data driven studies cited explored the differences in financial participation in North Carolina state legislative elections between PACs and political parties. Ex. B, 61:4-62:15. After hypothesizing about what those differences would look like, the authors gathered data regarding contributions for both PACs and political parties. *Id*. Further, unlike Osborn, they considered several (five) independent variables. *Id*. A second article cited by Osborn examined the strategies and behaviors of PACs as compared with political parties with regard to campaign contributions in state legislature elections in New Jersey, Pennsylvania and North Carolina. Again, that study recognized that the only reliable way to compare the behavior of the two is to collect data on both of them. Ex. B,

12

62:16-63:20. Dr. Osborn's "eyeballing" of the data and arbitrary selection of numbers as talking points in his report is not a sound statistical analysis upon which this Court should rely in determining whether the activity of legislative caucus committees is sufficiently similar to that of political parties.

Thus, to the extent that the factors apply to Osborn as a social science expert, the report simply is not reliable and should be stricken by this Court.

### B. Dr. Osborn is Not Qualified by his Knowledge, Skill, Experience, Training or Education.

A witness's potential qualification as an expert can only be determined by comparing the proffered expert's alleged specialized knowledge with that of the subject matter of the testimony. *Obrycka*, 792 F.Supp.2d at 1023. If such a determination cannot be made, there is no foundation for the expert testimony. *Obrycka*, 792 F.Supp.2d at 1023.

Here, Dr. Osborn cited to no prior experience with Illinois' election system, let alone Illinois' legislative caucus committees. Dr. Osborn's degrees are in Public Administration. Ex. B, 13:2-11. His dissertation, "Information or Money" focused exclusively on the State of Arizona and his other publications have no relevance to Illinois' Legislative Caucus Committees. Ex. B, 13:12-15:24. Similarly, Dr. Osborn's election projects as a consultant have been exclusive to the State of Arizona, and have focused on voter outreach projects, the physical process of tabulating votes and determining when run-off elections were necessary after a change in law and assisting with public relations and fundraising strategy for campaigns. Ex. B, 18-26. He has written nothing authoritative on this subject, and the report submitted in this case has never been reviewed, submitted or published outside of the instant litigation. Ex. B, 66:25-67:11.

The only consulting project Dr. Osborn has worked on even tangentially related to campaign finance law was when he represented the Arizona Chamber of Commerce in

attempting to have the legislature repeal the Clean Elections Act and set up a regulatory structure post *Citizens United* for PACs and independent expenditure committees. Ex. B, 20:19-21:3. Outside of the instant litigation, Dr. Osborn has never studied Illinois' legislative caucus committee system. Ex. B, 68:20-23. He has never studied legislative caucus committees outside of Arizona, and is unfamiliar with the details of other state structures, stating only "if you look at the general literature, most state parties set up some type of fundraising structure." Ex. B, 26:15-27:9; 68:24-69:3. Notably, his report does not draw upon any specific knowledge or empirical data he may have acquired when studying Arizona's legislative caucus committees, nor does the report specifically compare Arizona's campaign finance system to that of Illinois.

Indeed, Dr. Osborn appeared to have no independent knowledge of Illinois' election system. While his report sets out to opine on how Illinois' legislative caucus committees function, Osborn was completely unaware of how many such committees even *existed* in Illinois, speculating, "I would believe there's at least four, but there may be more than that." Ex. B, 33:4-7. Dr. Osborn's report, even in describing Leadership PACs, refers only to the literature, never drawing on any of his specific experiences or studies. Ex. A at 4. When asked in his deposition whether one had to be an incumbent to form a Leadership PAC under the federal regulations, Dr. Osborn indicated that he would "have to look at the federal more specifically." Ex. B, 29:2-8.

Dr. Osborn's stated knowledge and experiences simply do not qualify him to opine competently on the nature of Illinois' legislative caucus committees, and fail to provide a foundation for his proffered testimony. As such, Dr. Osborn's qualifications lack the requisite foundation for the opinions asserted in his report and they should be excluded. *Obrycka*, 792 F.Supp.2d at 1023-1024.

      C.    **Dr. Osborn's Testimony Will not Assist the Trier of Fact.**

Dr. Marcus Osborn's expert report will not aid the Court. His report is based on *ipse dixit*, flawed methodology, and incomplete data. When examining the report against the guidelines of reliability, it fails to satisfy any of the relevant factors prescribed by the advisory committee. When asked in his deposition how he believed his testimony would assist the trier of fact, Dr. Osborn stated that he "provides additional understanding of how the legislators or the speaker and the president have dual roles of both promoting the party and running the House of Representatives and Senate and how those activities are different than straight political parties or political action committees." Ex. B, 68:8-19. Yet, in Dr. Osborn's words, the report is an analysis of data, cherry picked by Plaintiffs' counsel, and viewed "in isolation." The report fails to review data from both organizations to make the comparison that he claims would assist this Court. Ex. B, 43:24-44:2. Dr. Osborn's report is neither based on sufficient facts or data, nor is it the product of reliable principles and methods. Such a report simply cannot assist this Court and should be stricken.

**WHEREFORE,** Defendants respectfully request this Court strike Dr. Marcus Osborn's expert report, bar any testimony from him in these proceedings, and for such further relief as this Court finds reasonable and just.

                                                  Respectfully submitted,

                                                  /s/ Laura M. Rawski

**LISA MADIGAN**                               Laura M. Rawski
Illinois Attorney General                  Colin B. White
                                                      Assistant Attorneys General
                                                      General Law Bureau
                                                      100 West Randolph Street, 13th Floor
                                                      Chicago, IL 60601
                                                      (312) 814-3700/5694
                                                      *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

      The undersigned attorney hereby certifies that the aforementioned document was filed on October 21, 2014 through the Court's CM/ECF system. Parties of record may obtain a copy of the paper through the Court's CM/ECF system.

                                                 /s/ Laura M. Rawski