# EXHIBIT B

MARCUS BRYAN OSBORN, PH.D.
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.

## Page 1

1    IN THE UNITED STATES DISTRICT COURT FOR THE
2    NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
3

ILLINOIS LIBERTY PAC, et al.,
4
     Plaintiffs,
5                                No. 12 CV 5811
     vs.
6
LISA MADIGAN, et al.,
7
     Defendants.
8    ------------------------------
9
10        TELEPHONIC DEPOSITION OF
11        MARCUS BRYAN OSBORN, Ph.D.
12
13         September 15, 2014
14            11:00 a.m.
15
16        8601 North Scottsdale Road
              Suite 300
17         Scottsdale, Arizona
18
19
20
21
22
23
24
25        Talia Douglas, RPR, CR No. 50775

## Page 2

1              APPEARANCES OF COUNSEL
2
     For the Plaintiffs:
3
         LIBERTY JUSTICE CENTER
4        JACOB H. HUEBERT, ESQ.
         (Appearing telephonically)
5        190 South LaSalle Street, Suite 1630
         Chicago, IL 60603
6        312.263.7668
         jhuebert@libertyjusticecenter.org
7
8    For the Defendants:
9        OFFICE OF THE ILLINOIS ATTORNEY GENERAL
         LAURA M. RAWSKI, ESQ.
10       (Appearing telephonically)
         100 West Randolph Street, 13th Floor
11       Chicago, IL 60601
         312.814.5694
12       lrawski@atg.state.il.us
13
     ALSO PRESENT:
14
         Colin White (Appearing telephonically)
15       Jeffrey Schwab (Appearing telephonically)
16
17
18
19
20
21
22
23
24
25

## Page 3

1              INDEX OF EXAMINATION
2
3    WITNESS:  MARCUS BRYAN OSBORN, Ph.D.
4    EXAMINATION                          PAGE
5    By Ms. Rawski                           5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1              INDEX OF EXHIBITS
2
3    Exhibit        Description          Page
4      1      Notice of Deposition          9
5      2      Expert Report                12
6      3      Original Report, Dated May 10, 2013   69
7      4      Invoice, Dated July 31, 2014  71
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



MARCUS BRYAN OSBORN, PH.D.                                    September 15, 2014
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.                                  5—8

Page 5

1      TELEPHONIC DEPOSITION OF MARCUS BRYAN OSBORN, Ph.D.
2                  SEPTEMBER 15, 2014
3
4            MARCUS BRYAN OSBORN, Ph.D.,
5   having been first duly sworn, testifies as follows:
6                    EXAMINATION
7   BY MS. RAWSKI:
8      Q.   Good morning, Dr. Osborn.
9           Can you please state your name for the
10  record?
11     A.   Marcus Bryan Osborn.
12     Q.   Okay.  And this deposition is being taken as an
13  expert deposition in the case of Illinois Liberty PAC
14  versus Madigan, et al., Case Number 12 CV 5811, currently
15  pending in the Northern District of Illinois.
16          Dr. Osborn, have you ever been deposed
17  before?
18     A.   Yes.
19     Q.   Okay.  So I won't -- I'll just briefly refresh
20  your memory on kind of the rules.
21          But obviously there's a court reporter there
22  to take down everything that we're saying, and sometimes it
23  can be a little more difficult over the phone, but we just
24  need to make sure that, you know, please always wait until
25  I finish my question for to you answer, and I will try to

Page 6

1   do the same in terms of making sure that you're finishing
2   your answer before I follow up.
3           If at any point I do accidentally cut you
4   off, please just let me know that you weren't finished with
5   your answer, and we'll go ahead and have you finish.
6           Please make sure you verbalize all of your
7   answers.  No uh-huhs, obviously no nods.  We're not even in
8   the same room.
9           But we just need to make sure we have a very
10  clear record for the court reporter.  Okay?
11     A.   Understood.
12     Q.   And if at any point you don't understand one of my
13  questions, please just let me know.  I can always rephrase.
14          And we could take breaks whenever you need
15  them.  I would just ask that we finish whatever question is
16  pending before we take a break.
17     A.   Okay.
18     Q.   Okay.  Dr. Osborn, have you ever been a party to a
19  civil lawsuit?
20     A.   No.
21     Q.   Do you currently serve on any boards of any
22  organizations?
23     A.   Yes.
24     Q.   Which organizations do you serve with?
25     A.   Actually, only one.  I'm on the Governor's

Page 7

1   Regulatory Review Council.  It's a state agency regulatory
2   board.
3      Q.   Is that in the State of Arizona?
4      A.   Correct.
5      Q.   Is that an appointed position?
6      A.   Yes.
7      Q.   And when were you first appointed to that
8   position?
9      A.   I want to say about 2007.
10     Q.   And how many members of the council are there
11  besides yourself?
12     A.   There are five others, plus a state employee.
13     Q.   So everyone together, there's seven of you?
14     A.   Yes.
15     Q.   And just briefly, what are the duties of this
16  council?
17     A.   We approve all rule packages going through state
18  agencies.  So we're the last approval process for state
19  agencies.
20     Q.   Did you say all rule packages?
21     A.   Rule, yes -- regulations.
22     Q.   And this covers all state agencies?
23     A.   Not all state agencies but the vast majority of
24  state agencies, single appointed -- agencies appointed by a
25  singly elected official having different regulatory

Page 8

1   processes they go through for approval.
2      Q.   Okay.  So it's not based on the subject matter of
3   the agency at all, like you only handle education or you
4   only handle human services or something?
5      A.   No.  We do across the board.
6      Q.   Okay.
7      A.   Pretty much most parts of state government.
8      Q.   Have you ever run for office?
9      A.   I will -- yes, I will be -- in January I will be
10  on the Madison School District board -- governing board.
11          I ran unopposed, so there isn't going to be
12  an election.  So I'll be starting in January.
13     Q.   Okay.  And prior to this current election cycle,
14  had you ever run for office?
15     A.   No.
16     Q.   Other than being hired for your opinion in this
17  case, are you at all affiliated with Illinois Liberty
18  PAC?
19     A.   No.
20     Q.   And other than being hired by the plaintiffs in
21  this case, are you at all acquainted with Illinois Senator
22  Kyle McCarter?
23     A.   No.
24     Q.   Have you ever met or spoke with Senator Kyle
25  McCarter?

MARCUS BRYAN OSBORN, PH.D.
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.

September 15, 2014
9–12

Page 9

1    A.  I believe we had one phone call with Diane Cohen
2  and myself I think prior to me being retained.
3    Q.  And you believe Senator McCarter was on that call
4  as well?
5    A.  Yes.
6    Q.  Okay.  Do you have handy the exhibits that I have
7  forwarded to Mr. Huebert earlier today?
8    A.  Yes.
9    Q.  Can you please turn to Exhibit 1?
10    A.  They were not labeled.
11    Q.  Oh, okay.
12        It's the one that says, "Notice of Expert
13  Deposition."
14    A.  Let's see.
15        Yup, I do have it.
16        MS. RAWSKI:  Okay.  Would the court reporter
17  be able to mark that as Exhibit 1 real quick, please?
18        THE WITNESS:  It's -- it's a two-page
19  document?
20        MS. RAWSKI:  Yes.
21        (Exhibit No. 1 marked)
22        THE WITNESS:  It's been marked.
23  BY MS. RAWSKI:
24    Q.  Okay.  I'm showing you the document which was the
25  notice of your deposition for today in this case.

Page 10

1        And within this document there were several
2  categories of documents which we requested that you produce
3  prior to this deposition, and I just wanted to go through
4  with you to confirm that we've received the documents that
5  we've requested outside of -- there have been some
6  privileged objections asserted by your counsel, and I'm not
7  interested in those documents at the moment.
8        I just want to make sure we have the rest of
9  the wealth of the documents.  Okay?
10    A.  Okay.
11    Q.  So have you provided to your counsel to provide to
12  us all documents reflecting facts, empirical evidence or
13  data relied upon in the report that you've submitted in
14  this case?
15    A.  Yes, I have.
16    Q.  Okay.  And just so the record is clear, unless I
17  otherwise state, when I refer to your report, I am
18  referring to the July 17th, 2014 report that you drafted in
19  this case.
20        Do you understand that?
21    A.  Yes.
22    Q.  Okay.  And did you provide to your counsel to
23  provide to us all documents reflecting any facts, data or
24  empirical evidence provided to you by Illinois Liberty PAC
25  or the Liberty Justice Center in connection with your

Page 11

1  report?
2    A.  Yes.
3    Q.  Did you provide to your counsel to provide to us
4  all studies relied upon in your report or which form the
5  basis of any opinions in your report?
6    A.  Yes.
7    Q.  Did you provide to your counsel to provide to us
8  all studies reviewed in forming the basis of the opinions
9  in your report?
10    A.  Yes.
11    Q.  Did you provide to your counsel to provide to us
12  all communications concerning your report?
13    A.  Yes.
14    Q.  Did you provide to your counsel to provide to us
15  all documents concerning any compensation you received in
16  connection with this report?
17    A.  Yes.
18    Q.  Did you provide to your counsel to provide to us
19  all communications with the Liberty Justice Center or
20  Illinois Liberty PAC which were considered in forming the
21  opinions expressed in your report?
22    A.  Yes.
23    Q.  Did you provide to your counsel to provide to us
24  all documents which reflect the sources of any data used in
25  forming the opinions expressed in your report?

Page 12

1    A.  Yes.
2    Q.  And finally, did you provide to your counsel to
3  provide to us any and all data reviewed in forming the
4  opinions expressed in your report?
5    A.  Yes.
6    Q.  Okay.  Thank you.
7        Okay.  Dr. Osborn, I would like to turn to
8  your -- to the next exhibit, which if it could please be
9  marked as Exhibit 2, it's your expert report, but it starts
10  with a page that says, "Plaintiffs' Rule 26(a)2
11  Disclosure."
12        (Exhibit No. 2 marked)
13        THE WITNESS:  Yes.  I see it.
14  BY MS. RAWSKI:
15    Q.  Do you recognize this document?
16    A.  Yes, I do.
17    Q.  Is it the expert report you submitted in this
18  case?
19    A.  Hold on one second.
20        Yes, it is.
21    Q.  Okay.  I would like to start by turning to page 15
22  of your report, the background on the author page.
23    A.  Okay.
24    Q.  What year did you earn your undergraduate degree
25  from University of Arizona?

MARCUS BRYAN OSBORN, PH.D.                    September 15, 2014
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.                13–16

Page 13

1    A. I believe 1993.
2    Q. What year did you earn your master's degree?
3    A. 1998.
4    Q. And your master's degree is in public
5    administration?
6    A. Correct.
7    Q. What year did you earn your Ph.D. From Arizona
8    State?
9    A. 2003.
10   Q. And is that also in public administration?
11   A. Correct.
12   Q. Okay. Your dissertation, which I believe the
13   short title was "Information or Money"?
14   A. Yes. It's a little longer, but yes.
15   Q. Okay. Did your dissertation include an analysis
16   of any state systems other than Arizona?
17   A. No.
18   Q. Okay. If you could flip to page 16, please, I
19   would just like to briefly walk through some of the
20   information that you provided on page 16.
21   A. Okay.
22   Q. Okay. It says you wrote a conference paper.
23       It looks like you co-authored a conference
24   paper in 2006 called, "In a Bind: Business Plans, Market
25   Position and Corporate Lobbying Strategies."

Page 14

1    A. Yes.
2    Q. And what was the purpose of that presentation?
3    A. The paper was designed to look at when
4    organizations lobby and the factors that will drive them to
5    lobby.
6        Most of the research before then had been
7    focused on key variables like organizational size to
8    determine when organizations will lobby, and we looked at
9    other competitive factors that would drive them to lobby.
10   Q. Okay. In 2003 you had a publication called, "An
11   Examination of the Effectiveness of Publicly Funded
12   Elections that Reduce the Interest Group Influence."
13   A. Yes.
14   Q. And did that study focus exclusively on the State
15   of Arizona?
16   A. The data set used was in Arizona. In the
17   literature review there was discussion of some other states who
18   had publicly funded elections, but it was focused on
19   Arizona.
20   Q. Okay. And I presume the same is true for the
21   publication above it, "The Road to Higher Education:
22   Closing the Participation Gaps for Arizona Minority
23   Students"?
24   A. That's exclusively Arizona focused.
25   Q. Okay. Now, in 2009 this says that you co-authored

Page 15

1    a publication called, "Governors, Lobbying, and the
2    Legislator: Evidence from a Pilot Study"?
3    A. Correct.
4    Q. And what was the focus of that study?
5    A. How governors offices lobby the legislature.
6        So we relied on several different states --
7    Nevada, Arizona, and a couple of other states as well.
8    Q. So it kind of looked at the interplay of the
9    executive branch lobbying the legislative branch?
10   A. Correct.
11   Q. Okay. And your conference paper from 2007, "Real
12   Political Actions for the Public Affairs Consultant," what
13   was the focus of that presentation?
14   A. It was a presentation to describe lobbying
15   strategies as options for executives.
16       It's a way of trying to explain to
17   nonpolitical corporate executives how to design a lobbying
18   or government relations approach.
19   Q. Okay. And finally, in 2004 you a conference paper
20   called, "An Examination of the Effectiveness of Publicly
21   Funded Elections at Reducing Interest Group influence."
22       Was this a presentation that was tied to the
23   publication that we discussed above?
24   A. Yes. It was related to my dissertation.
25   Q. Okay. Now, on your background page on page 15,

Page 16

1    you discuss that you have -- well, first of all, how long
2    have you been employed at your current firm?
3    A. About two years in October.
4    Q. Okay. And in that position, have you represented
5    any governments or government agencies?
6    A. Yes.
7    Q. Who have you represented in that position?
8    A. The Town of Queen Creek.
9    Q. Sorry.
10       Was it Queen Creek?
11   A. Queen Creek.
12   Q. Q-u-e-e-n?
13   A. Yeah, Queen.
14       I represented the Arizona legislature as an
15   expert witness, Salt River Project -- they're a quasi
16   governmental public utility.
17   Q. Is Salt River Project in the State of Arizona?
18   A. Yes.
19   Q. And is Queen Creek a town in Arizona?
20   A. Yes.
21   Q. In the two years that you've been at your current
22   firm, have there been any other government agencies that
23   you've represented?
24   A. Personally?
25       Oh, the Phoenix Industrial Development



MARCUS BRYAN OSBORN, PH.D.
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.

September 15, 2014
17–20

Page 17

1 Authority.
2 Q. Okay. Any others?
3 A. Not that I'm aware of.
4 Q. Okay. And prior to your current firm, where were
5 you employed?
6 A. R&R Partners.
7 Q. Sorry?
8 A. R&R Partners, government and public affairs.
9 Q. How long were you employed there for?
10 A. About 12 years.
11 Q. Okay. So you've been at your current firm since
12 October of 2012, you said, right?
13 A. Yes.
14 Q. Okay. Did you leave R&R on or about October
15 2012?
16 A. Yes.
17 Q. Do you think you started there sometime in 2000?
18 A. 2012?
19    Oh, you mean R&R?
20 Q. Yes. I'm sorry.
21 A. Yes.
22    It may have been a little earlier than that
23 because I worked as a consultant for them.
24 Q. Okay. You were working there while you were
25 working on your graduate degree?

Page 18

1 A. Correct.
2 Q. Okay.
3 A. And there are a couple additional public entities
4 that I currently represent.
5 Q. Oh, at your current firm?
6 A. Yes. I'm sorry.
7 Q. That's okay.
8 A. Golden Valley --
9 Q. Let's go back and finish that.
10 A. Golden Valley Fire District, the Northwest Fire
11 District, and the Green Valley Fire District.
12 Q. And are those all located in Arizona?
13 A. Yes.
14 Q. Okay. So going back to R&R, you started with them
15 as a consultant?
16 A. Yes.
17 Q. Okay. And at some point did your title change or
18 were you a consultant for them the entire time you worked
19 there?
20 A. No. I was, I think about -- I was promoted to
21 deputy director probably in the last five years of my
22 employ there.
23 Q. So maybe sometime in about 2007?
24 A. Roughly, yes.
25 Q. And did you represent government agencies in the

Page 19

1 work that you did at R&R Partners?
2 A. Yes.
3 Q. Do you recall which government agencies you
4 represented?
5 A. City of Phoenix, City of Goodyear, City of
6 Peoria.
7 Q. That's Peoria, Illinois?
8 A. No. Peoria, Arizona.
9    Valley Metro and Valley Metro --
10 Q. That's not in Illinois.
11 A. Valley Metro --
12 Q. There's no valley.
13 A. -- Rail.
14 Q. I'm sorry, Valley Metro.
15    Did you say one after that?
16 A. Valley Metro Rail.
17 Q. Oh, okay.
18    Any others that you can recall?
19 A. That's it.
20 Q. Did you work at all with any of the state election
21 authorities in your time at R&R Partners?
22 A. Actually, yes, we did. We worked with the
23 secretary of state on an election outreach communication.
24    So we did do some work for the secretary of
25 state.

Page 20

1 Q. When you say, "an election outreach," what exactly
2 was the project?
3 A. Voter outreach.
4 Q. Trying to get more people to come out to vote,
5 register to vote, et cetera?
6 A. Correct.
7 Q. Okay.
8 A. I was only tangentially involved in it.
9 Q. In what time period was that project?
10 A. Let's see. It was within probably six years
11 ago.
12 Q. In your time at R&R Partners, can you recall any
13 other work you did with state election authorities?
14 A. Legislative -- well, worked for them?
15 Q. Yes.
16 A. No.
17 Q. And was there something -- it sounds like you were
18 going to qualify your answer.
19    So is there some other work related to
20 elections that you did at R&R?
21 A. Yes. I represented the Arizona Chamber of
22 Commerce on industry legislative matters relating to
23 election law.
24 Q. What was the primary issue that you were
25 representing them on?



MARCUS BRYAN OSBORN, PH.D.
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.

September 15, 2014
21–24

Page 21

1    A.  Repealing the Clean Elections Act, and in
2  addition, setting up a regulatory structure post citizens
3  united for PACs and independent expenditure groups.
4    Q.  In your time at R&R, is there anything else you
5  can think of where you either worked with a state election
6  authority or worked with one of your other clients on an
7  election matter?
8    A.  Throughout my time at R&R, we had continual
9  interaction on behalf of the chamber on election related
10  matters.
11        In addition, prior -- well, at Kutak Rock I
12  had an election related issue for the Town of Queen Creek
13  where I worked election related officials.
14    Q.  And what was the issue with Queen Creek?
15    A.  It dealt with how you tabulate votes in an initial
16  election and the determination factor for when you need to
17  have a runoff.
18        The state went to consolidated elections, and
19  there was some clean up legislation that was necessary.
20    Q.  Okay.  Other than the projects and the clients
21  that we've discussed, can you think of anything else
22  election related that you did -- that you have done during
23  your time at either Kutak Rock or R&R Partners?
24    A.  That's the -- yeah, I think that's it.
25    Q.  Okay.

Page 22

1    A.  And that's in addition -- just to be clear -- in
2  addition to the two expert activities I did that were in
3  the vitae.
4    Q.  Yes.
5        And those are the two that are noted on page
6  16, correct?
7    A.  Correct.
8    Q.  Page 16 of your report?
9    A.  Correct.
10    Q.  Okay.  In your background page on page 15, you
11  reference work with ballot measure campaigns?
12    A.  Yes.
13    Q.  About how many ballot measure campaigns have you
14  worked with?
15    A.  Oh, probably 7 to 10, either formally or
16  informally.
17    Q.  And what kind of work have you done for them?
18        Has that been volunteer work or have you been
19  hired in some capacity?
20    A.  Both.
21    Q.  Okay.  Let's start with when you were hired.
22        In what capacity have you been hired by
23  ballot measure campaigns?
24    A.  I can't remember what year it is, but about -- I
25  would say four or six years ago we were the immediate

Page 23

1  consultants for a ballot measure relating to Payday Loans.
2        So we designed the TV and radio strategy for
3  that effort.
4    Q.  Okay.
5    A.  Prior to that --
6    Q.  Are --
7    A.  Oh.
8    Q.  I'm sorry, go ahead.
9    A.  And about four years prior to that, we were
10  retained by the Arizona Chamber of Commerce to help to
11  defeat a ballot proposition related to illegal immigration.
12        And then on the volunteer side -- it's really
13  not necessarily volunteer side, but it's clients who had
14  interests in different ballot propositions.
15        I have supported various ballot measures as a
16  more informal consultant, but underlying clients would pay
17  me to do that.
18    Q.  Okay.  For the two that we discussed that you were
19  hired for, those were projects that R&R Partners was also
20  hired on?
21    A.  Correct.
22    Q.  Okay.  And for the ones that you've done any sort
23  of informal work for, have you ever been a part of a
24  signature drive?
25    A.  Not formally, but I'm familiar with signature

Page 24

1  drives.
2    Q.  Okay.  And what about -- your background also
3  references work advising state legislative campaigns?
4    A.  Yes.
5    Q.  And was that hired or volunteer work?
6    A.  Both.
7    Q.  Okay.  Let's start with hired.
8        What state legislative campaigns have hired
9  you?
10    A.  Senator Carolyn Allen, both as a representative
11  and as a senator; Senator Randall Genant; Representative
12  Mike Gardner; Representative Knaperek; and then
13  Representative Carol Summers.
14    Q.  I'm sorry.
15        What was the one before Carol Summers?
16    A.  Laura Knaperek.
17    Q.  We thought you said, "Kaepernick."
18        I think we have the 49ers on the brain this
19  morning.
20    A.  Yeah, she doesn't have the easiest name to
21  pronounce.
22    Q.  Okay.  How does Laura spell her last name, if you
23  know?
24    A.  K-n-a-p-e-r-e-k.
25    Q.  Okay.



MARCUS BRYAN OSBORN, PH.D.
September 15, 2014
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.
25–28

Page 25

1    A.   And I may be off on that.
2    Q.   Now, these individuals that hired you to work on
3  state legislative campaigns, was that through R&R Partners
4  or Kutak Rock?
5    A.   R&R Partners.
6    Q.   Okay.
7    A.   R&R is both an ad agency and a lobbying firm.
8    Q.   So was the work that you did on those campaigns
9  public relations type work?
10    A.   Design mail pieces, executed mail strategies,
11  designed and wrote radio and TV ads.
12    Q.   Did you advise them at all on campaign financing
13  strategies?
14    A.   I've assisted candidates in fund raising, yes.
15    Q.   Which candidates did you assist in -- or not
16  assist in fund raising as much as, like, fund raising
17  financing strategies?
18    A.   I would say all of them.  It's kind of part of
19  being a consultant.
20    Q.   Did you advise them at all on compliance with
21  Arizona's campaign finance laws?
22    A.   No.
23    Q.   So was your services more directed at how to
24  gather a lot of money as a campaign, how to be an effective
25  fund raiser?

Page 26

1    A.   Yes, I would say so.
2    Q.   Okay.  All right.  So I would like to just kind of
3  go through your report with you and ask you questions along
4  the way.
5        And I think we'll just start on page 2 of
6  your report.
7    A.   Okay.
8    Q.   Let me know whenever you're ready.
9    A.   I'm ready.
10    Q.   Okay.  On page 2 of your report, you reference
11  that legislative caucuses are common across the United
12  States.
13        Do you see that?
14    A.   Yes.
15    Q.   To your knowledge, which states have legislative
16  caucus committees?
17    A.   Okay.  Be specific.
18        Legislative caucuses are organizations or
19  suborganizations of legislatures, and so they're -- or you
20  talking about formal legislative caucus committees, which
21  are finance committees?
22        Which one are you referring to?
23    Q.   I would be interested in knowing which states have
24  a setup similar to Illinois, so some sort of caucus
25  committee that's tied to financing.

Page 27

1    A.   I haven't looked at all specific states, but it
2  is -- if you look at the general literature, most state
3  parties set up some type of fund raising structure.
4        So I don't know.  I haven't gone through and
5  specifically looked at every single specific state, but as
6  a general rule, if you look at the academic literature,
7  it's well-known that there are legislative caucuses, and
8  they're designed to both promote the goals of the caucus
9  and organize around legislative activities.
10    Q.   Okay.  So in forming the opinions of your July
11  18th report, did you consider the operation of legislative
12  caucus committees in Illinois as compared with other
13  states' legislative caucus committees at all?
14    A.   No, I did not.
15    Q.   So this report is not intended to opine on how
16  legislative caucus committees in Illinois compare with
17  other state systems?
18    A.   Correct.
19    Q.   Okay.  I think we can flip to page 4 of the
20  report.
21        Now, you make an argument that you start to
22  develop in this section of your report that Illinois
23  legislative caucus committees operate more like a
24  leadership PAC than a political party committee.
25        Is that a fair representation?

Page 28

1    A.   Yes.
2    Q.   Okay.  When you say, "leadership PAC," what are
3  you referring to?
4    A.   A leadership PAC is a committee -- a political
5  action committee set up by a -- they're very common in
6  Congress -- to fund raise for other legislators.
7        So typically, a legislator who has leadership
8  aspirations will raise money, and the money is designed to
9  promote individuals within their party and to help them
10  secure support within their party.
11        So it has kind of two purposes.  The first
12  one meaning to make sure that more people of their like
13  party are elected.  The second purpose is to promote the
14  interest of the individual organizer of the political
15  action committee.
16    Q.   Are you -- when you use the term, "leadership
17  PAC," are you referring more to it as a generalized term or
18  are you referring to, like, a specific federal entity?
19    A.   In Congress there are -- there is a federal
20  designation for leadership PACs.  It's a regulatory
21  definition.
22    Q.   And is that what you're referring to when you use
23  that term in this report?
24    A.   Well, that, and I think more generally because
25  there could be state examples where individuals create



MARCUS BRYAN OSBORN, PH.D.                          September 15, 2014
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.                      29–32

Page 29

1 leadership PACs. They're common in Arizona.
2      Q.  Okay.  Under the federal regulations, do you have
3 to be an incumbent to form a leadership PAC?
4      A.  Well, there's two ways you could do it.  And I'll
5 have to think -- I'll have to look at the federal more
6 specifically, but they're considered like other political
7 action committees.  So you could form a PAC just as an
8 individual or as a leadership PAC.
9           A leadership PAC has the restriction of you
10 can't give a contribution to the member who is raising
11 funds.  So it can't be a circular contribution.
12     Q.  Okay.  And is it fair to say that your conclusion
13 that Illinois legislative caucus committees operate more
14 like a leadership PAC is based on your opinion that the
15 Illinois legislative caucus committees are focused on the
16 betterment of their organizers?
17     A.  I would say they have two goals.  First is the
18 promotion of the individual -- the speaker or the president
19 for the legislature.
20          And so they're supporting their position as
21 speaker and leader, but in doing that, they also promote
22 the needs of the larger caucus.
23     Q.  Okay.  And what do you rely upon in making this
24 opinion?
25     A.  Can you define that a little bit?

Page 30

1           I mean, that's a pretty broad question.
2      Q.  Well, we could break it out.
3           Is this based on any data that you reviewed?
4      A.  Oh.
5           So if you look at the academic literature, it
6 basically highlights that leaders will utilize fund raising
7 strategies to promote their own interest within the caucus.
8           And partly that is because speakers and
9 presidents and other types of legislative leaders want to
10 be able to enhance the size of the caucus and curry favor
11 with other caucus members.
12          The structure of the Illinois system where it
13 specifically designates the speaker and the president in
14 particular as the organizers of the caucus committee gives
15 them enormous authority and ability to raise funds.
16          And it is -- if they operate consistent with
17 the literature, they will expend those funds both to
18 promote themselves within the caucus and do so to expand
19 the scope and role of the caucus itself.
20     Q.  Okay.  And we'll come back to some of that.
21          Would you agree that political parties also
22 seek to shape policy?
23     A.  Yes.
24          Although they're less -- they're focus tends
25 to be primarily on expanding the number of Democrats or

Page 31

1 Republicans, Libertarians -- what have you -- but they do
2 engage in policy making activities.  They have policy
3 slates, policy platforms.
4           So they are engaged in policy -- in
5 influencing policy, not necessarily making policy.
6      Q.  Okay.  In the course of compiling your report, did
7 you collect any data comparing the policy or issue driven
8 goals of any legislative caucus committee to that of its
9 associated political party?
10     A.  No, but I would anticipate they would be highly
11 aligned.
12     Q.  So this report is not intended to opine on whether
13 legislative caucus committees have divergent views or
14 policy goals from their respective party?
15     A.  Well, the policy goals may be very similar, but
16 there's -- political parties tend to have very broad goals
17 on broad issues.  And when you're within the legislative
18 realm, there are a lot of issues that may emerge that a
19 political party may or may not have a position on.
20          And so in that case, the goals of the
21 individual caucus committee member could be divergent
22 mainly because the political party hasn't opined on those
23 type of issues.
24          Political parties tend to focus on big, broad
25 policy issues, not as much on the day-to-day minutiae of

Page 32

1 managing and running government.
2      Q.  But other than that generalized knowledge, by not
3 collecting data on the issue, I presume that this report is
4 not intended to opine on whether or not in Illinois
5 legislative caucus committees have divergent views or goals
6 from their respective parties?
7      A.  No.  I would -- I believe that they would be
8 aligned.
9      Q.  All right.  I think we can turn to page 5.
10          Another, I would say significant, piece of
11 your report that you focus on is that you believe that the
12 financial contributions made by the legislative caucus
13 committees in Illinois are not indicative of the expansive
14 strategy that you associate with other political party
15 committees.
16          Is that fair to say?
17     A.  I would say that they have probably two goals.
18          One is, they are -- there is evidence they
19 have an expansive strategy, but there is also evidence that
20 they are participating in strategies that are more
21 particularized to the goals of the leader.  So I would say
22 they have dual strategies.
23     Q.  Okay.  And in looking at this issue to form your
24 opinion, you indicate that you looked at two specific
25 legislative caucus committees in Illinois, the Democratic



MARCUS BRYAN OSBORN, PH.D.
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.

September 15, 2014
33–36

Page 33

1 majority and the Democratic Senate Victory Fund; is that
2 correct?
3    A. Correct.
4    Q. Do you know how many legislative caucus committees
5 there were in the 2012 election cycle in Illinois?
6    A. I would believe there's at least four, but there
7 may be more than that.
8    Q. And in forming your opinion in your report, did
9 you review any data pertaining to the House Republican
10 Organization?
11    A. Yes.
12    Q. What data did you review?
13    A. I looked at their campaign finance reports.
14    Q. I'm sorry.
15      Their what?
16    A. Their campaign finance reports -- their
17 expenditure reports.
18    Q. But that data is not discussed in your report,
19 correct?
20    A. Correct.
21      I focused on the majority party primarily
22 because that's the party who has most influence in policy
23 making because they are in the majority.
24      The patterns within the minority party are
25 more likely to be more purely expansionist mainly because

Page 34

1 for them to have any authority they need to be in the
2 majority party.
3    Q. Did you -- in reviewing the House Republican
4 Organization financial reports, did you conduct any
5 analysis on the data contained in those reports?
6    A. I looked over the data, but I did not do any
7 analysis.
8    Q. And in forming your opinion, did you review any
9 data pertaining to the House Republican leadership
10 committee?
11    A. I reviewed their financial information, but I did
12 not do any analysis.
13    Q. And in forming your opinion, did you review any
14 data pertaining to the Republican State Senate campaign
15 committee?
16    A. No.
17    Q. In forming your opinion, did you review any data
18 pertaining to the down state Democratic caucus?
19    A. No.
20    Q. And it's fair to say that though you did -- you
21 reviewed some data of the House Republican Organization and
22 the House Republican leadership.
23      That analysis is not contained in your
24 report, correct?
25    A. That is correct.

Page 35

1    Q. Okay.
2    A. I focused on the Democrat party's because they are
3 in the majority, and that's I think the more relevant
4 discussion.
5    Q. In forming your opinion, did you compare the
6 Democratic victory fund financial participation with that
7 of any political party committee other than a legislative
8 caucus committee?
9    A. I simply looked at the Democrat caucus committee
10 contribution patterns -- the caucus committee patterns.
11    Q. Okay. You did not compare the Democratic victory
12 fund or the Democratic majority's financial participation
13 with the Democratic party's financial participation?
14    A. No, I did not.
15    Q. Okay. This is probably obvious, but I assume you
16 also did not compare it to the Republicans financial
17 participation?
18    A. That is correct.
19    Q. Okay. In forming your opinion, did you compare
20 any of the 2012 Illinois election data to campaign
21 contribution data of Illinois election cycles prior to the
22 enactment of the legislative caucus committee?
23    A. No, I did not.
24    Q. Is it fair to say that your report opines in part
25 that political parties, they have a dual goal, but they're

Page 36

1 -- no, I'm sorry, I think that's -- strike that.
2      Is it fair to say that your opinion is that
3 political parties have a primary priority of expansion by
4 getting their candidates elected?
5    A. Political parties? Yes.
6    Q. And is it fair to say that you would presume that
7 political party's activity and financial activity would be
8 consistent with that primary goal of expansion?
9    A. Yes.
10    Q. Now, if you flip to page 6 of your report, you
11 discuss the five largest contributions from 2012 for the
12 Democratic victory fund.
13      And you note that they have focused almost
14 exclusively on the general election, correct?
15    A. Yes.
16    Q. And you opine in your report that these races were
17 not competitive?
18    A. Only two of them, 31 and 6, appear to be
19 competitive given the small margin of victory.
20    Q. Are you basing your opinion of whether or not the
21 race was competitive on anything other than the margin of
22 victory provided to you by the Illinois Liberty Justice
23 Center in appendix 1 of your report?
24    A. That was the basis of my conclusion.
25    Q. Okay. Would you consider the margin of victory in



MARCUS BRYAN OSBORN, PH.D.                          September 15, 2014
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.                     37–40

Page 37

1 the 49th district to be close?
2   A. I would say that's on the margins.
3      I would say anything under 5 is competitive.
4 Over 6, that's probably not as competitive.
5   Q. And you believe that this financial activity of
6 the Democratic victory fund supports your opinion because
7 generally this activity is not focused on electorally close
8 elections.
9      Is that fair to say?
10  A. No, that's not fair.
11  Q. Okay.
12  A. I think it reflects a dual strategy wherein those
13 races where there are very close margins, they clearly made
14 significant investments, but there are several races that
15 have very large margins that appear to be less reflective
16 of that strategy.
17  Q. In the races that you characterized as not being
18 close or competitive races, did you consider any other
19 variables or alternative explanations for why the
20 Democratic victory fund may have chosen to contribute to
21 those campaigns?
22  A. No. I did not go into each individual race and
23 look qualitatively at the activities.
24  Q. Okay. Also on page 6 of your report, you discuss
25 the Democratic majority committee, and you note that they

Page 38

1 participated financially in 52 primary elections in 2012;
2 is that correct?
3   A. Yes.
4   Q. And in your discussion of those primary elections,
5 you cite to two primary campaigns specifically where the
6 Democratic majority participated financially, and you found
7 the margin of victory to be slim.
8      You reference them as being the Maria Barrios
9 and Sue Sherra campaign?
10  A. Correct.
11  Q. And in both of those elections you indicate that,
12 though the primaries were slim victories, the general
13 elections were what you call, quote, "safe Democratic seats
14 because the candidate's margins of victory exceeded 20
15 percent."
16     Is that correct?
17  A. Yes.
18  Q. In forming your opinion as to whether those seats
19 were safe Democratic seats in the general election, are you
20 basing your opinion on anything other than the margin of
21 victory?
22  A. No. Because the margin of victory was so large
23 that they were clearly safe seats.
24  Q. Did you consider any other variables or
25 alternative explanations for why the Democratic majority

Page 39

1 may have chosen to contribute to these campaigns?
2   A. No. I focused on margin of victory.
3   Q. Did you examine whether any political party
4 committees outside of legislative caucus committees
5 financially participated in either of these campaigns
6 during the primary election?
7   A. I did look at their campaign finance reports, but
8 outside of that, no.
9   Q. You looked in the political party -- the
10 Democratic party and the Republican party's reports?
11  A. No, the individual candidates.
12  Q. Okay. But you did not examine whether the
13 Republican or Democratic parties financially participated
14 in either of these campaigns during the primary?
15  A. I did not.
16  Q. And as you sit here today, are you aware of
17 whether the Democratic or Republican party financially
18 participated in either of these campaigns during the
19 primary election?
20  A. No.
21  Q. Did you examine whether any political party
22 committees outside of legislative caucus committees
23 financially participated in either of these campaigns
24 during the 2012 general election?
25  A. No.

Page 40

1   Q. And as you sit here today, are you aware of
2 whether any political party committees outside of
3 legislative caucus committees financially participated in
4 either of these campaigns during the 2012 general
5 election?
6   A. I am not.
7   Q. Is it your position that primary election
8 participation is never part of an expansive strategy?
9   A. It could be, but it tends to be riskier business.
10     If you had a completely incompetent or
11 failure candidate, I could see a situation where the party
12 or the legislative leader may want to step in and try to
13 eliminate that individual, or it could be a situation where
14 a speaker or a president wants to assure that whoever is
15 voting, whoever gets elected will take positions that are
16 more aligned with the speaker or the president.
17     So there could be situations in which primary
18 activity is part of an expansion strategy, but generally
19 speaking, expansion strategies are focused on general
20 elections.
21  Q. So you would agree that incumbents within a
22 party's expansion strategy is to identify not just
23 candidates affiliated with a party but those who are
24 competent and meet the long term goals of the party?
25  A. And are aligned with the speaker or the president



MARCUS BRYAN OSBORN, PH.D.                                    September 15, 2014
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.                                    41–44

Page 41

1  or the legislative leadership.
2      Q.  Okay.  You talk on page 7 of your report that the
3  Democratic majority committee contributed money to an
4  independent candidate, Dee Bobian; is that correct?
5      A.  Correct.
6      Q.  In forming this report, did you conduct any
7  research to determine why the committee might have donated
8  to an independent candidate?
9      A.  It was -- through news accounts, she was known to
10  be a Democrat leaning independent.
11         So she appeared to be more friendly to the
12  Democrat side than the Republican side, so --
13      Q.  Okay.  Are you aware of whether or not the
14  Democratic party also supported this candidate?
15      A.  I am not, but it would not surprise me.
16      Q.  In formulating your report, did you review any
17  data concerning financial backing of independent candidates
18  by partisan candidates in other elections outside of this
19  one?
20      A.  No, I did not.
21      Q.  Did you examine whether political party committees
22  outside of legislative caucus committees contributed to Dee
23  Bobian in the general election?
24      A.  No, I did not.
25      Q.  On page 7 of your report, you indicate that based

Page 42

1  upon your review of the most significant contributions made
2  by the Democratic majority and the victory fund, quote,
3  "There appears to be no caucus expansion strategy being
4  utilized," end quote.
5         Do you see that?
6      A.  Uh-huh.
7      Q.  Are you basing this opinion on anything other than
8  the data collected regarding these two caucus committees
9  for the 2012 cycle?
10      A.  Yes.
11      Q.  What are you basing that opinion on?
12      A.  Oh, I'm sorry.
13         Repeat the question.
14      Q.  Are you basing that opinion on anything other than
15  the data collected regarding these two caucus committees
16  for the 2012 election cycle?
17      A.  Yeah.  I'm relying on the data from these two
18  caucus committee expenditure reports.
19      Q.  Okay.  So your opinion is based solely on the data
20  collected regarding Democratic majority and Senate
21  Democrat victory fund?
22      A.  In addition to my experience, yes.
23      Q.  In addition to your general experience?
24      A.  Correct.
25      Q.  Okay.  And in forming this opinion, did you

Page 43

1  conduct any interviews regarding the strategy of either of
2  these legislative caucus committees?
3      A.  No.
4         And generally speaking, direct interviews
5  typically in this scenario would lead to somewhat
6  unreliable results because legislators may not be overly
7  forthcoming about their actual legislative strategies.
8      Q.  Okay.  In forming your opinions contained in this
9  report regarding the financial participation of these two
10  legislative caucuses, did you review any data concerning
11  political parties other than the legislative caucus
12  committee data for these two committees in the 2012
13  cycle?
14      A.  I'm sorry.  Can you repeat the -- I didn't --
15      Q.  That was poorly worded.  Let me rephrase that.
16         In forming these opinions -- you've already
17  said that you relied upon the data that you gathered or
18  that was gathered for you regarding specifically these two
19  legislative caucus committees, correct?
20      A.  That is correct.
21      Q.  You did not compare that data to any data
22  regarding the Democratic political party, correct?
23      A.  Correct.
24      Q.  Okay.  And you did not collect any data for any
25  part of this report regarding the Democratic party?

Page 44

1      A.  No.  I looked at the committee in isolation of
2  other activities -- political activities going on.
3      Q.  Okay.  On page 7 you have a discussion of examples
4  of in-kind contributions to legislative staffers; is that
5  correct?
6      A.  Yes.
7      Q.  Did you examine data regarding in-kind
8  contributions made by political party committees outside of
9  legislative caucus committees in 2012?
10      A.  No, but I would -- it would not surprise me if
11  they existed.
12      Q.  I'm sorry.
13         It would not surprise you if what?
14      A.  If there were such contributions.
15      Q.  Okay.  And for which legislative caucus committees
16  were you provided data regarding in-kind contributions?
17      A.  The Democrats, and I believe the Republicans as
18  well, but I would have to look in my notes.
19         But I --
20      Q.  Okay.  Your report --
21      A.  -- thought --
22      Q.  Your report focuses on the same two legislative
23  caucus committees, correct?
24      A.  Because they're in the majority party --
25      Q.  Right.



MARCUS BRYAN OSBORN, PH.D.
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.

September 15, 2014
45–48

Page 45

1    A.  -- and they tend to have the most staff and
2    resources to dedicate.
3        Q.  In forming your report, did you review any data
4    regarding in-kind contributions prior to 2012 in
5    Illinois?
6        A.  No.
7        Q.  Page 9 of your report discusses the requirement
8    that a legislative candidate may only receive contributions
9    in a given election cycle from one caucus committee,
10   correct?
11       A.  Correct.
12       Q.  Is it your opinion that this provision is
13   indicative that the caucus committee operates more like a
14   PAC than a political party?
15       A.  Not necessarily -- well, just that provision, no.
16           If it was a generalized PAC, you can take
17   multiple contributions from multiple PACs.  In this case
18   there's some exclusivity to the contribution.
19           So once you've taken it from one caucus
20   committee, you are effectively barred from taking it from
21   other caucus committee.
22           So in that sense, it does not operate like a
23   PAC.  It's a more restrictive PAC, but it's also a PAC that
24   has superior fund raising advantages over traditional PACs.
25       Q.  But there is no limit on how many PACs a candidate

Page 46

1    can receive contributions from, correct?
2        A.  From noncaucus committee PACs, correct.
3        Q.  In forming your report, did you review any
4    legislative voting records to assist in determining whether
5    voting patterns in Illinois of Illinois legislators,
6    whether there was a -- strike that.
7           In drafting your report, did you review any
8    Illinois voting records of Illinois legislators?
9        A.  I did not.
10          MS. RAWSKI:  Do you mind if we just take a
11   brief two-minute break.
12          I'm just going to run to the ladies room real
13   quick.
14          THE WITNESS:  If we make it five, it would be
15   great, and I'll do the same.
16          MS. RAWSKI:  All right.  So we'll come back
17   on in five, Jacob?
18          MR. HUEBERT:  Sounds good.
19          (Recess taken from 12:05 p.m. to 12:11 p.m.)
20   BY MS. RAWSKI:
21       Q.  Okay.  So your report discusses that contributions
22   received by the two Democratic caucus committees in the
23   2012 election cycle were primarily from interest groups,
24   which in your opinion defers greatly from the diversity of
25   donors you would see contributing to a candidate or a

Page 47

1    political party; is that correct?
2        A.  Correct.
3           Yes, that is correct.
4        Q.  And you find this to be significant because
5    significantly absent is, quote, "a broad cross section of
6    donors that one would expect from traditional political
7    party contributors"?
8           Is that a statement from your report?
9        A.  Yes.
10       Q.  And in making this statement, did you rely upon
11   the data that you presented in appendix 3 of your report?
12       A.  Yes.
13          Hold on.  Let me make sure.  Yeah, the
14   campaign finance reports, yes.
15          And what I did was I went through the
16   campaign finance reports and looked at traditional, the
17   number of PACs, the type of organizations that are common
18   to be lobbying organizations down to legislature, and these
19   are similar across state lines, and that's how I came to my
20   determination.
21       Q.  In forming this opinion, did you rely on anything
22   else other than the data presented in appendix 3 of your
23   report?
24       A.  That, combined with my experience of being a
25   lobbyist for 20 plus years.  I know the type of groups who

Page 48

1    typically contribute, and I saw evidence of those groups in
2    the campaign finance reports.
3        Q.  Okay.  And in forming this opinion, what do you
4    consider to be significantly absent, I believe is the
5    phrase you used?
6           Is there a value that you can assign to that?
7        A.  What you don't see is a lot of low dollar
8    contributions from rank in file party members.
9           What you see is a more traditional lobbying
10   interest group type of fund raising system.
11       Q.  In reviewing the data contained in appendix 3 of
12   your report, did you run any numerical analysis as to what
13   percentage of the contributions received came from any
14   particular source including political action committees?
15       A.  No, I did not.
16       Q.  Did you run any analysis as to what percentage of
17   the contributions received came from individuals?
18       A.  Well, the individuals are a little trickier
19   analysis because you have to not only determine whether or
20   not they are -- one, that they're individuals, but
21   secondly, are they paid consultants, lobbyists, and other
22   types of interest groups.
23          Because commonly, if you just rely on PAC
24   contributions alone, that under reports the amount of
25   interest group influence that is occurring.



MARCUS BRYAN OSBORN, PH.D.                  September 15, 2014
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.              49–52

Page 49

1   Q.  Did you run an analysis of this data at all to
2   show the percentages of each contributor?
3   A.  No, I did not.
4   Q.  Did you run any data analysis on the numbers
5   provided in appendix 3?
6   A.  No, just a qualitative review.
7   Q.  Okay.  In forming your opinion, did you consider
8   any data or statistical breakdown of contributions received
9   by any political party committees outside of legislative
10  caucus committees in the 2012 election cycle?
11  A.  No.  Mine was focused just on the caucus
12  committees.
13  Q.  Now, you indicate in your report that you would
14  expect there to be a quantitative difference in the
15  distribution or contributions received by donor between
16  political parties and legislative caucus committees; is
17  that correct?
18  A.  There should be some similarities, but yeah,
19  there -- there could be some differences, yes.
20  Q.  You did not review any data that would -- there's
21  no data reviewed in this report that would provide that
22  comparison?
23  A.  No.  I think what I was focused on was the
24  structure of the legislative caucus committee will be
25  speaker or senate president focused, and there may be

Page 50

1   divergence in terms of their strategies to meet their
2   needs.
3          In some cases it may take years for that type
4   of divergence to occur.
5   Q.  And the data relied upon in your report concerning
6   Illinois throughout your report is limited to the 2012
7   election cycle, correct?
8   A.  Yes.
9   Q.  Now, page 6 of your report references appendix 1,
10  and it indicates that the data attached to appendix 1 was
11  provided by the Illinois Liberty Justice Center; is that
12  correct?
13  A.  That is correct.
14  Q.  Is this the exact spreadsheet that was provided by
15  Illinois Liberty Justice Center?
16  A.  I would have to go through it, but it looks like
17  it.
18  Q.  Okay.  I was hoping we could walk through this
19  because I wasn't entirely certain how to read this.
20  A.  Well, yeah, it's a little challenging to read
21  based on the printout.
22  Q.  Yeah.
23  A.  And I will have the same challenges that you
24  will.
25  Q.  Okay.  I think my main question is -- it seems to

Page 51

1   be broken down into two predominant columns.
2          So let's just take the first individual as an
3   example.  It says, "L. Riley," and then it says, "amount
4   donated."
5          Then if you go over to the next main column,
6   it says, "amount donated," again.
7   A.  Yeah.  It's broken down into primary and general
8   election.
9   Q.  Okay.  So the column on the left is the primary
10  election?
11  A.  Correct.
12  Q.  And the column on the right is the general
13  election?
14  A.  That is correct.
15  Q.  Okay.  And is this intended to include -- what
16  does this spreadsheet include?
17  A.  I believe it's those races which there was caucus
18  committee participation.
19  Q.  From the two legislative caucus committees that
20  we've discussed throughout this deposition?
21  A.  Yes.
22  Q.  And it's limited to the 2012 election cycle,
23  correct?
24  A.  Yes.
25  Q.  Okay.  Did you review the data used to compile

Page 52

1   this chart?
2   A.  The source data?
3   Q.  Yes.
4   A.  No, I did not.
5   Q.  Okay.  And you believe the chart represents the
6   data for both the Democratic majority and the Democratic
7   Senate victory fund, correct?
8   A.  That is correct.
9   Q.  Okay.  But not for the other legislative caucus
10  committees?
11  A.  Correct.
12  Q.  Okay.  I'm pretty sure based on one of your
13  answers earlier that I already know the answer to this, but
14  just to be clear, you did not conduct any interviews in the
15  course of forming this report?
16  A.  I did not.
17  Q.  In forming the opinions reflected in your report,
18  did you consider how legislative caucus committees compare
19  with congressional campaign committees?
20  A.  Meaning the RNC and the DCCC?
21  Q.  I guess we should start there.
22          Are you familiar with what a congressional
23  campaign committee is under the federal system?
24  A.  Yes.
25  Q.  You are?



MARCUS BRYAN OSBORN, PH.D.
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.

September 15, 2014
53–56

Page 53

1    A.  Yes.
2    Q.  Did you compare that system at all to the Illinois
3  legislative caucus committee system in Illinois?
4    A.  No.
5         Typically when you look at -- well, some of
6  the academic literature compares state to federal.
7         Typically when you do state legislative
8  politics, it's looked at more exclusively as state versus
9  federal, and usually I don't cross compare.
10    Q.  Okay.
11    A.  It's not as frequent.  Let me put it that way.
12    Q.  Did you review any -- so is it safe to say you
13  didn't review any data or collect any data concerning
14  financial participation at the federal level for the
15  purposes of this report?
16    A.  No.  I mean, I did look at some of the academic
17  research on leadership PACs because that's where they're
18  most prevalent and that's where most of the federal
19  research is at, but outside of that, no.
20    Q.  Okay.  I wanted to take a moment to go through and
21  discuss briefly some of the articles that you sent over in
22  response to our notice of deposition.
23         And I didn't resend everything to you because
24  it seemed like it was kind of redundant, but I do have
25  Bates numbers for the things I would like to discuss.

Page 54

1         Do you have handy what was produced to me?
2    A.  Yes.  But if you can give me the article name,
3  that would be the easiest way for me to find it.
4    Q.  Okay.  Great.
5         I guess I'll start out by asking, in the
6  course of forming your opinions expressed in your report,
7  did you review the campaign contribution limits in place
8  under Illinois law currently?
9    A.  Yes.
10    Q.  Did you review the limits as they were in place in
11  2012?
12    A.  Yes.
13    Q.  Okay.  I would like to discuss first the article,
14  "Crystal Elephants and Committee Chairs," by Kristin
15  Kanthak.
16         It's Bates numbered MBO 0900 through MBO
17  0918.
18    A.  Yes.
19    Q.  This article is from 2007; is that correct?
20    A.  Yes, that is correct.
21    Q.  In your review of this article, is it fair to say
22  that this article is limited to a review of the U.S. House
23  of Representatives and does not deal with state legislator
24  elections?
25    A.  Yes.

Page 55

1    Q.  And this article in part reviews the distribution
2  of funds from six different sources to candidates of both
3  parties?
4    A.  Yes.
5    Q.  Okay.  And I apologize, I have the Bates numbers
6  for just about all them, but for some reason I don't have
7  the Bates numbers for this one.
8         It's called, "Legislative Leadership and
9  Campaign Support in California," by Richard A. Clucas.
10         And if you can't find it, I can go pull the
11  Bates numbers.
12    A.  No, I know I have it.  Just give me a second.
13         1992?
14    Q.  Yes.
15         That was actually my first question, but this
16  article is from 1992?
17    A.  Yes.
18    Q.  And this article examined exclusively the strategy
19  employed by the then California assembly speaker, Willie
20  Brown, from 1982 to 1986; is that correct?
21    A.  That is correct.
22    Q.  Okay.  Next I would like to look at an article
23  called, "The Roles of Party Organizations, Party-Connected
24  Committees, and Party Allies in Elections," by Paul S.
25  Herrnson.

Page 56

1         It's Bates numbered MBO 0939 through MBO
2  0967.
3    A.  For some reason, I do not have that handy.
4         I know I have it, but -- can we take a short
5  break?
6         Because I must not have printed it out when
7  you --
8    Q.  Sure.
9         MS. RAWSKI:  Let's go off the record for a
10  second.
11         (Recess taken from 12:28 p.m. to 12:48 p.m.)
12         THE WITNESS:  Okay.  I'm back.
13         MS. RAWSKI:  Okay.  Can we go back on the
14  record?
15         Sorry about that.
16         THE WITNESS:  The confusion was there's a
17  slip sheet for the Herrnson article, but the article that's
18  underneath it, is a different article --
19  BY MS. RAWSKI:
20    Q.  Oh.
21    A.  -- and that's what was confusing me.
22    Q.  Okay.
23         MR. HUEBERT:  Do we have the correct article
24  in front of us now?
25         THE WITNESS:  Well, if you go one page in,

MARCUS BRYAN OSBORN, PH.D.
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.

September 15, 2014
57–60

Page 57

1  you'll see the cover sheet of the article. It should be
2  one by Kristin Kanthak.
3  BY MS. RAWSKI:
4      Q.  So maybe I have the wrong article, then.
5          Is the article that starts after that slip
6  sheet on 0940 not the article by Paul Herrnson?
7      A.  Go one page in, and it should be a different --
8  yeah, it's -- there was a --
9          MR. HUEBERT:  By Herrnson?
10         THE WITNESS:  Yes, that is correct.
11         THE COURT REPORTER:  Excuse me, are we on the
12  record?
13         MS. RAWSKI:  Yes.
14         THE WITNESS:  The slip sheet goes to an
15  article that I did not rely on that was inadvertently stuck
16  in the --
17  BY MS. RAWSKI:
18     Q.  Okay.  So did you rely on, "The Roles of Party
19  Organizations, Party-Connected Committees, and Party Allies
20  in Elections"?
21     A.  Yes.
22     Q.  Okay.  And do you have that in front of you right
23  now?
24     A.  I'm pulling it right now.
25     Q.  I'm sorry?

Page 58

1      A.  I'm pulling that right now.
2          Okay.  Go ahead.
3      Q.  Is this article from 2003?
4      A.  I'm sorry, I'm -- repeat the name of the article
5  one more time just so I'm -- I'm sorry, I'm --
6      Q.  That's okay.
7          It's "The Role of Party Organizations,
8  Party-Connected Committees" --
9      A.  Right.
10     Q.  -- "and Party Allies in Elections."
11     A.  No, that's the -- that is the slip sheet that I
12  did not rely on.
13     Q.  Okay.  So that article is not contained at all
14  within --
15     A.  Correct --
16     Q.  -- your --
17     A.  -- it's not referenced in my report.
18         The article that's immediately preceding it
19  is, "Leadership PAC Contribution Strategies and House
20  Member Ambitions," by Currinder.
21     Q.  Okay.
22     A.  That is the --
23     Q.  And what year is that article from?
24     A.  2003.
25     Q.  Okay.  And did that article deal exclusively with

Page 59

1  the federal system rather than any state legislator
2  system?
3      A.  I believe -- yes.
4      Q.  Yes, it did?
5      A.  Yes.
6      Q.  Okay.  Do you have handy the article, "Incumbency
7  and the Probability of Reelection in State Legislative
8  Elections," by John M. Carey, et al., which is found at MBO
9  0819 through MBO 849?
10     A.  Yes, I do.
11     Q.  And this article is from 2000; is that correct?
12     A.  Yes.
13     Q.  And is it fair to say that the focus of this study
14  was how incumbency impacts the probability of being
15  reelected?
16     A.  It focuses is on incumbency advantage, yes.
17     Q.  Okay.  And the data collected as a part of this
18  study pertained to the 1992/1994 election cycle?
19     A.  I would have to look in detail.
20     Q.  I'm referring specifically to page 839 in the
21  conclusion.
22     A.  Can you repeat the question?
23     Q.  That the data collected as a part of this study
24  pertained to the 1992/1994 election cycle?
25     A.  I'm just trying to look to see the study.

Page 60

1          1992 through 1994, yes.
2      Q.  In this study -- this study did collect some data
3  concerning legislative compensation, but the study did not
4  collect any data concerning campaign finance participation,
5  did it?
6      A.  Meaning -- be a little more specific.
7      Q.  Did the study collect any data concerning campaign
8  contributions?
9      A.  It does not look like it was included in the
10  model.
11     Q.  And I would like to look at your article that you
12  cited, "Political Power and Policy Subsystems in American
13  Politics," by James Thurber, which is found at MBO 0871
14  through MBO 0899.
15     A.  Yes.
16     Q.  Is it fair to say that this article is a general
17  discussion of political subsystems in American politics?
18     A.  Yes.
19     Q.  And is it fair to say that this article is not a
20  data driven article?
21     A.  That is correct, but it provided the foundation
22  for a number of other data driven articles.
23     Q.  Okay.  If you could turn next to -- it should be
24  the very next article, hopefully, MBO 0989, it starts at,
25  and it's called, "Party Impact Contributions to North



MARCUS BRYAN OSBORN, PH.D.
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.
September 15, 2014
61–64

**Page 61**

1 Carolina Legislative Candidates," by Joel Thompson and
2 William Cassie.
3   A. Yes, I have it.
4   Q. This study was from 1992; is that correct?
5   A. It was published in 1992, correct.
6   Q. And the study looked exclusively at the state
7 legislative elections in North Carolina?
8   A. That is correct.
9   Q. Now, in this study, the authors hypothesized what
10 the differences would look like in financial participation
11 between PACs and political parties.
12     Is that fair to say?
13   A. Yes.
14   Q. And one of the difficulties that they noted in
15 conducting their study was that there was limited
16 documentation on North Carolina campaign contributions
17 because only candidates from districts comprising more than
18 one county were required to report their contributions; is
19 that correct?
20   A. It's been a while since I've read the article.
21 Let me find that section.
22     Yes, that's correct.
23   Q. Okay. Despite the limited data that was available
24 in that study, those authors did gather data concerning
25 PAC, political party and total contributions reported for

**Page 62**

1 1988 to the extent it was available; is that correct?
2   A. Yes.
3   Q. And in conducting that analysis regarding factors
4 which may influence the allocation of political funds,
5 those authors compared PAC funds to political party funds;
6 is that correct?
7   A. Yes.
8   Q. And also in conducting this analysis, they
9 considered five independent variables of which one was the
10 1986 margin of victory?
11   A. Yes, that is correct.
12   Q. To your knowledge, did North Carolina have
13 campaign contribution limits in place at the time this
14 article was written?
15   A. I am not aware.
16   Q. Okay. I would like to turn next to "Sacred Cow or
17 Just a Lot of Bull? Party and PAC Money in State
18 Legislative Elections" by Joel Thompson and William Cassie.
19   A. Uh-huh.
20   Q. I believe it's at MBO 0999 through MBO 1014.
21   A. Okay.
22   Q. This is a 1994 study; is that correct?
23   A. Yes.
24   Q. And this study examined data from New Jersey,
25 Pennsylvania, and North Carolina?

**Page 63**

1   A. Pennsylvania, New Jersey, and North Carolina,
2 yes.
3   Q. And is it fair to say that this study utilized the
4 strategies and behaviors of PACs as compared with political
5 parties with regard to campaign contributions to state
6 legislative candidates?
7   A. Yes.
8   Q. In conducting this study, the authors collected
9 and compared data concerning financial participation of
10 political parties and PACs in their respective states
11 legislator; is that correct?
12   A. Say that one more time just so I'm clear on the
13 question.
14   Q. Sure.
15     In conducting the study, the authors
16 collected and compared data concerning the financial
17 participation of political parties and PACs in the
18 respective states legislator.
19     Is that fair to say?
20   A. Yes.
21   Q. Okay. Dr. Osborn, to your knowledge, did New
22 Jersey have campaign contribution limits in place at the
23 time this article was written?
24   A. Not that I'm aware of.
25   Q. To your knowledge, did Pennsylvania have

**Page 64**

1 contribution limits in place at the time this article was
2 written?
3   A. I am not sure.
4   Q. To your knowledge, did North Carolina have
5 campaign contribution limits in place at the time this
6 article was written?
7   A. I am not sure.
8   Q. Okay. I would like to turn to the next article,
9 which is found at MBO 1015 through 1040.
10     It's titled, "Congressional Parties and the
11 Mobilization of Leadership PAC Contributions," by Eric S.
12 Heberlig and Bruce Larson.
13   A. Yes.
14   Q. This article is from 2009, correct?
15   A. Yes.
16   Q. And is it fair to say that this study focused on a
17 comparison between the financial participation of personal
18 campaign committees and leadership political PACs?
19   A. Yes.
20   Q. And is it fair to say that this study was limited
21 to the federal system and did not discuss any state
22 system?
23   A. Yes.
24   Q. Okay. I might come back to that one, but for now
25 I would like to turn to the very next article, which is MBO



MARCUS BRYAN OSBORN, PH.D.                                    September 15, 2014
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.                              65–68

Page 65

1  1041 through MBO 1055, which is "Campaign Contributions and
2  Intercandidate Transfers in the California Assembly," by
3  Jay Dow.
4      A.  Yes.
5      Q.  Now, this study was from 1994; is that correct?
6      A.  It was published in 1994, yes.
7      Q.  And this study looked exclusively at the
8  California assembly election?
9      A.  That is correct.
10     Q.  And part of that article's conclusion was quote,
11  "Whether money influences either electoral results or
12  legislative voting behavior remains unclear," end quote?
13     A.  Yes.
14     Q.  To your knowledge, did California have any
15  campaign contribution limits in place at the time this
16  article was written?
17     A.  Not that I'm aware of.
18     Q.  Okay.  Do you have handy "State Legislative
19  Campaign Finance Research," a review essay by Graham
20  Ramsden found at MBO 0974 through 0818?
21         Wait, that doesn't make any sense.
22     A.  I have it.
23     Q.  Okay.  Strike the Bates number.
24         That was a typo somewhere along the way.
25  Sorry about that.

Page 66

1      A.  2002?
2      Q.  Yes.
3         Is it fair to say that this article was
4  essentially a critical review of various studies on the
5  issue to date.
6      A.  Yes.
7      Q.  And this article did not gather or analyze its own
8  data?
9      A.  That is correct.
10     Q.  Did you review any of the studies cited in this
11  article that examined fund raising and funding in state
12  political elections?
13     A.  I have in the past, yes.
14     Q.  And those studies were from the 1980s and early
15  '90s?
16     A.  For the most part, yes.
17     Q.  Do any of those studies examine Illinois?
18     A.  Not that I'm aware of.
19         I have not reviewed every single study
20  referenced in this study.
21     Q.  Okay.  Of the articles -- of the written articles
22  that you reviewed or relied upon in your report, did any of
23  them address Illinois specifically?
24     A.  Not that I'm aware of.
25     Q.  Has your report been published anywhere other than

Page 67

1  in this case?
2      A.  Not that I'm aware of.
3      Q.  Have you provided it to anyone other than to the
4  Liberty Justice Center?
5      A.  That's the only one I've provided it to.
6      Q.  Okay.
7      A.  I don't know if they have done something with it
8  other than --
9      Q.  You're not aware of any peer review of the
10  report?
11     A.  No.
12     Q.  In your opinion, what is it about Illinois
13  legislative caucus committees that requires an expert to
14  explain?
15     A.  I think it's the differences between -- it's the
16  interplay between how caucus committees interact with
17  legislative behavior.
18         I think that's the one area that makes them
19  somewhat unique.  They're not straight PACs.  They're not
20  straight political parties.  They are something in between
21  those two organizations.
22     Q.  Okay.  Do you believe your testimony will aid the
23  judge in this case?
24     A.  Yes.
25     Q.  And is that based on the answer you just gave or

Page 68

1  are there other reasons that you believe that your
2  testimony will aid the judge in this case?
3         MR. HUEBERT:  I object.  This calls for a
4  legal conclusion.
5  BY MS. RAWSKI:
6      Q.  You can still answer.
7      A.  Can you repeat the question?
8      Q.  We've already talked a little bit about why you
9  think this issue requires an expert, and I'm just wondering
10  if that is also your answer of why you believe your
11  testimony will aid the judge in this case or if there's
12  anything else -- any other reasons that you would want to
13  include.
14     A.  I think it just provides additional understanding
15  of how the legislators or the speaker and the president
16  have dual roles of both promoting the party and running the
17  House of Representatives and Senate and how those
18  activities are different than straight political parties or
19  political action committees.
20     Q.  Okay.  Outside of the work for which you have been
21  retained in this case, have you studied Illinois
22  legislative caucus committees at all?
23     A.  No, I have not.
24     Q.  Have you studied legislative caucus committees in
25  other states?



MARCUS BRYAN OSBORN, PH.D.
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.

September 15, 2014
69–72

Page 69

1    A.  Arizona in particular, yes.
2    Q.  Any states other than Arizona?
3    A.  Not specifically, no.
4    Q.  And outside of the work for which you've been
5  retained in this case, have you studied congressional
6  campaign committees at all?
7    A.  As part of my dissertation and other work, part of
8  the literature review I did study, but no primary
9  research.
10    Q.  Okay.  If you could flip to -- one of the
11  documents that Jacob sent you was your original report
12  dated May 10th, 2013.
13        MS. RAWSKI:  And I would like to mark that as
14  Exhibit 3 if we can please.
15        (Exhibit No. 3 marked)
16  BY MS. RAWSKI:
17    Q.  Is this the original report that you submitted
18  dated May 10, 2013 in this case?
19    A.  Yes.
20    Q.  Now, what changed from this report to your report
21  from July of 2014?
22    A.  The major change was the addition -- I looked into
23  the differences between caucus committees and looked at
24  them more in terms of a leadership PAC and drew that
25  analysis, and I looked more specifically at the

Page 70

1  contribution patterns of the leadership PACs.  I think
2  those are the fundamental additions.
3    Q.  Okay.  Anything else?
4    A.  No.  I think that is -- oh, the campaign
5  contribution limits were updated.
6    Q.  Illinois' campaign contribution limits?
7    A.  Yeah.  It went from the -- since they're indexed,
8  the July report had the updated dates in it -- or amounts
9  in it.
10    Q.  Were there specific articles that you relied upon
11  in the second report that you did not rely upon in this
12  report?
13    A.  There were a couple of them.
14        The big difference between the articles in
15  the first report and the second report is I pulled in some
16  of the literature on personal leadership PAC committees
17  because I thought those were analogous to the caucus
18  committee.
19        I thought that would draw a better conclusion
20  or a better relationship.
21    Q.  Okay.  Is there any data relied upon in your July
22  2014 report that was not relied upon in your May 2013
23  report?
24    A.  Some of the campaign finance reports provided to
25  me by the liberty center were in the July 17th report.

Page 71

1    Q.  Okay.  And if you could flip quickly to the fourth
2  attachment on the email that Jacob sent you, it's an
3  invoice dated July 31st, 2014.
4        MS. RAWSKI:  I would like to mark that as
5  Exhibit 4.
6        THE WITNESS:  Okay.  Hold on.
7  July 31st?
8        MS. RAWSKI:  Yes.
9        (Exhibit No. 4 marked)
10        THE WITNESS:  Go ahead.
11        MS. RAWSKI:  Oh, and just so the record is
12  clear, this document is Bates stamped MBO 0611.
13  BY MS. RAWSKI:
14    Q.  Dr. Osborn, is this document a true and accurate
15  representation of the invoice that you sent Illinois
16  Liberty Justice Center for the updated July 2014 report?
17    A.  Yes.
18    Q.  And is this document accurate when it indicates
19  that you spent approximately 9.4 hours updating that
20  report?
21    A.  Yes.
22    Q.  And just because it looks like at some point there
23  was confusion between you and Illinois Liberty Justice
24  Center, this is the amount that you ultimately charged
25  Illinois Liberty Justice Center for the updating of the

Page 72

1  report?
2    A.  Yes.
3        When I did the update, our billing system had
4  them in as a fixed fee client.  And so irrespective of the
5  hours I bill, the accounting department sent a fixed fee
6  bill of 5,000 --
7    Q.  Sure.
8    A.  -- so that's the confusion.
9    Q.  It seemed like that was the case.  I just wanted
10  to confirm.
11        Actually, one other question.
12        Dr. Osborn, do you have any statistical
13  background?
14    A.  Yes.
15    Q.  What is your statistical background?
16    A.  I have a Ph.D.  My dissertation was
17  quantitative -- a regression, quantitative analysis.
18    Q.  Okay.
19        MS. RAWSKI:  Jacob, would you mind if we just
20  take a quick two-minute break?
21        I'm pretty close to being done.  I just
22  wanted to take a chance to refer to my notes real quick.
23        MR. HUEBERT:  That's fine.
24        MS. RAWSKI:  Okay.  We'll go off the record
25  for a minute.



MARCUS BRYAN OSBORN, PH.D.
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.

September 15, 2014
73–76

**Page 73**

1 (Recess taken from 1:14 p.m. to 1:19 p.m.)
2 MS. RAWSKI: Okay. We can go back on the
3 record.
4 Dr. Osborn, thank you very much for your
5 time.
6 I do not believe I have any further questions
7 for you right now.
8 THE WITNESS: Thank you.
9 MR. HUEBERT: All right. And I don't have
10 any questions.
11 THE COURT REPORTER: This is the court
12 reporter.
13 May I get your specific orders on the record
14 please?
15 MR. HUEBERT: Yes. We will order the
16 transcript electronically.
17 MS. RAWSKI: We'll do the same.
18 THE COURT REPORTER: Okay. Thank you.
19 MS. RAWSKI: Thank you.
20 Jacob, do you want to explain signature to
21 him or do you want me to?
22 MR. HUEBERT: That's fine. We can review it
23 to make sure that everything is transcribed accurately, and
24 we'll go ahead and exercise the right to do that.
25 MS. RAWSKI: Okay. You're going to reserve

**Page 74**

1 signature?
2 MR. HUEBERT: Yes.
3 MS. RAWSKI: All right. Thank you
4 everyone.
5 THE WITNESS: Thank you.
6 MR. HUEBERT: All right. Thank you.
7 (Deposition concluded at 1:21 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 75**

1 STATE OF ARIZONA )
2 COUNTY OF MARICOPA )
3 BE IT KNOWN that the foregoing deposition was
4 taken by me pursuant to stipulation of counsel; that I was
5 then and there a Certified Reporter of the State of
6 Arizona, and by virtue thereof authorized to administer an
7 oath; that the witness before testifying was duly sworn by
8 me to testify to the whole truth; that the questions
9 propounded by counsel and the answers of the witness
10 thereto were taken down by me in shorthand and thereafter
11 transcribed into typewriting under my direction; notice was
12 provided that the transcript was available for signature by
13 the deponent; that the foregoing pages are a full, true,
14 and accurate transcript of all proceedings, all done to the
15 best of my skill and ability.
16 I FURTHER CERTIFY that I am in no way related to
17 nor employed by any parties hereto nor am I in any way
18 interested in the outcome hereof.
19 DATED at Phoenix, Arizona, this 19th day of
20 September, 2014.
21
22
23
24
 Talia Douglas, RPR
25 Certified Reporter #50775

**Page 76**

1 DEPOSITION SIGNATURE PAGE
2 ILLINOIS LIBERTY PAC, et al. vs. LISA MADIGAN, et al.
 Assignment No. 200102
3
4 DECLARATION UNDER PENALTY OF PERJURY
5 I declare under penalty of perjury that I have
6 read the entire transcript of my Deposition taken in the
7 captioned matter or the same has been read to me, and the
8 same is true and accurate, save and except for changes
9 and/or corrections, if any, as indicated by me on the
10 DEPOSITION ERRATA SHEET hereof, with the understanding that
11 I offer these changes as if still under oath.
12
13 Signed on the _____ day of
14
 _____, 20_____.
15
16
17
18
19 Marcus Bryan Osborn, Ph.D.
20
21
22
23
24
25



MARCUS BRYAN OSBORN, PH.D.
ILLINOIS LIBERTY PAC vs. MADIGAN, ET AL.

September 15, 2014
77–78

```
                                            Page 77
 1              DEPOSITION ERRATA SHEET
                  Assignment No. 200102
 2
 3    Page No._____Line No._____Change to:_____
 4    _____
 5    Reason for change:_____
 6    Page No._____Line No._____Change to:_____
 7    _____
 8    Reason for change:_____
 9    Page No._____Line No._____Change to:_____
10    _____
11    Reason for change:_____
12    Page No._____Line No._____Change to:_____
13    _____
14    Reason for change:_____
15    Page No._____Line No._____Change to:_____
16    _____
17    Reason for change:_____
18    Page No._____Line No._____Change to:_____
19    _____
20    Reason for change:_____
21    Page No._____Line No._____Change to:_____
22    _____
23    Reason for change:_____
24
      SIGNATURE:_____DATE:_____
25          Marcus Bryan Osborn, Ph.D.
```

```
                                            Page 78
 1              DEPOSITION ERRATTA SHEET
                  Assignment No. 200102
 2
 3    Page No._____Line No._____Change to:_____
 4    _____
 5    Reason for change:_____
 6    Page No._____Line No._____Change to:_____
 7    _____
 8    Reason for change:_____
 9    Page No._____Line No._____Change to:_____
10    _____
11    Reason for change:_____
12    Page No._____Line No._____Change to:_____
13    _____
14    Reason for change:_____
15    Page No._____Line No._____Change to:_____
16    _____
17    Reason for change:_____
18    Page No._____Line No._____Change to:_____
19    _____
20    Reason for change:_____
21    Page No._____Line No._____Change to:_____
22    _____
23    Reason for change:_____
24
      SIGNATURE:_____DATE:_____
25          Marcus Bryan Osborn, Ph.D.
```

