IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS LIBERTY PAC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | |
| v. | ) | No. 12 CV 5811 |
| | ) | |
| LISA M. MADIGAN, Attorney General of the State of Illinois, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFFS' STATEMENT OF MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Plaintiffs Illinois Liberty PAC, Edgar Bachrach, and Kyle McCarter submit the following statement of material facts as to which there is no genuine issue, which entitle Plaintiffs to summary judgment as a matter of law. All materials cited herein to support assertions of fact are attached as exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment.

**PARTIES**

1. Plaintiff Illinois Liberty PAC is a political action committee as defined by Illinois state law and exercises its rights to free speech and association by donating funds and providing political and marketing consulting to the state candidates its supports. Second Amended Complaint ("Compl.") ¶ 6; Answer to Second Amended Complaint ("Ans.") ¶ 6.

2. Plaintiff Edgar Bachrach is an individual who exercises his rights to free speech and association by making contributions to PACs and candidates he supports. Compl. ¶ 7; Ans. ¶ 7.

3. Plaintiff Kyle McCarter is a member of the Illinois Senate and exercises his rights to free speech and association by running for elected office, fundraising in order to run a competitive campaign, and spending contributions he receives to support his candidacy. Compl. ¶ 8; Ans. ¶ 8.

4. Defendant Lisa Madigan is Attorney General of the State of Illinois and has the power to prosecute criminal violations of the Illinois Election Code. Compl. ¶ 11; Ans. ¶ 11.

5. Defendants William McGuffage, Jesse R. Smart, Bryan A. Schneider, Betty J. Coffrin, Harold D. Byers, Judith C. Rice, Charles W. Scholz, and Ernest L. Gowen are members of the Illinois State Board of Elections, a body which is empowered to enforce the statute that Plaintiffs challenge in this action through, among other things, the imposition of fines for violations. Compl. ¶¶ 10, 12-19; Ans. ¶¶ 10, 12-19.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over Plaintiffs' claim under 28 U.S.C. §§ 1331, 1343 because Plaintiffs brought their suit under 42 U.S.C. §§ 1983 and 1988 to seek relief for alleged violations of their federal constitutional rights. Compl. ¶ 4; Ans. ¶ 4.

7. Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants maintain offices in this district. Compl. ¶¶ 5, 11, 12; Ans. ¶¶ 5, 11, 12.

## FACTS

**I. Features of the Illinois Disclosure and Regulation of Campaign Contribution and Expenditures Act**

    **A. Limits on Contributions to and from Political Committees**

8. The Illinois Disclosure and Regulation of Campaign Contribution and Expenditures Act (the "Act") defines several types of political committees that it regulates:

candidate political committees, political party committees, political action committees ("PACs"), ballot initiative committees, and independent expenditure committees. 10 ILCS 5/9-1.8(a).

9. The Act regulates the amount of money that individuals, corporations, unions, associations, and political committees may contribute to certain political committees and the amount of money that political committees may receive from individuals, corporations, unions, associations, and certain other political committees. 10 ILCS 5/9-8.5.

10. Under the Act, subject to adjustments for inflation, individuals may contribute no more than $5,000 to a candidate political committee ("candidate"); political action committees= PACs may contribute no more than $50,000; and corporations, unions, and other associations may contribute no more than $10,000. 10 ILCS 5/9-8.5(b)-(d), (g).

11. Political party committees are not limited in the amounts they can contribute to a candidate in general elections. 10 ILCS 5/9-8.5(b); Compl. ¶ 24; Ans. ¶ 24.

12. In primary elections for statewide office, political party committees are limited to contributing 40 times the amount that individuals may contribute to candidates ($200,000 versus $5,000) and four times the amount that PACs can contribute ($200,000 versus $50,000) (subject to adjustments for inflation). 10 ILCS 5/9-8.5(b), (g).

13. In primary elections for nomination to the Illinois Senate, political party committees are limited to contributing 25 times the amount that individuals may contribute to candidates ($125,000 versus $5,000) and 2.5 times the amount that PACs may contribute ($125,000 versus $50,000) (subject to adjustments for inflation). 10 ILCS 5/9-8.5(b), (g).

14. In primary elections for nomination to the Illinois House of Representatives, political party committees are limited to contributing 15 times the amount that individuals may

contribute ($75,000 versus $5,000) and 1.5 times the amount that PACs may contribute ($75,000 versus $50,000) (subject to adjustments for inflation). 10 ILCS 5/9-8.5(b), (g).

      B.      **Legislative Caucus Committees**

           1.      **Generally**

15. The Act's definition of "political party committees" includes not only the state and county central committees of a political party and committees formed by parties' ward or township committeemen, but also "legislative caucus committees." 10 ILCS 5/9-1.8(c). Compl. ¶ 30; Ans. ¶ 30.

16. Because the Act defines them as political party committees, legislative caucus committees are not limited in the amounts they can contribute to candidates in general elections, and are subject to the same limits as traditional political party committees in primary elections. 10 ILCS 5/9-8.5(b). Compl. ¶¶ 30, 31; Ans. ¶¶ 30, 31.

17. A legislative caucus committee can only be established by the Speaker of the House of Representatives, the Senate President, the House Minority Leader, the Senate Minority Leader, five or more members of the same party in the Senate, or 10 or more members of the same party in the House. 10 ILCS 5/9-1.8(c). Compl. ¶ 31; Ans. ¶ 31.

18. The Act prohibits a candidate for the General Assembly from accepting contributions from more than one legislative caucus committee. 10 ILCS 5/9-1.8.5(b).

           2.      **The Speaker and Senate President's Legislative Caucus Committees**

19. The current Speaker of the Illinois House of Representatives, Michael J. Madigan, chairs a legislative caucus committee, Democratic Majority, as well as the Democratic Party of Illinois, and serves as treasurer of his own candidate committee, Friends of Michael J. Madigan. Exhibit A, Illinois State Board of Elections report.

20. The current Senate President, John Cullerton, chairs a legislative caucus committee, the Senate Democratic Victory Fund, and also has a candidate committee, Citizens for John Cullerton for State Senate. Exh. A, Illinois State Board of Elections report.

### 3. Legislative Leaders Can Circumvent Limits Using Legislative Caucus Committees

21. During the 2012 general election cycle, Senate President John Cullerton's candidate committee, Citizens for John Cullerton, contributed $41,000 to the Dan Kotowski for State Senate campaign committee. Citizens for John Cullerton also contributed $850,000 to Cullerton's legislative caucus committee, the Senate Democratic Victory Fund, which in turn contributed $229,339.99 to Dan Kotowski's campaign committee. Exhibit B, Illinois State Board of Elections contribution reports. Thus, Senator Cullerton was able to direct 5.4 times the amount to Kotowski that he could have given through his candidate committee alone and 2.7 times the amount that he could have given through his candidate committee and an ordinary PAC.

### 4. Powers of the Speaker of the House and Senate President

22. The Speaker of the Illinois House of Representatives has the power to, among other things, appoint and remove House majority members from leadership positions; select the Chairpersons, Co-Chairpersons, and Vice Chairpersons of all House committees; select the members of his party who will serve on all House committees; select and remove members of the House Rules Committee; determine the number of majority and minority caucus members assigned to each House committee, with limited exceptions; and establish new special committees. Exhibit C, Illinois House Rules 3, 4(c)(13), (14), 13, 15.

23. The committee Chairpersons the Speaker appoints have the power to, among other things, call meetings of that committee, subject to the Speaker's approval; designate which

5

bills and resolutions their respective committees will take up and the order in which they will be taken up; to create subcommittees; and to appoint majority-party members of subcommittees. Exh. C, Illinois House Rules 10(c), (e), 14.

24.     The Senate President has the power to, among other things, appoint and remove House majority members from leadership positions; select the Chairpersons, Co-Chairpersons, and Vice Chairpersons of all Senate committees; select the members of his party who will serve on all Senate committees; determine the number of majority and minority caucus members assigned to each Senate committee, with limited exceptions; and establish new special committees. Exhibit D, Illinois Senate Rules 2-5(c)(13), (14), (d), 3-1(b), 3-2, 3.3(a).

25.     The committee Chairpersons the Senate President appoints have the power to, among other things, call meetings of that committee, subject to the President's approval; and designate which bills and resolutions their respective committees will take up and the order in which they will be taken up.. Exh. D, Illinois Senate Rules 3-1(c), (e).

## II.     Plaintiffs' Injuries

### A.     Injury to Illinois Liberty PAC

26.     But for the Act's limits on the amounts PACs may contribute to candidates, Illinois Liberty PAC would seek to make and would make contributions to candidates that exceed the Act's current limits. Exhibit E, Declaration of Matthew Besler ¶ 4.

27.     But for the Act's limits on the amounts donors can contribute to PACs, Illinois Liberty PAC would solicit contributions that exceed the Act's current limits. Exh. E, Decl. of Matthew Besler ¶ 5.

28. The Act's contribution limits prevent Illinois Liberty PAC from directing its contributions to candidates in a manner that best advances its principles and strategic purpose. Exh. E, Decl. of Matthew Besler ¶ 6.

29. But for the contribution limits in the Act, Illinois Liberty PAC would have the freedom to direct its in-kind and monetary contributions in a manner that best advances its principles and strategic purpose, just as legislative caucus committees are allowed to do. Exh. E, Decl. of Matthew Besler ¶ 7.

**B.  Injury to Edgar Bachrach**

30. During the 2012 election cycle, Edgar Bachrach contributed the maximum amounts allowable to a state senate candidate's committee ($5,000 to Citizens for Babcock) and to a political action committee ($10,000 to Illinois Liberty PAC). Exhibit F, Deposition of Edgar Bachrach ("Bachrach Dep.") 26:2-20.

31. But for the Act's contribution limits, Bachrach would have contributed amounts exceeding the Act's limits to Citizens for Babcock and Illinois Liberty PAC in the 2012 election cycle. Exh. F, Bachrach Dep. 26:21-24, 27:4-6.

32. During the 2014 election cycle, Edgar Bachrach contributed $5,000 to a candidate for state representative, Jeanne Ives, and $10,500 to Illinois Liberty PAC. Exh. F, Bachrach Dep. 27:21-28:5, 43:19-44:3, Exhibit 7 at 1.

33. But for the Act's contribution limits, Bachrach would have contributed amounts exceeding the Act's limits to Jeanne Ives's candidate committee and to Illinois Liberty PAC in the 2014 election cycle. Exh. F, Bachrach Dep. 27:21-28:5, 43:19-44:3, Exhibit 7 at 1.

### C. Injury to Kyle McCarter

34. But for the Act's limits on the amounts of contributions candidates may receive from individuals, corporations, labor organizations, associations, and PACs, Sen. Kyle McCarter would seek to raise funds and accept contributions in excess of what the Act allows. Exhibit G, Deposition of Kyle McCarter 63:13-22.

### III. Facts from Plaintiffs' Expert, Marcus Osborn

35. Majority-party caucus leaders in a legislature can use organizational rewards and punishments to enforce policy-making discipline and prevent challenges to their leadership status by other members of their political party. Exhibit H, Report at 3.

36. In general, scholars consider political party committees, which attempt to maximize the number of party members in elected position, to be a counterbalance to the influence of interest groups, which make contributions designed to maximize the influence of their specific interest group. Exh. H, Report at 4.

37. It is generally understood that political party committees pursue "access" strategies while parties typically pursue an "electoral" strategy. Exh. H, Report at 4.

38. The design of legislative caucus committees makes them operate like PACs – or "Leadership PACs" – because they are focused on the betterment of their organizers, not only the benefit of party. Exh. H, Report at 4.

39. Where parties tend to serve as a "mitigation tool against the concentration of interest group influence" because they draw contributions from "other contributions from citizens and other groups," legislative caucus committees do not. Exh. H, Report at 4.

40. Legislative caucus committees "operate more like Leadership PACs than political party committees because they are designed not only to support the needs of the Caucus but they

provide individualized benefits to the Speaker of the House and Senate President." Exh. H, Report at 4.

      41.     A Leadership PAC, according to the scholarly literature, is a political action committee that is established by a legislator to raise funds for other legislators. Exh. H, Report at 4-5.

      42.     One of the purposes of the Leadership PACs is to create tools for a leader to generate support for his or her own candidacy as a legislative leader. Exh. H, Report at 5.

      43.     Academic literature indicates that "Leadership PACs" use contribution strategies that serve two goals: (1) the "Type I" goal of expanding the size of the party's caucus in the legislature and (2) the "Type II" goal of increasing the leader's influence over existing legislators or to enhance support for his or her own election as a legislative leader. Exh. H, Report at 5.

      44.     "Type II" contributions are designed primarily to benefit the leader personally or policies the leader follows and are therefore similar to private-sector PACs' contributions attempting to gain influence through a contribution strategy. Exh. H, Report at 5.

      45.     "Legislators who are able to direct campaign funds to legislators can utilize those funds to curry favor with recipient legislators which will increase [the recipients'] willingness to support the contributors' efforts to lead the Caucus." Exh. H, Report at 5.

      46.     "The ability to raise campaign contributions for other legislators helps to solidify [a leader's] base." Exh. H, Report at 5.

      47.     By making the Speaker of the House, Senate President, and the respective Minority Leaders the managers of legislative caucus committees, the Act has given these legislative leaders the ability to operate a de facto Leadership PAC with fundraising advantages over ordinary PACs and the ability to exclusively finance campaigns. Exh. H, Report at 5.

48. Academic literature indicates that Leadership PACs are likely to focus on caucus expansion when control over the legislature is in doubt. Exh. H, Report at 5.

49. With Democrats having overwhelming majorities in both the House and Senate, the likelihood that Democrats will lose their majority status appears to be slim. Exh. H, Report at 5.

50. If the House Speaker and Senate President's respective legislative caucus committees were exclusively attempting to maximize the size of their party's caucus, consistent with the strategy one would expect to see from a political party committee, their "contribution patterns should be heavily focused in the General Elections," particularly "elections that are electorally close." Exh. H, Report at 5.

51. Legislative caucus committee contributions in primary elections and contributions to candidates with larger margins of victory indicate a design "to improve the Legislative influence of the Caucus Committee organizers." Exh. H, Report at 5.

52. "Contributions [by legislative caucus committees] to heavily favored candidates or to candidates in the Primaries are contributions strategies that are designed to curry favor with candidates/legislators to support the organizational positions of the Speaker of [the] House and Senate President." Exh. H, Report at 5.

53. Examining the largest contributions of House and Senate caucus committees highlights the political priorities of the respective committees and is helpful in determining whether a caucus committee is engaged in contributions strategies exclusively designed to expand the party's caucus in the legislature. Exh. H, Report at 6.

54. Contributions made in close general elections are indicative of a caucus-expansion strategy, while contributions to electorally safe seats or in primary elections "are

reflective of a strategy designed to enhance the Legislative influence of the Caucus Committee operators." Exh. H, Report at 6.

55. Dr. Osborn examined the largest contributions of the legislative caucus committees respectively controlled by the Senate President and Speaker of the House, the Democratic Victory Fund and Democratic Majority committees. Exh. H, Report at 6.

56. Dr. Osborn examined the expenditures of the Democratic legislative caucus committees "because they maintain a legislative majority and they have operational authority over each body." Exh. H, Report at 6.

57. The largest contributions by the Democratic Victory Fund were "almost exclusively" in the general election, which "appear[s] to be reflective of a caucus expansion strategy but in an environment that was generally not competitive," based on the margins of victory greater than five percent in four of the six elections with the largest contributions. Exh. H, Report at 6.

58. The largest contributions made by the Democratic Majority committee operated by the Speaker of the House "are not consistent with an exclusive party maximization strategy. Exh. H, Report at 7.

59. The Democratic Majority committee "participated financially in 52 Primary Election contests and contributed amounts ranging from as low as $371 to [as] high as $67,777." Exh. H, Report at 6.

60. "Examples of aggressive primary participation" include a $67,777 contribution House candidate Sue Scherer, who won her primary by a margin of 1.18%, and a $60,604 contribution to House candidate Maria Berrios, who won her primary by a margin of 1.58%. Exh. H, Report at 6-7.

11

61. The "slim margin of victory in [the Scherer and Berrios primaries] suggests that the contributions by the Democrat[ic] Majority Committee impacted the outcome of these close Primary elections." Exh. H, Report at 6.

62. Scherer and Berrios did not "face tough elections after the Primary, as both candidates won their General Election contest[s] by more than 20%," which demonstrates that the seats were "safe Democratic seats as the real competition was in the primary." Exh. H, Report at 6-7.

63. Accordingly, "[t]he pattern of Primary Election contributions appeared to be designed to shape the Democrat Caucus in competitive Primary Elections and these contributions are not consistent with an exclusive party maximization strategy." Exh. H, Report at 7.

64. "[T]he ability to create Caucus Committees is valuable" to legislative leaders "[a]s individual political actors" because "it provides these legislators with the capacity to reward or punish members of their own caucus in furtherance of their individual goals," using their ability to provide unlimited funds in a general election and sizable contributions in a primary elections as "both a huge carrot and large hammer of organizational control." Exh. H, Report at 9.

65. The Act's "exclusivity provision," which allows a candidate to only accept contributions from one legislative caucus committee, enhances the power of the Speaker of the House and the Senate President by crowding out other competing Caucus Committees." Exh. H, Report at 9.

66. "[A] legislator who wants to challenge the Speaker or President for organizational leadership will not only have to convince their colleagues that they can do a better job as a leader

but [also] must overcome the enormous fundraising advantages the leaders are empowered with." Exh. H, Report at 9.

67. Because of their organizational power, the House Speaker and Senate President "are well-positioned to solicit funds from organized interests with business at the Capitol." Exh. H, Report at 8-9.

68. Legislative caucus committees controlled by the legislative leaders "create an elevated risk for corruption because the leaders have the caucus committees have both policymaking authority and the ability to influence elections." Exh. H, Report at 10.

69. Unlike traditional political party committees, "Legislative Caucus Committees tie policymaking and fundraising together in close proximity," which "make[s] them more susceptible to interest group influence and capture." Exh. H, Report at 10.

70. Donors to the Senate Democratic Victory fund and Democratic Majority legislative caucus committees "come from a concentrated group of special interests with heavy contributions generated by PACs associated with organized labor and business trade associations," which is "not surprising given that the leaders of these Caucus Committees are the same individuals who have institutional authority over the legislative process." Exh. H, Report at 10. In contrast, one would expect to see "a broad-cross section of donors" to political parties. Exh. H, Report at 10.

71. The Act also allows legislators to create legislative caucus committees "organized around standing committees," which could "solicit funds from impacted interest groups that have a particular interest in supporting members of [a] specific legislative committee." Exh. H, Report at 10.

72. A legislative caucus committee organized around "key legislative standing committees" could be "utilized to solicit funds from the interests lobbying each committee," which could "then be used to fund the campaigns of other Caucus members who support the legislation being championed by the committee-oriented Legislative Caucus Committee." Exh. H, Report at 11. In this way, the caucus committees would further "instituionallytie[] legislative decision making with fundraising." Exh. H, Report at 11.

73. "The ability of legislators to create Legislative Caucus Committees appears to be specifically designed to enhance these relationships [between committees and the interest groups they affect] by providing a systematic means for the legislative committee members to raise funds from the very stakeholders most impacted by their policy decisions." Exh. H, Report at 11.

74. The establishment of legislative caucus committees based around standing committees "can expand influence vertically within the Caucus from the Speaker of the House and the Senate President down to their team of appointed legislative committee chairs," creating "additional fundraising opportunities through additional Caucus Committees to solicit funds from impacted interest groups that have a particular interest in supporting members of a specific legislative committee." Exh. H, Report at 10.

75. "[I]n designing this system, the Legislature failed to enact even the most basic protections against tying to contributions to the policymaking by authorizing contributions to these committees even during legislative deliberations" – that is, it did not prohibit contributions during the legislative session. It restricted fundraising in Sangamon County, where the state capital is, during the legislative session, but not elsewhere, providing "scant protection against the potential for influence peddling" because legislators could simply raise funds outside of Sangamon County. Exh. H, Report at 11-12.

76. On August 17, 2012, SEIU Healthcare IL PAC contributed $47,000 and SEIU Illinois Council PAC Fund contributed $50,000 to the Democratic Majority legislative caucus committee, which corresponded to the convening of a special legislative session on pension reform. Exh. H, Report at 11, Appendix 2.

77. The proximity of the two SEIU PAC contributions to Democratic Majority to legislative action on pensions highlights one of the problems with legislative caucus committees and a heightened appearance of corruption. Exh. H, Report at 11.

Dated: December 12, 2014

                                          Respectfully submitted,

                                          /s/ Jacob H. Huebert
                                          Jacob H. Huebert (#6305339)
                                          Jeffrey M. Schwab (#6290710)
                                          Attorneys for Plaintiffs

LIBERTY JUSTICE CENTER
190 S. LaSalle Street, Suite 1500
Chicago, Illinois 60603
(312) 263-7668

**<u>CERTIFICATE OF SERVICE</u>**

I, Jacob H. Huebert, an attorney, hereby certify that on December 12, 2014, I served Plaintiffs' Statement of Material Facts in Support of Their Motion for Summary Judgment on Defendants' counsel by filing it through the Court's electronic case filing system.

<u>/s/ Jacob H. Huebert</u>