**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ILLINOIS LIBERTY PAC, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Judge Gary Feinerman** |
| | ) | |
| **v.** | ) | **No. 12 CV 5811** |
| | ) | |
| **LISA M. MADIGAN, Attorney General** | ) | |
| **of the State of Illinois, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

I.    Facts   .......................................................................................................... 1

II.   Procedural History ................................................................................... 1

SUMMARY JUDGMENT STANDARD ........................................................................... 3

ARGUMENT ..................................................................................................................... 3

I.    The First Amendment prohibits restrictions on speech, including campaign
contribution limits, that arbitrarily favor some speakers over others. ................................ 4

II.   Defendants must show that the Act's contribution limits are narrowly tailored
to prevent quid pro quo corruption. .................................................................................... 5

III.  The Act's limits that discriminate in favor of legislative caucus committees
and against PACs and other political speakers are not narrowly tailored to prevent
corruption.   .................................................................................................... 6

      A.    By giving legislative leaders the right to make unlimited contributions
           through legislative caucus committees while others are limited, the Act
           allows and encourages quid pro quo corruption and its appearance. ...................... 6

            1.    Legislative leaders can use caucus committees to serve their
                 personal interests. ........................................................................ 6

            2.    Legislative caucus committee contributions have the same potential
                 to corrupt as PAC contributions. ................................................. 7

            3.    The Act's inconsistent treatment of legislative caucus committees
                 and PACs is not narrowly tailored to prevent corruption. ......................... 8

            2.    Dr. Osborn's lack of prior experience with Illinois' election system
                 does not disqualify him as an expert. .......................................... 8

B.      Legislative caucus committees are not comparable to other party
        committees. ........................................................................................... 9

C.      It is not necessary or ordinary for states to give legislative caucus
        committees such disproportionate favorable treatment. ...................................... 11

D.      The report of Plaintiffs' expert, Marcus Osborn, further shows that
        legislative caucus committees are similar to PACs and that the Act's
        discriminatory limits are not narrowly tailored to prevent corruption................. 13

CONCLUSION ......................................................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................... 3

*Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729 (2011) ............................................ 6

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................ 3

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) .................................. 4

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) .......................................................... 5

*Fla. Star v. B.J.F.*, 491 U.S. 524 (1989) ............................................................. 5

*McCutcheon v. FEC*, 134 S. Ct. 1434 (2014) ......................................................... 4, 5

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002) ..................................... 6, 8, 9

*Wis. Right to Life State PAC v. Barland*, 664 F.3d 139 (7th Cir. 2011) ......................... 5

## Illinois State Statutes

10 Ill. Comp. Stat. 5/9-1.8 ............................................................................... 7

10 Ill. Comp. Stat. 5/9-8.5 ......................................................................... 7, 8, 10

10 Ill. Comp. Stat. 5/7-8 ................................................................................ 9

## Other State Statutes and Constitutions

Ala. Code § 17-5-2 ...................................................................................... 12

Alaska Stat. § 15.13.070 ............................................................................... 12

Alaska Stat. § 15.80.010 ............................................................................... 12

Ark. Code Ann. § 7-6-203 ............................................................................. 12

Cal. Gov't Code § 85301 ............................................................................................ 12

Cal. Gov't Code § 85205 ............................................................................................ 12

Conn. Gen. Stat. § 9-611 ............................................................................................ 12

Fla. Stat. § 106.08 ...................................................................................................... 12

Mich. Comp. Laws. § 169.252 .................................................................................... 13

Ga. Code Ann. § 21-5-41 ............................................................................................ 12

Haw. Rev. Stat. § 11-302 ............................................................................................ 12

Haw. Rev. Stat. § 11-357 ............................................................................................ 12

Idaho Code Ann. § 67-6610A ...................................................................................... 12

Ind. Code § 3-9-2 ........................................................................................................ 12

Iowa Code § 68A ........................................................................................................ 12

Ky. Rev. Stat. Ann. § 121 ............................................................................................ 12

Kan. Stat. Ann. § 25-4143 .......................................................................................... 12

Kan. Stat. Ann. § 25-4153 .......................................................................................... 12

Me. Rev. Stat. Ann. tit. 21-A, § 1015 ........................................................................ 12

Minn. Stat. § 10A.01 .................................................................................................. 12

Minn. Stat. § 10A.27 .................................................................................................. 12

Miss. Code Ann. § 23-15-1 ........................................................................................ 12

Miss. Code Ann. § 97-13-15 ...................................................................................... 12

Mo. Rev. Stat. § 130.011 ............................................................................................ 12

Mont. Code Ann. § 13-1-101 ............................................................................. 13

Mont. Code Ann. § 13-37-216 ........................................................................... 13

N.C. Gen. Stat. § 163-278.13 ............................................................................ 12

N.D. Cent. Code § 16.1-08.1-03.5 .................................................................... 12

N.H. Rev. Stat. Ann. § 664:4 ............................................................................ 12

N.J. Stat. Ann. § 19:44A-11.3 (West) .............................................................. 13

N.J. Admin. Code § 19:25-1.1 .......................................................................... 13

N.M. Stat. § 1-19-34.7 ...................................................................................... 12

Neb. Rev. Stat. § 32 .......................................................................................... 12

Nev. Const. art. II, § 10 .................................................................................... 12

Nev. Rev. Stat. § 294A.100 .............................................................................. 12

Ohio Rev. Code Ann. § 3517.102 ..................................................................... 12

Or. Rev. Stat. § 260.......................................................................................... 12

25 Pa. Cons. Stat. Ann. § 3253 ........................................................................ 12

S.C. Code Ann. § 8-13-1314 ............................................................................ 12

S.D. Codified Laws § 12-27-8 .......................................................................... 12

Tenn. Code Ann. § 2-10-302 ............................................................................ 13

Tenn. Code Ann. § 2-10-306 ............................................................................ 13

Tex. Elec. Code Ann. § 253 .............................................................................. 12

Va. Code Ann. § 24.2-945 ................................................................................ 12

v

W. Va. Code § 3-8-12 ................................................................................................ 12

Wash. Rev. Code § 42.17A.405 .............................................................................. 12

Wash. Admin. Code § 390-05-400 ......................................................................... 12

Wis. Stat. § 11.26 ................................................................................................. 12-13

## INTRODUCTION

The First Amendment prohibits the government from using campaign contribution limits to favor some political speakers over others. That, however, is exactly what Illinois has done by enacting a campaign finance "reform" law that allows legislative leaders to give unlimited amounts to the candidates they favor through legislative caucus committees while restricting the amounts that competitors – including political action committees ("PACs") such as Plaintiff Illinois Liberty PAC and individual donors such as Plaintiff Edgar Bachrach – can give to the candidates they favor. Because this difference in treatment is not narrowly tailored to serve the State's interest in preventing corruption or the appearance of corruption, this Court should grant summary judgment in favor of Plaintiffs as a matter of law on their First Amendment claim and strike down the discriminatory limits.

## BACKGROUND

### I. Facts

Plaintiffs have submitted their statement of material facts separately in accordance with Local Rule 56.1(a).

### II. Procedural History

Plaintiffs Illinois Liberty PAC and Edgar Bachrach's first amended complaint in this action (Doc. 27) alleged that the scheme of campaign contribution limits in the Illinois Disclosure and Regulation of Campaign Contribution and Expenditures Act (the "Act") violates their First Amendment right to free speech and their Fourteenth Amendment right to equal protection. They alleged that the Act violates their right to equal protection because it imposes lower contribution limits on them than on similarly situated political parties, which, in general elections, face no limits at all. (Doc. 27, ¶¶ 41-42.) Bachrach also alleged that the Act violated

his right to equal protection by allowing him to contribute only half the amounts that corporations, labor unions, and associations may contribute to candidates, PACs, and parties. (*Id.* ¶¶ 43-44.) Illinois Liberty PAC and Bachrach also argued that the Act's limits violated the First Amendment because they were not narrowly tailored or closely drawn to serve a compelling or important government interest. Specifically, they alleged that the Act's removal of all limits in races where independent expenditures or a candidate's self-funding exceed certain amounts wrongfully made their own right to speak contingent upon the speech of others, and that the Act's lifting of limits under those circumstances, along with the other constitutional defects, demonstrated that the Act's limits do not serve an anticorruption purpose but instead serve the impermissible purpose of favoring political parties and their leaders over Plaintiffs and all other political speakers. (*Id.* ¶¶ 62-64.)

This Court denied Plaintiffs' motion for preliminary injunction seeking to enjoin enforcement of the Act's limits before the 2012 election. (Doc. 44, Memorandum Opinion and Order.)

Plaintiffs then filed a second amended complaint (Doc. 65) with an additional plaintiff, state senator Kyle McCarter. The second amended complaint alleges that the Act's scheme of limits fails to serve an anticorruption purpose (or is not narrowly tailored to do so) and thus violates the First Amendment because it: (1) shows favoritism to legislative leaders by authorizing legislative caucus committees and by allowing political party committees to make unlimited contributions to candidates; (2) tethers Plaintiffs' free-speech rights to the speech of others by removing limits only when independent expenditures or a candidate's funding exceed certain amounts in a race; (3) discriminates against individual contributors by allowing them to contribute only half the amounts that corporations, labor unions, and other associations may

contribute to candidates, PACs, and parties; (4) creates opportunities for political parties and legislative leaders, through legislative caucus committees, to circumvent the Act's limits. (Doc. 65, Second Am. Compl. ¶¶ 47-71.)

The Court granted Defendants' motion to dismiss Plaintiffs' second amended complaint with respect to all facets of Plaintiffs' First Amendment claim except for "Plaintiffs' challenge to the Act's treatment of legislative caucus committees." (Doc. 96, Memorandum Opinion and Order at 6-9.) The parties engaged in limited discovery related to that narrow issue. (*See* Doc. 97, Initial Status Report.) Discovery included Plaintiffs' disclosure of an expert witness, Dr. Marcus Osborn, whom Defendants have deposed and moved to exclude. (Doc. 116.) In accordance with the Court's instructions, this memorandum separates the portion of Plaintiffs' argument that relies on Dr. Osborn's testimony so the Court can consider the merits of Plaintiffs' claim with and without it.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no disputed issues of material fact and the moving party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). The Court must view the evidence and draw inferences in the light most favorable to the nonmoving party, but, to defeat a motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## ARGUMENT

**I.     The First Amendment prohibits restrictions on speech, including campaign contribution limits, that arbitrarily favor some speakers over others.**

"Premised on mistrust of governmental power, the First Amendment stands against . . . restrictions distinguishing among different speakers, allowing speech by some but not others."

*Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (citing *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784 (1978)). "Speech restrictions based on the identity of the speaker are all too often simply a means to control content." *Id.* In particular, the First Amendment prohibits government attempts to control the "relative ability of individuals and groups to influence the outcome of elections." *Id.* at 350.

These principles apply to limits on campaign contributions, which affect the First Amendment rights to political expression and political association. *McCutcheon v. FEC*, 134 S.Ct. 1434, 1448 (2014) (citing *Buckley v. Valeo*, 424 U.S. 1, 15, 21-22 (1976)). Accordingly, the government "may not regulate contributions simply to . . . restrict the political participation of some in order to enhance the relative influence of others." *Id.* at 1441. As the Supreme Court recently emphasized, "those who govern should be the *last* people to help decide who *should* govern." *Id.* at 1441-42.

## II.  Defendants must show that the Act's contribution limits are narrowly tailored to prevent quid pro quo corruption or its appearance.

The Supreme Court has recently emphasized that limits on campaign contributions must receive rigorous scrutiny because they affect a fundamental right. *McCutcheon*, 134 S.Ct. at 1441. Under *Buckley v. Valeo*, limits on campaign contributions violate the First Amendment unless the government can show that they are closely drawn to serve a sufficiently important interest. *Wisconsin Right to Life State PAC v. Barland*, 664 F.3d 139, 152 (7th Cir. 2011) (citing, inter alia, *Buckley*, 424 U.S. at 20-21, 23-25).[1] Under that test, as under strict scrutiny, the Court

---

[1]  Plaintiffs maintain that the contribution limits they challenge should be subject to strict scrutiny both because they place a special and substantial burden on their rights and because the Supreme Court erred in applying less-than-strict scrutiny to campaign contribution limits in *Buckley.* (See Doc. 87, Plaintiffs' Response to Defendants' Motion to Dismiss at 6.) This Court, however, has ruled that Buckley's standard applies in this case and noted that Plaintiffs have preserved the issue for appellate review. (Doc. 96, Memorandum Opinion and Order at 4-5)

"must assess the fit between the stated governmental objective and the means selected to achieve that objective." *McCutcheon*, 134 S.Ct. at 1445. Although the fit need not be "perfect," it must be "reasonable" and must use a "means narrowly tailored to achieve the desired objective." *Id.* at 1456-57.

The only interest that is sufficiently important to justify campaign contribution limits is preventing quid pro quo corruption or its appearance. *McCutcheon*, 134 S.Ct. at 1441. Accordingly, the Act's limits that discriminate in favor of legislative caucus committees and against PACs can only survive if Defendants meet their burden to show that the limits are narrowly tailored to limit corruption or the appearance of corruption.

An exemption from restrictions on speech – even from restrictions that are "otherwise permissible" – can "diminish the credibility of the government's rationale for restricting speech in the first place" and demonstrate that the restrictions are not narrowly tailored to serve a sufficiently important governmental interest. *City of Ladue*, *v. Gilleo*, 512 U.S. 43, 52 (1994). "[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon . . . speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Florida Star v. B.J.F.*, 491 U.S. 524, 541-42 (1989) (Scalia, J., conurring) (internal marks and citations omitted). Thus, for example, in *Republican Party of Minnesota v. White*, the Supreme Court held that a rule that prevented judicial candidates from stating their views on legal issues during their campaigns, supposedly for the purpose of keeping them open-minded, was fatally underinclusive because candidates could still state their views on those issues immediately before announcing their candidacies, which could just as easily affect their open-mindedness when deciding cases. 536 U.S. 765, 779-80 (2002). Similarly, in *Brown v. Entertainment Merchants Ass'n*, the Court held that a law restricting the sale of violent video

5

games to minors was underinclusive because some minors could nonetheless acquire the games lawfully and all minors still had unlimited access to other media that could have the same effects, such as "Saturday morning cartoons, . . . games for young children, [and] . . . pictures of guns." 131 S.Ct. 2729, 2740 (2011).

Accordingly, if the Act arbitrarily exempts certain contributions from its limits, it is underinclusive and therefore not narrowly tailored to prevent corruption.

### III. The Act's limits that discriminate in favor of legislative caucus committees and against PACs and other political speakers are not narrowly tailored to serve an anti-corruption interest.

#### A. By giving legislative leaders the right to make unlimited contributions through legislative caucus committees while others are limited, the Act allows and encourages quid pro quo corruption and its appearance.

By giving legislative caucus committees no limits in general elections, higher limits than other political speakers in primary elections, and other special privileges, the Act allows and encourages contributions that could give rise to actual or apparent quid pro quo corruption. As a result, the Act is underinclusive, is not narrowly tailored to prevent corruption, and violates the First Amendment

##### 1. Legislative leaders can use caucus committees to serve their personal interests.

Legislative leaders can use legislative caucus committees to serve their personal interests. The Act defines "legislative caucus committees" to include four committees respectively established by the four legislative leaders: the Speaker of the House, the Senate President, and the two minority leaders. 10 ILCS 5/9-1.8(c). The Act only requires that legislative leaders establish the committee "for the purpose of electing candidates to the General Assembly"; it does not require them to use their respective caucus committees to advance their political party's

6

interests rather than their own personal interests.[2] *Id.* Accordingly, legislative leaders can use their caucus committees to advance their personal interests in keeping their leadership positions and promoting their own policy agenda among their fellow legislators.

> **2.** **Legislative caucus committee contributions have the same potential to corrupt as PAC contributions.**

Because legislative leaders can use their caucus committees to serve their personal interests rather than party interests alone, there is no reason to believe that contributions from those committees pose any less threat of actual or apparent corruption than contributions from a PAC controlled by a legislator. A legislative leader donating money through his or her legislative caucus committee can make quid pro quo demands on a candidate to whom he or she donates, just as an ordinary PAC can. For example, a legislative leader could contribute to a legislator's campaign committee in exchange for that legislator's vote on a bill, or in exchange for the legislator's promise to continue to vote for the leader to remain the leader.

Indeed, the State of Illinois considers PACs controlled by legislators to pose a threat of corruption when they give to candidates: a PAC formed by an ordinary Illinois legislator is subject to the same $50,000[3] contribution limit as any other PAC; there is no exception to the usual limits for legislator-controlled PACs. *See* 10 ILCS 5/9-1.8(d), 5/9-8.5(b). Illinois law also assumes that contributions from one legislator's candidate committee to another's candidate committee pose the same threat of corruption as a PAC's contributions to a candidate because those are limited to $50,000 as well. 10 ILCS 5/9-8.5(b).

---

[2] Indeed, Illinois law imposes very few requirements specific to legislative caucus committees. It appears to recognize them only for the purpose of giving them more favorable treatment than other committees, not to impose any particular responsibilities on them.
[3] For simplicity, all contribution limits are stated as the amounts stated in the Act, unadjusted for inflation.

### 3. The Act's inconsistent treatment of legislative caucus committees and PACs is not narrowly tailored to prevent corruption.

Thus, in general, the Act considers contributions from a committee controlled by a legislator to another candidate's committee to be potentially corrupting to the same extent as any PAC's contributions, such that they must be limited to $50,000 per election cycle. But the Act inexplicably makes an exception for contributions that a legislator makes through a legislative caucus committee, treating them as though they have *no* potential to corrupt.

The Act's inconsistent treatment of legislator-to-candidate contributions makes its limits so "woefully underinclusive as to render" the notion that is has been narrowly tailored to prevent corruption "a challenge to the credulous." *Republican Party of Minn.*, 536 U.S. at 780. There is no reason to believe that a candidate who would be (actually or apparently) corrupted by contributions exceeding $50,000 from a legislative leader's candidate committee and/or PAC would not be corrupted to the same extent by contributions exceeding $50,000 from a legislative leader's caucus committee. Regardless of which committee gives the contribution, the recipient knows who is responsible for it: the legislative leader. And regardless of which committee gives the contribution, the legislative leader is in the same position to make a quid pro quo demand from the recipient.

Legislative leaders can use the Act to circumvent the limits they would face if they could only contribute through their candidate committees and an ordinary PAC. For example, in the 2012 general election cycle, Senate President John Cullerton's candidate committee, Citizens for John Cullerton, gave $41,000 to the Dan Kotowski for State Senate campaign committee and also gave $850,000 to Cullerton's legislative caucus committee, the Senate Democratic Victory Fund, which, in turn, gave $229,339.99 to the Kotowski campaign committee. (Statement of Facts ("SOF") ¶¶ 21.) Thus, Senator Cullerton was able to direct 5.4 times the amount to

Kotowski that he could have given through his candidate committee alone and 2.7 times the amount that he could have given through his candidate committee and an ordinary PAC. (*Id.*)

Thus, because the Act's discriminatory limits are underinclusive and not narrowly tailored, they fail First Amendment scrutiny.

### B.    Legislative caucus committees are different from other party committees.

As discussed above, legislative caucus committees, unlike political party committees, inherently give one individual the ability to use campaign contributions to pursue his or her personal interests. Legislative caucus committees thus more closely resemble PACs than parties because they can be used to pursue a leader's own interests rather than party interests. Accordingly, even if the Act is justified in allowing traditional political party committees to make unlimited contributions while others are restricted, as this Court has ruled, it does not follow that it is proper for the Act to similarly favor legislative caucus committees simply because it has labeled them "party committees."

Unlike the leaders' legislative caucus committees, the State and county central committees of a political party are not established or controlled by any one person; on the contrary, the law requires that those committees consist of a body of many elected members. *See* 10 ILCS 5/7-8(a), (d). Accordingly, there is no inherent reason why State and county central committees would pursue any given individual's personal interest rather than the party's broader interests.[4] The Act does allow ward and township committeemen to create their own party committees as well, but there is no reason to believe those committeemen, at the bottom of the

---

[4] It is not impossible that a traditional political party committee would be heavily influenced or controlled by one person, however, and Plaintiffs have argued that House Speaker Michael Madigan uses the Democratic Party of Illinois to advance his own interests. (*See* Second Am. Compl. ¶ 37.) Plaintiffs of course intend to preserve their argument that the Act's discrimination in favor of other party committees also violates the First Amendment along with the other dismissed facets of their First Amendment claim.

party hierarchy and representing a small geographical area, are in a position to raise funds and thus to exert influence over legislative candidates on a scale that is comparable to what the legislative leaders can do.

Another difference between legislative caucus committees and other state party committees is that a General Assembly candidate who receives a contribution from a legislative caucus committee is prohibited from accepting contributions from any other caucus committee during the same cycle. 10 ILCS 5/9-8.5(b). The Act places no comparable restriction on a candidate's ability to receive contributions from multiple traditional political party committees (such as different state, county, and ward committees). The exclusivity provision serves no apparent purpose except to "lock in" a candidate to depend upon the first caucus committee that gives him or her money and to make it difficult for new legislative caucus committees to arise and compete. If, in the middle of an election cycle, a candidate who has taken money from a leader's caucus committee decides that he or she no longer wants to support the leader's agenda, the candidate cannot turn to another legislative caucus committee for support. The candidate could of course seek support from other types of committees, but the Act limits how much other committees (except political parties) can give them. Accordingly, the Act gives legislative leaders the ability to use caucus committees to make legislators dependent on them for support, which in turn facilitates the making of quid pro quo demands on legislators, requiring that they obey the leader to avoid losing financial support not only from the leader's committee but from *any* legislative caucus committee. Thus, legislative caucus committees have a tool for engaging in corruption that traditional political parties lack.

Legislative caucus committees also differ from Congressional campaign committees in the federal system. No federal law places any Congressional campaign committee under the

control of one person, let alone under the control of the parties' leaders within the two Houses of Congress. Indeed, none of the four major Congressional campaign committees is currently chaired by the Speaker of the U.S. House of Representatives, the House Majority or Minority Leader, the Senate President, the President Pro Tempore of the Senate, or the Senate Majority or Minority Leader.[5] These committees are not the organizations of a particular person, as Illinois legislative leaders' caucus committees are by definition under the Act. Accordingly, there is no reason to expect Congressional campaign committees to pursue the personal interests of any particular legislator as there is with Illinois legislative caucus committees.

Thus, legislative caucus committees are not like actual political party committees and considerations that might warrant allowing the Act to treat other party committees more favorably than PACs and other non-party contributors do not warrant treating legislative caucus committees more favorably than those contributors. Again, legislative caucus committees more closely resemble PACs because they can be used to pursue a leader's own interests rather than party interests, and their contributions give rise to at least as much actual or apparent corruption. The Act's failure to account for these differences shows that it is not narrowly tailored to prevent corruption.

      **C.**     **It is not necessary or ordinary for states to give legislative caucus committees such disproportionate favorable treatment.**

Other states' election laws demonstrate that, while it is not uncommon for legislative leaders or their parties to have political committees focused on electing members of their chamber, it is not necessary or ordinary for states to treat legislative caucus committees the same

---

[5] *See* Democratic Congressional Campaign Committee, http://dccc.org/about/; Democratic Senatorial Campaign Committee, http://www.dscc.org/; National Republican Congressional Committee, http://nrcc.org/about/; National Republican Senatorial Committee, http://www.nrsc.org/About/.

as political parties or to treat them more favorably than PACs, let alone to give them the disproportionate favorable treatment that Illinois does.

In at least 26 states, the law subjects legislative caucus committees and PACs to the same contribution limits (or lack thereof). Ala. Code § 17-5-2; Alaska Stat. §§ 15.13.070, 15.80.010; Ark. Code Ann. § 7-6-203; Cal. Gov't Code §§ 85301, 85205; Fla. Stat. § 106.08; Ga. Code Ann. § 21-5-41; Haw. Rev. Stat. §§ 11-302, 11-357; Idaho Code Ann. § 67-6610A; Ind. Code § 3-9-2; Iowa Code Ann. § 68A; Me. Rev. Stat. Ann. tit. 21-A, § 1015; Miss. Code Ann. §§ 23-15-1, 97-13-15; Mo. Stat. Ann. § 130.011 et seq.; Neb. Rev. Stat. § 32; Nev. Const. Art. II § 10; Nev. Rev. Stat. § 294A.100; N.D. Cent. Code § 16.1-08.1-03.5 (restricting only contributions by corporations); N.H. Rev. Stat. Ann. § 664:4; N.M. Stat. § 1-19-34.7; N.C. Gen. Stat. Ann. § 163-278.13; Or. Rev. Stat. § 260; 25 Pa. Cons. Stat. Ann. § 3253; S.C. Code Ann. § 8-13-1314; S.D. Codified Laws § 12-27-8; Tex. Elec. Code Ann. § 253; Va. Code Ann. § 24.2-945 et seq.; W. Va. Code § 3-8-12. In most of the remaining states, legislative caucus committees are not given the disproportionately favorable treatment the Act gives them in Illinois. For example, in Connecticut, Kentucky, Minnesota, North Dakota, Ohio, Washington, and Wisconsin, legislative caucus committees have higher contribution limits than PACs, but, unlike Illinois legislative caucus committees, they are never unlimited in the amounts they can contribute. Conn. Gen. Stat. § 9-611 et seq.; Ky. Rev. Stat. Ann. § 121; Minn. Stat. §§ 10A.01, 10A.27; Ohio Rev. Code Ann. § 3517.102; Wash. Rev. Code § 42.17A.405; Wash. Admin. Code 390-05-400; Wis. Stat. Ann. § 11.26. In Tennessee, legislative caucus committees are further constrained because contributions to all committees of a political party (such as the Republican Party), including contributions to the legislative caucus committee, count toward the party's aggregate limit ($40,000 in a state senate race or $20,000 in a state house race). Tenn. Code Ann. § 2-10-

302, §2-10-306. In Montana, contributions to any political committee controlled by a legislative leader count toward the leader's personal limits on the amounts he can receive from others, preventing the sort of double-fundraising and double-giving that Illinois legislators can do through their candidate and legislative caucus committees. Mont. Code Ann. §§ 13-1-101, 13-37-216. In Kansas, legislative caucus committees are unlimited in their spending in a general election but must conform to the same limits as all other contributors in a primary election. Kan. Stat. Ann. §§ 25-4143, 25-4153. In Michigan, legislative caucus committees are unlimited except in contested primaries, where they are not allowed to make contributions at all – presumably because of the heightened risk of corruption, discussed above and in Plaintiffs' expert's testimony discussed below, from legislative leaders threatening to withhold funds from primary candidates who do not obey the leader. Mich. Comp. Laws § 169.252. The only state Plaintiffs have found that has contribution limits that discriminate in legislative caucus committees' favor as much as Illinois' limits do is New Jersey, which does not limit legislative caucus committee contributions in either primary or general elections. N.J. Stat. Ann. § 19:44A-11.3 (West); N.J. Admin. Code § 19:25-1.1.

Thus, the Act's treatment of legislative caucus committees is not necessary and is far from normal, casting further doubt on the State's claim that its limits are narrowly tailored to limit corruption.

> **D.** **The report of Plaintiffs' expert, Marcus Osborn, further shows that legislative caucus committees are similar to PACs and that the Act's discriminatory limits are not narrowly tailored to prevent corruption.**

The report of Plaintiffs' expert witness, Dr. Marcus Osborn, further shows that legislative caucus committees are similar to PACs and create similar opportunities for corruption and that the Act's discrimination between them is therefore unjustified.

As Dr. Osborn's report explains, political parties and PACs generally pursue different election strategies. Political parties seek to maximize the number of party members elected to office, while PACs pursue "access strategies," which are "designed to maximize the influence of [a PAC's] specific interest group." (SOF ¶ 37.) Parties tend to be a counterbalance to the influence of interest groups, which make contributions (through PACs) designed to maximize their own influence. (SOF ¶ 36.)

Leadership PACs in particular use contribution strategies that serve two goals: (1) the "Type I" goal of expanding the size of the party's caucus in the legislature and (2) the "Type II" goal of increasing the leader's influence over existing legislators or enhancing support for his or her own election as a legislative leader. (SOF ¶ 43.) "Type II" contributions are designed primarily to benefit the leader personally or policies the leader favors and are therefore similar to private-sector PACs' contributions attempting to gain influence through a contribution strategy. (SOF ¶ 44.)

The legislative caucus committees created by the Act "operate more like Leadership PACs than [like] political party committees because they are designed not only to support the needs of the Caucus" but also to "provide individualized benefits to the Speaker of the House and Senate President." (SOF ¶ 40.) Academic literature indicates that by directing Leadership PAC funds to legislators, legislative leaders can "curry favor with the recipient legislators which will increase [the recipients'] willingness to support the contributors' efforts to lead the Caucus" and thus "solidify [the leader's] base." (SOF ¶¶ 45-46.)

Dr. Osborn notes that Leadership PACs are – as one would logically expect – likely to focus on caucus expansion when control over the legislature is in doubt. (SOF ¶ 48.) After all, if the legislative leader's party loses power, then he or she loses power. Control over the legislature

14

is not in doubt in Illinois, however, where the Democrats have "overwhelming" majorities in both the House and Senate and the likelihood that the Democrats will lose their majority status therefore appears to be slim. (SOF ¶ 49.) Accordingly, it is more likely that legislative caucus committees would pursue "Type II" strategies.

Reviewing the largest contributions made by legislative caucus committees in the 2012 election cycle, Dr. Osborn observed that the contributions of at least the Democratic Majority were "not consistent with an exclusive party maximization strategy" – that is, not consistent with what one would expect to see with a committee solely concerned with expanding the party caucus rather than serving the legislative leader's own interests. (SOF ¶¶ 53-58.) Democratic Majority's contributions included "aggressive primary participation" including contributions of over $50,000 to House candidate Sue Scherer, who won her primary by a margin of just 1.18%, and Maria Berrios, who won her primary by a margin of 1.58%. (SOF ¶ 60.) Those slim margins of victory suggest that Democratic Majority's contributions "impacted the outcome of these close Primary elections." (SOF ¶ 61.) Following the primaries, Scherer and Berrios did not "face tough elections," as both won their general election races by more than 20 percent, which demonstrates that the seats were "safe Democratic seats as the real competition was in the primary." (SOF ¶ 62.) Accordingly, the pattern of primary election contributions "appeared to be designed to shape the Democrat[ic] Caucus," not to maximize the number of Democrats elected. (SOF ¶ 63.)

Dr. Osborn also observed that legislative caucus committees controlled by legislative leaders "created an elevated risk for corruption" because the legislative leaders "have both policymaking authority and the ability to influence elections." (SOF ¶ 68.) Unlike traditional political parties, legislative caucus committees "tie policymaking and fundraising together in

close proximity," which "make[s] them more susceptible to interest group influence and capture." (SOF ¶ 69.) That is, special interests know that legislative leaders can exercise a large degree of control over the legislative process *and* are in a position to exert greater influence because of their ability to contribute (or threaten to not contribute) funds to other legislators in their caucus. As a result, one would expect legislative caucus committees to attract contributions from special interests rather than from a broad base of supporters as one would expect to find with a traditional political party committee. (SOF ¶ 70.) Reviewing the list of contributions to the majority party's legislative caucus committees, that is exactly what Dr. Osborn found: the caucus committees' contributions "come from a concentrated group of special interests with heavy contributions generated by PACs associated with organized labor and business trade associations." (SOF ¶ 70.)

Dr. Osborn also concluded that the Act creates the opportunity, so far unrealized, for corruption through the creation of legislative caucus committees "organized around standing committees," which could "solicit funds from impacted interest groups that have a particular interest in supporting member of [a] specific legislative committee." (SOF ¶ 71.) A legislative caucus committee organized around one of the "key legislative standing committees" could be "utilized to solicit funds from the interests lobbying each committee," which could "then be used to fund the campaigns of other Caucus members who support the legislation being championed by the committee-oriented Legislative Caucus Committee." (SOF ¶ 72.) In this way, the caucus committees would further "institutionally tie[] legislative decision making with fundraising." (SOF ¶ 72.) "The ability of legislators to create Legislative Caucus Committees appears to be specifically designed to enhance these relationships [between committees and the interest groups they affect] by providing a systematic means for the legislative committee members from the

16

very stakeholders most impacted by their policy decisions." (SOF ¶ 73.) This is not inconsistent with the system being designed to benefit legislative leaders: it "can expand influence vertically within the Caucus from the Speaker of the House and the Senate President down to their team of appointed legislative committee chairs," creating "additional fundraising opportunities through additional Caucus Committees to solicit funds from impacted interest groups that have a particular interest in supporting members of a specific legislative committee." (SOF ¶ 74.)

Dr. Osborn notes that, "in designing this system, the Legislature failed to enact even the most basic protections against tying contributions to the policymaking by authorizing contributions to these committees even during legislative deliberations" – that is, it did not prohibit contributions during the legislative session. (SOF ¶ 75.) It restricted fundraising in Sangamon County, where the state capital is, during the legislative session, but not elsewhere, providing "scant protection against the potential for influence peddling" because legislators could simply raise funds outside of Sangamon County. (SOF ¶ 75.) And, indeed, Dr. Osborn noted special interests making large contributions to legislative caucus committees in close proximity to legislative consideration of issues importance to them, with SEIU Healthcare II PAC contributing $47,000 and SEIU Illinois Council PAC contributing $50,000 to the Democratic Majority legislative caucus committee on August 17, 2012, corresponding with the convening of a special legislative session on pension reform. (SOF ¶ 76.)

In sum, Dr. Osborn's testimony confirms what is already evident from the face of the statute: that legislative caucus committees do not necessarily act like political party committees but may instead act like PACs serving legislative leaders' personal interests, with legislative caucus committees' additional characteristics creating a heightened potential for, or appearance

of, corruption. Accordingly, Dr. Osborn's testimony further demonstrates that the Act's limits are underinclusive and not narrowly tailored to prevent actual or apparent corruption.

## CONCLUSION

Illinois' scheme of campaign contribution limits is not narrowly tailored to prevent corruption or the appearance of corruption.

Dated: December 12, 2014

Respectfully submitted,

/s/ Jacob H. Huebert
Jacob H. Huebert (#6305339)
Jeffrey M. Schwab (#6290710)
Attorneys for Plaintiffs

LIBERTY JUSTICE CENTER
190 S. LaSalle Street, Suite 1500
Chicago, Illinois 60603
(312) 263-7668

## <u>CERTIFICATE OF SERVICE</u>

I, Jacob H. Huebert, an attorney, hereby certify that on December 12, 2014, I served

Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment on Defendants'

counsel by filing it through the Court's electronic case filing system.

<u>/s/ Jacob H. Huebert</u>