UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ILLINOIS LIBERTY PAC, EDGAR BACHRACH, and KYLE McCARTER, | )<br>)<br>) 12 C 5811 |
| Plaintiffs, | )<br>) Judge Feinerman |
| vs. | )<br>) |
| LISA MADIGAN, Attorney General of Illinois, WILLIAM McGUFFAGE, Chairman of the Illinois State Board of Elections, JESSE R. SMART, Vice-Chairman of the Illinois State Board of Elections, HAROLD D. BYERS, Member of the Illinois State Board of Elections, BETTY J. COFFRIN, Member of the Illinois State Board of Elections, ERNEST L. GOWEN, Member of the Illinois State Board of Elections, JUDITH C. RICE, Member of the Illinois State Board of Elections, BRYAN A. SCHNEIDER, Member of the Illinois State Board of Elections, and CHARLES W. SCHOLZ, Member of the Illinois State Board of Elections, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Illinois Liberty PAC, Edgar Bachrach, and Kyle McCarter brought this declaratory judgment action under 42 U.S.C. § 1983 against the Attorney General of Illinois and the Chairman, Vice-Chairman, and other members of the Illinois State Board of Elections, all in their official capacities, alleging that certain contribution limits imposed by the Illinois Disclosure and Regulation of Campaign Contributions and Expenditures Act, 10 ILCS 5/9-1 *et seq.*, violate the First Amendment. Doc. 65. Early in the litigation, Illinois Liberty and Bachrach moved for a preliminary injunction. Doc. 32. The court denied the motion, Docs. 43-44 (reported at 902 F. Supp. 2d 1113 (N.D. Ill. 2012)), and the Seventh Circuit summarily affirmed, 2012 WL 5259036 (7th Cir. Oct. 24, 2012). After Plaintiffs filed a second amended complaint,

1

Doc. 65, Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), Doc. 77. The court granted in part and denied in part the motion. Docs. 95-96 (reported at 2014 WL 859325 (N.D. Ill. Mar. 3, 2014)).

Plaintiffs' only surviving claim alleges that the Act's treatment of legislative caucus committees violates the First Amendment by imposing the same restrictions on them as on political party committees and less onerous conditions on them as on political action committees ("PACs"), corporations, and individuals. The operative complaint attaches Dr. Marcus Osborn's expert report. Doc. 65-6. Defendants have moved to bar Osborn's testimony, Doc. 116, and the parties have cross-moved for summary judgment, Docs. 122, 126. For the following reasons, all three motions are denied.

**Background**

When considering Plaintiffs' summary judgment motion, the facts are considered in the light most favorable to Defendants, and when considering Defendants' summary judgment motion, the facts are considered in the light most favorable to Plaintiffs. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court had cross-motions for summary judgment before it, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012). Much of the factual background is set forth in the court's two previous opinions, familiarity with which is assumed.

Illinois Liberty PAC is a PAC that has made contributions to political candidates and would make larger contributions if permitted by Illinois law. Doc. 133 at ¶ 3. Bachrach is a

private individual who has made contributions to PACs and political candidates; he, too, would like to make contributions larger than those allowed by the Act. *Id*. at ¶ 4. Kyle McCarter is an Illinois State Senator who would like to receive contributions from individuals and groups in amounts larger than those permitted by the Act. *Id*. at ¶ 5. Defendants are Illinois state officials sued in their official capacities. *Id*. at ¶¶ 6-9.

The Act defines a legislative caucus committee as "a committee established for the purpose of electing candidates to the General Assembly by the person elected President of the Senate, Minority Leader of the Senate, Speaker of the House of Representatives, Minority Leader of the House of Representatives, or a committee established by 5 or more members of the same caucus of the Senate or 10 or more members of the same caucus of the House of Representatives." 10 ILCS 5/9-1.8. The Act lists "legislative caucus committee" as a kind of "political party committee," and accordingly subjects both types of committees to the same restrictions. *Id*.; 10 ILCS 5/9-8.5. The General Assembly's four legislative leaders have the power to "establish" legislative caucus committees. Those leaders are chosen by other legislators: the Senate President and House Speaker are elected by the membership of their respective legislative bodies, and the two Minority Leaders are elected by "member[s] of the numerically strongest political party other than the party to which the Speaker or the President belongs." Ill. Const. art. IV, §§ 6(b)-(d).

Plaintiffs' only remaining claim alleges that the Act's favorable treatment of legislative caucus committees as compared to individuals, corporations, and PACs—and the identical treatment of legislative caucus committees and political party committees—violates the First Amendment. Because the First Amendment allows campaign finance laws that give favorable treatment to political party committees, 902 F. Supp. 2d at 1120-24, Plaintiffs' claim turns on

3

whether legislative caucus committees, as defined in 10 ILCS 5/9-1.8(c), are similar enough to political party committees to justify their identical treatment under the Act. Doc. 133 at ¶ 10; 2014 WL 859325, at *3-4. In answering "no" to that question, Plaintiffs rely primarily on the report and deposition testimony of Dr. Osborn, who opines that legislative caucus committees are unlike political party committees.

Osborn's report, as supplemented, opines that legislative caucus committees have two goals: (1) to promote legislative leaders; and (2) to expand their respective political parties. Doc. 133 at ¶¶ 13, 15-17. Osborn contrasts those goals with simply electing candidates to office, which he says is the primary purpose of political parties, *id*. at ¶ 15, although he acknowledges that political parties, like legislative caucus committees, also seek to shape policy, *id*. at ¶ 18. Based on the structure of the Illinois governmental system and his literature review—which included only articles written prior to the 2010 enactment of the Act, none specific to Illinois— Osborn opines that legislative caucus committees operate like federal Leadership PACs. *Id*. at ¶¶ 26-27, 45-47.

In preparing his report, Osborn did not collect or analyze data comparing the policy goals of any legislative caucus committee with its associated political party, and he did not know how many legislative caucus committees existed in Illinois during the 2012 election cycle. *Id*. at ¶¶ 19, 24. Osborn does not know which other States have legislative caucus committees, and he accordingly did not compare legislative caucus committees in Illinois to committees in other States. *Id*. at ¶¶ 20-21. Osborn did not collect or analyze data on congressional campaign committees, and did not compare legislative caucus committees in Illinois to federal congressional campaign committees. *Id*. at ¶¶ 22-23. Osborn did not conduct any interviews or review the voting records of any Illinois legislator. *Id*. at ¶¶ 42-43.

4

Osborn focused on spending in the 2012 election cycle. His report includes data from two Democratic legislative caucus committees: the Senate Victory Fund, headed by the President of the Senate, and the Democratic Majority Committee, headed by the Speaker of the House. *Id*. at ¶ 29. Osborn did not examine whether the Democratic Party or Republican Party participated financially in the same elections as the legislative caucus committees, and he did not compare the legislative caucus committees' contributions with those of political parties or political party committees. *Id*. at ¶¶ 31-32, 41. Osborn discounted the importance of data from the Illinois House Republican committee, which was more likely to show a purely expansionist strategy, as opposed to a dual purpose strategy that would also work to advance the Republican legislative leaders' personal power. *Id*. at ¶ 30.

With those parameters, Osborn found that during the 2012 general election, the Democratic Majority Committee and the Senate Victory Fund primarily utilized a caucus expansion strategy. *Id*. at ¶¶ 34, 37. However, Osborn highlighted two contributions that the Democratic Majority Committee made in what he deemed "safe" general election contests, which did not indicate an expansionist strategy. *Id*. at ¶ 36. Osborn viewed the Senate Victory Fund's five largest general election contributions as reflecting a dual strategy of expanding the Democratic caucus and promoting the Senate President's agenda. *Id*. at ¶ 38.

At summary judgment, Plaintiffs submitted a declaration by Osborn explaining many of the choices he made in preparing his report. Doc. 133-1. Osborn opted for a qualitative analysis rather than a quantitative analysis because he was analyzing the structure of the Act just four years after its enactment. Doc. 134 at ¶¶ 34-35. Only two election cycles had occurred by the time Osborn completed his report, and data from three cycles would be more amenable to a quantitative approach because it often takes several years for key players to fully understand and

exploit changes in campaign finance laws.  *Id*. at ¶¶ 35-36.  Osborn explained that he chose not to review data from Republican-led legislative caucus committees because Republicans are the minority in the Illinois legislature, and a minority party's legislative caucus committee is likely to pursue a caucus expansion strategy.  *Id*. at ¶ 37.  Osborn highlighted certain elections because they showed that legislative caucus committees may not exclusively pursue a caucus expansion or party maximization strategy.  *Id*. at ¶ 38.  Osborn meant to provide a qualitative analysis; he was not attempting to predict the frequency or likelihood of future non-expansionist spending by legislative caucus committees.  *Ibid*.

Matthew Besler testified as a Rule 30(b)(6) witness for Illinois Liberty.  Doc. 133 at ¶ 48.  Besler testified to his understanding that a legislative caucus committee's role is to elect candidates to the General Assembly.  *Id*. at ¶ 49.  Senator McCarter testified during his deposition that he was not familiar with the term "legislative caucus committee."  *Id*. at ¶ 51.  McCarter could not identify any examples of legislative leaders rewarding or punishing candidates through the granting or withholding of electoral support from their legislative caucus committees.  *Id*. at ¶ 52.

## Discussion

### I. Defendants' Motion to Exclude Dr. Osborn

Defendants move under Federal Rule of Evidence 702 to strike Osborn's report and exclude his testimony.  Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010).  The district court serves as the "gate-keeper who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007) (internal quotation marks omitted).  The expert's proponent bears the burden of proving by a preponderance of the evidence that the expert's testimony satisfies Rule 702.  *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Osborn has provided a report under Federal Rule of Civil Procedure 26(a)(2), Doc. 116-2, and was deposed, Doc. 116-4.  Osborn has approximately two decades' experience with legislative advocacy and campaigns.  Doc. 116-2 at 18.  He earned a Ph.D. in Public Administration, and undergraduate degrees in Political Science and History.  *Ibid*.  Osborn has represented and consulted for businesses, trade associations, and government agencies in Arizona over the past two decades.  *Ibid*.; Doc. 116-4 at 6 (p. 20:21-23).  He has also advised clients on campaign fundraising and studied fundraising strategies and methods for more than ten years.  Doc. 116-2 at 18.  He represented the Arizona Chamber of Commerce in its efforts to repeal Arizona's "Clean Elections Act" and to restructure the State's campaign finance laws in the wake of *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010).  Doc. 116-4 at 6 (20:24-21:3).  Osborn wrote a book chapter and his doctoral dissertation on campaign finance, and has presented his work at academic conferences.  Doc. 116-2 at 18.

Osborn's report draws the following conclusions about Illinois's campaign finance law in general and legislative caucus committees in particular:

> A review of elements of the Illinois[] campaign finance system identifies a number of significant issues that impact the integrity of elections and

7

> legislative process by creating structures that increase the potential for corruption and the appearance of corruption. … The Illinois campaign regulatory system creates mechanisms that enhance the authority of the existing legislative leadership by providing them access to fundraising tools that are unavailable to potentially competing interests. The regulatory system provides contribution advantages to political parties and then extends those advantages to Legislative Caucus Committees. The benefits provided to Legislative Caucus Committees are unwarranted because they operate more like political action committees than party committees.
>
> Caucus Committees dangerously tie the institutional authority of legislators to fundraising. The special regulatory status of the Legislative Caucus Committee provides an ample environment to create overly close fundraising and policymaking relationships. The risk of corruption is amplified because of the lack of general election contribution limits on Legislative Caucus Committees and the contribution restrictions that are placed on potentially countervailing political action committees, corporations and individuals who may be supporting opposing candidates. The deck is unbalanced in terms of regulatory requirements to allow those in the Legislature with the most organizational authority to also have the best campaign tools. This is self-protecting that is likely to result in a consolidation of power, not a robust electoral environment.

*Id*. at 15-16.

Defendants argue that Osborn's knowledge, skill, experience, training, and education do not qualify him as an expert on Illinois's election system or campaign finance laws. Doc. 116 at 13-14. They further contend that Osborn's methodology was unreliable due to his use of an incomplete data set, noting that he analyzed only some of the spending by only two of the six legislative caucus committees in Illinois during one election cycle. *Id*. at 4-7. Defendants also fault Osborn's methodology for not comparing legislative caucus committees spending to that of political party committees in Illinois or to any federal campaign spending. *Id*. at 8-10. They submit that Osborn's inquiry was incomplete because he did not conduct any interviews or review any deposition transcripts, adding that the literature upon which he relied has limited relevance and undermines his methodology. *Id*. at 10-12. And they assert that Osborn's testimony will not assist the trier of fact. *Id*. at 15.

8

The Seventh Circuit has cautioned that "the test for reliability for nonscientific experts is flexible." *United States v. Romero*, 189 F.3d 576, 584 (7th Cir. 1999) (internal quotation marks omitted). Unlike scientific or technical experts, whose hypotheses can be tested or subjected to peer review and whose methods can be measured against specific industry standards, a political scientist's testimony (political science is not "science" for Rule 702 purposes) cannot be so mechanically scrutinized. *See Lees v. Carthage Coll.*, 714 F.3d 516, 525 (7th Cir. 2013) (holding that nonscientific expert testimony in the field of premises security did "not easily admit of rigorous testing and replication"). Osborn's report relies on his experience, a literature review, and some spending data from the 2012 election. Doc. 116-2 at 6-11. His report is qualitative; his inclusion of some contributions as examples does not transform the fundamental character of his analysis, and he does not purport to have conducted a comprehensive quantitative or statistical analysis. Doc. 133-1 at ¶ 3. Contrary to Defendants' submission, expert testimony "is not unreliable simply because it is founded on [a witness's] experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting Fed. R. Evid. 702); *see also Kumho*, 526 U.S. at 150 (distinguishing expert testimony based on science and engineering from "other cases," in which "the relevant reliability concerns may focus upon personal knowledge or experience," and reaffirming that the *Daubert* factors "do *not* constitute a 'definitive checklist or test'") (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 593 (1993)).

Osborn's analysis of the possibilities and incentives for corruption in Illinois's campaign finance structure rests primarily on his understanding of the literature and his experience as a consultant and lobbyist. Doc. 116-2 at 6-8. His report uses examples from two legislative

caucus committees' largest expenditures during one election cycle to illustrate how those committees' apparent priorities align with his predictions. *Id*. at 9-11. This analysis is consistent with the qualitative nature of the report. Although Osborn does not purport to make factual conclusions about actual quid pro quo corruption actually occurring in Illinois, his report concludes that there is an amplified "risk of corruption" when legislative caucus committees are treated like political parties and both are treated more favorably than PACs and other political speakers. Doc. 116-2 at 16; Doc. 119 at 14.

The methods Osborn used were appropriate for his qualitative inquiry into (what he, rightly or wrongly, views as) the risks created by the Act. *See United States v. Mikos*, 539 F.3d 706, 711 (7th Cir. 2008) ("Rule 702 does not condition admissibility on the state of the published literature, or a complete and flaw-free set of data …."). Moreover, Osborn's background makes him eminently qualified to undertake that inquiry. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (internal quotation marks omitted). Osborn's twenty years of experience with legislative advocacy, campaigns, ballot measures, campaign fundraising, and studying campaign strategies, methods, and competitiveness easily meet this standard.

Defendants retort that Osborn is unqualified to testify about the Illinois campaign finance system because he lacks Illinois-specific knowledge or experience. Doc. 116 at 13-14; Doc. 129 at 8. True enough, the question the court must ask on a Rule 702 motion "is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Gayton*, 593 F.3d at 617 (internal quotation marks omitted,

alteration in original). Yet Osborn's education and experience give him the foundation necessary to opine about the incentives and power structure inherent in any American campaign financing scheme. *See United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) ("[W]hile extensive academic and practical expertise is an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.") (internal quotation marks omitted). The ability to identify opportunities and incentives in the structure of a campaign finance law is essential to Osborn's professional activities, and he used that skill to prepare his report. The distinctions (if any) between the campaign finance systems of Illinois and the other States impact the weight, not the admissibility, of Osborn's opinions.

For these reasons, Defendants' motion to exclude is denied, and Osborn's testimony is admitted for its examination of "the structure of Illinois' scheme of campaign contribution limits and the incentives and opportunities for corruption it creates." Doc. 119 at 9-10.

## II.     Cross-Motions for Summary Judgment

As noted, Plaintiffs' sole remaining claim alleges that legislative caucus committees are insufficiently similar to political party committees to justify their identical treatment under the Act and their more favorable treatment as compared to individuals, corporations, and PACs. 2014 WL 859325 at *4; *see Citizens United*, 558 U.S. at 340 ("[T]he Government may commit a constitutional wrong when by law it identifies certain preferred speakers."). Plaintiffs allege that the Act's disparate contribution limits are not closely drawn to serve a sufficiently important interest, as required by *Buckley v. Valeo*, 424 U.S. 1 (1976). Specifically, they maintain that the limits are underinclusive because legislative caucus committees have the same potential to corrupt as PACs, so the justification for limiting PAC contributions should extend to legislative

caucus committees. Doc. 128 at 11-14; *see Buckley*, 424 U.S. at 20-25. The inquiry is appropriately focused on corruption, as "the only public interest strong enough to justify restricting election-related speech is the interest in preventing quid pro quo corruption or the appearance of corruption." *Wis. Right-to-Life, Inc. v. Barland*, 751 F.3d 804, 823 (7th Cir. 2014).

The "basic object" of a political party is "to help elect whichever candidates the party believes would best advance its ideals and interests." *Randall v. Sorrell*, 548 U.S. 230, 257-58 (2006) (plurality opinion). Political parties do not blindly pursue at any cost to maximize their representation in a legislative body; rather, they seek and promote candidates who, as a general matter, will advance their goals and be loyal team players. *See FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 476 (2001) ("*Colorado II*") (Thomas, J., dissenting) ("The very aim of a political party is to influence its candidate's stance on issues and, if the candidate takes office or is reelected, his votes.") (internal quotation marks omitted). Plaintiffs assert that the "basic object" of legislative caucus committees is not just to elect like-minded candidates, but also to advance the legislative leaders' personal interests by doling out campaign contributions from their committees in exchange for quid pro quo commitments from the recipients of those contributions. Doc. 128 at 13-14; Doc. 132 at 8-9.

The court cannot conclude that this indisputably is true or not true on the summary judgment record. Viewed in the light most favorable to Defendants, the record would allow the conclusion that because the House Speaker, the Senate President, and the two Minority Leaders must maintain the broad-based support of their respective caucuses to hold their leadership posts, they could not hijack legislative caucus committees to primarily serve their personal goals at the expense of their respective parties' causes as a whole. Moreover, "[c]orruption is a subversion

of the political process. … The hallmark of corruption is the financial *quid pro quo*: dollars for political favors." *FEC v. Nat'l Conservative PAC*, 470 U.S. 480, 497 (1985). It is difficult to imagine political parties using campaign contributions to "corrupt" recipients in the way that individual contributors or PACs can. *See Randall*, 548 U.S. at 256-259 (emphasizing "a particularly important political right, the right to associate in a political party," and striking down contribution limits that subjected political parties to the same restrictions as other contributors); *Colorado II*, 533 U.S. at 453 (recognizing that parties' "strong working relationship with candidates and [their] unique ability to speak in coordination with them should be taken into account in the First Amendment analysis"); *id*. at 477 (Thomas, J., dissenting) ("One can speak of an individual citizen or a political action committee corrupting or coercing a candidate, but what could it mean for a party to corrupt its candidate or to exercise coercive influence over him?") (internal quotation marks omitted). Viewing the record in the light most favorable to Defendants, it is similarly difficult to imagine that a legislative caucus committee, created by a legislator whose leadership role depends upon an election by other legislators in the same party, could corrupt a candidate or incumbent from that political party.

At the same time, viewing the record (particularly Osborn's opinions) in the light most favorable to Plaintiffs, the court cannot conclude as a matter of law that Plaintiffs are wrong to claim that legislative caucus committees serve their leaders' personal interests at the expense of their associated parties' interests, and therefore that legislative caucus committees are more similar to PACs and corporations than to political party committees. *See Costello v. Grundon*, 651 F.3d 614, 636 (7th Cir. 2011) ("On summary judgment, a court may not weigh the evidence or decide which inferences should be drawn from the facts."); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) ("[O]f course, a district court may not weigh the evidence

at the summary judgment stage; it must view the evidence in the light most favorable to the non-movant."). It follows that Defendants' summary judgment motion must be denied as well.

## Conclusion

For the foregoing reasons, Defendants' motion to strike Osborn's testimony and the parties' cross-motions for summary judgment are denied. The case will proceed to trial on Plaintiffs' First Amendment challenge to the Act's treatment of legislative caucus committees as compared to political party committees, on the one hand, and to PACs, corporations, and individuals, on the other.

September 21, 2015

_____
United States District Judge