```
1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3
   ILLINOIS LIBERTY PAC,  a          )
4  Political Action Committee        )
   registered with the Illinois      )
5  State Board of Elections,         )
   EDGAR BACHRACH, and KYLE          )
6  McCARTER,                         )
                                     )
7                 Plaintiffs,        )
                                     )
8  -vs-                              )  Case No. 12 C 5811
                                     )
9  LISA M. MADIGAN, Attorney         )
   General of the State of           )
10 Illinois; WILLIAM McGUFFAGE,      )
   Chariman of the Illinois          )
11 State Board of Elections;         )
   JESSE R. SMART,                   )
12 Vice-Chairman of the              )
   Illinois State Board of           )
13 Elections; HAROLD D. BYERS,       )
   Member of the Illinois State      )
14 Board of Elections; BETTY J.      )
   COFFRIN, Member of the            )
15 Illinois State Board of           )
   Elections; ERNEST L. GOWEN,       )
16 Member of the Illinois State      )
   Board of Elections; JUDITH        )
17 C. RICE, Member of the            )
   Illinois State Board of           )
18 Elections;  BRYAN A.              )
   SCHNEIDER, Member of the          )
19 Illinois State Board of           )
   Elections; and CHARLES W.         )
20 SCHOLZ, Member of the             )
   Illinois State Board of           )
21 Elections, all in their           )
   official capacities,              )  Chicago, Illinois
22                                    )  January 25, 2016
                  Defendants.        )  9:30 a.m.
23

24        TRANSCRIPT OF PROCEEDINGS - Trial
        BEFORE THE HONORABLE GARY FEINERMAN
25
```

1  APPEARANCES:

2  For the Plaintiffs:    LIBERTY JUSTICE CENTER
                          BY:   MR. JACOB H. HUEBERT
3                               MR. JEFFREY M. SCHWAB
                                MR. JAMES McQUAID
4                         190 South LaSalle Street
                          Suite 1630
5                         Chicago, Illinois  60654
                          (312) 263-7668
6

7  For the Defendants:    ILLINOIS ATTORNEY GENERAL'S OFFICE
                          BY:   MS. JESSICA M. SCHELLER
8                               MR. KEVIN R. LOVELLETTE
                                MR. T. ANDREW HORVAT
9                         100 West Randolph Street
                          13th Floor
10                        Chicago, Illinois  60601
                          (312) 814-2098
11

12

13

14

15

16

17

18

19

20

21

22  Court Reporter:

23              CHARLES R. ZANDI, CSR, RPR, FCRR
                    Official Court Reporter
                   United States District Court
24         219 South Dearborn Street, Suite 2128
                   Chicago, Illinois  60604
25             Telephone:  (312) 435-5387
           email:  Charles_zandi@ilnd.uscourts.gov

1    (Proceedings heard in open court:)

2         THE CLERK:  12 C 5811, Illinois Liberty PAC versus

3    Madigan.

4         THE COURT:  Good morning.

5         MR. HUEBERT:  Good morning, your Honor.

6         THE COURT:  So, who do we have at counsel table?

7         MR. HUEBERT:  Jacob Huebert here with Jeffrey Schwab

8    and James McQuaid for the plaintiffs.

9         THE COURT:  And for the defendant?

10        MS. SCHELLER:  Good morning, your Honor.  Assistant

11   Attorneys General Jessica Scheller, Kevin Lovellette and

12   Andrew Horvat on behalf of the State of Illinois defendants.

13        THE COURT:  Good morning.  Are both sides ready for

14   trial?

15        MR. HUEBERT:  We are, your Honor.

16        MS. SCHELLER:  The defendants are ready.

17        THE COURT:  All right.  So, is there anything we need

18   to discuss before we have opening statements?

19        MR. HUEBERT:  Your Honor, I'd like to move for

20   judicial notice that Plaintiffs' Exhibits 2 through 5 are

21   authentic Illinois State Board of Election records.

22        THE COURT:  Any objection to that?

23        MR. LOVELLETTE:  Can we have one second just to look

24   at them, your Honor?

25        THE COURT:  Sure.

4

1        MS. SCHELLER:  Your Honor, one of our witnesses will

2   be able to testify as to the authenticity of these documents;

3   but in any event, if plaintiffs' counsel doesn't mind, if we

4   could wait until the lunch break so we could have him take a

5   look at them and see whether or not he would be willing to

6   authenticate them or if we could have them certified just to

7   remove any ambiguity over the documents.

8        THE COURT:  Okay.  Why don't you just act as if

9   they're fine, and then we'll dot the i's and cross the t's

10  later on.

11       MR. HUEBERT:  That sounds good.  Thank you, your

12  Honor.

13       THE COURT:  All right.  Anything else before we get

14  started?

15       MR. HUEBERT:  That's all from the plaintiffs.

16       THE COURT:  Okay.  Defendants?

17       MS. SCHELLER:  Nothing from the defendants.

18       THE COURT:  Okay.  Go ahead.

19       MR. HUEBERT:  Thank you, your Honor.  May it please

20  the Court.  In 2009, the Illinois General Assembly passed an

21  act touted as campaign finance reform.  One of the act's most

22  noticeable features was a scheme of campaign contribution

23  limits that limited the amounts that individuals and groups

24  can give to candidates for office in Illinois.  It limited the

25  amount that individuals can give to $5,000.  It limited the

1    amount that corporations, unions, and other associations can

2    give to $10,000.  And it limited the amounts that political

3    action committees or PACs can give to $50,000.

4            In short, the act limited what everyone and every

5    group in Illinois can give to candidates except for the

6    state's political parties and its legislative leaders.  The

7    act allowed those groups and those leaders to give unlimited

8    funds to the candidates they support in a general election,

9    and much greater funds than anyone else to the candidates they

10   support in a primary election.

11           The act allowed the legislative leaders to do this

12   through what it called legislative caucus committees.  A

13   legislative caucus committee under the act is a special kind

14   of committee that can only be formed by the state's four

15   legislative leaders, the Speaker of the House, the Senate

16   President, the House Minority Leader and the Senate Minority

17   Leader, or by a group of 10 representatives or five senators.

18           The legislative caucus committees have another

19   strange feature.  There's a rule that says that a candidate

20   can only accept contributions from one of them in any given

21   two-year election cycle.

22           So, what did Illinois' legislative leaders really do

23   when they enacted so-called campaign finance reform?  They

24   gave themselves special committees that they could use to

25   direct unlimited funds or disproportionately large funds to

1  the candidates they support while restricting what everyone

2  else other than the political parties can give to the

3  candidates who they support.  In other words, they tilted the

4  political playing field in a way that preserves and enhances

5  their own political power.

6        And that's why the plaintiffs are here today.  The

7  plaintiffs include an individual who makes contributions to

8  candidates in Edgar Bachrach, a political action committee

9  called Illinois Liberty PAC run by a man named Matthew Besler,

10 and a candidate for office, State Senator Kyle McCarter.

11       Mr. Bachrach and Mr. Besler think that it's not fair

12 that they are limited in the amounts that they can give to

13 candidates while the legislative leaders are not limited or

14 face much higher limits in the amounts that they can give.

15 And Senator McCarter thinks that it's not fair that he's

16 limited in the amounts that he can accept from an individual

17 or a PAC while a candidate who has the support of a

18 legislative caucus committee can receive unlimited amounts or

19 disproportionately large amounts from the legislative leaders

20 who run those committees.

21       The First Amendment is on the plaintiffs' side.  In

22 one of its most recent decisions on campaign finance,

23 *McCutcheon versus FEC*, the U.S. Supreme Court said that those

24 who govern should be the last people to decide who should

25 govern.  And the court made clear when campaign contribution

1  limits are designed in a way to affect who governs, they
2  violate the constitution.

3          The Supreme Court has long held that limits on the
4  amounts that individuals or groups can contribute to
5  candidates impinge upon First Amendment rights.  And the court
6  has said that the only governmental interest that is
7  potentially important enough to justify such a restriction on
8  First Amendment rights is the government's interest in
9  preventing quid pro quo corruption or the appearance of
10  quid pro quo corruption.

11          And the court has said that when an individual or
12  group challenges limits on campaign contributions, the
13  government bears the burden to prove that those limits are
14  constitutional.  Specifically, the government bears the burden
15  to prove that the limits are narrowly tailored to serve the
16  government's interests in limiting corruption.

17          So, in this case, the question is whether Illinois'
18  limits on the plaintiffs are narrowly tailored to limit
19  corruption in light of the act's treatment of legislative
20  caucus committees.  That is, the question is:  Can the
21  limitation on the plaintiffs be narrowly considered to address
22  corruption when at the same time the act allows the
23  legislative leaders to give unlimited or disproportionately
24  large amounts to candidates?

25          And again, the defendants -- and the Supreme Court

1  has said that the government, to justify its limits, to meet

2  its burden, must provide evidence.  So, in this case, the

3  defendants, to meet their burden, to show that these limits

4  are narrowly tailored must provide evidence.  And this trial

5  will confirm that the defendants have no evidence to show that

6  these limits are narrowly tailored to address corruption.  And

7  for that reason alone, the limits must be struck down.

8          The plaintiffs will present evidence to show that the

9  act's limits have impaired their ability to participate fully

10  in the democratic process.  And although the plaintiffs don't

11  bear the burden of proof in this case, the plaintiffs will

12  also present evidence affirmatively showing that the acts are

13  not designed in a way that would limit corruption, but instead

14  are designed in a way that is -- preserves the legislative

15  leaders' power and actually enhances opportunities for

16  corruption.

17          Edgar Bachrach will testify that the limits have

18  impaired his ability to participate fully in the democratic

19  process.

20          Matthew Besler will testify that the limits affect

21  not only how much Illinois Liberty PAC gives to the candidates

22  it supports, but also which candidates Illinois Liberty PAC

23  financially supports.

24          And Senator McCarter will testify that the act's

25  limits have impaired his ability to raise funds for his

1    campaigns.

2        The plaintiffs will present testimony from an expert

3    witness, Dr. Marcus Osborn.  Dr. Osborn is a political

4    scientist who studied the relationship between campaign

5    contributions, campaign finance restrictions, and interest

6    group influence.

7        Dr. Osborn will testify that the limits do not appear

8    to be designed to address corruption, but instead appear to be

9    designed to enhance the legislative leaders' power and, in so

10   doing, create new opportunities for corruption.

11       The defendants have maintained that the State is

12   justified in treating legislative caucus committees just like

13   other political party committees.  The act defines legislative

14   committees as a type of political party committee, and so the

15   defendants have argued that really they're justified in just

16   treating them the same with respect to the limits.

17       But Dr. Osborn will explain that a legislative caucus

18   committee is not just like any other political party

19   committee.  Dr. Osborn will testify that, in fact, a

20   legislative caucus committee more closely resembles a type of

21   PAC, and its potential for corruption through its

22   contributions is more like that of a PAC accordingly.

23       Dr. Osborn will explain that the legislative leaders'

24   ability to give unlimited or disproportionately large

25   contributions gives them a powerful tool that they can use to

1   make quid pro quo demands on the candidates they support.

2   He'll also explain that the rule that says that a candidate

3   can only accept contributions from one of these candidates in

4   a two-year election cycle enhances the leaders' leverage in

5   potentially making quid pro quo demands on legislators.

6           Common sense would tell a reasonable observer looking

7   at this from the outside that the state's legislative leaders

8   were not thinking about how to narrowly tailor these limits to

9   limit corruption or how to minimize burdens on anyone's First

10  Amendment rights when they just happened to create a scheme

11  that just happens to give themselves the ability to direct

12  unlimited or disproportionately large contributions while

13  restricting virtually everyone else, conveniently including

14  their political rivals.

15          Dr. Osborn's testimony will confirm that this common

16  sense conclusion is correct, and the defendants won't be able

17  to refute it, let alone meet their burden to show that the

18  act's limits are narrowly tailored to address corruption.

19          So, at the end of this trial, the plaintiffs will

20  respectfully ask this Court to find that the evidence does not

21  support the conclusion that the act's limits are narrowly

22  tailored to address corruption, and the plaintiffs will ask

23  the Court to strike down these limits which infringe the

24  plaintiffs' fundamental First Amendment right to engage in

25  political speech.

 1          THE COURT:  Thank you.  So, is your argument going to

 2   be -- that's okay.

 3          Is your argument going to be that the act's

 4   under-inclusive nature, because it doesn't treat legislative

 5   caucus committees like political action committees, undermines

 6   or throws into doubt the purported justification for limiting

 7   PAC speech through contributions and individual speech through

 8   contributions?

 9          MR. HUEBERT:  That's correct, your Honor.

10          THE COURT:  Okay.  All right.  Thank you.

11          Defendants.

12          MR. HORVAT:  Good morning, your Honor.

13          THE COURT:  Good morning.

14          MR. HORVAT:  A famous American author once said,

15   "Get your facts first, and then distort them as you please."

16   But if Samuel Clemens were here today and were to read

17   Dr. Osborn's purported expert report, he would have the same

18   question that your Honor is going to have to ask himself at

19   the end of this trial, and that is:  Where exactly are the

20   facts?  Where are the facts to suggest, as plaintiffs claim,

21   that the act is unconstitutional because it is, in fact,

22   under-inclusive?  In fact, are there any facts at all for the

23   plaintiff to distort?

24          And that is the issue in this case, your Honor.

25   You're being asked to declare a statute unconstitutional.  You

1    may only do so, as the Court is aware, based on the facts

2    presented.  And this case is about just that, the inability of

3    the plaintiffs to present any facts to suggest that the act

4    is, in fact, under-inclusive.

5           As your Honor is well aware, we are no longer at the

6    stage where we are determining whether a claim has been made

7    or whether there is an issue of triable fact or whether

8    potentially somebody could win on the merits.  This is the

9    merits phase, the prove-it phase.  And the fact of the matter

10   is there are no facts to suggest that this act is

11   under-inclusive and, therefore, unconstitutional.

12          As your Honor just stated succinctly, it is the

13   plaintiffs' basis that legislative caucus committees are

14   similarly situated to the three plaintiffs, to an individual

15   recipient, an individual donor, and a PAC.  And it is their

16   assertion that because they are similarly situated and that

17   legislative caucus committees, through this nefarious

18   activity, also engage in quid pro quo, that the respective

19   entities must be legislated or otherwise -- excuse me, your

20   Honor, otherwise regulated in the same manner.

21          But there will be no facts to suggest that, because

22   in order to prove, number one, that the act is

23   under-inclusive, they must show that the plaintiffs and the

24   legislative caucus committees are similarly situated.  But the

25   facts of this trial will suggest that they are not.

1    The facts will show that, number one, that they are,

2    in fact, different entities, the plaintiffs and legislative

3    caucus committees.  The facts will show that they engage in

4    different activities for different purposes.  The facts will

5    show that they, in fact, engage in different forms of speech.

6    But even if your Honor were to find during the course

7    of this trial that the plaintiffs and legislative caucus

8    committees are similar and, therefore, must be regulated in a

9    similar manner, there will not be any facts to suggest that

10   the complained-of conduct actually exists.

11   That is one of the key points of this trial, your

12   Honor.  The plaintiffs claim that legislative leaders within

13   the legislature use legislative committees to entrench

14   themselves in power and that this gives rise to an appearance

15   of quid pro quo.  But, if there are no facts to suggest that

16   that actually exists, there is no basis for the act to

17   regulate such conduct.  In other words, your Honor, the act

18   need not regulate what does not exist.

19   In 2015, just in this past year, the Supreme Court,

20   in the case of *Williams-Yulee versus the Florida Bar*, stated

21   some very succinct language on this exact point, and I quote,

22   "Under-inclusivity creates a First Amendment concern when the

23   state regulates one aspect of a problem while declining to

24   regulate a different aspect of the problem that affects its

25   stated interest in a comparable way.  But even under strict

1    scrutiny, the First Amendment does not require states to

2    regulate for problems that do not exist."

3         Your Honor, this is the prove-it phase, and if there

4    are no facts to suggest that legislative caucus committees are

5    used by the members of the legislature to entrench themselves

6    in power, if there are no facts to suggest that the

7    legislative caucus committees are used in such a nefarious

8    manner, this Court cannot declare a statute unconstitutional

9    for failing to regulate what does not exist.

10        But there is one more point that plaintiffs will also

11   fail to bring forth any facts upon, and your Honor again in

12   his question to Mr. Huebert showed where this case is going.

13        As your Honor is well aware, the doctrine of

14   under-inclusiveness is concerned with the fact that the stated

15   purpose, in this case, quid pro quo, is actually pretextual.

16   It actually exists only, in fact, as subterfuge; in other

17   words, that it helps to regulate speech on the basis of

18   viewpoint, that it is not content-neutral.

19        Your Honor, there will be no facts brought before

20   this Court to suggest that the act as applied or across the

21   board regulates speech in a content-discriminatory manner,

22   and that is the concern of the under-inclusive doctrine.

23        Your Honor, this case was brought to you via an

24   accusation and a theory.  In one hand, the plaintiffs pointed

25   the finger, and in the other, they trumpeted a report of

1    Dr. Osborn.  But at no time throughout this litigation has

2    either hand ever held a fact that supported either assertion;

3    and at the end of this case, nothing will change.  There are

4    no facts to suggest that this statute is under-inclusive

5    because -- or excuse me, is unconstitutional because it is

6    under-inclusive.  Because of that, at the end of the evidence,

7    we're going to ask that your Honor deny plaintiffs' requests,

8    find for the defendants across the board.

9            Thank you, your Honor.

10            THE COURT:  Thank you.  And if I could ask one

11   question of you.  The plaintiffs say that the burden of proof

12   is on the defendants.  Do you agree with that?

13            MR. HORVAT:  Judge, the burden of proof would be on

14   the plaintiffs if this was an issue of *Buckley*, in other

15   words, the restrictions directly on the plaintiffs' speech.

16   It is the defendants' position that even if the burden is

17   still on the defense to prove that, in fact, it is not

18   under-inclusive, that they still have the burden of

19   persuasion.  In other words, they still must bring facts

20   before this Court to establish its under-inclusivity.

21            So, although the initial burden may be on the

22   defendants to prove that, in fact, it is narrowly drawn, not

23   narrowly tailored, narrowly drawn, that's not where we're at

24   right now because we're not talking about the direct

25   restrictions on the plaintiffs' speech like in a *Buckley*

1  matter.  We're talking about whether somebody else's speech

2  should be similarly regulated; and, therefore, we believe that

3  plaintiffs have to bring forth facts to show that it is not.

4       THE COURT:  Are you saying that the plaintiffs have

5  the burden of production with respect to evidence and that the

6  defendants have the burden of persuasion as to whether there's

7  an under-exclusivity problem?

8       MR. HORVAT:  Judge, I believe so.  I think the

9  plaintiffs will always have the burden of production to bring

10  forth evidence to suggest that the act is unconstitutional and

11  to overcome that significant presumption that, in fact, it is

12  constitutional.

13       THE COURT:  But at the end of the day, in deciding

14  whether the act as drafted is under-inclusive, that's

15  something that the defendants have the burden on?

16       MR. HORVAT:  Judge, I don't believe the defendants

17  have the burden on that, no.  I believe --

18       THE COURT:  Okay.  So, what is the defendants'

19  burden, if any?

20       MR. HORVAT:  Judge, the defendants' burden, to the

21  extent that it has a burden, is just to prove that the act's

22  not under-inclusive as the facts show it.  It's not to prove

23  that it's narrowly drawn because that issue is no -- I

24  understand that the plaintiffs still believe that that issue

25  is an issue in the case, in other words, the limitations, 5,

opening - defendants

1    10, 50,000 under *Buckley*.  And then I would agree with you

2    that it would be the burden of the plaintiff to show that it

3    is narrowly drawn.  There's no question about that.

4              But that's not what we're dealing with here.  We're

5    dealing with whether or not the act itself is under-inclusive.

6    And I believe that although ultimately the burden might well

7    be on the defendants to defend the constitutionality of the

8    act, that they still have the burden of production, if you

9    will, your Honor, to bring facts.

10             THE COURT:  So, with respect to evidentiary facts,

11   the plaintiffs have the burden --

12             MR. HORVAT:  I believe so, your Honor.

13             THE COURT:  -- but with respect to the legal issue of

14   whether there's under-inclusivity, the defendants have the

15   burden?

16             MR. HORVAT:  I believe so, your Honor.

17             THE COURT:  Based on the factual predicate at trial?

18             MR. HORVAT:  Correct, your Honor.

19             THE COURT:  All right.  Thank you.

20             MR. HORVAT:  Thanks, your Honor.

21             THE COURT:  So, are the plaintiffs ready to call

22   their first witness?

23             MR. HUEBERT:  Yes, your Honor.  The plaintiffs will

24   call Edgar Bachrach.

25             THE COURT:  Please step up, Mr. Bachrach, and if you

1    could step up and remain standing.

2             MS. SCHELLER:  Your Honor, may I be briefly heard?

3             THE COURT:  I'm sorry?

4             MS. SCHELLER:  May I be briefly heard on an issue?

5    The defendants filed a motion *in limine*, to which the

6    plaintiffs agreed, to exclude all non-party testifying

7    witnesses during testimony.  We would just like to ask that

8    any witnesses who will be testifying who are non-parties be

9    excused from the courtroom at this time, to the extent there

10   are any.

11            MR. HUEBERT:  There are none, your Honor.

12            THE COURT:  Okay.

13            MS. SCHELLER:  Thank you.

14            THE COURT:  Please raise your right hand.  State your

15   name.

16            THE WITNESS:  Edgar H. Bachrach.

17      (Witness sworn.)

18            THE WITNESS:  I do, sir.

19            THE COURT:  Okay.  You've been sworn.  You may be

20   seated.  If you'd like to pour yourself a glass of water,

21   there's a pitcher and some cups right there.  I don't think

22   there's any wheels on the bottom of the chair, so it's going

23   to be tough.

24            And with respect to the microphone, you don't have to

25   be right on top of it; but if you're speaking directionally

1    towards the microphone in a moderate tone of voice, we should

2    be able to pick you up.

3            MR. HUEBERT:  Thank you.

4        EDGAR HENRY BACHRACH, A PLAINTIFF HEREIN, DULY SWORN.

5                        DIRECT EXAMINATION

6    BY MR. HUEBERT:

7    Q.  Mr. Bachrach, can you please state your full name for the

8    record.

9    A.  Edgar Henry Bachrach.

10   Q.  Mr. Bachrach, what is your occupation?

11   A.  Retired.

12   Q.  What was your career before you were retired?

13   A.  I owned and operated a chain of men's specialty clothing

14   stores.

15   Q.  Have you ever made any contributions to candidates for

16   office in Illinois?

17   A.  Yes.

18   Q.  Did you make any contributions to candidates for state

19   office in the 2012 election cycle?

20   A.  I believe that I did.  I'm not sure.

21           MR. HUEBERT:  Your Honor, may I approach the witness?

22           THE COURT:  Sure.  And are you going to be giving the

23   witness something?

24           MR. HUEBERT:  Yes.

25           THE COURT:  Would you mind just showing defense

1  counsel first.

2  BY MR. HUEBERT:

3  Q.  Mr. Bachrach, I've handed you what's been marked as

4  Plaintiffs' Exhibit 4.  Do you recognize this document?

5  A.  Yes.

6  Q.  What is it?

7  A.  It appears to be a recap of all of the political

8  contributions that I have made in recent years.

9  Q.  Could you please turn to page 4 of this document.

10          Do you see the third item from the bottom on this

11  page, where it says, "Individual Contributions, Citizens For

12  Babcock"?

13  A.  Yes.

14  Q.  Can you explain what that is?

15  A.  This describes a contribution that I made to Citizens For

16  Babcock on August 29th, 2012.

17  Q.  And what was the amount of that contribution?

18  A.  $5,000.

19  Q.  And is that correct?  Did you contribute $5,000 to

20  Citizens For Babcock at that time?

21  A.  Yes.

22  Q.  What is Citizens For Babcock?

23  A.  That is a campaign committee that was attempting to elect

24  Michael Babcock to the state senate.

25  Q.  Did you make any other contributions to Citizens For

1   Babcock during the 2012 general election?

2   A.  No.

3   Q.  Why not?

4   A.  I was limited by state law.

5   Q.  If there hadn't been a legal limit on your contributions,

6   would you have given Citizens For Babcock more than $5,000 in

7   the 2012 general election?

8   A.  Yes.

9   Q.  Can you please turn to the first page of Exhibit 4.

10          Do you see the item at the bottom of the first page

11  there where it says, "Individual Contribution, Illinois

12  Liberty PAC, Matthew Besler"?

13  A.  Yes.

14  Q.  Can you explain what that is?

15  A.  This was a contribution that I made on February 18th of

16  2014 to the Illinois Liberty PAC for $10,500.

17  Q.  And is that correct?  Did you contribute $10,500 to

18  Illinois Liberty PAC at that time?

19  A.  Yes, I did.

20  Q.  Did you make any other contributions to Illinois Liberty

21  PAC during the 2014 election cycle?

22  A.  No.

23  Q.  Why not?

24  A.  I was limited by state law.

25  Q.  If there had not been a legal limit on your contributions,

1  would you have given Illinois Liberty PAC more than $10,500 in
2  that election cycle?
3  A.  Yes, I would have.
4  Q.  In the current election cycle, would you like to give more
5  than the law allows to any candidate for state office in
6  Illinois?
7  A.  Yes.
8  Q.  Can you identify the candidate to whom you would like to
9  contribute more than the law currently allows?
10 A.  Jeanne Ives.
11 Q.  What office is she a candidate for?
12 A.  State representative.
13 Q.  If there were no limit on the amount that you could give
14 to Jeanne Ives in the current election cycle, how much would
15 you give?
16 A.  $10,000.
17 Q.  In the current election cycle, would you like to
18 contribute more than the law currently allows to any Illinois
19 political action committee?
20 A.  Yes.
21 Q.  Which one?
22 A.  Illinois Liberty PAC.
23 Q.  If there were no limit on the amount that you could give
24 to Illinois Liberty PAC in the current election cycle, how
25 much would you give?

1    A.  I can't say exactly, but it would be more than $10,500.

2    Q.  Finally, Mr. Bachrach, can you please look at -- I'm

3    sorry.  Strike that.

4              MR. HUEBERT:  No further questions.

5              THE COURT:  Okay.  Thank you.

6              Anything from defendants?

7              MR. HORVAT:  Briefly, your Honor.

8                        CROSS-EXAMINATION

9    BY MR. HORVAT

10   Q.  Good morning, Mr. Bachrach.  Mr. Bachrach, my name is

11   Andrew Horvat, and I represent the defendants in this matter.

12   I have a few questions for you, but I should be fairly brief.

13             When you give a donation to a candidate or you are

14   anticipating giving a donation to a candidate, you do so

15   because of the issue that that candidate is trumpeting,

16   correct?

17   A.  Yes.

18   Q.  You do not do so because you're supporting any particular

19   party, is that correct?

20   A.  That's correct.

21   Q.  In other words, just so the record is clear, you're not

22   what would be referred to as maybe a straight ticket voter,

23   only voting for one party or the other, is that fair?

24   A.  That's correct.

25   Q.  And so when you donate to a particular candidate, you're

 1   not intending to speak on behalf of any particular political
 2   party, is that correct?
 3   A.  That's correct.
 4   Q.  You're speaking on behalf of Mr. Bachrach, correct?
 5   A.  Yes.
 6   Q.  Did I pronounce your last name correctly?
 7   A.  Close enough.
 8   Q.  Bachrach?
 9          Now, these questions might sound interesting, but I
10   need to make the record.  You as an individual donor are not
11   actually selecting slates of candidates to run for any
12   particular party, correct?
13   A.  That's correct.
14   Q.  And so in lieu of that answer, when you are speaking or
15   donating to a particular individual, you are not intending to
16   advocate on any particular slate of potential candidates,
17   correct?
18   A.  That's correct.
19   Q.  Now, as an individual donor, you do not determine who sits
20   on, for instance, legislative committees; would you agree with
21   that?
22   A.  Yes.
23   Q.  And so would you agree, then, that when you donate to
24   particular candidates, you're not intending through that
25   donation to advocate for who sits on any particular committee;

1    is that fair?

2    A.  That's correct.

3    Q.  And again, you don't determine who sits in the leadership

4    positions in either house of the Illinois legislature; is that

5    fair?

6    A.  That's fair.

7    Q.  And again, you can see where we're going with these

8    questions, but when you donate your money, when you make your

9    speech on behalf of a particular individual, you're not

10   advocating that any particular individual be designated to sit

11   on any congressional leadership positions, correct?

12   A.  Correct.

13          THE COURT:  Do you mean legislative?

14          MR. HORVAT:  Yes.  If I misspoke, my apologies, your

15   Honor.

16   BY MR. HORVAT:

17   Q.  Now, Mr. Bachrach, as an individual donor, you are not,

18   shall we say, beholden to the electorate; you're not voted in

19   or out of office, is that fair?

20   A.  Yes, sir.

21   Q.  You're not answerable to the electorate if you vote

22   opposite of what some of them might think is their best

23   interests, correct?

24   A.  Correct.

25   Q.  Now, the limits on your ability to donate, those limits

1    are in place regardless of your political affiliation,

2    correct?

3            Did you not understand my question?

4    A.  I didn't -- yes, I didn't.

5    Q.  Okay.  Let me back up for a second.  You have no specific

6    political affiliation, correct?  In other words, you don't

7    align yourself with one party or another, do you?

8    A.  That's correct.

9    Q.  And so if your limits are $5,000, that $5,000 limit would

10   be upon you regardless of whether you're affiliated with one

11   party or another or, as the case may be, that you're not

12   affiliated with any party; is that fair?

13   A.  That's fair.

14   Q.  And to the same extent, your donation would be limited

15   regardless of the recipient's political affiliation, is that

16   correct?

17   A.  That's correct.

18   Q.  And again, along the same lines, your donation yourself,

19   it would be limited across the board regardless of which issue

20   that you are advocating on behalf of when you give your money,

21   correct?

22           Yeah, I mumbled that.  Let me try it one more time.

23   Okay?

24           Regardless of the issue that you are advocating on

25   behalf of when you give your money, regardless of the issue

 1   that is supported by the candidate to whom you give that
 2   money, the limits remain the same, correct?
 3   A.  Yes.
 4   Q.  Now, you joined this lawsuit -- do you recall when?
 5   A.  I don't recall.  I believe it was sometime in the summer
 6   of 2013.
 7   Q.  Okay.  The second amended complaint in this case was filed
 8   in May of 2013.  Does that sound about right when you joined
 9   this case?
10   A.  I don't specifically recall.
11   Q.  Okay.  You agree with the proposition put forward by your
12   co-plaintiffs and counsel that the legislative caucus
13   committees are used by legislative leaders to entrench
14   themselves in power; is that my understanding?
15   A.  Yes.
16   Q.  But you have no factual support for that proposition,
17   that, in fact, the legislative leaders in Illinois use those
18   committees to entrench themselves in power, isn't that
19   correct?
20           THE COURT:  And you mean Mr. Bachrach personally, and
21   not --
22           MR. HORVAT:  Yes, yes.
23           THE COURT:  -- other plaintiffs and counsel?  Just
24   him personally.
25   BY MR. HORVAT:

1    Q.  I should have made that clear, Mr. Bachrach.  Do you

2    understand my question, sir?

3    A.  Yes.

4    Q.  Okay.  Do you personally have any factual support for that

5    position that legislative leaders use these caucuses to

6    entrench themselves in power?

7    A.  No.

8    Q.  You did not have that at the time that the second amended

9    complaint was filed, correct?

10   A.  That's correct.

11   Q.  And almost a year later, when you gave your deposition,

12   you did not have any factual support for that proposition, is

13   that correct?

14   A.  That's correct.

15           MR. HORVAT:  Mr. Bachrach, I appreciate your time,

16   sir.  Thank you very much.

17           THE COURT:  Anything -- any redirect?

18           MR. HUEBERT:  Nothing further, your Honor.

19           THE COURT:  Okay.  Thank you, Mr. Bachrach.  You can

20   step down.

21           And you're a party, so you're welcome to stay for as

22   much or as little of the rest of the trial as you like.

23           THE WITNESS:  Thank you, your Honor.

24     (Witness excused.)

25           THE COURT:  And who is the plaintiffs' next witness?

1          MR. HUEBERT:  The plaintiffs will call Kyle McCarter.

2          THE COURT:  Okay.  Senator McCarter, if you could

3    please step up, raise your right hand, and state your name.

4          THE WITNESS:  Kyle McCarter.

5      (Witness sworn.)

6          THE WITNESS:  Yes, I do.

7          THE COURT:  Okay.  You've been sworn.  You may be

8    seated.  If you'd like to pour yourself a glass of water,

9    there's a pitcher and some cups.

10          KYLE McCARTER, A PLAINTIFF HEREIN, DULY SWORN.

11                    DIRECT EXAMINATION

12    BY MR. HUEBERT:

13    Q.  Senator McCarter, can you please state your name for the

14    record.

15    A.  Kyle McCarter.

16    Q.  Senator McCarter, do you currently hold an elected office?

17    A.  Yes.

18    Q.  What office do you hold?

19    A.  State senator for the 54th District.

20    Q.  How long have you held that office?

21    A.  Almost two years.

22    Q.  And how long have you been a state senator?

23    A.  Almost six years.

24    Q.  Did you have to originally run for election to the Senate?

25    A.  No.  I was appointed.

1    Q.  Did you have to run for election after that?

2    A.  I did.  I had to run for -- be elected for the completion

3    of the term appointed, and then two other times after that.

4    Q.  When were the next two elections?

5    A.  2012 and 2014.

6    Q.  When you ran for election in 2010, did people contribute

7    money to your campaign?

8    A.  Yes.

9    Q.  When you ran for election in 2010, did political action

10   committees contribute money to your campaign?

11   A.  Yes, I believe so.

12   Q.  When you ran for election in 2012, did individuals

13   contribute to your campaign?

14   A.  Yes.

15   Q.  And when you ran in 2012, did political action committees

16   contribute to your campaign?

17   A.  I believe so.

18   Q.  And did both of those types of donors also contribute to

19   your 2014 campaign?

20   A.  Yes.

21   Q.  Do you have a campaign committee that receives the

22   contributions to your campaign?

23   A.  I do.

24   Q.  What's it called?

25   A.  Citizens For Kyle McCarter.

 1  Q.  And what is your role in the Citizens For Kyle McCarter
 2  committee?
 3  A.  I'm the chairman.
 4  Q.  Who makes decisions for Citizens For Kyle McCarter?
 5  A.  I do.
 6  Q.  Is it your understanding that the Illinois Election Code
 7  has limited the amount your campaign committee can receive
 8  from any individual in a given election cycle?
 9  A.  Yes.
10  Q.  And is it your understanding the election code has limited
11  the amount your campaign committee can receive from any
12  political action committee in a given election cycle?
13  A.  Yes.
14  Q.  Has your campaign committee ever accepted any
15  contributions from individuals or political action committees
16  that exceeded the legal limits?
17  A.  No.
18  Q.  During your races for office, if the law allowed it, would
19  you have sought contributions for your campaign committee from
20  individuals that exceeded the legal limits?
21  A.  Yes.
22  Q.  And would you also have sought contributions from
23  political action committees that exceeded the legal limits?
24  A.  Yes.
25  Q.  If it were allowed?

1    A.  If it were allowed, I would have.

2    Q.  If it were legal, would your campaign committee currently

3    accept contributions from individuals in greater amounts than

4    the law allows?

5    A.  Yes.

6    Q.  If it were legal, would your campaign committee accept

7    contributions from political action committees in greater

8    amounts than the law currently allows?

9    A.  Yes.

10   Q.  Senator McCarter, do you play a role in any political

11   action committees that make contributions to candidates for

12   state offices in Illinois?

13   A.  Yes.

14   Q.  What political action committee is that?

15   A.  It's the Common Sense Caucus PAC.

16   Q.  What's your role in that PAC?

17   A.  I'm the chairman.

18   Q.  Who decides which candidates that PAC will give money to?

19   A.  I do.

20   Q.  Do you play a role in any other political action

21   committees that make contributions to candidates for state

22   office in Illinois?

23   A.  No.

24   Q.  Are you familiar with the term "legislative caucus

25   committee"?

1    A.   I am.

2    Q.   And what is that?

3              MR. LOVELLETTE:   Objection, your Honor.   We had a

4    motion *in limine* that new information should be excluded.

5    During his deposition, Senator McCarter said he was not

6    familiar with them.   If he's become familiar in the meantime,

7    we believe that should be excluded from this trial.

8              THE COURT:   Overruled.   Go ahead.   You can give your

9    understanding.

10   BY THE WITNESS:

11   A.   I understand.   I was -- I understand what it is now.   And

12   the -- I think the confusion on that was when I established

13   that as a PAC, that original Common Sense Caucus PAC, the

14   intention was for it to be a legislative caucus PAC, but then

15   it was made just a standard PAC.

16   BY MR. HUEBERT:

17   Q.   And to be clear, what is a legislative caucus committee?

18   A.   It's essentially a PAC made up of members.

19   Q.   Can you give an example of a legislative caucus committee?

20   A.   The SRO, Senate Republican Organization.

21             MR. HUEBERT:   No further questions.

22             THE COURT:   Thank you.

23             MR. LOVELLETTE:   Can I have just a moment, your

24   Honor?

25             THE COURT:   Sure.

1        MR. LOVELLETTE:  Thank you.

2        THE COURT:  And you're saying that the SRO is a

3   legislative caucus committee, or is it a PAC?

4        THE WITNESS:  I believe it is.

5        THE COURT:  And does that mean that there are five

6   senators who got together and formed it?

7        THE WITNESS:  I don't know the difference between the

8   original -- I guess on the Republican side, what that is

9   versus the five members coming together.

10        THE COURT:  Okay.  Thank you.

11        THE WITNESS:  I'm just telling you.

12                    CROSS-EXAMINATION

13   BY MR. LOVELLETTE:

14   Q.  Senator McCarter, we've never met before.  My name is

15   Kevin Lovellette.  I'm with the Attorney General's Office

16   representing the defendants in this lawsuit.  I've got a few

17   questions for you, too.  Okay?

18        If constituents in a senatorial district in Illinois

19   don't like their Illinois senator's voting record or are

20   otherwise dissatisfied with the senator, they can vote him or

21   her out of office, is that correct?

22   A.  That's correct.

23   Q.  And the entities that a candidate or candidate's committee

24   for senator that they accept money from is a matter of public

25   record; is that your understanding?

McCarter - cross

1    A.  Yes.

2            THE COURT:  Would you mind positioning yourself or

3    the microphone just a little bit closer?

4            MR. LOVELLETTE:  Closer?  Sure.

5            THE COURT:  Thank you.

6            MR. LOVELLETTE:  I usually speak too loud.

7            THE COURT:  No, that's not going to be a problem

8    here.

9    BY MR. LOVELLETTE:

10   Q.  Okay.  If constituents don't like who a candidate or who a

11   senator is accepting money from, they can vote the senator out

12   of office, is that right?

13   A.  Yes.

14   Q.  And this would apply to you as a senator?

15   A.  Of course.

16   Q.  I don't like bringing this specter up, but I have to ask

17   the question.  If you were ever voted out of office, you would

18   still be associated with your PAC, is that correct?

19   A.  I could.

20   Q.  The voters can't vote you out of your PAC?

21   A.  That's correct.

22   Q.  Are you aware if under Illinois law there is anything

23   called a legislative caucus PAC?

24   A.  Please clarify that.

25   Q.  Sure.  I am just asking if you were aware under Illinois

McCarter - cross

36

1   law if there's anything titled a legislative caucus PAC?

2   A.  Yes, there is.

3   Q.  What is that?

4   A.  It's my understanding that that's a PAC made up of

5   members.

6   Q.  Members of --

7   A.  Members of the legislature.

8   Q.  Who is the -- if you know, who is the current Minority

9   Leader of the Illinois House of Representatives?

10  A.  Christine Radogno.

11          THE COURT:  Is she the Senate Minority Leader?

12          THE WITNESS:  She's the Senate.

13  BY MR. LOVELLETTE:

14  Q.  She's the Senate.  I'm asking --

15  A.  I'm assuming you were talking about the Senate.

16  Q.  I actually -- yeah, that was my next question.  I should

17  have started with the Senate.  I apologize.

18          Senator Radogno is the Minority Leader of the Senate,

19  is that correct?

20  A.  That is correct.

21  Q.  Do you know who the current Minority Leader of the House

22  is?

23  A.  Of the House?  I would think that would be Representative

24  Durkin.

25  Q.  Is that James Durkin?

McCarter - cross

37

1  A.  Yes.

2  Q.  Thank you.  Are you aware of how the Senate Minority

3  Leader is chosen?

4  A.  Yes.

5  Q.  Will you briefly describe the way that that happens.

6  A.  That is a vote of the members closely following the

7  completion of the election.

8  Q.  Is that all members of the Senate that vote on the

9  Minority Leader, or is it the members of the caucus?

10  A.  All members of the caucus.

11  Q.  Have you participated in that process?

12  A.  Yes.

13  Q.  And you voted for the person that you voted for because

14  they would be the best leader for your party; is that fair to

15  say?

16  A.  Each time, yes.

17  Q.  And you voted for them because they gave your party the

18  best opportunity to expand in the Senate; is that fair?

19  A.  I voted for the best leader at the time.

20  Q.  You did not vote for them because they gave you money?

21  A.  No.

22  Q.  At the time you first became involved in this lawsuit --

23         THE COURT:  And by gave money, you mean made a

24  contribution to Senator McCarter's campaign from the

25  legislative caucus committee?

1    MR. LOVELLETTE:  That's exactly what I meant.

2  BY MR. LOVELLETTE:

3  Q.  I'm sorry.  That's what I meant.  Is that the way you

4  understood the question?

5  A.  I always vote for who I think is the best leader, whether

6  they gave me money or not.

7  Q.  Okay.  Thank you.

8    THE COURT:  And by give you money, you don't mean in

9  an envelope, obviously.

10    THE WITNESS:  No.  Whether they contribute to my

11  campaign.

12    THE COURT:  Okay.  I just want -- for your sake, I

13  wanted to make that clear.

14  BY MR. LOVELLETTE:

15  Q.  Burlap bag with a dollar sign on it, is that more

16  preferable?  I'm joking.  I'm sorry, Senator.

17    At the time that you first became involved in this

18  lawsuit, you didn't have any knowledge that your -- any of

19  your fellow senators voted for a minority leader to be the

20  leader because they had donated to their campaigns, is that

21  correct?

22  A.  Clarify that.

23  Q.  Sure.  At the time you became involved in this lawsuit,

24  you didn't have any knowledge that one of your fellow senators

25  voted for a minority leader because that individual had

1  donated to their campaign, is that correct?

2  A.  I don't know why they voted for the leader.  I have no

3  idea.

4  Q.  Would it be fair to say that you can't judge their

5  intentions?

6  A.  I don't know.  I just don't know.

7  Q.  Would it also be fair to say that you don't know, you

8  can't judge the intentions of legislative caucus committees

9  and why they donate to the causes or individuals that they

10  donate to?

11  A.  Well, I have -- I believe I have some understanding why

12  they give to who they give.

13  Q.  So, you understand why -- what their intentions are?

14  A.  Based on -- personally, based on whether they would give

15  to me.

16  Q.  So, their intent --

17  A.  I can't Judge others' intentions, but I can say to myself

18  if I'm in a position of not agreeing with leadership, they are

19  most likely not going to give to me.

20  Q.  And that's your assumption, is that correct?

21  A.  That's my belief.

22  Q.  But the flip side of the same coin, you don't know exactly

23  why they did or didn't give you money, is that correct?

24  A.  It's my belief that because I at times disagree with the

25  leadership and the direction of the caucus, I am not given

1  contributions.

2  Q.  By whom?

3  A.  By the leader of that caucus and the chairman of that

4  legislative caucus.

5  Q.  Through what mechanism?  Through a PAC?  Through --

6  A.  Well, I'm referring to the Senate Republican Organization

7  and the minority leader that you asked me who it was, and

8  that's -- that's specifically what I'm talking about.

9  Q.  So, it's your belief that if you don't follow, that you

10  won't receive any money?

11  A.  Yes, it is.

12  Q.  And do you have evidence that contributions of the SRO has

13  followed your belief?

14  A.  There's probably evidence that they didn't give me money.

15  Q.  The question was, do you have any evidence to support your

16  belief that SRO did not give you money because you didn't

17  follow them?

18  A.  I believe the evidence would be based on whether they gave

19  me money or not.

20  Q.  I understand your belief, Senator.  I'm asking if you have

21  any evidence that supports your belief that the SRO did not

22  give you money because you did not follow them.

23  A.  I think if you -- if you looked originally where they gave

24  me money, and then when I spoke out against the leadership and

25  they didn't give me money, that would be evidence.

1  Q.  I understand.  I'm asking if you have any evidence as you

2  sit here today --

3          THE COURT:  I think what you're asking him is:  Has

4  anybody told you, "By the way, the reason we're not giving you

5  money is because you went against us on these particular

6  issues"?  Is that your question?

7          MR. LOVELLETTE:  I didn't want to get into hearsay,

8  though, your Honor.

9          THE COURT:  That wouldn't be hearsay.  That would

10 be --

11         MR. LOVELLETTE:  Oh, you're right.  You're right.

12 Could the court reporter repeat that question, your Honor?

13         THE WITNESS:  I heard it.

14         THE COURT:  Yes.

15 BY THE WITNESS:

16 A.  No.

17         THE COURT:  No one's ever told you that?

18         THE WITNESS:  I have not heard that statement from

19 anyone.

20         THE COURT:  But from the timing, you got

21 contributions at one point and then you opposed and you didn't

22 get contributions, you're making an inference of a causal

23 relationship?

24         THE WITNESS:  Yes, I am.

25         THE COURT:  Does that answer your question?

1         MR. LOVELLETTE:  That does.  Thank you.
2    BY MR. LOVELLETTE:
3    Q.  Senator, are you aware of any specific instances in which
4    legislative leaders have used organizational rewards and
5    punishments through their legislative caucus committees?
6    A.  Yes.
7    Q.  Senator, do you remember sitting for -- I believe this was
8    your first deposition in this case on June 3rd, 2014?
9    A.  Yes.
10   Q.  And your attorneys were there?
11   A.  Correct.
12   Q.  And there was a court reporter there taking down all the
13   information?
14   A.  Correct.
15   Q.  And you were sworn to tell the truth?
16   A.  Yes.
17   Q.  Do you remember being asked --
18        MR. LOVELLETTE:  I'm sorry.  For counsel, it is
19   page 50, starting at line 3.
20   BY MR. LOVELLETTE:
21   Q.  Do you remember being asked this question and giving this
22   answer?
23        "Question:  Are you aware of any specific instances
24   in which legislative leaders have used organizational rewards
25   and punishments through their legislative caucus committees?

1          "Answer:  I can't judge the intention of their

2     actions."

3          Do you remember that question and answer?

4     A.  Yes.

5     Q.  Okay.  Thank you.

6          At the time of your deposition, it was your

7     understanding that the House Republican Leadership

8     Organization was the main campaign arm of the Republican Party

9     in the House, is that correct?

10    A.  Yes.

11    Q.  And again at the time of your deposition, it was your

12    understanding that the Republican State Senate Campaign was

13    the campaign arm of the Republican Party in the Illinois

14    Senate, is that correct?

15    A.  Yes.

16         MR. LOVELLETTE:  May I have just a moment, your

17    Honor?

18         May I have a moment?

19         THE COURT:  Sure.  Go ahead.

20         MR. LOVELLETTE:  Thank you.

21         A few more questions, your Honor.  Thank you.

22    BY MR. LOVELLETTE:

23    Q.  You mentioned before that you wanted to set up the Common

24    Sense PAC, is that correct?

25    A.  Yes.

1  Q.  Did you want to set this up as a PAC, or did you want to
2  set it up as a legislative caucus committee?
3  A.  Originally, I wanted to set it up as a legislative caucus.
4  Q.  But you were unable to persuade four other senators from
5  your caucus to join, is that correct?
6  A.  That could not be put together.
7  Q.  I'm sorry.  What could --
8  A.  We could not meet the qualifications.
9  Q.  In order to form the Common Sense legislative caucus,
10 right?
11 A.  Correct.
12 Q.  Because there was not five senators from the same caucus,
13 is that correct?
14 A.  Well, there was numerous reasons.
15 Q.  Was one of the reasons because there wasn't five senators
16 from the same caucus?
17 A.  They didn't believe it was the right thing to do.
18 Q.  Was one of the reasons because there wasn't five senators
19 from the same caucus?
20 A.  I'm not saying there couldn't have been.
21 Q.  I'm asking --
22 A.  So, I'm telling you that wasn't the main reason.
23 Q.  I'm not asking about the main reason.
24 A.  I know what you want me to say, it's the main reason.  It
25 wasn't the main reason.

1  Q.  I'm not asking the main reason.  Was one of the reasons

2  because there wasn't five members of the same caucus that

3  would join Common Sense?

4  A.  No.  I believe I perhaps could have gotten five members.

5  Q.  But you didn't?

6  A.  I didn't file it that way.

7  Q.  I'm sorry.  You didn't --

8  A.  I didn't file it as that caucus.  I didn't file as that

9  caucus.  I filed as a regular PAC.

10  Q.  Because there were not five members -- and one of the

11  reasons was there wasn't five members of the same caucus that

12  would sign on to that, is that correct?

13  A.  No.  I chose not to form it as a legislative caucus.

14          MR. LOVELLETTE:  Thank you.

15          THE COURT:  So, when -- you testified that at some

16  point, you got contributions from the leadership, then you

17  started opposing the leadership on certain issues, and then

18  you stopped getting contributions from the leadership.

19          After you started opposing the leadership on certain

20  issues, did the leadership ever fund an opponent to your

21  candidacy in the primary?

22          THE WITNESS:  I believe so.  And, your Honor, it was

23  more than just differing on opinions.  I actually ran for

24  leadership in 2012.

25          THE COURT:  Okay.  And then -- and that's -- was that

1    the breaking point where they stopped giving you

2    contributions?

3              THE WITNESS:  Yes, yes.  I mean, it was -- I think it

4    had started a little before that, but primarily, yes.

5              THE COURT:  And after you bucked the leadership, did

6    the leadership start funding a primary opponent against you?

7              THE WITNESS:  I don't have proof that they put a

8    sitting senator against me, but he did file against me, and --

9    in the 2014 race.  I mean, I don't have -- I'm not privy to

10   all of those conversations that went into that.  It was a

11   redistricting year, and I was in the same senate district as

12   the sitting senator, so there was a lot of movement.  I don't

13   have evidence of that.

14             THE COURT:  So, you were redistricted into -- the

15   redistricting caused you and another sitting senator to be in

16   the same senate district?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  Okay.  And you both ran in the primary?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  And you prevailed?

21             THE WITNESS:  Well, no, actually, he never ran.

22             THE COURT:  He filed, but didn't run?

23             THE WITNESS:  He filed, and then he was -- he

24   withdrew his nomination papers because of issues.

25             THE COURT:  I see.  Okay.  Thank you.

1           Any redirect based on either defendants' questions or

2    my questions?

3           MR. HUEBERT:  No, your Honor.

4           THE COURT:  Okay.  Do you have anything based on my

5    questions?

6           MS. SCHELLER:  We may have one question, your Honor.

7           THE COURT:  Okay.  Go ahead.

8                         CROSS-EXAMINATION

9    BY MR. LOVELLETTE:

10   Q.  Senator, I want to make sure that the record's clear.  You

11   have not presented any evidence through the course of your

12   testimony either in the deposition or here, as far as you can

13   remember, that a legislative caucus committee gave money to an

14   electoral foe of yours because you, as the judge said, bucked

15   the leadership, is that correct?

16          MR. HUEBERT:  Objection.  The evidence in the record

17   is what it is.  It's not necessarily for Senator McCarter to

18   opine on what conclusions it leads to.

19          THE COURT:  I'm going to sustain the objection as to

20   the form.  Why don't you just, instead of asking him, "Have

21   you presented any evidence," say, "Has it happened?"

22   BY MR. LOVELLETTE:

23   Q.  Has it happened?

24   A.  Has what happened?

25   Q.  Has it happened that since you bucked the legislative

1    leaders, as you've -- the judge said earlier, you know that

2    the legislative caucus committee has given money and helped to

3    fund an electoral foe of yours?

4    A.  I think if you look at -- I think you'd have to look at

5    Senator Jones' records as to whether he was given money.  I

6    don't know that.  He may have been.  I don't know that.

7    Q.  Okay.  Thank you.

8              THE COURT:  Actually, I have a follow-up.

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Do you know -- putting your own

11   experience aside, are you aware of any of your Senate

12   Republican colleagues who opposed the leadership in some way

13   and then had the leadership fund primary opponents of those

14   members?

15             THE WITNESS:  No, sir, I don't.  I -- this is not

16   always in the form of funding campaigns.  I mean, there are

17   repercussions as slight as not being able to sit where you

18   want to sit, take the office you want to get, the parking

19   place you're put at.  I mean, there are repercussions to this.

20             As far as whether the money was intended to go

21   against me or someone else, I don't know that, sir.

22             THE COURT:  Okay.  There are repercussions, but so

23   far as you know, those repercussions don't include

24   contributions from a legislative caucus committee to a primary

25   opponent of a member who opposed the leadership in certain

1    ways?

2            THE WITNESS:  You may see that money went to Senator

3    Jones but it didn't go to me.  I can't connect those two, but

4    you probably could see that.

5            THE COURT:  Okay.  How about out -- other than you,

6    how about any of your colleagues who opposed the leadership?

7    Do you believe that anything like that has happened to them?

8            THE WITNESS:  I would have to look, and I really

9    haven't looked.

10           THE COURT:  How about on the -- your friends from

11   across the aisle?  Are you aware of anything like that

12   happening with Democratic members of the Senate who opposed

13   President Cullerton.

14           THE WITNESS:  I've got enough problems of my own.  I

15   don't even look toward the other side to see what they do.  I

16   really don't.

17           THE COURT:  Okay.  Thank you.

18           Anything based -- I just kind of added some

19   questions, and the defendants asked a question.  Do you have

20   anything -- any redirect based on the most recent questions?

21           MR. HUEBERT:  No, thank you, your Honor.

22           THE COURT:  Do you have any questions based on my

23   most recent questions?

24           MR. LOVELLETTE:  No, your Honor.

25           THE COURT:  Okay.  Thank you, Senator McCarter.  You

1   can step down.  And you're a party, so the exclusion rule

2   doesn't apply to you, so you're welcome to stay for as much or

3   as little of the trial as you'd like.

4      (Witness excused.)

5            THE COURT:  And who is the plaintiffs' next witness?

6            MR. HUEBERT:  Matthew Besler, your Honor.

7            THE COURT:  If you could raise your right hand, state

8   your name.

9            THE WITNESS:  Matthew Besler.

10     (Witness sworn.)

11           THE WITNESS:  Yes, your Honor.

12           THE COURT:  You've been sworn.  You may be seated.

13  If you'd like to pour yourself a glass of water, there's a

14  pitcher and some cups.

15           THE WITNESS:  Thank you.

16           THE COURT:  And you heard what I said about the

17  microphone, right?

18           THE WITNESS:  Yes, thanks.

19           THE COURT:  Good.

20     MATTHEW ALLEN BESLER, PLAINTIFFS' HEREIN, DULY SWORN.

21                     DIRECT EXAMINATION

22  BY MR. HUEBERT:

23  Q.  Mr. Besler, can you please state your full name for the

24  record.

25  A.  Sure.  It's Matthew Allen Besler.

1    Q.  Mr. Besler, do you play a role in any political action
2    committees that participate in elections for state offices in
3    Illinois?
4    A.  Yes.
5    Q.  What political action committees do you have a role in?
6    A.  The Illinois Liberty PAC.
7    Q.  And is Illinois Liberty PAC registered as a political
8    action committee with the Illinois State Board of Elections?
9    A.  Yes.
10   Q.  And what is your role with Illinois Liberty PAC?
11   A.  I serve as the chairman.
12   Q.  How long have you been chairman of Illinois Liberty PAC?
13   A.  I believe since 2012.
14   Q.  What are your responsibilities in your role as chairman of
15   Illinois Liberty PAC?
16   A.  To support candidates that support and align with us on
17   free market principles.
18   Q.  And when you say support, what do you mean?
19   A.  Provide financial contributions in legislative House and
20   Senate districts.
21   Q.  Does Illinois Liberty PAC do anything else to support
22   candidates?
23   A.  We might do some material support, in other words,
24   education on -- or briefings on policy.
25   Q.  Who decides which candidates Illinois Liberty PAC will

1  support?

2  A.  I do.

3  Q.  Are you the only person responsible for those decisions?

4  A.  Yes.

5  Q.  Has that been true for the entire time you've been

6  chairman of Illinois Liberty PAC?

7  A.  Yes.

8  Q.  Does the Illinois Election Code currently limit the amount

9  that a political action committee can give to a candidate in a

10  given election cycle?

11  A.  Yes.

12  Q.  What is the current limit on the amount that a political

13  action committee can give to a candidate in a given election

14  cycle?

15  A.  For Liberty PAC, it's 21,000.

16  Q.  The amount --

17  A.  Liberty PAC can give -- are you asking what Liberty PAC

18  can give to a candidate?

19  Q.  To a candidate in a given election cycle.

20  A.  Liberty PAC can give 21,000 to a candidate, Liberty PAC.

21  Q.  Are you familiar with the term "legislative caucus

22  committee"?

23  A.  Yes.

24  Q.  What does that term mean to you?

25  A.  In the House and the Senate chambers of the General

1　Assembly, there's four leaders.  Each leader runs a political

2　committee, political PAC, committee PAC.  There's the Senate

3　President, Cullerton.  There's the Senate Minority Leader, and

4　then there's the House Minority Leader, and then there's the

5　Speaker of the House.  They each have campaign committees that

6　they run.

7　Q.  Do you know whether the law places any limits on the

8　amounts that a legislative caucus committee can give to a

9　candidate in an election cycle?

10　A.  Yeah, there's no amounts in the general election.  There's

11　limits in the primary election.

12　Q.  Do you know what those limits are?

13　A.  For the Senate, it's 130,900, and for the House, it's

14　80,900.

15　　　　　　MR. HUEBERT:  Your Honor, may I have a moment?

16　　　　　　THE COURT:  Sure.

17　BY MR. HUEBERT:

18　Q.  Mr. Besler, is it possible you're confusing the limit on

19　what Illinois Liberty PAC gives to candidates to what others

20　can give to candidates?

21　A.  Yes, that's correct.

22　Q.  Can you clarify how much Illinois Liberty PAC can give to

23　the candidates?

24　A.  Sure, it's 52,900.

25　Q.  Does Illinois Liberty PAC ever support candidates who are

1    running against a candidate who receives support from a

2    legislative caucus committee in a primary election?

3    A.  I'm sorry.  Can you say that again?

4    Q.  Does Illinois Liberty PAC ever support candidates who are

5    running against a candidate who receives support from a

6    legislative caucus committee in a primary election?

7    A.  Yes.

8    Q.  Does Illinois Liberty PAC ever support candidates who are

9    running against a candidate who receives support from a

10   legislative caucus committee in a general election?

11   A.  Yes.

12   Q.  As chairman of Illinois Liberty PAC, do you want to give

13   contributions to candidates for state office in Illinois that

14   exceed the current legal limits?

15   A.  Yes.  As we get into a campaign or are looking to support

16   a candidate, Liberty PAC is capped on what we can give,

17   especially in a general election, where the legislative caucus

18   committees are not capped.  So, we can only spend a certain

19   amount right out of the gate, but they can spend any amount.

20          In the primaries, we can only spend 53,900, where

21   they can spend more.  In the House, they can spend up to

22   $80,000.  So, in races that have -- that are, let's say, a

23   media market where the caucus committees can buy hundreds of

24   thousands of dollars of TV advertising for a candidate, we can

25   only spend -- Liberty PAC can only spend $53,000 on that race

1    and then we're done, so we're completely hampered by that.

2    Q.  Can you identify any specific candidates to whom Illinois

3    Liberty PAC currently wants to give contributions that would

4    exceed the legal limit?

5    A.  Sure.  We could start with Jeanne Ives, or we can go to

6    candidates that are currently running right now, like Dan

7    McConchie in the Senate.

8    Q.  Do the limits on political action committees'

9    contributions to candidates affect the strategies that

10   Illinois Liberty PAC pursues with its contributions?

11   A.  Yes.  You know, we're limited with funds that we raise,

12   and it changes the way that we raise money.  But if I see that

13   a race is very close and that additional TV buys or additional

14   dollars might help that candidate that I want to be able to

15   provide them, right now, if I hit my limit, I'm capped.  I

16   can't do any more.  So, I have to strategically look at the

17   dollars I have currently on hand to where I can provide the

18   most support where I think I'm going to get the biggest bang

19   for my dollar.

20   Q.  Do the limits on political action committees'

21   contributions to candidates affect which candidates Illinois

22   Liberty PAC will provide the financial support?

23   A.  Yes.

24   Q.  How so?

25   A.  So, for instance, if you have a candidate that is running

1    for office that has not generated a lot of dollars or support,

2    putting 5 to $10,000 to them versus putting more to another

3    race that might be more beneficial, like, say, a media race or

4    something like that, then I have to make those decisions as

5    early as I possibly can so I can spend our money wisely.

6    Q.  So, if there were no limits on how much Illinois Liberty

7    PAC could give to candidates, would that change your

8    contribution strategies?

9    A.  Yes.

10   Q.  And how so?

11   A.  So, if I -- if there's a candidate that is maybe in a

12   large media market or is very close that I feel that more

13   dollars can help support that candidate for office, then I

14   would use those dollars effectively.

15              MR. HUEBERT:  Thank you.  That's all I have.

16              THE COURT:  Okay.  Thank you.

17              Defendants?

18                        CROSS-EXAMINATION

19   BY MR. HORVAT:

20   Q.  Good morning, Mr. Besler.  Mr. Besler, I'm not sure if you

21   were in the room earlier when I spoke to Mr. Bachrach, but my

22   name is Andrew Horvat, and I represent the defendants.  I have

23   just a few questions for you.

24              You indicated that Illinois Liberty PAC is a PAC that

25   supports free market principles; is that fair?

1  A.  That's correct.

2  Q.  Now, as a PAC that supports free market principles, are

3  you aligned with any particular party?

4  A.  No.

5  Q.  You would support -- if you believed a candidate -- strike

6  that.

7         If you believed a candidate was sufficiently

8  supporting the interests that your PAC is interested in, you

9  would support them regardless of party affiliation?

10  A.  Yes.

11  Q.  Mr. Huebert asked you about the limitations on your

12  donations.  Donations are not the only activity, political

13  activity that Illinois Liberty PAC engages in, is that

14  correct?

15  A.  That's correct.

16  Q.  You also do consulting -- and by you, I mean Liberty PAC

17  also does consulting work, is that correct?

18  A.  We provide policy briefings.  If we see a briefing or

19  something that talks about a free market principle policy, we

20  might send that on to legislative candidates.

21  Q.  Would that be consulting?

22  A.  That's -- in my definition, I guess it would be.

23         THE COURT:  Would you mind aligning yourself --

24         MR. HORVAT:  Yes, sir.  My apologies.

25         THE COURT:  That's okay.

1  BY MR. HORVAT:

2  Q.  You also engage in fundraising, correct, outside of what

3  Liberty PAC might also take in, is that -- in other words,

4  you'll help candidates raise funds, is that correct?

5  A.  We will help -- we'll support the candidate any way we

6  can, and if that means raise funds, then we'll do that.  We'll

7  help them.

8  Q.  Can you also go out and, for instance, put forth flyers

9  for a candidate's election if you wanted to?

10  A.  We can do mails, yes, that's correct, in-kind

11  contributions, so we can do a mail into a district that would

12  help support that candidate.  That mailing is also a part of

13  the cap, so if we do that in-kind contribution, then, yes,

14  that goes to that 53.

15  Q.  What about, say, for instance, electronic media, TV ads

16  and things of this nature?

17  A.  Yeah.  I believe anything that we are going to do for the

18  candidate, we are capped.  If we're spending money on behalf

19  of the candidate, that money is against that cap.

20  Q.  Well, I'm not asking particularly about a candidate, but

21  just to engage or just to advocate for free market principles,

22  you can put forth TV ads, put forth other manners of advocacy,

23  if you will, to support the principles that Liberty PAC

24  supports, correct?

25  A.  I suppose we could.  I mean, the main mission of Liberty

1    PAC is to support candidates directly.

2    Q.  But you're not aware of any limitations on your ability to

3    do those things that we just discussed, correct?

4    A.  As long as it's not -- it's my understanding that as long

5    as it's not benefiting the candidate as -- so it wouldn't go

6    against that cap, then, yes, we could do that.

7    Q.  And just so the record is clear, when you say benefiting

8    the candidate, you mean directly going into, shall we say, the

9    coffers of the candidate?

10   A.  Correct, correct.  Or even mentioning the candidate,

11   "Go vote for this person," that would be something.  But we

12   don't do that, so I'm not that familiar with it.

13   Q.  And similar to what I asked Mr. Bachrach, you're not, for

14   instance, a straight line party supporter, correct?  We

15   established that you would give donations to either party

16   depending on their principles?

17   A.  Correct, right.

18   Q.  So, when you speak with your money, you're not advocating

19   for any political party, correct?

20   A.  That's correct.

21   Q.  You are only advocating for the interests that your PAC

22   determines are most pressing, for lack of a better word?

23   A.  Correct.

24   Q.  Now, similar to what I asked Mr. Bachrach, just so the

25   record is clear, as a PAC, you do not, for instance, select

1    slates of candidates, correct?

2    A.  Correct.

3    Q.  So, when you speak with your money, you are not advocating

4    on behalf of any particular slate of candidates, is that

5    correct?

6    A.  Correct.

7    Q.  Again, you do not determine who sits on legislative

8    committees, is that correct?

9    A.  Correct.

10   Q.  And again, when you give money, you are not advocating on

11   behalf of who should sit on any particular legislative

12   committee, correct?

13   A.  Correct.

14   Q.  And along those same lines, you do not determine who sits

15   in legislative leadership positions, correct?

16   A.  Correct.

17   Q.  And, therefore, once again, when you give your money, when

18   you speak, you are not advocating on who should be in any

19   particular legislative leadership position?

20   A.  Correct.

21   Q.  As a PAC, you are not beholden to any particular

22   electorate, correct?

23   A.  No.

24   Q.  Nobody can vote you in or out of office, right?

25   A.  Correct.

Besler - cross

1  Q.  Now, the limitations that you discussed with Mr. Huebert,
2  those limitations remain constant despite the issue you
3  advocate for, correct?
4  A.  Correct.
5  Q.  And they remain constant despite the issue that the
6  recipient of your donation advocates for, correct?
7  A.  Correct.  You mean the money that they can receive?
8  Q.  Yes.
9  A.  Yes, correct.
10  Q.  And so, for instance, the limits that are on Illinois
11  Liberty PAC would apply regardless of whether you are giving a
12  donation to a candidate who is expounding free market
13  principles or one who is expounding socialism, correct?
14  A.  There's limits on what we can give candidates, correct.
15  Q.  Sure.  And it's regardless of the interest that is put
16  forth by the candidate, correct?
17  A.  Correct.  Like in the general election, there are no
18  limits for the other side, for campaign committees.  There are
19  for us.
20  Q.  I understand.  And I'm just speaking of you, just so you
21  and I are clear.
22  A.  Okay.
23  Q.  The limits are the same regardless of the viewpoint of
24  either the donor or the donee, correct?
25  A.  Correct.

1  Q.  Now, Liberty PAC was formed to support the candidates who

2  support free market principles, correct?

3  A.  Correct.

4  Q.  It was not formed to elect members to the General

5  Assembly, correct?

6  A.  By members, do you mean sitting legislators, or do you

7  mean members by -- so, Liberty PAC supports individuals that

8  are running for office, for legislative office.  So, if that's

9  considered a member --

10  Q.  Right.  That was a misnomer.  I shouldn't have used

11  members.

12          In other words, you are not -- Liberty PAC was not

13  formed to design -- or designed to elect candidates to office

14  on the whole, correct?

15  A.  We are -- I'm confused by your question.

16  Q.  Sure.

17  A.  We are -- we -- our mission is to support candidates for

18  legislative office.

19  Q.  Particular candidates, correct?

20  A.  Correct, particular candidates.

21  Q.  Not slates of candidates from the Republican Party or

22  slates of candidates from the Democratic Party, correct?

23  A.  Correct.  But I'm confused on what you're calling a slate.

24  Q.  Well, it goes back to my initial questions.  Liberty PAC

25  is not party affiliated, correct?

1   A.  Correct.

2   Q.  So, it's not the point of Liberty PAC to pack the

3   legislature with as many Republicans or Democrats as possible,

4   correct?

5   A.  That's correct.

6   Q.  You're not there to expand any particular caucus, correct?

7   A.  Correct.

8   Q.  Mr. Besler, I assume because you are a named plaintiff in

9   this case that you subscribe to the theory that legislative

10  leaders use these legislative caucus committees to entrench

11  themselves in power, correct?

12  A.  You know, I don't familiarize myself with how legislative

13  leaders operate.  I focus on what our PAC operates on.

14  Q.  Fair enough.  Then you would agree that you have no

15  factual support to indicate any instances in which legislative

16  caucus committees used rewards or punishments or withheld

17  electoral support?

18  A.  I'm not aware of any.

19  Q.  And just so I can finish my question, do so to entrench

20  the leadership in power, correct?

21  A.  Again, I'm not aware of any.

22          MR. HORVAT:  Mr. Besler, I appreciate your time, sir.

23  Thank you very much.

24          THE COURT:  Thank you.  Just to follow up on some of

25  the questions, you were talking about directly supporting a

1    candidate, and you were suggesting that Illinois Liberty PAC

2    could spend money in a way that doesn't directly support the

3    candidate.  Were you referring to independent expenditures?

4             THE WITNESS:  No.  I'm just referring to what my

5    understanding is of campaign reporting laws, that if I go out

6    there and send out a piece that says, "Free market principles

7    are generally a good practice.  We should all engage in that,"

8    I don't think I'm capped by doing that because I'm not

9    mentioning a candidate, so it's not directly supporting a

10   candidate.  But if I say, "Go support so-and-so candidate

11   because they represent true free market principles," then I

12   think that means I'm supporting a candidate, so that piece or

13   whatever that is would be looked at as helping that candidate,

14   which then I have to make sure that doesn't go against our

15   cap.

16            THE COURT:  I see.  So -- but even if you're not

17   coordinating with the campaign, you think that that money

18   still goes against the cap?

19            THE WITNESS:  No, I don't think it does.  But if I'm

20   just doing a blanket piece that says -- that doesn't mention

21   the candidates, I don't think it goes against any candidate's

22   cap.

23            THE COURT:  But what if -- are you saying that you

24   can't operate in the way that, say, a federal Super PAC like

25   Rite to Arise can operate?

1    THE WITNESS:  Correct.  Because it's my understanding

2  I cannot give -- I can give direct contributions to

3  candidates, which means the money that the PAC is raising is

4  capped.  I believe that independent expenditures can't

5  coordinate candidates, so their dollars that are coming in are

6  not capped.

7    THE COURT:  I see.  So, could you do things like

8  Rite to Arise is doing, which is to run an advertisement

9  either in favor of your preferred candidate or against a

10  not-preferred candidate, so long as you don't coordinate with

11  your favored candidate, in a way that doesn't count against

12  the cap?

13    THE WITNESS:  I'm not familiar with that

14  organization, but if I put anything out there that supports

15  the candidate, then I am -- then I am bound to report that as

16  an in-kind contribution, because Illinois Liberty PAC is a

17  direct expenditure PAC.

18    THE COURT:  I see.  Could Illinois Liberty PAC

19  organize itself in a different way so that it would be allowed

20  to make independent expenditures in support of a particular

21  candidate so long as there was no coordination with that

22  candidate?

23    THE WITNESS:  I think anybody can become an

24  independent expenditure PAC.  Liberty PAC is intended to be a

25  direct expenditure PAC; and as a direct expenditure PAC, we

Besler - cross

1    have to follow the law, which is the limitations that we have.

2            THE COURT:  But if Illinois Liberty -- if the powers

3    that be at Illinois Liberty PAC decided to do so, it could

4    become an independent expenditure organization?

5            THE WITNESS:  Sure, sure.  But our main thing is we

6    like to work with candidates.

7            THE COURT:  Could you have two arms that are separate

8    but for both --

9            THE WITNESS:  I don't know.  I mean, I guess -- I

10   don't know if you can have the same name.  I'm not familiar

11   with those legal restrictions on Liberty -- a direct and

12   independent, if they can have the same name or not.  I'm not

13   aware.  I don't believe they can.  Maybe it's different

14   federally, but I don't know.

15           THE COURT:  Okay.  Thank you.

16           Plaintiffs, any redirect based on the defendants'

17   questions or mine?

18           MR. HUEBERT:  No, your Honor.

19           THE COURT:  Okay.  Defendants, any recross based on

20   my questions?

21           MR. HORVAT:  No, your Honor.

22           THE COURT:  Okay.  Thank you, Mr. Besler.  You can

23   step down.

24     (Witness excused.)

25           THE COURT:  And Mr. Besler is the rep of Illinois

1    Liberty PAC?

2              MR. HUEBERT:  That's correct, your Honor.

3              THE COURT:  Okay.  So, you can stay in the courtroom

4    as well.

5              We've been going for about an hour and 20 minutes, so

6    why don't we take a 10-minute break.  We'll come back at a

7    little after 11:00 o'clock, and then we'll probably go until

8    about 12:10.

9              And if you could -- do you have one more witness, or

10   more than that?

11             MR. HUEBERT:  Just one, your Honor.

12             THE COURT:  Okay.  And that will be your expert?

13             MR. HUEBERT:  That's correct, your Honor.

14             THE COURT:  Okay.  Very good.  Thank you.

15     (Recess had.)

16             THE COURT:  Do one of plaintiffs' counsel want to

17   check in the hallway to see if defense counsel is there?

18             So, do we have -- are plaintiffs ready to call their

19   next witness?

20             MR. HUEBERT:  Yes, your Honor.  The plaintiffs call

21   Marcus Osborn.

22             THE COURT:  Dr. Osborn, if you could step up, please.

23   If you could remain standing, raise your right hand, and state

24   your name.

25             THE WITNESS:  Marcus Brian Osborn.

1       (Witness sworn.)

2               THE WITNESS:  I do.

3               THE COURT:  You've been sworn.  You may be seated.

4       There's a pitcher and some cups if you'd like to pour yourself

5       some water.

6               And the -- in terms of the microphone and how it

7       works, you don't have to be right on top of it like that; but

8       if you speak directionally towards it in a moderate tone of

9       voice, it should be able to pick you up.

10              THE WITNESS:  I do have a bad habit of not speaking

11      into the microphone, so please, if I do that --

12              THE COURT:  Sure.  I've never had any problem

13      directing a witness to do that.

14              MS. SCHELLER:  Your Honor, I apologize.  I was out in

15      the hallway.  I just -- if we're calling Dr. Marcus Osborn,

16      the defense would just like to renew their objection to

17      Dr. Osborn's testimony to preserve our record.

18              THE COURT:  Okay.  That's fine.  I think you're

19      already preserved on that twice, but in case not, you're now

20      preserved a third time.  And I'm going to deny that motion for

21      the reasons stated in my most recent opinion.

22              Are you ready to go, Dr. Osborn?

23              THE WITNESS:  Yes, I am.

24          MARCUS BRIAN OSBORN, PLAINTIFFS' WITNESS, DULY SWORN.

25                      DIRECT EXAMINATION

1  BY MR. HUEBERT:

2  Q.  What do you do for a living, Dr. Osborn?

3  A.  I'm in the government relations field.

4  Q.  And what is it that you do working in the government

5  relations field?

6  A.  I represent clients before legislative bodies,

7  administrative bodies, assist them in developing political

8  policy strategies, draft legislation, review legislation,

9  provide policy expertise on various public policy issues, and

10  work with policy-makers, legislators, campaign and

11  other-related issues.

12  Q.  What is it that you do related to campaigns?

13  A.  I advise clients on contribution strategies.  I've -- in

14  the past, I've also assisted candidates in actually running

15  campaigns, developing marketing strategies, and running

16  elections, assisting them in campaign finance strategies, all

17  aspects of running campaigns.

18  Q.  And how long have you been doing this type of government

19  relations work?

20  A.  Since the early 1990s.

21  Q.  Do you work for a firm?

22  A.  Yes.  I work for Kutak Rock.

23  Q.  What kind of business is Kutak Rock?

24  A.  It's a national law firm.

25  Q.  Are you an attorney?

1   A.  No.

2   Q.  So, Kutak Rock offers government relation services in

3   addition to legal services?

4   A.  Yes, they do.

5   Q.  How long have you been working in this field at Kutak

6   Rock?

7   A.  About three years.

8   Q.  You mentioned a moment ago that you're -- strike that.

9           Do your clients that you serve as a government

10  relations specialist include governmental agencies?

11  A.  Yes, they do.

12  Q.  Can you provide some examples of government agencies

13  you've represented while working at Kutak Rock?

14  A.  Yes, I can.  I represented the Town of Queen Creek, and

15  still do, on legislative matters.  I've represented Phoenix

16  Industrial Development Authority.  I've also done work for the

17  Arizona state legislature on campaign finance issues related

18  to the *Clean Election v. Bennett* case.

19  Q.  And what exactly did you do for the Arizona legislature in

20  connection with the case you just identified?

21  A.  The legislature increased campaign contribution limits

22  because of the increased outside money spending.  The Clean

23  Elections Commission sued to overturn those limits, and I

24  provided a report explaining how the presence of increased

25  outside campaign contributions put candidates at risk unless

1    they had a better opportunity to fundraise.

2    Q.  Do you know what court that case was before?

3    A.  I believe it was -- went all the way up to the Arizona

4    Supreme Court.

5    Q.  Before you worked at your current firm, did you work

6    somewhere else?

7    A.  Yes.  I worked for a marketing and lobbying firm called

8    R & R Partners for about 12 years.

9    Q.  What kind of business is that, to be clear?

10   A.  They provide generalized marketing efforts, and then they

11   have a government relations division that provides lobbying

12   services, campaign services, and other types of policy,

13   political-related services to both business clients and

14   individuals.

15   Q.  How long did you work for R & R Partners?

16   A.  12 years.

17   Q.  And did you do the same type of work there essentially as

18   you do now for Kutak Rock?

19   A.  Very similar, yes.

20   Q.  Did you represent any governmental agencies when you

21   worked for R & R Partners?

22   A.  Yes.  I represented the City of Phoenix, Valley Metro,

23   which is a local transit agency in the Phoenix area.  And we

24   also did work for the Arizona Secretary of State on voter

25   outreach communication and messaging.

Osborn - direct

1    Q.  You said that you have represented clients before the

2    legislative branch of government.  Have you done that kind of

3    work in any matters related to election law?

4    A.  Yes, I have.

5    Q.  Who was your client for that work?

6    A.  The Arizona Chamber of Commerce and Industry, which is the

7    largest chamber of commerce in Arizona in terms of public

8    policy matters.  And I -- I assisted them in helping craft

9    some legislation to deal with the regulatory environment for

10   campaigns in the post-*Citizens United* environment.

11   Q.  And do you advise state legislative campaigns?

12   A.  Yes, I do.

13   Q.  What state legislative campaigns have you advised?

14   A.  Senate President Randall Gnant; Senator and former

15   Representative Carolyn Allen, who was the House Majority

16   Leader.  I represented Laura Knaperek, Representative Michael

17   Gardner.  Those were all done on a more formal basis, and I've

18   informally advised numerous other candidates as well, in

19   addition to Representative Carol Sommers.

20   Q.  And just to be clear, those are all Arizona state

21   candidates?

22   A.  Yes.

23   Q.  And what are some examples of things you've advised

24   legislative candidates on?

25   A.  Marketing strategies, campaign strategies, designing

1    direct mail and voter outreach efforts, fundraising

2    strategies, general campaign consulting strategies.

3    Q.  Do you believe that anything in particular makes you

4    qualified particularly to advise candidates on campaign

5    financing strategies?

6    A.  My professional experience, understanding both the

7    relationship of marketing and public relations, and my

8    academic background and professional background.

9    Q.  Speaking of your academic background, let's discuss that.

10   Where did you receive your undergraduate degree?

11   A.  The University of Arizona.

12   Q.  And what year did you graduate?

13   A.  1993.

14   Q.  Do you have any graduate degrees?

15   A.  Yes.  I have an MPA, a Master's in Public Administration,

16   and a doctorate in public administration from Arizona State

17   University.

18   Q.  Is that doctorate a Ph.D.?

19   A.  Yes, it is.

20   Q.  And when did you receive the Master's Degree?

21   A.  I think about 1998.

22   Q.  And when did you receive your Ph.D.?

23   A.  2003.

24   Q.  And the Ph.D. was in public administration?

25   A.  That is correct.

1   Q.  What is public administration?

2   A.  Public administration is a science that deals with the

3   management of government.  It involves both issues of

4   traditional -- applies concepts from the business sector in

5   terms of business management.  It also applies concepts from

6   the political science field and merges those together to

7   inform how governments operate both politically and from a

8   policy perspective.

9   Q.  As part of your work to earn your Ph.D., did you write a

10  dissertation?

11  A.  Yes, I did.

12  Q.  What was your subject of your dissertation?

13  A.  It was on how interest groups achieve influence through

14  campaign contributions and the importance of both money,

15  information, and how those interact together.

16  Q.  To complete your dissertation, did you have to become

17  familiar with the general body of academic literature in any

18  particular subjects?

19  A.  Yes.

20  Q.  What did those subjects include?

21  A.  Political science, particularly focused on interest group

22  theory and how interest groups get influence both at the

23  federal and state level, state legislative operations,

24  campaign-related issues, and to a lesser extent, political

25  parties.

1  Q.  Can you give more details on what the -- what you studied

2  with respect to campaigns?

3  A.  So, in terms of campaigns, how electoral vulnerability and

4  other issues impact the willingness of candidates to be

5  influenced by interest groups is one of the themes in the

6  interest group literature.

7  Q.  Was the literature you became familiar with in your Ph.D.

8  studies focused primarily on Arizona law and politics?

9  A.  No.  It's a much broader literature.  They incorporate

10 some elements from the congressional literature as well as

11 state legislative issues.

12 Q.  Today, do you remain familiar with the general body of

13 academic literature with respect to the subjects you studied

14 in obtaining your Ph.D.?

15 A.  Yes.

16 Q.  Since you received your Ph.D., have you written any other

17 academic works related to the subjects you've just described?

18 A.  Yes, I have.

19 Q.  Can you tell us what works you've written on those

20 subjects and just briefly what each one is about?

21 A.  I wrote a book chapter on how governors lobby the

22 legislature.  I wrote a piece on the use of -- it was an

23 application of my dissertation on -- basically a conference

24 paper based off of my dissertation.  I wrote a conference

25 paper that describes how different economic factors drive the

1    need for lobbying and government relation services.

2            And then I developed a paper on using options theory

3    to help -- as a tool for campaign consultants in lobbying

4    strategies.

5    Q.  You mentioned earlier that you served as an expert witness

6    on behalf of the Arizona legislature in a court case.  Have

7    you served as an expert witness in any other court cases?

8    A.  Yes, I have.

9    Q.  What case was that?

10   A.  *Arizona Free Enterprise Club v. Bennett*.

11   Q.  Do you know what court that case was before?

12   A.  It eventually went up to the U.S. Supreme Court.

13   Q.  On whose behalf did you testify in that case?

14   A.  I was representing or was recruited by the plaintiffs on

15   the prevailing side, and the plaintiffs were a number of

16   legislators who were concerned about the matching funds

17   provision of the Arizona Clean Elections Act.

18   Q.  And what was the subject matter of your expert testimony

19   in that case?

20   A.  I looked at strategies for gaming the election system and

21   the -- and how the current system of campaign contribution

22   limits was adequate to protect against the appearance of

23   corruption.

24   Q.  Do you know the result of that litigation?

25   A.  The plaintiffs were ultimately successful.

1  Q.  Dr. Osborn, have you reviewed Article 9 of the Illinois
2  Election Code?
3  A.  Yes, I have.
4  Q.  So, as we talk, if I refer to the code, you'll understand
5  that I'm referring to the Illinois Election Code?
6  A.  Yes.
7  Q.  And it's possible I'll also refer to Article 9 of the
8  Illinois Election Code as the act.  If I do that, you'll also
9  understand what I'm referring to?
10  A.  Yes, I will.
11  Q.  In particular, have you reviewed the contribution limits
12  that Article 9 of the code places on individuals, political
13  action committees, political party committees, and legislative
14  caucus committees?
15  A.  Yes, I have.
16  Q.  And have you analyzed how the structure of those limits
17  affects opportunities for corruption and the appearance of
18  corruption?
19  A.  Yes, I have.
20  Q.  And in particular, have you analyzed the role of
21  legislative caucus committees within that structure?
22  A.  Yes, with particular focus.
23  Q.  And do you have an opinion as to whether the Illinois
24  Election Code's treatment of legislative caucus committees
25  affects opportunities for corruption and the appearance of

1  corruption?

2  A.  Yes, I do.

3  Q.  And in summary, what is your conclusion as to whether the

4  Illinois Election Code's treatment of legislative caucus

5  committees affects corruption or the appearance of corruption?

6  A.  The -- the structure of the caucus committee system

7  enhances the potential of corruption because it links a

8  policy-making authority directly with a fundraising system.

9         MR. HUEBERT:  Your Honor, may I approach the witness?

10        THE COURT:  Sure.

11 BY MR. HUEBERT:

12 Q.  Dr. Osborn, I've handed you what's been marked as

13 Plaintiffs' Exhibit 1.  Do you recognize it?

14 A.  Yes, I do.

15 Q.  What is it?

16 A.  It is the report I prepared.

17 Q.  And does this report state your opinion on how the code's

18 treatment of legislative caucus committees affects corruption

19 or the appearance of corruption?

20 A.  Yes, it does.

21 Q.  And does this report state the basis for that opinion?

22 A.  Yes, it does.

23 Q.  Before you explain your opinion, we should define some

24 terms.  The Illinois Election Code defines several different

25 categories of people or entities that commit contributions to

1  candidates for office, is that correct?

2  A.  Yes, that is correct.

3  Q.  What are those categories?

4  A.  There are individuals, political action committees,

5  corporations, political action committees, and then there's

6  also individual candidate committees.

7  Q.  Are there also political party committees?

8  A.  Yes, yes, I'm sorry.

9  Q.  And does the code also refer to a type of entity called a

10  legislative caucus committee?

11  A.  Yes, it does.

12  Q.  And what is a legislative caucus committee under the code?

13  A.  There's in essence three ways a caucus committee can be

14  formed.  First, the code designates the Speaker, the Senate

15  President, and the two minority leaders as -- gives them the

16  authority to create a caucus committee.  And it additionally

17  allows five members of the Senate or 10 members of the House

18  to raise their own caucus committees as well.

19  Q.  Can you give -- provide some examples of entities other

20  than legislative caucus committees that would be considered

21  political party committees under the code?

22  A.  The Democratic Party.  I think I understood your question

23  right.

24  Q.  But the Democrats could have different political party

25  committees, right?  Can you provide some examples of the

Osborn - direct

80

1    different kinds they could have?

2    A.  Oh, yes.  The code allows there to be multiple types of

3    political party committees, whether it's based at the county

4    level, the legislative district level, ward level.  There's,

5    I think, approximately 379 different types of political

6    parties in Illinois.

7    Q.  Now, as you proceed in your testimony, if I say political

8    parties or political party committees, I am referring to

9    political party committees other than legislative caucus

10   committees.  And if I mean to include legislative caucus

11   committees, I'll specifically refer to legislative caucus

12   committees.  Does that make sense?

13   A.  Yes, it does.

14            THE COURT:  Defendants, you got that?

15            Okay.  Go ahead.

16   BY MR. HUEBERT:

17   Q.  The code places different contribution limits on the

18   different categories of political contributors, is that

19   correct?

20   A.  Yes, it does.

21   Q.  And at the time you submitted your report, the most an

22   individual could give to a candidate in an election cycle was

23   $5300, is that correct?

24   A.  That's correct.

25   Q.  And at the time you prepared your report, the most a

1    corporation or other association could give to a candidate in

2    an election cycle was $10,500, is that correct?

3    A.   That is correct.

4    Q.   And at the time you prepared your report, the most a

5    political action committee could give to a candidate in an

6    election cycle was $52,600, is that correct?

7    A.   That is correct.

8    Q.   And at the time you prepared your report, what was the

9    most a political party committee could give to a candidate in

10   an election cycle?

11   A.   Can you be a little more clear when you say "election

12   cycle"?

13   Q.   In a general election, at the time you prepared your

14   report, what was the most a political party committee could

15   give to a candidate?

16   A.   Unlimited amounts.

17   Q.   And at the time you prepared your report, what was the

18   most a political party committee could give to a candidate in

19   a primary election?

20   A.   There were limitations.  I'm trying to remember.  I know

21   for the caucus committees, they were about 78,000, and 131,000

22   for -- depending on whether they were a Senate or House race.

23   Q.   So, those are approximate figures?  It might be 131,600

24   for a Senate candidate?

25   A.   Right.

1  Q.  And it might be 78,900 for an Illinois House candidate?

2  A.  That's correct.

3  Q.  You mentioned that the code considers legislative caucus

4  committees to be a type of political party committee.  Does

5  that mean that legislative caucus committees have the same

6  type of contribution limits or lack of contribution limits as

7  any other political party committee?

8  A.  I'm sorry.  Can you repeat the question?

9  Q.  The code -- you mentioned that the code considers

10  legislative caucus committees to be a type of political party

11  committee.  Does that mean, then, that legislative caucus

12  committees face the same contribution limits or lack of

13  contribution limits as any other type of political party

14  committee?

15  A.  That is correct.

16  Q.  Are there differences between the way the code treats

17  legislative caucus committees and the way that it treats other

18  types of political party committees?

19  A.  There are some differences.

20  Q.  What are those differences?

21  A.  The major difference is that candidates are limited from

22  accepting contributions from only one caucus committee.

23  Q.  Are there differences with respect to how those committees

24  are formed?

25  A.  Yes.

1    Q.   What are those differences?

2    A.   The differences is the code specifies whether it's the --

3    I'm sorry, the Senate President, the Speaker, or the minority

4    leaders can create their own caucus committees.  And as I

5    mentioned before, the combination of five senators or 10 House

6    members can also create a caucus committee.  So, it's

7    prescriptive; whereas, the party provisions relate more to the

8    nature of the legislative -- or the district in which they're

9    forming a party, the geographic boundary is probably the

10   easier way to say that.

11   Q.   Now, let's step back from the Illinois code for a moment

12   to talk about the characteristics of the different types of

13   political contributors in general based on your knowledge

14   of -- from your education and from your work.

15          Can you explain what goals and strategies that

16   political parties generally, not including legislative caucus

17   committees, generally pursue?

18   A.   Political parties pursue what I would call an expansion

19   strategy.  They are always trying to enhance their numbers,

20   either their numbers of registered voters or the number of

21   officeholders that they can get elected.

22          In addition, they are also there to protect their

23   existing membership as well to make sure that the other side

24   does not make inroads.  So, they are designed as a body to

25   elect.  They're not focused necessarily on policy-making as

1  such.

2  Q.  Do political parties pursue any other goals or strategies

3  besides trying to maximize the number of party members elected

4  to office?

5  A.  That's their primary and overwhelming goal.

6  Q.  Do political parties tend to attract campaign

7  contributions from any particular types of donors?

8  A.  Political parties tend to get a broad cross section of

9  donors, including small individuals.  In some cases,

10  corporations or allied interest groups also contribute.  So,

11  they get a broader mix of contributors who are interested in

12  the broader electoral goals of the party.

13  Q.  Does that diverse mix of contributors affect the potential

14  for corruption or the appearance of corruption with respect to

15  contributions to a political party?

16  A.  Yes, it does.

17  Q.  How so?

18  A.  The potential for corruption increases when you have an

19  intense concentration of contributions, meaning that it's from

20  one select group of industries or one select group of

21  interests.  And those contributions become heavily favored and

22  valued.  If you have a diverse series of contributions, that

23  mitigates the potential for corruption because you have a

24  diverse cross section of contributors.

25          Second is parties are one step removed from the

1   policy-making process, meaning while their goal or job is to

2   elect candidates, they are also not actively involved in the

3   day-to-day legislating or policy-making as a legislator or a

4   governor would be.

5   Q.  So, when a political party receives contributions and then

6   donates them to candidates for office, does the diverse mix of

7   contributors to the political party affect the potential for

8   corruption inherent in the donations from the party to a

9   candidate?

10  A.  Yes, it does.  If you look at the academic literature,

11  scholars tend to believe that parties are a countervailing

12  force against interest group influence; and so because

13  interest groups are seeking access, they have a slightly

14  different strategy than a political party, which is there to

15  promote the interests of their party members and grow their

16  party.

17  Q.  And just to be clear, what is your basis for the testimony

18  you've just given about the strategies that political parties

19  pursue and how that affects the potential for corruption?

20  A.  That's based on the academic literature, some of which

21  I've cited in my report.

22  Q.  Okay.  Now let's talk for a moment about political action

23  committees.  Can you explain to us what goals and strategies

24  political action committees in general pursue?

25  A.  Political action committees tend to implement what we call

1   access-driven strategies.  The goal of a political action

2   committee is to help set the environment so that they can

3   influence a public policy decision.

4        Yes, there are some what I'd call ideologically-based

5   political action committees that are just trying to promote a

6   broader agenda; but when you think about the political action

7   committees tied to corporations or labor unions or trade

8   associations, they are pursuing an access strategy where

9   they're trying to supplement their on-the-ground lobbying or

10  influence strategies on public policy with campaign

11  contributions.

12  Q.  Is there a relationship between political action

13  committees' use of these access strategies that you've

14  described and the potential for quid pro quo corruption or the

15  appearance of quid pro quo corruption inherent in political

16  action committees' contributions to candidates?

17  A.  Yes, there is a relationship.  One of the reasons why many

18  states will limit campaign contributions from political action

19  committees or corporations is to provide a buffer so that

20  there isn't as intense a level of concentration of these

21  contributions.

22        And because of their tie to policy-making in a more

23  direct fashion than, say, a political party contribution, the

24  risk is higher for quid pro quo type of corruption.

25        The idea would be, "Unless you support X, Y, or Z

1    candidates, we will not move your piece of legislation through

2    the process."

3    Q.  And just to be clear, what's your basis for the testimony

4    you've just given about the strategies that political action

5    committees pursue and how that affects the potential for

6    corruption?

7    A.  As someone who has worked and helped manage political --

8    political action committees and my review of the literature,

9    those two elements provide the foundation for that argument.

10   Q.  Does the academic literature you're familiar with say

11   anything about the combined effects of political party

12   contributions and political action committee contributions on

13   a candidate?

14   A.  Yes.

15   Q.  And what does it say about that?

16   A.  Can you be a little bit more specific?

17   Q.  Does the literature say anything about the relative

18   influence on political party contributions and political

19   action committee contributions on a candidate?  Is there a

20   relationship?  Is there an interaction between the effects

21   of those contributions coming in to a candidate?

22   A.  Political party contributions in terms of influence, in

23   terms of specific public policy issues, tend to be more

24   general; whereas, the risk of an interest group contribution,

25   since they tend to be a little bit more transactional, there's

1  a higher degree of potential for influence or corruption on

2  the interest group contribution as compared to the political

3  party contribution.

4  Q.  You described some general characteristics of political

5  parties and political action committees.  Do the

6  characteristics of political parties you've described

7  necessarily apply to every political party committee?

8  A.  No, they're generalizations of how political parties

9  operate.

10  Q.  And do the characteristics of political action committees

11  you've described necessarily apply to every political action

12  committee?

13  A.  No.  As I said before, they represent diverse interests.

14  But as a general notion, they tend to be access-granting or

15  -seeking organizations.

16  Q.  So, if you were presented with an example of a political

17  action committee that did not pursue the strategies you said

18  that political action committees generally pursue, would that

19  change your views regarding the strategies those groups

20  generally pursue?

21  A.  No.

22  Q.  Why not?

23  A.  As I said before, there's a diversity of interest groups

24  or political action committees.  Some may have varying degrees

25  of sophistication or different policy goals, so there may be

1   examples on the outside where they don't pursue necessarily an

2   access strategy and they're more electorally focused.

3   Q.  So, if you were presented with an example of a political

4   action committee that did not pursue the strategies you said

5   that political action committees generally pursue, would that

6   change your opinion regarding the strategies that those groups

7   generally pursue?

8   A.  No.

9   Q.  Why not?

10  A.  Because it's a generalization of what as a group those

11  interests seek out.

12         When I -- as an example, when I did my dissertation,

13  I labeled all interest groups as a uniform category and used

14  that as a variable in my model.  So, it's taken as a

15  generalization of what interest groups as compared to other

16  actors in the political process provide.

17  Q.  Is that the approach taken in the academic literature

18  generally?

19  A.  The academic literature looks for trends and themes, and

20  it's social-science-based, so we're not looking for absolutes

21  because these are dynamic systems with dynamic interests.

22  Q.  Apart from the legislative caucus committees defined in

23  the Illinois Election Code, is the concept of a legislative

24  caucus committee something that you're familiar with

25  generally?

Osborn - direct

90

1   A.  Yes.

2   Q.  And what is that in general, according to your

3   understanding?

4   A.  Outside --

5          MS. SCHELLER:  Objection.  Relevance.

6          THE COURT:  Overruled.

7   BY THE WITNESS:

8   A.  Outside of the caucus committee structure specifically

9   defined in the statute, caucuses in general are bodies that

10  manage the legislative operations of a legislature.  They are

11  how parties organize themselves for both political

12  organization and for policy-making.

13         So, caucuses are utilized as tools to help Democrats,

14  Republicans organize themselves, help establish policy

15  positions, and create administrative structures to manage the

16  operation of legislative bodies.

17  BY MR. HUEBERT:

18  Q.  And so just to be clear on the terms you're using, would

19  you call what you just described a legislative caucus?

20  A.  Yes.

21  Q.  And is there something different from that you're familiar

22  with that would be called like a caucus committee?

23  A.  A legislative caucus committee would be the finance arm

24  of -- as defined in the Illinois statute.

25  Q.  Is that a concept that -- is that a more general concept

1    that exists or could exist in other states?

2    A.  The idea of caucus committees -- caucuses can also be

3    arranged with subcommittees and other organizational features,

4    so a caucus committee could be a body -- outside of the

5    Illinois campaign finance definition, it's any mechanism to

6    organize members within a legislative body.

7    Q.  Are you talking about with respect to financing?

8    A.  It could be either financing or administration and

9    policy-making.

10   Q.  Would those be two different types of things you're

11   talking about there, two different concepts?

12   A.  Yes.

13   Q.  So, just for clarity as we talk, if I say legislative

14   caucus, it would make sense that that refers to the

15   organization within the legislature that is not necessarily

16   tied to fundraising; does that make sense as to the use of

17   that term?

18   A.  Yes.  They may have some activity generally speaking for

19   fundraising, but it's more -- normally a caucus is more a

20   group that operates the operations of the House and Senate on

21   a partisan basis.

22   Q.  And if I were to use the term "caucus committee," would it

23   make sense to use that term to refer to a type of committee

24   that's used as a fundraising vehicle?

25   A.  Yes.

1  Q.  Okay.  So, do legislative caucuses -- excuse me.  Strike

2  that.

3           In general, do legislative caucuses have all the same

4  characteristics as a political party committee?

5  A.  No.

6  Q.  What are the differences?

7  A.  The primary difference is while they both have electoral

8  goals in order to maintain their status as a -- in the

9  legislature, a legislative caucus committee is also organized

10 to manage the policy affairs of whatever legislative body they

11 are part of.  So, they organize themselves in a committee

12 structure.  They assign members to different committees to do

13 policy work.  They use the caucuses as a filtering mechanism

14 for policy ideas and try to coordinate legislating --

15 legislative activity.

16          So that it's easiest to think of it in two ways:  The

17 political side of making sure they maintain their agendas,

18 which could include fundraising and campaigning and those

19 elements; and the second area is the actual legislating and

20 organizing the legislating activity.

21 Q.  Just so we're clear on our terms, is what you described --

22 just described what you defined earlier as a legislative

23 caucus?

24 A.  That is correct.

25 Q.  Not necessarily identical to the concept of a legislative

1    caucus committee in Illinois?

2    A.  Correct.

3    Q.  In general, do caucus committees, the kind we talked about

4    for financing purposes, have all the same characteristics as a

5    political party committee?

6    A.  Yes, they do, with a couple of exceptions.  One, they have

7    the exclusivity limitation, and they are focused on just

8    legislative members have the ability to create those

9    committees.  So, they are similar, but there is some

10   differences.

11   Q.  I just want to be clear.  The question I just asked was

12   not about legislative caucus committees as defined in the

13   Illinois code.

14   A.  Okay.

15   Q.  I'm talking about the more general concept of a caucus

16   committee, the vehicle you described that members of a

17   legislature could use for financing.  Is that type of

18   committee -- does that type of committee have all the same

19   characteristics as a political party committee?

20   A.  No.  While they are both -- have an electoral interest, a

21   legislative caucus has the secondary or additional requirement

22   of managing the legislative operations on a partisan basis.

23   Q.  We keep going back and forth between these twos terms, so

24   I want to make sure we're very clear.  There's the -- you've

25   described a legislative caucus as the thing that is involved

1  in managing legislative affairs in the legislature.

2         The question I just asked was not about that.  My

3  question was about -- specifically about a committee for

4  financing related to members of the legislature.  So, just to

5  be clear, does that kind of committee for financing have all

6  the same characteristics as any other political party in

7  general in the abstract?

8  A.  No.  They're similar, but not identical.

9  Q.  What makes them different?

10  A.  The legislative caucus committee for financing is a

11  vehicle that is -- gives special powers to the legislative

12  leaders of each of the caucuses or a self-organizing group of

13  members within the legislature to organize financing for

14  legislative financing purposes.  So, it's a -- it has a more

15  narrow focus than a political party, which is examining all of

16  the aspects of political races within that.  So, it's

17  specifically tied to legislative elections.

18  Q.  Do legislative caucuses typically have a leader?

19  A.  Yes, they do.

20  Q.  And who, if anyone, typically serves as a leader of a

21  legislative caucus?

22  A.  The leader tends to be either the Senate President, the

23  Speaker of the House, could be a minority leader, and in some

24  states, it could be a majority leader.  So, there's a mix.

25  But usually the majority party, their leader also has the role

1    as being the Speaker or the President of the body.  So, they

2    have both formal authority over the body, but also authority

3    over the caucus as well.

4    Q.  Do the leaders of legislative caucuses generally have any

5    kind of institutional authority?

6    A.  Yes, they do.

7    Q.  And what does that include?

8    A.  The Senate President and the Speaker of the House have the

9    ability to make committee assignments, direct legislation,

10   calendar legislation, appoint individuals to committees.  So,

11   they have very significant legislating authority in terms of

12   managing the legislative process.  They also commonly control

13   staff and have a key role in defining rules and policies for

14   each legislative body.

15   Q.  Are caucus leadership positions generally considered

16   desirable among legislators?

17   A.  They are probably the most desirable positions, where

18   members -- many members will aspire to become a Speaker or a

19   Senate President, if possible.

20   Q.  Why is that?

21   A.  Given their fairly significant institutional power puts

22   them in the best position to influence public policy and the

23   legislative agenda of the caucus.

24   Q.  If a leader of a majority party's legislative caucus wants

25   to maintain his or her position as leader, are there certain

1  things that he or she must do to stay in that position?

2  A.  Yes.

3  Q.  And what are those things, at a high level of generality?

4  A.  First, they have to be supported by their caucus.  Second,

5  they have to maintain the numbers of their caucus.  And third,

6  they must make sure that the membership or the majority of the

7  membership of their caucus is supportive of their position as

8  leader.

9       So, those are the core elements.  So, they have to

10 provide enough benefits to the broad base of the members that

11 the members see value in them as leader.  They have to

12 maintain the numbers of the caucus or electoral status.  And

13 then they have to be an effective public policy leader as well

14 so that the members respect their ability to guide the public

15 policy process for the legislative body.

16 Q.  After someone becomes a legislative leader, are there

17 particular tools that he or she can use to maintain his or her

18 support within the caucus?

19 A.  There are a series of carrots and sticks that they can

20 use providing members with plum committee assignments or

21 fast-tracking the legislation or providing assistance to the

22 legislation.  They can provide fundraising support, either

23 direct or indirect, or they can withhold fundraising support.

24 Similarly, if a member has been problematic on some issues,

25 they can slow down or restrict their legislative efforts.

1          So, there's a series of carrots and sticks that a

2    leader can utilize.  They have to be judiciously handled to

3    make sure that the caucus as a whole is content with their

4    leadership, but there are a series of kind of levers or

5    hammers and carrots that they can use.

6    Q.  You said the leader can do things related to fundraising

7    to support him -- to maintain support for himself or herself

8    within the caucus.  How could a leader use fundraising to

9    maintain support within the caucus?

10   A.  Well, in the role of leading the finance -- caucus

11   committee finance arm, they can direct contributions to

12   members.  In addition, they can attend or help solicit members

13   funds if they did not have a caucus committee fundraising

14   source.

15          But the caucus committee in particular fundraising

16   structure allows them a very direct mechanism to distribute

17   campaign contributions directly to members.

18   Q.  Can a legislative leader use campaign contributions to

19   advance his or her personal policy agenda?

20   A.  Yes.  When I was speaking of the tools that they can

21   utilize, that could be a potential tool as a way of

22   influencing members, saying, you know, additional campaign

23   funds will either be provided or withheld depending on how

24   supportive they are of the Speaker's agenda or the caucus's

25   agenda.  So, it is a tool that can be utilized.

1  Q.  Does a legislative leader's ability to make campaign

2  contributions, through whatever vehicle is available, to

3  legislative candidates create any opportunities for quid pro

4  quo corruption?

5  A.  Potentially, yes.

6  Q.  How so?

7  A.  Well, the leader can formally say, "Unless you vote for

8  this bill, you will not receive contributions," or even a more

9  subtler form to say -- where a member could say, "You know,

10 that bill's going to be very difficult in my district.  It

11 would be helpful if I had some additional fundraising

12 opportunities from the caucus committee to help mitigate

13 that."

14         So, there's a range of kind of discussions that can

15 occur that could lead to potentially quid pro quo corruption.

16 Q.  Is having a caucus committee fundraising vehicle an

17 inherent part of being a legislative leader?  In other words,

18 is that something that legislative leaders kind of by

19 definition would always have everywhere?

20 A.  No.  They will always be active at some level in

21 fundraising, and that could be indirect or hosting events for

22 other members.  But having such a direct mechanism isn't

23 necessarily a requirement for a leader to manage a caucus.

24 Q.  Now, considering the legislative caucus committees that

25 exist under the Illinois Election Code in particular, can you

1   see any advantages that having those legislative caucus
2   committees would give Illinois' legislative leaders?
3   A.  Yes.
4   Q.  And what would those be?
5   A.  Because they're able to redirect significant amounts of
6   campaign funds, it potentially can create some dependency
7   between the members and the legislative leaders in terms of
8   their fundraising efforts.
9           In addition, because those contributions -- once
10  they've received them from one caucus committee or in essence
11  an exclusive contribution, it helps to mitigate potential
12  rivals within the caucus from creating their own caucus
13  committees and creating a really effective fundraising
14  strategy to create electoral pressure on the legislative
15  leaders.
16          So, it has the effect of concentrating power at the
17  top of the caucus and minimizing the potential for individuals
18  who are -- want to rise up in the caucus to challenge the
19  legislative leader.
20  Q.  And do the limits that the code places on other types of
21  political contributors besides legislative caucus committees
22  affect how much of an advantage the legislative caucus
23  committees give to the legislative leaders?
24  A.  The ability to have a countervailing fundraising source I
25  think is an important interaction.  Legislative caucus

1    committees can be a very dominant fundraising source; whereas,

2    political action committees and other organizations which can

3    be much more decentralized have stricter campaign contribution

4    limits, and so it minimizes some of the competition from the

5    caucus committees.

6           Secondly, because a lot of the interest groups are --

7    and PACs and other contributors are access-seeking

8    organizations, contributing to the legislative leaders'

9    committees are one of the most attractive areas to dedicate

10   resources because of their strong role in the policy-making

11   process.

12   Q.  Can you elaborate a little bit more about why legislative

13   caucus committees would tend to attract interest group

14   contributions?

15   A.  So, if you look at a lot of the academic literature about

16   where interest groups contribute, they're going to contribute

17   to folks that, one, are aligned to their issues, but two, are

18   in positions of authority and power.  So, if it's a specific

19   issue, they're going to dedicate more of their contributions

20   to a relevant committee.

21          The Speaker and the President and the legislative

22   leaders are at the top of the food chain in terms of

23   organizational power, so it makes sense that they would

24   dedicate those resources there, because having access to those

25   individuals is the most important goal in terms of granting --

1    achieving an access strategy.

2    Q.  You testified earlier that in general, a legislative

3    leader's ability to give campaign contributions can give rise

4    to opportunities for quid pro quo corruption.  Does the

5    Illinois Election Code's treatment of legislative caucus

6    committees affect those opportunities for corruption?

7    A.  Yes, it does.

8    Q.  How so?

9    A.  The issue is by combining the policy-making function of

10   the Senate President, the two minority leaders, and the

11   Speaker with extraordinary fundraising power, you've now, in

12   essence, merged policy-making and electoral in a very tight

13   nest together; and that relationship, I think, enhances the

14   potential for corruption.

15            This is compared to a party or a distant external

16   organization that would be fundraising or supporting the

17   caucuses.  By tying that so close, I think you've brought in

18   an enhanced potential for corruption.

19   Q.  Does the provision of the Illinois Election Code that

20   prohibits candidates from accepting contributions from one --

21   more than one legislative caucus committee in a given two-year

22   election cycle have an effect on the opportunities for

23   corruption inherent in legislative caucus committees'

24   contributions to candidates?

25   A.   It does, because it centralizes the fundraising to

1  candidates -- the caucus committee structure.  So, once -- if

2  you're the only game in town or the most powerful game in

3  town, even if there's other caucus committees that are formed,

4  if you get your contributions in early from those

5  organizations, you've in essence got exclusive rights to those

6  members in terms of contribution strategies.

7  Q.  And how does that relate to the opportunities for quid pro

8  quo corruption?

9  A.  Well, if a candidate is -- a member is in electoral

10  distress when they need the resources the most and they're

11  already committed to the caucus committee, that creates a

12  powerful incentive or power to influence not only the

13  candidate's behavior but influence their policy-making as

14  well.  In essence, it's almost a dependency factor.

15         Now, that has to be judiciously used because if the

16  Speaker or President uses it too aggressively, they will lose

17  the will and the interest of their caucus; but when you have a

18  strong fundraising machine, it allows the legislative leaders

19  on both minority and minority to have a fairly good series of

20  carrots and potential sticks.

21  Q.  Does the provision of the Illinois code that prohibits

22  candidates from accepting contributions from more than one

23  legislative caucus committee in a given election affect a

24  legislative leader's ability to remain in his or her position

25  as leader?

1  A.  I think it enhances it, because it gives them a sense of
2  exclusivity.  Whether they had a caucus committee or not,
3  legislative leaders will always have a superior fundraising
4  ability.  As I mentioned before, interest groups in particular
5  want access to the highest-level leaders, and they will always
6  seek that out.
7          When you enhance that by also making a caucus
8  committee that has the ability to limit access from other
9  caucus committees, you've really enhanced that centralization
10  of fundraising authority.
11  Q.  Now, you testified that the exclusivity enhances that.
12  Then what do the limits -- what effect do the limits on other
13  political contributors do to that ability?
14  A.  The -- if you're looking for -- if candidates can find
15  other sources of funding that are as efficient and can be
16  achieved through higher limits, that could be a
17  counterbalancing force to the concentration of fundraising
18  within the caucus committee system.
19  Q.  When you examine the characteristics of legislative caucus
20  committees under the Illinois Election Code, do they bear a
21  closer resemblance to other types of political party
22  committees, or do they bear a closer resemblance to political
23  action committees?
24  A.  I believe they're somewhat in between.  And where I think
25  they fall is they're -- they more closely resemble what I

1    would call a leadership PAC.  And when I speak of legislative

2    caucus committees, I'm speaking of the ones that are

3    exclusively managed by the four top leaders.

4           In that sense, the legislative caucus will operate in

5    both a -- kind of an expansionist strategy or kind of a caucus

6    strategy, but they will also have a secondary purpose of

7    managing or assisting in a leader achieving their personal

8    objectives.

9           Now, commonly, those will be very aligned, where the

10   leader wants to do the best for the caucus, but there could be

11   opportunities where they diverge either in subtle ways or even

12   in more significant ways.

13   Q.  You used the term "leadership PAC."  To be clear, what is

14   a leadership PAC?

15   A.  A leadership PAC is a concept where a -- and they're

16   common in Congress, where a congressional member will create a

17   fundraising arm and use those funds to contribute to other

18   candidates within their caucus or within their party.  So,

19   it's a way that the emerging leaders or even senior leaders

20   can provide electoral support in a decentralized way.

21          One of the benefits for the member managing that

22   legislative leadership committee is they're able to curry some

23   favor with other legislators who receive those contributions.

24   And so there's a benefit both for the caucus or for the party,

25   but there's also a benefit for that individual leader.

1        That seems very similar to the kind of four-top

2   legislative caucus committee, where they have both some

3   individualized benefits as well as some caucus benefits.

4        Now, for the other caucus committees where they're

5   created by five or 10 members, you don't see that same

6   concentration of individualized benefit.  Those are more

7   generalized benefits for the caucus or at least the members

8   who are creating those broader-based caucuses.

9   Q.  Does the academic literature in your field discuss the

10  strategies and goals that leadership PACs pursue?

11  A.  Yes, it does.

12  Q.  And according to that literature, what strategies and

13  goals do leadership PACs generally pursue?

14  A.  They call them Type 1 goals, which are kind of the broader

15  caucus-building, party-building goals, and then Type 2 goals

16  are the more individualistic goals of the leaders of the

17  leadership PACs, so how can those contributions benefit the

18  leaders.  So, they may give to individuals on certain

19  committees or folks that they may want to seek out for their

20  efforts to become a leader or a committee chair or something

21  of that nature.

22  Q.  How do leadership PACs differ in their goals and

23  strategies from political party committees?

24  A.  Political party committees are there to support the broad

25  agenda of the party, and they always have an access -- or not

1  access, excuse me, a membership expansion strategy.

2          Where a leadership PAC may differ slightly is yes,

3  they want to expand the leadership -- or the membership of

4  their party, but they also want to make sure those who get the

5  most attention are ones who are most closely aligned either

6  ideologically or for political reasons to those managing the

7  leadership PACs.

8  Q.  Are there any factors that affect whether a leadership PAC

9  is likely to focus on the Type 1 goal or the Type 2 goal?

10  A.  The primary difference is if you were in the minority

11  party, you're going to be much more likely to pursue an

12  expansionist goal, because until you achieve majority status,

13  the organizational benefits of being in leadership cannot be

14  attained.  So, those type of organizations tend to always seek

15  a more expansionist strategy.  With power comes, you know --

16  or with larger numbers comes more authority.

17  Q.  And so what is the implication there for the majority

18  party legislative -- or excuse me, the majority party

19  leadership PACs?

20  A.  The majority party leadership PACs will also seek to

21  protect their majority status, but it does give them a little

22  bit more flexibility to pursue other smaller individualized

23  goals.

24  Q.  So, you testified that the legislative caucus committees

25  referenced in the Illinois Election Code resemble leadership

1    PACs.  Why do you say that?

2    A.  Because they're organized -- well, the ones for the four

3    senior leaders are specifically organized around the leader

4    themselves.  If they were broad-based PACs that -- or caucus

5    committees that all the members came and appointed a board of

6    five or 10 members, that would make them a little less

7    individualized.

8         But what the statute here has done is actually

9    statutorily appointed those four as the ones who have that

10   specialized authority.  So, it's a subtle difference, but I

11   think it's an important difference.

12        THE COURT:  Have you reached a good breaking point,

13   or is there a certain line of questioning that you'd like to

14   continue with?

15        MR. HUEBERT:  I think we can break now.

16        THE COURT:  Okay.  All right.  Why don't we break for

17   lunch right now.  We'll -- well, let me ask, about how much

18   longer do you think you'll have with Dr. Osborn?

19        MR. HUEBERT:  It will be a while yet.  Maybe an hour,

20   but I don't know.

21        THE COURT:  Okay.  All right.  So, why don't we -- I

22   have to go to a meeting at 12:15.  Why don't we plan on

23   starting at 1:20.  Is that all right?

24        MR. HUEBERT:  That's fine.

25        THE COURT:  Okay.  Anything anybody would like to

1    discuss before we break?

2            MR. LOVELLETTE:  Yes, your Honor.  We were talking

3    during our previous break.  I have let our witnesses know to

4    be here tomorrow.  I don't know if I should change that.

5    We'll have at least one witness that could be here this

6    afternoon, but I don't know what --

7            THE COURT:  Well, don't worry about it.  If it were a

8    jury trial and we'd be putting the jury on ice for two hours,

9    it would be one thing, but it's not a concern with a bench

10   trial.

11           MR. LOVELLETTE:  Thank you.

12           THE COURT:  So, if they're down the street and they

13   want to come this afternoon, great.  If it's just more

14   convenient to start tomorrow, we can start tomorrow with your

15   witnesses.

16           MR. LOVELLETTE:  Thank you.

17           THE COURT:  Anything else?

18           MR. HUEBERT:  No, your Honor.  Thank you.

19           THE COURT:  Okay.  You can step down, and we'll

20   resume at about -- let's say 1:25 just to be safe.

21     (Lunch recess had.)

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT.
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3
       ILLINOIS LIBERTY PAC,  a        )
 4     Political Action Committee      )
       registered with the Illinois    )
 5     State Board of Elections,       )
       EDGAR BACHRACH, and KYLE        )
 6     McCARTER,                       )
                                       )
 7                       Plaintiffs,   )
                                       )
 8     -vs-                            )  Case No. 12 C 5811
                                       )
 9     LISA M. MADIGAN, Attorney       )
       General of the State of         )
10     Illinois; WILLIAM McGUFFAGE,    )
       Chariman of the Illinois        )
11     State Board of Elections;       )
       JESSE R. SMART,                 )
12     Vice-Chairman of the            )
       Illinois State Board of         )
13     Elections; HAROLD D. BYERS,     )
       Member of the Illinois State    )
14     Board of Elections; BETTY J.    )
       COFFRIN, Member of the          )
15     Illinois State Board of         )
       Elections; ERNEST L. GOWEN,     )
16     Member of the Illinois State    )
       Board of Elections; JUDITH      )
17     C. RICE, Member of the          )
       Illinois State Board of         )
18     Elections;  BRYAN A.            )
       SCHNEIDER, Member of the        )
19     Illinois State Board of         )
       Elections; and CHARLES W.       )
20     SCHOLZ, Member of the           )
       Illinois State Board of         )
21     Elections, all in their         )
       official capacities,            )  Chicago, Illinois
22                                     )  January 25, 2016
                         Defendants.   )  1:30 p.m.
23

24                 TRANSCRIPT OF PROCEEDINGS - Trial
                BEFORE THE HONORABLE GARY FEINERMAN
25
```

```
 1   APPEARANCES:

 2   For the Plaintiffs:    LIBERTY JUSTICE CENTER
                            BY:   MR. JACOB H. HUEBERT
 3                                MR. JEFFREY M. SCHWAB
                                  MR. JAMES McQUAID
 4                          190 South LaSalle Street
                            Suite 1630
 5                          Chicago, Illinois  60654
                            (312) 263-7668
 6

 7   For the Defendants:    ILLINOIS ATTORNEY GENERAL'S OFFICE
                            BY:   MS. JESSICA M. SCHELLER
 8                                MR. KEVIN R. LOVELLETTE
                                  MR. T. ANDREW HORVAT
 9                          100 West Randolph Street
                            13th Floor
10                          Chicago, Illinois  60601
                            (312) 814-2098
11

12

13

14

15

16

17

18

19

20

21
     Court Reporter:
22
                       CHARLES R. ZANDI, CSR, RPR, FCRR
23                          Official Court Reporter
                          United States District Court
24                 219 South Dearborn Street, Suite 2128
                         Chicago, Illinois  60604
25                      Telephone:  (312) 435-5387
                   email:  Charles_zandi@ilnd.uscourts.gov
```

1    (Proceedings heard in open court:)

2         THE COURT:  Everybody can be seated.  Apologies.  The

3    meeting ran about five minutes long.

4         So, should we resume with Dr. Osborn?

5         MR. HUEBERT:  Yes, your Honor.

6         THE COURT:  Is there anything we need to discuss

7    before we do that?  No?

8         Okay.  Dr. Osborn, if you could resume the stand,

9    please, and you're still under oath.

10        MARCUS BRIAN OSBORN, PLAINTIFFS' WITNESS, DULY SWORN.

11             DIRECT EXAMINATION (Resumed)

12   BY MR. HUEBERT:

13   Q.  Dr. Osborn, in Illinois, is it possible for a legislative

14   leader to use his or her legislative caucus committee to serve

15   his or her own personal interests?

16   A.  Yes, it is.

17   Q.  And how is it possible?

18   A.  Well, remember that the leader is designated as the

19   chairman or the director of the legislative caucus committee,

20   so he has discretion in how those funds are to be used.  Now,

21   he always has to balance that with the needs of the caucus,

22   but it does give him a great deal of discretion on how he

23   utilizes those funds.

24   Q.  Does legislative leaders' ability to use their legislative

25   caucus committees to serve their own personal interests affect

1  the potential for quid pro quo corruption in the contributions
2  that they make from those committees?
3  A.  Yes, it could.  If -- if he or she has some personal
4  objectives, it makes he or she more susceptible to those
5  types of requests when interest groups or other individuals
6  are making contributions.
7          And similarly, if he has certain legislative or other
8  priorities that he wants, it allows him the ability to direct
9  those funds to legislators who are either supportive of his
10 effort or withhold those type of funds to those members who
11 are not.
12 Q.  And does that affect the potential for quid pro quo
13 corruption inherent in campaign contributions from the
14 legislative leaders' caucus committees relative to the
15 potential for corruption inherent in the typical political
16 party contribution?
17 A.  Because the contributions and the caucus committee is more
18 closely associated with the legislative authority, that risk
19 is enhanced, where a traditional political party is one step
20 removed from the policy-making, and so their goals are to
21 promote the party and aren't as specific to actual
22 legislating.
23 Q.  You noted exclusivity as a difference between legislative
24 caucus committees and other political party committees under
25 Illinois law, the idea that a candidate can accept

1    contributions from -- I'm sorry.  Strike that.

2            A candidate in Illinois -- can a candidate in

3    Illinois accept contributions from more than one political

4    party committee other than a legislative caucus committee?

5    A.  Yes, they can.

6    Q.  But you testified that a candidate can only accept

7    contributions from one legislative caucus committee in an

8    election cycle?

9    A.  That is correct.

10   Q.  Does that difference affect the relative potential for

11   corruption inherent in legislative caucus committees'

12   contributions versus other political party committees'

13   contributions?

14   A.  It could, because of the exclusivity factor.  If a

15   candidate or a member is dependent on the legislative caucus

16   committee's contribution and they can't accept contributions

17   from other caucus committees, the level of dependency

18   increases; whereas, with the political parties, they can

19   accept from multiple political parties.

20   Q.  You testified earlier that political party committees

21   tend to attract contributions from a variety of donors, a

22   diverse mix of donors.  Is that what you would expect to see

23   in contributions to legislative caucus committees as well?

24   A.  Not necessarily.  You'll likely see a higher concentration

25   of interest group contributions because those contributions

1    are more closely tied to the policy-making process.

2    Q.  Are you aware of any evidence that legislative caucus

3    committees in Illinois have received heavy support from

4    special interests?

5    A.  Yes.  I reviewed the campaign finance reports for two of

6    the caucus committees and saw heavy reliance on campaign

7    contributions from interest groups and corporations.

8    Q.  And that was from which caucus committees?

9    A.  Yes.

10   Q.  For which ones?

11   A.  The Senate caucus committee and the House caucus

12   committee, Democratic Majority and the Senate Victory Fund, I

13   believe.

14   Q.  And for which election cycle was that?

15   A.  2012.

16   Q.  Are you sure it was 2012?

17   A.  Let me check my --

18   Q.  Well, do you not recall?

19   A.  Oh, I'm sorry.  Yes, it was the 2014 cycle.

20   Q.  Did you find anything notable about the list of

21   contributions to the Senate Democratic Victory Fund caucus

22   committee that you reviewed?

23   A.  There appear to be a very high reliance on PAC

24   contributions and corporate contributions.

25   Q.  And have you reviewed a list of contributions to the

1  Democratic Majority for the 2014 election cycle?

2  A.  Yes, I did.

3  Q.  And did you find anything notable about the list of

4  contributors to the Democratic Majority legislative caucus

5  committee that you reviewed?

6  A.  Similarly, it was heavily reliant on interest group

7  contributions.

8  Q.  If legislative caucus committees do receive a large

9  portion of their contributions from special interests, does

10  that affect the potential corruption associated with

11  legislative caucus committees?

12  A.  Potentially, it could.

13  Q.  How so?

14  A.  Because interest groups are access-seeking organizations,

15  and they're looking to influence the public policy process,

16  and so heavy reliance on those contributions kind of mirrors

17  the policy-making process along with the electoral process.

18  Q.  So, just so it's clear, would that affect the potential --

19  assuming a legislative caucus committee receives a large

20  portion of its contributions from interest groups, would that

21  affect the potential for corruption in the contributions that

22  the caucus committee in turn makes to candidates --

23  A.  Potentially.

24  Q.  -- after receiving that money?

25  A.  Potentially, it could.

1    Q.  And just so it's clear, how so?

2    A.  Because it's, in essence, a triangle between the donors,

3    the interest groups, the legislative caucus committee; and

4    the policy agenda of each of those groups, that cozy

5    relationship could lend itself to increased opportunities for

6    corruption.

7    Q.  Have you -- excuse me.

8           Have you reviewed data regarding any contributions by

9    legislative caucus committees in Illinois to see what

10   contribution strategies those committees appear to be

11   pursuing?

12   A.  Yes, I did.

13   Q.  What contributions did you review?

14   A.  I reviewed contributions for the 2012 election cycle from

15   the two legislative caucus committees managed by the

16   legislative leaders.

17   Q.  By which legislative leaders?

18   A.  The Speaker of the House and the Senate President, the

19   Democrat Victory fund and the Senate fund.

20   Q.  Where did you obtain that information?

21   A.  I requested that information from the Liberty Institute

22   For Justice as part of a follow-up report.

23   Q.  Do you mean to say Liberty Justice Center, which is --

24   A.  Excuse me, Liberty Justice Center.

25   Q.  And why did you have the Liberty Justice Center compile

1    that information?

2    A.  It was an economic cost-savings.  Instead of paying me to

3    collect that data, it was cheaper to have you guys assemble

4    it; and it is common in the academic world to use compiled

5    data as part of your analysis.

6    Q.  Is the information that you reviewed contained in your

7    expert report?

8    A.  It is.

9    Q.  Where in your expert report?

10   A.  It's in the appendices.

11   Q.  Did you request data on these two legislative caucus

12   committees in the 2012 election cycle in particular?

13   A.  Yes.

14   Q.  Why did you request data from these two Democratic

15   legislative caucus committees in particular?

16   A.  Because those two are the caucus committees associated

17   with the majority party who had institutional control over the

18   House and the Senate.  The House Republicans and the Senate

19   Republicans also have caucus committees, but they don't have

20   the same level of organizational management control, so these

21   were the two caucus committees I was the most interested in.

22   Q.  And why did you request data from the 2012 election cycle

23   rather than some other election cycle?

24   A.  That was the latest election cycle, and it was the

25   election cycle post-redistricting as well.

1   Q.  Why did it matter that it was the latest election cycle?

2   A.  In many cases, when you implement a campaign finance

3   change, it takes several cycles for the parties or

4   participants to fully understand the -- how to utilize the

5   tools, and so having the latest election cycle provided the

6   most up-to-date area for strategy.

7   Q.  Within the contributions that you reviewed, did you focus

8   on any particular contributions within those groups?

9   A.  Yes.  I focused on the largest contributions that were

10  made by each group.  That seemed to be reflective of the areas

11  and the races that were of most importance or highest value to

12  the caucus leaders.

13  Q.  When you reviewed the contributions made by the Senate

14  Democratic Victory Committee in the 2012 primary and general

15  elections, did they appear to be consistent with any

16  particular type of strategy?

17  A.  Yes.  They were consistent with an expansion strategy,

18  electoral expansion strategy.  The largest contributors tend

19  to be focused on some of the lower margin of victory races.

20  Although many of the races, the margin of victories were still

21  fairly large, but that's probably more a factor of the lack of

22  competitiveness in some of the other elections.

23  Q.  When you reviewed contributions by the Democratic Majority

24  legislative caucus committee in the 2012 primary elections in

25  particular, did they appear to be consistent with any

Osborn - direct

1   particular type of strategy?

2   A.  Yes.

3   Q.  And what did you observe with respect to the strategies

4   that appeared to be -- that the committee appeared to be

5   pursuing?

6   A.  While there was evidence of an electoral expansion

7   strategy, there was also evidence that they -- that the

8   Democratic Majority committee participated in several primary

9   elections; and many of those primary elections, the general

10   elections were won overwhelmingly.  So, it appears that there

11   is some evidence that there was some focus on primaries versus

12   just a general election expansion strategy.

13   Q.  And were there any primaries in particular where the

14   Democratic Majority committee did not appear to be acting

15   consistently with a party expansion strategy?

16   A.  Yes.  The election of Sue Scherer and Maria Berrios.

17           THE COURT:  Can you spell those names, please.

18           THE WITNESS:  S-C-H-E-R-E-R, and Maria, M-A-R-I-A,

19   B-E-R-R-I-O-S.

20   BY MR. HUEBERT:

21   Q.  And what in particular led you to conclude that the

22   contributions that were made in that -- in those races did not

23   appear to be consistent with a party expansion strategy?

24   A.  They were large contributions in the primary, and the

25   margin of victory for those two candidates in the primary was

1    very narrow, which suggested that there were competitive

2    candidates in that race and the caucus committee took sides in

3    that election.

4    Q.  And I'm sorry if I didn't catch it.  Did you remark just

5    now upon what happened after the primary races in the general

6    elections that those candidates faced?

7    A.  Yes.  Both of them won by wide margins in the general

8    election.

9    Q.  And does that tell you anything about what strategy the

10   legislative caucus committee appeared to be pursuing with its

11   primary election contributions?

12   A.  It appears they were trying to hand-select or be provided

13   a preference of Democratic candidates in the primary.

14   Q.  And just so it's clear, do you mean a preference between

15   two different Democratic candidates?

16   A.  Between, yes.

17   Q.  If you could, please, turn to page 7 of Exhibit 1.  Are

18   the two races you referred to in which the Democratic Majority

19   did not appear to be pursuing a pure party expansion strategy

20   referenced on this page?

21   A.  Yes, they are.

22   Q.  And is that in the table that's the topmost table on that

23   page?

24   A.  That is correct.

25   Q.  And just so it's clear, in that table where it says,

1   "Contribution Amount," what does that signify?

2   A.   The level of contribution from the caucus committee.

3   Q.   And are the amounts that were given important to your

4   analysis?

5   A.   They represented significant amounts of contributions.   A

6   good way to think about it is for every dollar of

7   contribution, you know, for a $67,000 contribution, you can

8   distribute, you know, approximately 67,000 pieces of campaign

9   mail or other various tactics.   So, they're significant

10  contributions.

11  Q.   Would your opinion about the strategy that the committee

12  was pursuing change if the amounts given to these candidates

13  were lower than the amounts indicated here?

14  A.   If they were extremely low contribution levels, yes; but

15  at the high -- high levels that they all are at, no.

16  Q.   So, if they were all, say, the same amount as in the

17  last-ranked one here in the table, that wouldn't change your

18  analysis if the dollar amount had been the same for all of

19  them?

20  A.   Probably not, no.

21  Q.   When you reviewed contributions made by the Democratic

22  Majority legislative caucus committee in the 2012 general

23  election, did they appear to be consistent with any particular

24  type of strategy?

25  A.   There was some evidence of an expansion strategy, but also

1    evidence of an individualistic strategy, meaning that many of

2    the highest recipients of funds had wide margins of victory,

3    in excess of, you know, 5, 10 points, which suggested that

4    those candidates were not electorally vulnerable.  And then

5    one of the candidates was actually an independent.

6    Q.  To be clear, did you just testify that one of the

7    candidates to which the Democratic Majority gave funds in the

8    general election was not running as a member of the Democratic

9    Party?

10   A.  That's correct.

11   Q.  And was that -- and that candidate who was not the

12   Democratic -- who was not a Democratic Party candidate

13   received the fourth-highest amount of contributions in -- of

14   any candidate in that part of the -- in that general election?

15   A.  Yes.

16   Q.  You say that the margins of victory in some of these races

17   indicated that the committee was not pursuing a party

18   expansion strategy with those contributions.  Can you explain

19   a little further why that is or why you reached that

20   conclusion?

21   A.  Well, with large margins of victory, those are likely not

22   electorally vulnerable individuals.  If you're pursuing a more

23   expansion strategy, you would dedicate high resources into

24   either high-risk districts or districts in which you, even if

25   it's a longer shot, have the ability to pick up a seat.  And

1    these appear to be more incumbent protection strategies than

2    more expansionist strategy.

3    Q.  I'm sorry.  When you say incumbent protection strategy,

4    what incumbent are you referring to?

5    A.  The incumbent candidates.

6    Q.  If the candidates won by a large margin, do they need

7    protection from --

8    A.  They need lesser amounts of protection.

9            One of the things to think about in campaigns is

10   candidates will always want more resources and dollars, even

11   if they're in non-competitive races.  And so there is a

12   benefit to members if they receive contributions, even in

13   non-challenging races.  And so they can build up a war chest.

14   It helps protect them against future races, and it reduces

15   their individualized burden to actually fundraise for

16   themselves.

17           So, if you ask a candidate do they need more money,

18   their answer unless they're about ready to retire is always

19   going to be yes.

20   Q.  And could they use those contributions in future primary

21   contests?

22   A.  They could.  They're free to use them as they see fit.

23   Q.  When you gave your opinion earlier on the opportunities

24   for corruption that legislative caucus committees present

25   relative to other types of political committees, did you base

1    that opinion on the election data that's included in the

2    appendices to your report?

3    A.  Can you repeat the question?

4    Q.  Sure.  When you gave your opinion about the opportunities

5    for corruption that the structure of limits creates, did you

6    base that opinion on the campaign contribution data that's

7    included in the appendices to your report?

8    A.  In small part, yes, but the foundation of the potential

9    for corruption is the link between the policy-making side and

10   the campaign finance side.  That's the core element that

11   provides the greatest risk of the potential for corruption.

12          The election data helps to illustrate that there is

13   some examples where a purely expansionist strategy may have

14   occurred.

15   Q.  Would your conclusions about the opportunities for

16   corruptions that legislative caucus committees present

17   relative to other types of political committees have been

18   different if the data you reviewed from the 2012 election

19   cycle had not shown any apparent efforts to pursue something

20   other than an expansionist strategy?

21   A.  I'm sorry.  Can you repeat the question?

22   Q.  I'll see if I can rephrase it to be clearer.

23          If you had looked at the 2012 contribution data that

24   you reviewed and you didn't see anything that looked to you

25   like an attempt to pursue a strategy other than a caucus

1    expansion strategy, if you had not seen evidence of that,

2    would that have changed your opinion about the opportunities

3    for corruption that the structure of limits creates?

4    A.  No, because it's the structure that is the problem.  A

5    leader may certain years have a more expansionist strategy;

6    but at any given time, they can restrict that strategy or

7    modify that strategy to pursue a more personalized agenda.

8    Q.  Dr. Osborn, how would you describe the methodology you

9    applied in forming your opinion in this case?

10   A.  It was a qualitative methodology.  I was really focused on

11   looking at the structure of the campaign finance system.  I

12   was not looking to create a predictive model about how

13   contributions would be directed.  That would require a more

14   quantitative model.

15   Q.  And what is a qualitative analysis?

16   A.  It's an analysis where you review documents, contacts,

17   sometimes interviews, and make a conclusion about a structure

18   or a policy question.

19   Q.  Have you used qualitative analysis in your scholarly work?

20   A.  Yes.  The book chapter I wrote with Dr. Nownes on

21   governors lobbying was primarily developed through long-form

22   interviews with governors' staff.

23   Q.  Did you use qualitative analysis in your dissertation at

24   all?

25   A.  Well, it was primarily a quantitative dissertation.  There

1    were elements of qualitative analysis in that.

2    Q.  Is qualitative analysis a type of analysis that's used in

3    the political science field generally?

4    A.  Yes.

5    Q.  You also referenced quantitative analysis.  To be clear,

6    what is quantitative analysis?

7    A.  Quantitative analysis is analyzing numbers, taking

8    concepts and creating models where you can predict future

9    activities.  So, it can be a range of different types of

10   analysis, but --

11   Q.  In your field, is either of the two methods you've

12   mentioned, qualitative analysis and quantitative analysis,

13   inherently preferable to the other?

14   A.  It depends on the research question.

15   Q.  But in general, is either inherently preferable to the

16   other?

17   A.  No.

18   Q.  Why did you choose to do a qualitative analysis rather

19   than a quantitative analysis in this case?

20   A.  For a couple of reasons.  One, there wasn't a long history

21   of election and contribution data to create models off of; and

22   secondly, I was really more interested in analyzing how the

23   structure of the caucus committee worked, which lent itself to

24   a more qualitative design.

25   Q.  So, when you applied a qualitative analysis in forming

1  your opinion in this case, did you follow the same standard of

2  intellectual rigor that you would apply in your other

3  professional work?

4  A.  Yes.

5  Q.  You've testified that you based your opinion in this case

6  in part on the academic literature in your field.  Did the

7  literature you relied on in forming your opinion include any

8  literature specifically addressing Illinois' system of

9  campaign contribution limits?

10  A.  No, it did not, which is not surprising.  A lot of the

11  state-specific literature addresses a variation of states, so

12  it's in essence a kind of hodgepodge of states.  And then

13  there's a series of other literature that's more focused on

14  the congressional literature, and it's common for scholars to

15  use some of the congressional literature as well as the state

16  literature with the appropriate caveats.  Obviously, you're

17  not comparing apples to apples when you're looking at Congress

18  and states, but there are some similarities that you can draw

19  conclusions from.

20  Q.  So, to be clear, is there literature in the field on

21  Illinois' system that has been published and been created

22  after Illinois enacted the contribution limits we're

23  discussing here today?

24  A.  Not that I'm aware of in scholarly journals.

25  Q.  And did the lack of literature specifically addressing

1  Illinois' system impair your ability to form your opinion?
2  A.  No.
3  Q.  You testified a moment ago that qualitative analysis can
4  involve interviews.  Did you conduct any interviews as part of
5  your qualitative analysis in this case?
6  A.  No.
7  Q.  Why not?
8  A.  One of the challenges with interviews when you're talking
9  about campaign corruption is witnesses may not be forthcoming
10  about their real motives.  In addition, if you're asking
11  members of the legislature to say do they have concerns that
12  they have been overly influenced by the Speaker or President's
13  contributions, that's a heavy request to make of a member to
14  get truly objective and forthright answers.  So, that seemed
15  like an approach that could be wrought with unreliability.
16  Q.  In your -- the analysis that you performed for this case,
17  did you look at the voting records of any Illinois
18  legislators?
19  A.  No.  That wasn't the research question -- while there is a
20  healthy literature about how PAC contributions relate to
21  voting records, I did not look to see if X contributions led
22  to a certain voting result.  The literature is very mixed and
23  creates a series of methodological challenges when you attempt
24  to do that.
25  Q.  In your analysis for this case, did you compare data from

1  Illinois elections with data from federal elections?

2  A.  No, I did not.

3  Q.  And why not?

4  A.  The focus was on the Illinois example and not the federal

5  system.

6  Q.  And is there anything that would have limited your ability

7  to compare data in Illinois to data in the federal system?

8  Would that have been difficult?

9  A.  Well, the question is:  What are you trying to prove or

10  determine if you're comparing -- if there are similar

11  structures or -- there may be some ability to do that, but in

12  this context, we were focused on the Illinois system and not

13  trying to do a comparative analysis between other states or

14  the federal system.

15  Q.  Given that this act came into being in 2009, would there

16  be enough data from Illinois for you to make a meaningful

17  comparison with federal data?

18  A.  It would depend on what your research question was, but I

19  don't think so, no.

20  Q.  In your analysis for this case, did you compare data from

21  Illinois elections with data from other states' elections?

22  A.  No.

23  Q.  Why not?

24  A.  The question was:  Is there a structure that is -- creates

25  the potential for corruption?  It wasn't whether or not

1    Illinois' structure looks like other states'.

2    Q.  Before we conclude, let's return once more to the

3    structure created by Illinois' campaign finance laws.  Does

4    that structure appear to be designed to limit corruption?

5    A.  While it created a series of contribution limits, it

6    created a major window to -- of more unregulated contributions

7    through the caucus committee system.  While some of the limits

8    may have a beneficial impact on the potential for corruption,

9    when combined with the presence of the caucus committee

10   system, it creates some real new opportunities for corruption

11   that did not exist in the prior system.

12   Q.  Does the structure of limits appear to be designed to

13   serve any particular purpose?

14   A.  In particular relation to the caucus committee structure,

15   it appears to be designed to make sure that fundraising power

16   is concentrated in the most senior leaders of the caucuses.

17   Q.  And why do you say that?

18   A.  Because the act gave specific authority for the Speaker,

19   the President, and the two minority leaders to create their

20   own caucus committees.  If the act was simply designed to make

21   sure that you're limiting interest group access, they could

22   have just relied on the existing Democratic and Republican

23   party structures to provide mechanisms to fund more

24   legislative-specific campaign committees.

25   Q.  Does the exclusivity feature you referenced earlier have

1    any bearing on your conclusion about what purpose the limits

2    are designed to serve?

3    A.  It appears the exclusivity provision is a tool that can

4    enhance the power of the largest caucus committees or the

5    Speaker, President, and minority-leader-managed caucus

6    committees.

7              MR. HUEBERT:  I think I'm about done.  Let me just

8    take a moment here to make sure.

9              Thank you, Dr. Osborn.

10             THE COURT:  Okay.  Thank you.

11             Defendants?

12                      CROSS-EXAMINATION

13   BY MS. SCHELLER:

14   Q.  Good afternoon, Dr. Osborn.

15   A.  Good afternoon.

16   Q.  My name is Jessica Scheller.  I'm one of the Assistant

17   Attorneys General who's representing the defendants in this

18   case.  I'm going to be asking you just a few more questions

19   this afternoon.

20             I think you can likely hear me, but will you let me

21   know if you have difficulty hearing me?

22   A.  You're good.

23   Q.  Okay.  Are you hearing me okay right now?

24   A.  Yes, I am.

25             THE COURT:  And if you can move a little bit closer.

Osborn - cross

1    Thank you.

2            THE WITNESS:  Okay.

3    BY MS. SCHELLER:

4    Q.  Perfect.  So, Dr. Osborn, I want to begin with the two

5    examples that you cited where, according to your report,

6    legislative caucus committees engaged in spending patterns

7    which were not consistent with party expansion.  Do you recall

8    your testimony on that point?

9    A.  I do.

10   Q.  Okay.  And if I'm understanding your opinions correctly,

11   there is some statistical significance to the margin of

12   victory in the general election which led you to that

13   conclusion.  Am I correct on that as well?

14   A.  There is a significance to the margin of victory.  Larger

15   margins of victory in the general election indicate an

16   electorally safer seat, yes.

17   Q.  So, in your report, what margin of victory did you assign

18   to an electorally safer seat in the general election for the

19   two contributions that you opined upon?

20   A.  I didn't express the -- actually, I may have.  But I

21   usually use 5 percent.

22   Q.  Okay.  So, in the general election, if a candidate wins by

23   a margin of victory greater than 5 percent, in your opinion,

24   that victory is indicative that that was a politically safe

25   seat?

1    A.  It is more indicative, yes, the larger the margin of

2    victory as it grows.  The closer you are to 5 means more

3    competition.

4    Q.  And is this a number that you've selected based upon

5    more -- my math is not great today, 20-plus years as a

6    political consultant or operative, or what do you base that

7    number upon?

8    A.  Yes, I think when I advise candidates about the

9    contributions and what races are electorally at risk, that's

10   been the rule of thumb.

11   Q.  Okay.  And in your expertise, you've worked both in state

12   electoral politics and national as well?

13   A.  Primarily state, but some federal.

14   Q.  Okay.  So, I want to look at that 5 percent margin of

15   victory in the general election indicating that we could have

16   predicted from the outset of the primaries who that winner was

17   going to be.

18           Are you familiar with the 2008 presidential election,

19   Dr. Osborn?

20   A.  Generally.

21   Q.  And are you generally aware that President Obama defeated

22   Senator McCain by a margin of victory greater than 5 percent?

23   A.  You have to be more specific, because you have to take

24   into account the electoral college.  So, it certainly -- if

25   you're taking the average of all of the states, that is a --

1  it's apples and oranges.  It's in each state how large the
2  margin of victory was.
3  Q.  I will be fair to you by making my question far more
4  specific.
5  A.  Okay.
6  Q.  Would you agree with me that President Obama obtained 365
7  electoral votes, and that Senator McCain won 173?
8  A.  I haven't -- out of my recollection, I don't remember
9  exactly what he won by, but that does not seem out of
10 question.
11 Q.  And if the popular vote numbers reflected a margin of
12 victory for Senator -- excuse me, President Obama of -- I'll
13 list the vote numbers, 69,498,516 votes to Senator McCain's
14 59,948,323 votes, the victory percentages would be about 52.9
15 to 45.7.  Does that sound about right to you?
16 A.  Again, because of the electoral college, the national
17 popular vote is somewhat irrelevant.
18 Q.  The margin of victory for that particular election was
19 greater than 5 percent, right?
20 A.  Yes.
21 Q.  Okay.  So, according to the analysis that you've employed
22 here for your model, we all should have been able to predict
23 that outcome dating all the way back to the time before the
24 Democratic primaries began, correct?
25 A.  Not necessarily, but at the lower level of the scale,

1    that's a more competitive race, but --

2    Q.  Well, in this particular race, if we had picked a winner

3    at the beginning of the primary seasons for the Democratic

4    primary, we would not have been picking President Obama,

5    correct?

6    A.  I can't recall the details of that election, but --

7    Q.  I believe that Hillary Clinton for many months was

8    referred to as the presumptive nominee.

9    A.  Yes, I would agree with that.

10   Q.  And after Ms. Clinton was referred to as the presumptive

11   nominee, both President Obama and I suppose I should refer to

12   her as Secretary of State Clinton -- it's unclear; she's held

13   many titles -- engaged in unprecedented campaign fundraising,

14   right?

15   A.  Yes.

16   Q.  And there was unprecedented participation in the primary,

17   also, right?

18   A.  Yes.

19   Q.  And that's because, among other reasons, the members of

20   the Democratic Party wanted to pick the candidate who was most

21   likely to win the general election, right?

22   A.  That's one of the reasons.  But what you also will see in

23   the way they distributed their campaign contributions,

24   actually the way they spent, those contributions were

25   dedicated in the I think 11 or 12 most electorally competitive

1  seats in the general election.  So, they focused those dollars

2  in states like Ohio, Florida, and states which were seen as

3  electorally safe for one party or the other did not see much

4  campaign spending.

5  Q.  But that's not true in the primary race for 2008.  Is that

6  what you're referring to?

7  A.  No.  In the primary -- the primary system is --

8  Q.  I'm sorry.  I misunderstood what you were referring to

9  with regard to states, so --

10  A.  If you're talking about fundraising for the general

11  election, my point was that the distribution of funds in the

12  general election went to electorally competitive states where,

13  for electoral college purposes, they needed to maximize votes.

14  They did not go to states where there was huge registration or

15  polling advantages in one state or another.

16        For example, the Obama campaign did not spend a lot

17  of resources in Arizona.

18  Q.  And my point, I guess, is, Dr. Osborn, that your entire

19  theory that these legislative caucus committees' contributions

20  are not related to party expansion relies upon the premise

21  that those contributions could have predicted the winner of a

22  general election when they were made far before the primary

23  had been completed, correct?

24  A.  That sounds like your assertion, yes.

25  Q.  Would you agree that that's consistent with your opinion?

1   A.  You also have to look at the specific timing of when the

2   contributions occurred, and so super early contributions can

3   be treated differently than later contributions.

4   Q.  And your report doesn't analyze the timing of when the

5   contributions occurred with regard to the two specific

6   candidates you cited in your report, right?

7   A.  No, I did not.

8   Q.  It does not?

9   A.  It does not.

10  Q.  And your report doesn't discuss the qualitative

11  differences in the platforms of the candidates you've

12  discussed in your report, right?

13  A.  That is correct.

14  Q.  We don't know a single thing, based on your report, about

15  what the political platform was of Sue Scherer, right?  Is

16  that correct?

17  A.  That is correct.

18  Q.  We don't know anything about her challenger, right?

19  A.  That's correct.

20  Q.  And we don't know a single thing about the opponent that

21  Ms. Scherer faced in the general election, right?

22  A.  Other than she beat him or her very badly.

23  Q.  So, there's nothing in your report which would contradict

24  a strategy by the legislative caucus committee of funding the

25  candidate most likely to prevail in the general election, is

1   there?

2   A.  Given the fact that both her and her opponent were very

3   close in the primary, it demonstrates to me that there was

4   competition even amongst the Democratic Party, and so it is

5   clearly not that clear-cut as you're suggesting.

6   Q.  Well, competition among the Democratic Party doesn't

7   necessarily mean electability in a general election, though,

8   does it, right?  Because Democrats tend to like Democrats with

9   Democratic ideologies; would you agree with that?

10  A.  Yes.

11  Q.  But electability in the general election also frequently

12  depends upon either candidate being able to pull voters from

13  the middle, independent voters, centrist voters, left-leaning

14  Republicans, right-leaning Democrats, et cetera?

15  A.  That is correct.

16  Q.  All right.  I'd like to move on now to focus a little bit

17  on your qualitative report.  So, you mentioned that your

18  report was qualitative because you wanted to analyze the

19  structure of how the election code worked, correct?

20  A.  Um-hum.

21  Q.  And despite this espoused desire to learn how the election

22  code worked, you interviewed absolutely nobody?

23  A.  That is correct.

24  Q.  Including but not limited to Senator McCarter, your own

25  client, correct?

1    A.  That is correct.

2            MR. HUEBERT:  Objection.  It's not in the record that

3    Senator McCarter is Mr. Osborn's client, assumes facts not in

4    evidence.

5            THE COURT:  I think what you meant is -- I think you

6    might be equating counsel with Dr. Osborn, and while Senator

7    McCarter is counsel's client, I'm not -- I think what counsel

8    is saying is that that doesn't necessarily mean that Senator

9    McCarter is Dr. Osborn's client.

10           MS. SCHELLER:  I understand counsel's objections,

11   your Honor.  I would say Senator McCarter is a plaintiff in

12   this case.  Dr. Osborn has been retained to testify on behalf

13   of the plaintiffs.  It seems like a logical connection.

14           THE COURT:  I think what you're saying is that an

15   expert witness, a retained opinion witness has a client, and

16   I'm not sure that's the right term.

17           MS. SCHELLER:  I can rephrase it.

18           THE COURT:  Okay.

19   BY MS. SCHELLER:

20   Q.  You did not even interview Senator McCarter, one of the

21   plaintiffs who retained you to testify in this case?

22   A.  No.  Taking and just cherry-picking random interviews

23   would not be part of a thoughtful qualitative strategy.

24   Q.  And so instead, you did not try to interview anybody?

25   A.  That is correct.

1   Q.  Now, you also testified that you wanted to review

2   literature concerning legislative caucus committees, and that

3   was the method pursuant to which you were going to analyze the

4   election code and the structure of legislative caucus

5   committees, correct?

6   A.  Yes.

7   Q.  And yet you did not review any literature concerning

8   Illinois -- excuse me, Illinois caucus committees, right?

9   A.  Correct.

10  Q.  And you did not review any literature written after

11  Illinois legislative caucus committees were created, right?

12  A.  That is correct.

13  Q.  Now, aside from this, in your qualitative analysis, you

14  didn't conduct any type of analytical analysis comparing

15  congressional campaign committees to Illinois legislative

16  caucus committees and comparing their spending habits, right?

17  A.  No.

18  Q.  You did, however, review the financial data provided to

19  you by plaintiffs' counsel, the Liberty Justice Center, right?

20  A.  Yes.

21  Q.  And from that data they provided to you, you either

22  incorporated the data into tables in your report or used the

23  Liberty Justice Center's tables in your report, right?

24  A.  I don't believe I used any of the Liberty Center's

25  specific tables.

Osborn - cross

1  Q.  It was somewhat unclear in your deposition, so I'm

2  clarifying.  So just the appendices?

3  A.  As appendices, yes.

4        Actually let me correct the question.  I did modify

5  the table they had on staff spending and incorporated that

6  into my report, so --

7  Q.  So, the table on staff spending that's incorporated into

8  your report was actually a table generated by plaintiffs'

9  counsel, which then you modified and incorporated into your

10 report?

11 A.  I believe so, yes.

12 Q.  Is there anything else in your report that was generated

13 by plaintiffs' counsel which you took and either incorporated

14 whole hog or modified slightly and plugged in to your report?

15 A.  Just the contribution data that I requested.

16 Q.  And aside from the contribution data and the table,

17 everything else is your own?

18 A.  Or a source document, yes.

19 Q.  So, we're going to switch gears entirely now, and I'd like

20 to direct your attention to what Illinois law discusses or

21 defines as political party committees.  Okay?

22 A.  Okay.

23 Q.  And if I'm understanding your direct examination properly,

24 you have reviewed that area and offered opinions on political

25 party committees here today?

1    A.   Yes.

2    Q.   Okay.  So, setting aside legislative caucus committees

3    just for the moment, let's turn to other political party

4    committees as defined under Illinois law.  Okay?

5    A.   Okay.

6    Q.   So, you would agree with me, would you not, that the state

7    central committee of a political party is an Illinois

8    political party committee?

9    A.   Yes.

10   Q.   And the state central committee has the same contribution

11   limits or restrictions as a legislative caucus committee,

12   right?

13   A.   With some exceptions, yes.

14   Q.   Okay.  And your report doesn't address any specific

15   conduct of any state central committee for any Democrat in any

16   race in any election, right?

17   A.   That's correct.

18   Q.   It doesn't address the conduct of any Republican state

19   central committee for any official in any race?

20   A.   That is correct.

21   Q.   It doesn't look at Libertarians, right?

22   A.   Correct.

23   Q.   The Green Party?  Your report does not opine on how anyone

24   is elected into any position of leadership within a state

25   central political party committee, does it?

1  A.  No, it does not.

2  Q.  There's zero analysis in your report as to how someone

3  obtains a position of leadership in a state central political

4  party committee, right?

5  A.  That is correct.

6  Q.  And you also don't discuss what a state central political

7  party can do, right?

8  A.  Not in much detail, no.

9  Q.  You don't review any contributions made by any state

10 central committee to any candidate in any race?

11 A.  I do not.

12 Q.  Now, a political party committee under Illinois law is

13 also a county central committee, right?

14 A.  That is correct.

15 Q.  Your report doesn't address the specific conduct of any

16 county central committee under Illinois law, does it?

17 A.  No, it does not.

18 Q.  You're not familiar with the power structure of a county

19 central committee, are you?

20 A.  Not in detail, no.

21 Q.  Your report contains absolutely no discussion of them,

22 does it?

23 A.  No.

24 Q.  So, you don't know who holds positions of power or

25 leadership in a county central committee for the Democrats?

1    A.  No.

2    Q.  Republicans?

3    A.  No.

4    Q.  Or any other party?

5    A.  No.

6    Q.  Your report doesn't review the actions of any county

7    central committee with regard to campaign spending, right?

8    A.  That's correct.

9    Q.  And your report does not contain any analysis of a county

10   central committee insofar as it compares to some of the other

11   legal structures you discussed in your direct examination,

12   right?

13   A.  That is correct.

14   Q.  You don't compare county central committees to PACs,

15   right?

16   A.  Correct.

17   Q.  You don't talk about the different types of activities

18   that county central committees engage in?

19   A.  That's correct.

20   Q.  And that follows through, really, for every political

21   party definition under Illinois law except for legislative

22   caucus committees, right?

23   A.  That is correct.

24   Q.  Your report doesn't address ward committeemen, does it?

25   A.  No.

1    Q.  Are you aware of what a ward committeeman is?

2    A.  A ward committeeman is like a -- in essence like a

3    precinct committeeman.

4    Q.  How many wards are there in Chicago?

5    A.  I do not know.

6    Q.  I'm sorry?

7    A.  I do not know.

8    Q.  And you also do not know who the committeeman is for any

9    particular ward, right?

10   A.  I do not.

11   Q.  You couldn't say in your report whether those committeemen

12   are aldermen who sit on the City Council, right?

13   A.  They could be.

14   Q.  And they could be somebody else, correct?

15   A.  That's correct.

16   Q.  That's simply not something that you analyzed in reaching

17   any of the opinions or conclusions in your report?

18   A.  That is correct.

19   Q.  It's also not something that you analyzed in determining

20   whether legislative caucus committees were more similar to

21   political party committees or to PACs, correct?

22   A.  That is correct.

23   Q.  And the same would hold true for any township

24   committeemen, right?

25   A.  That is correct.

1  Q.  Your report is similarly not addressing political party

2  committees as it applies to township committeemen?

3  A.  That is correct.

4  Q.  And as was the case with the other political party

5  committees, your report does not address how county central

6  committees, ward committeemen, or township committees have

7  spent on any particular campaign under the contribution

8  requirement -- excuse me, contribution limitations under the

9  election code, right?

10 A.  That is correct.

11 Q.  So, I want to direct your attention now to our infamous

12 legislative caucus committees.  And we've spent a lot of time

13 discussing those, right?  So, just briefly, they're defined

14 under Illinois law as a type of political party committee,

15 correct?

16 A.  Yes.

17 Q.  And your report doesn't identify any statutory

18 distinctions between legislative caucus committees and

19 political party committees, right?

20 A.  Say that again?

21 Q.  So, your report doesn't identify any legal distinguishers

22 between legal -- excuse me, legislative caucus committees and

23 political party committees?  So, it's not as though they're

24 defined the same under the election code; but somewhere else

25 in the election code, it says something else, and you've

1   identified that in your report, right?

2   A.  I've identified the definition of caucus committee in my

3   report.

4   Q.  Right.  But you haven't cited us in your report to any

5   provision of Illinois law which suggests that the definition

6   of "legislative caucus committee" was fabricated just for the

7   election code and it means something different elsewhere?

8   A.  No.

9   Q.  So, there are a few different ways to establish

10  legislative caucus committees under the act, right?

11  A.  Correct.

12  Q.  And the President of the Senate may form a legislative

13  caucus committee if he or she so chooses, right?

14  A.  Correct.

15  Q.  And you may or may not be aware, I assume you are, that

16  the President of the Senate in Illinois is an elected

17  position, right?

18  A.  Yes.

19  Q.  And they're elected by the members of their caucus,

20  correct?

21  A.  Yes, like most legislatures.

22  Q.  And the same, then, would be true for the minority leader

23  of any party in the Senate, right?

24  A.  I agree.

25  Q.  They may also form a legislative caucus committee if he or

1  she so chooses, correct?

2  A.  That is correct.

3  Q.  And if for some reason the majority or the minority leader

4  lost in a general election, someone new would have to step in

5  to that seat, correct?

6  A.  That's correct.

7  Q.  So, if, for example, the legislative caucus committee

8  controlled by the minority leader of the Senate was engaging

9  in corruption, the electorate could remove that person from

10 office, correct?

11 A.  Of course they could.

12 Q.  And that would be the end of it, right?

13 A.  Yes.

14 Q.  Now, the same power structures hold true throughout the

15 House, correct?  Elected Speaker, may form a legislative

16 caucus committee, right?

17 A.  Correct.

18 Q.  Minority leader, may form a legislative caucus committee?

19 A.  Correct.

20 Q.  Each is elected by their respective caucuses, right?

21 A.  Correct.

22 Q.  And each may be removed, right?

23 A.  Correct.

24 Q.  Either by the members of their caucus?

25 A.  Yes.

1   Q.  Or by the general electorate?

2   A.  Correct.

3   Q.  However, you would agree -- and I think we walked through

4   it a little bit with Senator McCarter -- that it's not just

5   leadership in the Illinois Congress who can form a legislative

6   caucus committee, right?

7   A.  You mean the General Assembly?  You said Congress.

8   Q.  I meant both, but I'll be specific.

9   A.  Okay.

10   Q.  So, it's not just leadership in Illinois that can form a

11   legislative caucus committee, right?

12   A.  Correct.

13   Q.  If I were an Illinois senator and I could find four

14   like-minded individuals, we could form a caucus committee?

15   A.  Yes, you could.

16   Q.  There is no other barrier to entry, correct?

17   A.  Barrier to entry, correct.

18   Q.  So we're not only allowed to form a legislative caucus

19   committee if we are in the majority party, right?

20   A.  That's correct.

21   Q.  We could be the only five people who caucus of that party,

22   and we would be allowed to form one, right?

23   A.  Yes.

24   Q.  So, say there are five members of the Green Party?

25         THE COURT:  If you could --

Osborn - cross

1    THE WITNESS:  I'm sorry.  Yes.

2    THE COURT:  Thank you.

3  BY MS. SCHELLER:

4  Q.  So, there are five members of the Green Party and we say

5  we want to caucus.  So long as there are five of us, we can

6  form a legislative caucus committee, correct?

7  A.  That is correct.

8  Q.  And similarly, if there are 25 Republican senators and

9  five of us say, "You know what, we're really going to focus on

10  this one issue, and we're going to form a legislative caucus

11  committee, and we are going to advance that agenda because

12  that is what the electorate wants," we would be free to do

13  that as well?

14  A.  That's correct.

15  Q.  And then in the House of Representatives, the same holds

16  true, the only difference being if I were a congresswoman, I

17  would have to persuade nine people to join me, correct?

18  A.  That is correct.

19  Q.  The House legislative caucus committee requires 10 people?

20  A.  Yes.

21    THE COURT:  You mean a representative?

22    MS. SCHELLER:  Yes.

23  BY MS. SCHELLER:

24  Q.  And that is the only barrier to entry for forming a

25  legislative caucus committee in the Illinois House of

1  Representatives, right?

2  A.  Yes.

3  Q.  There's no restriction based upon viewpoint?

4  A.  No.

5  Q.  Now, for the purposes of your report, you seem to focus

6  primarily on two legislative caucus committees, right?

7  A.  Yes.

8  Q.  Both controlled by Democrats?

9  A.  Yes, because they're the majority party.

10 Q.  You are aware, though, that there were six legislative

11 caucus committees at the time you prepared your report?

12 A.  I was aware of four of them.

13 Q.  Did you look into how many there were prior to writing

14 your report?

15 A.  No, I did not.

16 Q.  Why not?

17 A.  I was focused on the caucus committees that had the

18 institutional control of the body.

19 Q.  So, would it be fair to say that your report doesn't

20 really address the structure or the behavior of legislative

21 campaign caucuses generally; you were focused exclusively on

22 those of the leadership party with the majority?

23 A.  There are elements that talk about -- in my report about

24 if you form some of the smaller caucus committees, that --

25 that that is an option and how that could be designed around

1  legislative committee structures.  But generally speaking, my
2  focus was on the legislative leaders' caucus committees.
3  Q.  Right.  So, you did not analyze or review the structure of
4  any other legislative caucus committee?
5  A.  No, I did not.
6  Q.  Your report does not reference any specific dangers
7  created by legislative caucus committees formed by a
8  non-leadership group of legislators, does it?
9  A.  Yes, it does.  I talked about if a minority -- or if a
10  subset of the caucus created a caucus around a particular
11  committee, that could create some problematic aspects.
12        The same -- I do believe the same potential for
13  corruption could occur in the minority party.  It's not party
14  specific.  But the potential for corruption is obviously
15  higher in those who have the most authority and influence.
16  So, if it was a Republican legislature, the structural
17  concerns would still be the same.  It's not a party-specific
18  issue.
19  Q.  That is correct.  Your report does reference that that
20  could happen; however, in your review for your report, you did
21  not find any specific circumstance of that type of corruption
22  taking place in Illinois?
23  A.  No, I did not.
24  Q.  So, I want to turn your attention now to our discussion of
25  legislative caucus committees, and we've heard the word

1   "leadership PAC," and I think I even heard legislative caucus

2   PAC today, the phrase "legislative caucus PAC."  But for the

3   purposes of Illinois law, you would agree with me that there's

4   a PAC, right?

5   A.  Correct.

6   Q.  And legislative caucus committees?

7   A.  Correct.

8   Q.  And there are corporations, right?

9   A.  Correct.

10  Q.  Individuals?

11  A.  Yes.

12  Q.  And candidates, right?

13  A.  Yes.  Did you mention political action committees?

14  Q.  I did.

15  A.  Okay.

16  Q.  And those are the groups that we're primarily focused upon

17  here, right?  We have plaintiffs, who are a PAC, a candidate,

18  an individual, and we're defending a statute on the other side

19  related to legislative caucus committees, right?

20  A.  You are right.

21  Q.  Okay.  So, you would agree with me that PACs, or political

22  action committees, are referred to in your report as special

23  interest groups?

24  A.  They can be, yes.

25  Q.  And what is a special interest group?

1    A.  It could be a corporation, an individual, or group of

2    individuals who have a policy or political agenda.

3    Q.  A policy -- I'm sorry.  I didn't hear you.

4    A.  I'm sorry.  A policy or political agenda.

5    Q.  Okay.  And that policy or political agenda advanced by

6    that individual or group of individuals or corporations does

7    not need to be tied to the desires of the democratic majority

8    of whatever geographical area that PAC occupies?

9    A.  You are correct.

10   Q.  And in this case, I believe Illinois Liberty PAC described

11   their special interest as a free market system, is that

12   correct?

13          MR. HUEBERT:  Objection.  Dr. Osborn wasn't present

14   for that testimony.

15          THE COURT:  Hold on.  Counsel?

16          MS. SCHELLER:  I'm thinking.

17   BY MS. SCHELLER:

18   Q.  Are you familiar with what type of --

19          THE COURT:  So, the last question was --

20          MS. SCHELLER:  I'll withdraw that.

21          THE COURT:  The last question was withdrawn, and

22   you're going on to your next question.

23          MS. SCHELLER:  Right.

24   BY MS. SCHELLER:

25   Q.  Are you aware of what type of special interest group

1    Illinois Liberty PAC might be?

2    A.  Generally, yes.

3    Q.  And what do you generally know about Illinois Liberty PAC

4    insofar as it's a special interest group?

5    A.  It's a free market advocacy group, but much more than

6    that, I do not know.

7    Q.  What does it mean to be a free market advocacy group?

8    A.  It means that you believe in free market principles,

9    markets -- they tend to be associated with conservative

10   movements.

11   Q.  So, what are some free market principles?

12   A.  Deregulation, less taxes -- I mean, there's a host of free

13   market principles -- less government, all of those type of

14   concepts are pretty core to that ideology.

15   Q.  And in your opinion, to the extent you have one, are free

16   market interest groups on the same side or a different side as

17   groups that advocate for collective bargaining?

18   A.  Opposite side.

19   Q.  So, when you're acting as the chairperson of a special

20   interest group, nobody outside of that interest group has to

21   approve of your ideological message, right?

22   A.  That is correct.

23   Q.  It can help with fundraising, correct?

24   A.  Yes.

25   Q.  But an independently wealthy chairperson of a PAC doesn't

1  require the majority of the electorate to sign on to their

2  ideas?

3  A.  That is correct.

4  Q.  So, if we're looking at special interest groups, I want to

5  go to the concept of quid pro quo corruption.  Okay?

6         So, if I am engaging in quid pro quo corruption as

7  the chairperson of a political action committee and I approach

8  a Republican who shares my free market ideology, right?  Are

9  you with me so far?  And I offer to give them money in

10  exchange for voting against collective bargaining, is that

11  quid pro quo corruption?

12  A.  Not necessarily.  If you're supporting -- if you're

13  providing resources to a candidate that is consistent with

14  their ideology, that's a campaign contribution.  I wouldn't

15  consider that quid pro quo corruption.

16  Q.  So, taking that to the next logical step, let's look at

17  those contributions from SEIU, which you reference in your

18  report, to the Democratic legislative caucus committees.  You

19  would agree with me that collective bargaining tends to be

20  consistent with Democratic principles, yes?

21  A.  With many Democrats, yes.

22  Q.  And so a donation from a proponent of collective

23  bargaining to a legislative caucus committee which

24  ideologically tends to vote in favor of collective bargaining

25  is not necessarily indicative of the appearance of quid pro

1  quo corruption, right?

2  A.  May not, no.

3  Q.  Right.  Because in order to be corrupt, the money has to

4  be in exchange for a change in the vote, right?

5  A.  Yes.

6  Q.  So, I'm not corrupting anyone if I'm giving them money and

7  they're going to vote the same way they would have had they

8  not received the money?

9  A.  I would agree with that.

10  Q.  Now, a great deal of your direct exam before we took the

11  break dealt with the carrot and stick principle or the carrot

12  and the hammer principle, right?  Do you have a preferred

13  metaphor?

14  A.  It's your choice.

15  Q.  We'll do the carrot and the hammer for today.

16         You would agree with me, would you not, that the

17  Speaker of the House in the State of Illinois is going to have

18  an extraordinary amount of both carrot and stick regardless of

19  his or her position as the chair of a legislative caucus

20  committee?

21  A.  Agreed.

22  Q.  And the same would hold true for the Speaker of the House

23  of Representatives of the United States of America, right?

24  A.  Yes.

25  Q.  And if we look to that particular position, there's the

1   Speaker of the United States House, and that person has a

2   deputy.  Do you know what that person is called?

3   A.  I think in the U.S. -- well, it's the majority leader,

4   majority whip, and it moves down.  There's a whole detailed

5   structure within, at least, congressional.

6   Q.  And are you familiar with the background for why that

7   person is called the whip?

8   A.  Yes.

9   Q.  And what is that?

10  A.  Their job is to collect votes for the caucus on key

11  issues.  They count votes.

12  Q.  And to euphemistically whip people into shape, right?

13  A.  Absolutely.

14  Q.  Cause them to toe the line?

15  A.  Absolutely.

16  Q.  And so the political goals that you describe party

17  leadership engaging in in Illinois are really no different,

18  right?

19  A.  If you focus just on the policy levers, they're similar

20  across Congress and most states.  Leadership has a series of

21  organizational hammers and carrots.

22  Q.  And your report does not suggest that the leader would be

23  less powerful if they didn't have that particular hammer or

24  carrot, does it?

25  A.  Which hammer or carrot are you referring to?

1    Q.  The legislative caucus committee, the control of the

2    caucus committee?

3    A.  I think it enhances their authority because it gives them

4    fundraising structure; but they will always have those

5    organizational controls, that is correct.

6    Q.  And if there wasn't a legislative caucus committee, the

7    Speaker of the House or the President of the Senate or the

8    Minority Leader of the Senate, the Minority Leader of the

9    House, would have other manners pursuant to which they could

10   assist their membership in fundraising?

11   A.  Oh, absolutely, yes.

12   Q.  Now, when I asked you about the qualitative nature of your

13   report, I specifically asked whether you compared legislative

14   caucus committees' financial spending to that of their federal

15   counterpart, congressional campaign committees.  Do you recall

16   that?

17   A.  Yes.

18   Q.  But I don't believe I asked the follow-up question, which

19   is:  You didn't conduct any comparison between those two

20   entities at all, right?

21   A.  No.  The only reference that I had is I pulled some

22   literature about leadership PACs, but comparing how Congress

23   operates and the Illinois legislature, no.

24   Q.  And under Illinois law, there is no such thing as a

25   leadership PAC, is there?

1  A.  Not that I'm aware of.

2  Q.  Now, in your deposition, I believe you stated and you

3  opine in your report that you discounted data from the

4  Illinois House Republican committee because it was more likely

5  to show a purely expansionist strategy.

6  A.  That is correct.

7  Q.  So, when you say you discounted data, do you mean you

8  ignored it?

9  A.  No.  I didn't look at House and Senate minority party

10  caucus committees, so discounted is probably a -- I did not

11  review is a more appropriate term.

12  Q.  Why not?

13  A.  I was most interested in the caucus committees that had

14  both institutional control and -- actually, the committees

15  that have institutional control.

16  Q.  Now, I want to get back to the concept of an election

17  cycle and a candidate's ability to accept from exclusively one

18  legislative caucus committee.

19      I don't believe that your report contains a

20  definition under Illinois law of an election cycle.  Have I

21  missed it?

22  A.  You have not.

23  Q.  So, you are not able to tell us as you sit here today, at

24  least not through your report, what an Illinois election cycle

25  is?

1   A.  It was not in my report.

2   Q.  And you also don't mention in your report whether an

3   election cycle includes a primary and the general election or

4   just a primary or a general election, correct?

5   A.  You are correct.

6   Q.  So, your report also does not notify us whether a party

7   might be able to accept contributions from one legislative

8   caucus committee for a primary and another for the general

9   election?

10  A.  It does not.

11  Q.  You would agree with me that the political -- that

12  political parties, in addition to expanding the number of

13  seats that they possess in any given legislative body, also

14  seek to shape policy?

15  A.  At a very high level, yes.  They're not transactional in

16  the sense of detailed, specific policies.  They do highly

17  salient policies, big picture issues.  They don't get in the

18  weeds of the details of a lot of policy-making.

19  Q.  So, be more specific.  In your opinion, political parties

20  do get into X, but don't get into Y.

21  A.  It is common for them to have a policy platform of big

22  issues that their members provide kind of a basis for

23  membership so that they know what it's like to be a Democrat

24  or to be a Republican.

25  Q.  So, for example, a political party like the Democrats

1    might say, "You know, if you're a Democrat, the political

2    party thinks you believe in collective bargaining," right?

3    A.  That's certainly possible, yes.

4    Q.  But in your opinion, the party would not get down into the

5    weeds such as, "The exclusive representative for this

6    bargaining unit will be So-and-So"?

7    A.  I think that's a fair example, yes.

8    Q.  Now, your report opines that in the 2012 general election,

9    the Democratic Majority committee utilized primarily an

10   expansion strategy, right?

11   A.  The Democratic Majority?

12          THE COURT:  Is that the Senate or the House?

13          THE WITNESS:  The House.

14   BY MS. SCHELLER:

15   Q.  That's the House.

16   A.  Used an expansionist and a personalized strategy, so both.

17   The Senate used a more exclusive expansionist package.

18   Q.  Okay.  So, in your report, I'm going to direct you to

19   page 7.  If you look just below Table 3, do you agree with me

20   that in your report, you opine, "In the general election, the

21   Democratic Majority committee utilized primarily a caucus

22   expansion strategy"?

23   A.  Yes.

24   Q.  And then you included an analysis of those two

25   expenditures that we spoke about, right?

1    A.  Yes.

2    Q.  The races involving Ms. Scherer?

3    A.  Yes.

4    Q.  And Ms. Berrios?

5          And then with regard to the Democratic Victory

6    Fund --

7          THE COURT:  And which one is which?

8          MS. SCHELLER:  Majority is the House.  Victory Fund

9    is the Senate.

10   BY MS. SCHELLER:

11   Q.  Am I correct, Dr. Osborn?

12   A.  Yes, it's the Senate Victory Fund.

13   Q.  And you said the Senate Victory Fund engaged in an

14   expansion strategy as well?

15   A.  When looking at their top contributions, yes.

16         When looking at their top contributions, yes.

17   Q.  Thank you.  So, when you were looking at the legislative

18   caucus committees and preparing your qualitative report, we

19   discussed some of the things that you did and some of the

20   things that you did not do.  But I'd like to frame your

21   reference back to that.  Okay?

22         THE COURT:  Actually, is this a good breaking point?

23         MS. SCHELLER:  Yeah.

24         THE COURT:  We've been going for about an hour 25, so

25   why don't we take a 15-minute break, and we'll come back at

1  3:10.

2          MS. SCHELLER:  And I anticipate having about

3  10 minutes.

4          THE COURT:  10 minutes?  Okay.  And then will there

5  be any redirect?

6          MR. HUEBERT:  A little bit.

7          THE COURT:  Okay.  Very good.  You can step down,

8  Dr. Osborn, and we'll resume in about 15 minutes.

9    (Recess had.)

10          THE COURT:  Are you ready to proceed, Dr. Osborn?

11          THE WITNESS:  Yes, I am.

12          THE COURT:  Do you want us to hold off for a couple

13  of seconds?  Do you have something --

14          THE WITNESS:  No, no, I just have a mint in my mouth,

15  but I'll be fine.

16          THE COURT:  Okay.

17          THE WITNESS:  If I'm mumbling, just let me know.

18          THE COURT:  Okay.

19  BY MS. SCHELLER:

20  Q.  Dr. Osborn, picking up where we left off, when you

21  generated this report, you did not review the voting record of

22  any Illinois legislator, correct?

23  A.  No, I did not.

24  Q.  And that would include you didn't look into any indication

25  as to how a legislator was going to vote before a particular

1  contribution, right?

2  A.  That is correct.

3  Q.  And you didn't look at how they voted after?

4  A.  That is correct.

5  Q.  Now, your report does not contain an opinion that the

6  election code in Illinois promotes the view of one political

7  party over another, right?

8  A.  It does not.

9  Q.  And it does not contain the opinion that the election code

10 as written promotes any particular vantage point over another?

11 A.  No.

12 Q.  And your report does not contain an opinion that the

13 election code designates which speaker or which vantage point

14 will control in any chamber of the legislature, either as a

15 majority or minority leader?

16 A.  No.

17 Q.  Now, when you were reviewing documents to prepare for your

18 report, you indicated that you reviewed articles and other

19 writings about the behaviors of these organizations, right?

20 A.  Yes, I did.

21 Q.  However, your review did not include any legal writings

22 about the behaviors of political parties or special interest

23 groups, correct?

24 A.  That is correct.

25 Q.  So, for example, in your report, you did not review

1  *McConnell versus FEC*, 540 U.S. 188?

2  A.  I did not.

3  Q.  How, if at all, would it change your report if the Supreme

4  Court in *McConnell* said that Congress is fully entitled to

5  consider the real world differences between political parties

6  and interest groups when crafting a system of campaign finance

7  regulation?

8  A.  It would not change my opinion.

9  Q.  And how, if at all, would it change your opinion if in

10  that same case, when comparing the behaviors of interest

11  groups to political parties, the Supreme Court said that

12  interest groups do not select slates of candidates for

13  elections?

14  A.  I would agree with that.

15  Q.  And how, if at all, would it change your report if in that

16  same case the Supreme Court said interest groups do not

17  determine who will serve on legislative committees?

18  A.  It would not change my report.

19  Q.  And how, if at all, would it change your report if the

20  Supreme Court in that same opinion opined that interest groups

21  do not elect congressional leadership?

22  A.  It would not change my report.

23  Q.  How, if at all, would it change your report if in that

24  opinion the Supreme Court opined that special interest groups

25  do not organize legislative caucuses?

1   A.  That would not change my report.

2   Q.  How, if at all, would it change your report if in that

3   opinion the Supreme Court opined that political parties have

4   influence and power in the legislature that vastly exceeds

5   that of any interest group?

6   A.  It would not change my report.

7   Q.  How, if at all, would it change your report if in that

8   same opinion the Supreme Court opined that party affiliation

9   is the primary way by which voters identify candidates?

10   A.  It would not change my report.

11   Q.  And how, if at all, would it change your report if in that

12   same opinion the Supreme Court opined that parties in turn

13   have special access to and relationships with officeholders?

14   A.  It would not change my report.

15   Q.  How, if at all, would it change your report if the Supreme

16   Court's acknowledgment that political parties engage in all of

17   these activities may be accounted for in campaign finance

18   regulation when dealing with the salient differences between

19   political parties and interest groups?

20   A.  It would not change my report.

21   Q.  You would agree with me, would you not, that there is no

22   secrecy in voting when it comes to the Illinois Senate or the

23   Illinois House of Representatives?

24   A.  Yes and no.  The formal vote is very public.  The backroom

25   negotiations about policy opinions and amendments is -- can be

1  far more clouded; and that's why a lot of scholars, when they

2  attempt to tie interest group contributions to votes, find it

3  to be a challenging determination because a lot of the deals

4  are cut, and by a time a bill comes up for a vote, a lot of

5  the policy work has already been done.

6         So, yes, the actual final vote is very public, but

7  some of the pre-voting activities may be more obscured.

8  Q.  But the final vote is what, in fact, creates laws?

9  A.  Yes.

10 Q.  And there's no hiding the record on that, right?

11 A.  That is correct.

12 Q.  And similarly, under the election code in Illinois,

13 there's no hiding where a candidate receives campaign

14 contributions?

15 A.  That is correct.

16         MS. SCHELLER:  Your Honor, may I have just a moment?

17         THE COURT:  Sure.

18         MS. SCHELLER:  Thank you.  I have nothing further.

19         THE COURT:  Thank you.  I just wanted to follow up on

20 one line of questioning about the 2008 election.  I think

21 your -- not objection in the formal sense, but your

22 disagreement with the premise of the question regarding the

23 2008 elections was that counsel was focusing on the national

24 vote, and the national vote doesn't really tell us anything

25 because the winner of the presidential election is determined

1    by the electoral college.

2              So, let me ask you to focus on one particular state,

3    Wisconsin.  And it turns out that Senator Obama prevailed over

4    Senator McCain in Wisconsin by 14 percentage points, 13 and

5    some change.  Does that mean that all the money that Senator

6    Obama and the National Democratic Party spent in Wisconsin on

7    the presidential campaign was wasted money?

8              THE WITNESS:  No, not necessarily.

9              THE COURT:  And why not?

10             THE WITNESS:  Ideally, if you're a campaign

11   consultant and you get just enough votes so that you can spend

12   money elsewhere, you would do that.  But margin of victory is

13   important.

14             One of the things and what was challenging, just to

15   bring this back to the Illinois example, without really good

16   registration numbers and prediction numbers, those are pretty

17   determinative of where you spend your money.  And so they may

18   have had strategies to beat what they thought they would model

19   out, so they may have been more successful than they thought.

20   And things change during the campaign.

21             So, if you go back to the 5 percent idea, it's a very

22   rough guide to look at competition; but as you go up to 13,

23   15, 20 percent, those are very wide margins.

24             I don't know if that answers your question.

25             THE COURT:  So, even though 13 percent is a very wide

1  margin, you're saying it still was not a mistake -- you're

2  saying that Senator Obama and the National Democratic Party

3  did not misspend the money, you know, in Wisconsin during the

4  2008 election?  Or could they have known at the time that they

5  were misspending -- that they were wasting money where it

6  didn't have to be spent?

7          THE WITNESS:  So, they most likely had some

8  information that made them think that it would be much closer

9  than it was.  Now, what I'm unclear on, just because I'm not

10 that familiar with Wisconsin, is how much they actually spent

11 in the general election.  It may have been one of the 11 or 13

12 swing states, but it may not have been.  It would not surprise

13 me if it was.  It all depends on what analysis they have on

14 the front side.

15         So, the question is if you asked consultants at the

16 back end if they got 13 or 14 percent, they probably would

17 have dialed some of that back so they could get an extra 4 or

18 5 in another state if at all possible.

19         THE COURT:  Right.  And let me just -- same question

20 about Arizona in the 2012 election.  Governor Romney defeated

21 President Obama in Arizona by 10 percentage points.  And I

22 believe that the Republican Party and Senator -- I'm sorry,

23 and Governor Romney's campaign spent money in Arizona.

24         Given the 10 percentage-point victory that Governor

25 Romney ultimately obtained in Arizona, was it a mistake for

1  the campaign and the national party to spend money in Arizona
2  on that race?
3        THE WITNESS:  Let's be clear.  When we talk about
4  national party, depending on -- that money in some cases helps
5  other down-ballot candidates.  So, that could have been --
6  Arizona in that race had a series of congressional races that
7  were at risk, very high profile, two of the highest-profile
8  swing districts.
9        So, in that case, it may make sense for them to spend
10  those resources to bring voter turnout particularly in those
11  two districts.  One's down in Tucson, and the other one was up
12  in northern Arizona.
13        So, as I recall, part of the reason why they made
14  those heavy investments is to bring up the down-ticket vote.
15        THE COURT:  What about the Romney campaign itself?
16  Was it -- given their 10-point margin of victory, was it a
17  mistake at the time they spent the money in Arizona to have
18  spent the money in Arizona?
19        THE WITNESS:  It depends on how much they spent.  I
20  don't believe they spent a heck of a lot of money in Arizona,
21  as I recall.
22        THE COURT:  Okay.  All right.  That's all I have.
23        Any redirect?
24        MR. HUEBERT:  Yes, your Honor.
25                    REDIRECT EXAMINATION

Osborn - redirect

1  BY MR. HUEBERT:

2  Q.  Dr. Osborn, a candidate's campaign can certainly misjudge

3  how competitive the race is going to be, correct?

4  A.  Yes.

5  Q.  And so they could unnecessarily pour resources into a race

6  that's not -- that actually was safer than they realized, is

7  that right?

8  A.  Yes.

9  Q.  And would you say a candidate is relatively -- that

10  someone is relatively less likely to make that judgment if,

11  for example, they have been the Speaker of the House of

12  Representatives in a state for several decades?  Do you think

13  they would have a pretty good sense of how competitive the

14  districts in their state are?

15  A.  Yes.  And they were actively involved in drawing the lines

16  in which they were -- so, they would have a very good idea.

17  Q.  And do you think that would also be true of someone who

18  has been chairman of the state's Democratic Party for several

19  decades, that they would have a good sense of how competitive

20  the various districts in their state are?

21  A.  Yes.  I think part of their job is to have a very good

22  handle on competition.

23  Q.  So, they might have been able to judge that better than a

24  candidate who's running in a nationwide election for the first

25  time?

1   A.  They may, yes.  It's also important to remember there's

2   kind of competing objectives, too.  National candidates have a

3   different focus than local candidates.

4   Q.  You mentioned that the Speaker of the House would be --

5   particularly if they are Speaker over a long period of time,

6   would be involved in drawing the legislative districts of the

7   state, typically, unless there's some kind of reform that puts

8   it in somebody else's hands?

9   A.  That's correct.

10  Q.  And so when the leaders -- when a Speaker of the House or

11  a Senate President of whichever party does that, will they

12  tend to draw districts in a state where the -- that are

13  relatively homogeneous with respect to the political

14  composition of the citizens within that state, of their party

15  orientation?

16          For example, if you are a Democrat, Speaker of the

17  House, a Democratic legislative leader and you're drawing the

18  boundaries for legislative districts, will you tend to put

19  high concentrations of Democrats perhaps in a single district

20  to make you able to win that district?

21  A.  Yes and no.  What you will do is try to balance -- you

22  have to look at the state strategically and try to balance an

23  electoral map that allows you to gain the most votes.  And

24  sometimes that may mean pulling some folks out of some

25  districts and more in others.  You obviously have to balance

1    that with the legal and constitutional requirements, but there

2    is definitely a party maximumization strategy that is somehow

3    with redistricting.  That's one of the normal critiques of

4    state legislatively drawn districts.

5    Q.  And so if you're involved in drawing those lines, you're

6    probably not going to create very many districts where you are

7    going to have to fight close elections in those districts and

8    devote a lot of resources to campaigns in those districts

9    because they're going to be close?

10   A.   Ideally, no, you would not do that.  You would -- it just

11   depends on how -- what the party mix in your state.  If you

12   have a very 50-50 state, it's going to be very difficult to

13   draw wildly divergent districts; but as a general rule,

14   they'll try to maximize their membership opportunities.

15   Q.  So, if districts are drawn to favor the drawer's party, in

16   general, understanding some districts will be given over to

17   the other party for strategic reasons, is it possible that

18   the -- would you consider it likely that some districts will

19   be drawn so that the real competition will typically -- if

20   any, will typically be in the primary, and whoever wins the

21   primary will not have to concern himself or herself much with

22   appealing to voters of the other party in the general

23   election?

24            THE COURT:  If you could hold on one second.

25            MS. SCHELLER:  At this point, I would object to

1    scope, and I would also say we are pretty far afield from

2    plaintiffs' Rule 26 disclosures.  I also think plaintiff is

3    leading.

4           MR. HUEBERT:  If I may, I think I am -- I think I'm

5    well within the scope because we're talking about having to

6    appeal to the center in elections.  There were questions about

7    that on cross.  And my understanding is I am free to lead to a

8    certain extent on redirect.

9           THE COURT:  Not so much, but a little bit.

10          MR. HUEBERT:  Okay.

11          THE COURT:  I'm going to sustain a form objection to

12   the question because I -- I don't understand the question.

13   So, if you could restate it.

14          It kind of went on, and then there were

15   qualifications --

16          MR. HUEBERT:  I understand.

17          THE COURT:  -- and I'm not sure.  I don't understand

18   it.  Maybe the witness understands it, but if you could

19   restate it.

20          MR. HUEBERT:  Actually, I think I've covered what I

21   need to cover on that topic, so I'll move on.

22          THE COURT:  All right.

23   BY MR. HUEBERT:

24   Q.  Dr. Osborn, when you opined about characteristics of

25   political party committees in your -- when I conducted my

1   direct examination, were you speaking about the

2   characteristics of political parties generally without respect

3   to whether they were at the state level or the county level or

4   some other level?

5   A.  That is correct.  Parties as an entity.

6   Q.  On cross-examination, you testified that a legislative

7   leader who engages in corruption could be voted out of office.

8   Is that equally true of any elected official?

9   A.  Yes.

10  Q.  On cross-examination, you testified that finding -- if

11  you're a senator or you're a representative, finding other

12  legislators to join with you in forming a legislative caucus

13  committee is the only barrier to entry to forming a

14  legislative caucus committee.  Does that mean that forming a

15  legislative caucus committee will be easy?

16  A.  Well, I think there's two issues there.  One is, can you

17  form it; and the second is, how successful are you going to be

18  at fundraising and recruiting funds?

19          And we talked about kind of the carrots and the

20  hammers that the Speaker and the leadership has irrespective

21  of caucus committees.  They can help guide or retard

22  fundraising efforts by members within their caucus.  Interest

23  groups are going to be very reticent to contribute to a caucus

24  committee that may anger the Speaker if they have issues with

25  the Speaker.  If they're ideologically-based or a single

1  issue, I think that's a little different; but it's one thing

2  to say, "I've created a healthy caucus committee."  It's

3  another thing to say it has enough funds and resources to

4  actually be impactful.

5  Q.  You testified on cross-examination that the Speaker has

6  carrots and hammers to control in both the U.S. House and the

7  Illinois House that would help them to retain their position.

8         Are there any factors that might give the Illinois

9  Speaker of the House advantages in doing so that the Speaker

10  of the U.S. House does not have?

11  A.  Well, I think there's a couple of factors.  One, the

12  Illinois House is much smaller, and it also depends on how

13  homogeneous the caucus is in terms of ideology.  If you have

14  wide divergence in ideology in your caucus, then the Speaker's

15  leadership tends to be more tenuous.

16         Now, in terms of the formal structure of things, the

17  caucus committee is a tool that the Illinois Speaker has that

18  the U.S. Speaker does not have.  There's other fundraising

19  tools that he has, where that's not one of them.

20         And as we saw with the last Speaker, you know, there

21  is continually competition to go after leadership, and so when

22  John Boehner was removed, that came from within.  One of the

23  ways -- if you centralize fundraising from the top, it helps

24  to mitigate the potential for those kind of intra-party

25  uprisings.

1    And so it would be a little bit different if any

2    member of a caucus could create their own caucus committee so

3    they could challenge the leadership, but that's not the case

4    in Illinois.  They have to find four other people or nine

5    other people, depending upon which house they're in.

6    Q.  You were asked about a statement possibly from a U.S.

7    Supreme Court case that said interest groups do not select

8    slates of candidates, and you testified that you agreed with

9    that statement.  I don't believe you testified as to whether

10   that statement, if it were stated in a U.S. Supreme Court

11   opinion, would affect your opinion in this case.

12            Would that statement affect your opinion in this

13   case?

14   A.  No.  The primary elections is how parties select their

15   slate of candidates, and so it has less to do with the access

16   strategy impacts.

17   Q.  You gave some testimony related to Illinois Liberty PAC,

18   one of the plaintiffs in this case.  Have you had any personal

19   involvement with Illinois Liberty PAC?

20   A.  No, other than being retained as an expert.

21   Q.  Do you have any knowledge of the specific policy positions

22   that Illinois Liberty PAC takes?

23   A.  No, other than a general understanding that they're a

24   conservative organization.

25   Q.  Do you know specifically what Illinois Liberty PAC means

1   when it says that it supports free market principles?

2   A.  Not in detail, just generally.

3   Q.  Do you mean that you generally know what the term "free

4   market principles" means, or you know generally what they mean

5   when they say free market principles?

6   A.  I know what the general term "free market principles"

7   means.

8   Q.  Are you aware of the strategies that Illinois Liberty PAC

9   in particular pursues?

10  A.  No.

11  Q.  You testified that you weren't aware of any legislative

12  caucus committees organized around legislative committees,

13  which as you said was possible in your report.  Does it

14  surprise you that you didn't find that?

15  A.  No.

16  Q.  Why not?

17  A.  The structure seems to be centralized now with the senior

18  leadership.  Only in a scenario where -- if you would have a

19  change in leadership or a change in philosophy would you

20  likely see those emerge.

21          MR. HUEBERT:  Nothing further.  Thank you.

22          THE COURT:  Okay.  Thank you.

23          MS. SCHELLER:  Very brief.

24          THE COURT:  Okay.

25                      RECROSS-EXAMINATION

1    BY MS. SCHELLER:

2    Q. Dr. Osborn, you did not analyze any congressional

3    districting or redistricting as part of your report, correct?

4    A. I did not.

5    Q. And you don't have any opinions as to how the districts

6    were drawn in Illinois during any of the elections you've

7    analyzed?

8    A. I do not.

9    Q. Now, changing focus, are you familiar with the saying,

10    "That's why you play the game"? Do you know what I mean when

11    I say that?

12    A. Not particularly. I mean, I've heard it before, but --

13    Q. Well, while you can always predict the winner of any game,

14    you don't know who's going to win until the game is played,

15    right?

16    A. Yes.

17    Q. And the same would be true of any election, correct? You

18    can make all the predictions you want, but until all of the

19    voting is finished, there is no winner?

20    A. There is some truth to that, yes.

21    Q. And you mentioned that you're not aware whether any

22    legislative caucus committees have -- I'm sorry. I'm going to

23    strike that and start over.

24        You testified that some donors might be reticent to

25    donate to non-leadership legislative caucus committees because

1   they didn't want to anger the Speaker, correct?

2   A.  Yes.

3   Q.  And yet in your report, you didn't analyze any

4   non-leadership legislative caucus committees, right?

5          MR. HUEBERT:  Objection.  This isn't within the scope

6   of my redirect scope.

7          THE COURT:  Counsel?

8          MS. SCHELLER:  It is, your Honor.  He specifically

9   asked whether donors might shy away from donating to

10  non-leadership legislative caucus committees to avoid angering

11  the Speaker.

12         THE COURT:  Was that on redirect?

13         MS. SCHELLER:  It was.

14         THE COURT:  Counsel?

15         MR. HUEBERT:  I don't recall asking that question.

16  If -- I don't have a transcript, but I don't recall asking

17  that.

18         THE COURT:  You know what, I'll allow it, and then if

19  you would like to re-redirect the witness on that, then you

20  can go ahead.

21  BY THE WITNESS:

22  A.  So, as someone who's been involved in fundraising for

23  interest groups for a number of years, granted, my experience

24  is in Arizona, but when there are challenges to the Speaker's

25  leadership and they have created outside organizations to fund

1    candidacy, you get calls from the Speaker saying, "If you give

2    this, there will be issues."

3         So, it's not uncommon in terms of the concept of

4    legislative leadership has a fairly significant hold on who

5    gives and when.

6    BY MS. SCHELLER:

7    Q.  But, Dr. Osborn, my question was:  You didn't even analyze

8    any of the non-leadership legislative caucus committees in

9    Illinois, correct?

10   A.  That is correct.

11   Q.  So, you don't know who gave to them, right?

12   A.  That is correct.

13   Q.  You don't know who didn't, correct?

14   A.  That is correct.

15   Q.  And you weren't able to point to a single phone call like

16   the one you just referenced in your testimony which stopped

17   someone from donating to a non-leadership legislative caucus

18   committee in Illinois?

19   A.  You are correct.

20          MS. SCHELLER:  I have nothing further.

21          MR. LOVELLETTE:  May we have one moment, your Honor?

22          MS. SCHELLER:  I'm sorry.  I may have one more.

23   BY MS. SCHELLER:

24   Q.  Dr. Osborn, when I was asking my questions about

25   congressional redistricting, I was referring to Illinois.  Was

1  your testimony related to Illinois, or were you speaking about
2  national redistricting?
3  A.  I was -- I interpreted the question to mean Illinois
4  redistricting.
5  Q.  Thank you.
6           THE COURT:  So, you meant legislative, and you
7  understood counsel to say legislative?
8           THE WITNESS:  Yes.  She's kind of blurred Congress
9  and the legislature a few times, but I'm able to follow it.
10          THE COURT:  Okay.
11          MS. SCHELLER:  Thank you.
12          THE COURT:  Dr. Osborn, at the beginning of your
13 redirect, I thought I -- I think I'm interpreting your
14 testimony as saying that if -- if you're able to draw the
15 lines, the legislative lines, you could -- you pretty much
16 know how the general election is going to come out, is that
17 right?  Is that what you were saying in response to counsel's
18 questions?
19          THE WITNESS:  It makes it easier.  It's not an
20 absolute, but those who draw the lines have the ability to
21 kind of shape the electoral map in a way that they understand.
22          And does it mean that it will change or we'll have
23 differences?  Because you're also predicting it over a 10-year
24 span, so what may be good today may not be good eight or nine
25 years from now, especially in states where you see a lot of

1    demographic shift.

2          But they are very attuned to how many voters are

3    turning out and in what party.  That is a high degree of focus

4    in redistricting efforts nationally.

5          THE COURT:  I see.  Do you know who was in charge of

6    drawing the Illinois congressional -- and by congressional, I

7    do mean congressional -- lines after the 2010 census?

8          THE WITNESS:  I believe it was the Illinois

9    legislature, but I'm not positive.

10         THE COURT:  Do you know which party was pretty much

11   in the driver's seat?

12         THE WITNESS:  The Democrats.

13         THE COURT:  Right.  And are you familiar with what

14   happened in the Illinois congressional elections in 2014,

15   which was only three or four years after the lines were drawn?

16         THE WITNESS:  I am not.

17         THE COURT:  Would it surprise you that the

18   Republicans took two House seats away from the Democrats in

19   that election?

20         THE WITNESS:  If it was part of the Republican wave,

21   that would be possible.

22         THE COURT:  So, does that suggest to you that just

23   because you draw the lines doesn't mean that you know how it's

24   going to come out, and you haven't really rigged it completely

25   in your favor?

1      THE WITNESS:  Well, it's a balancing act, because

2    unfettered with statutes, they would draw them perfectly for

3    their own benefit; but you have to balance communities of

4    interest.  You know, there's a number of other factors.

5      And sometimes you actually have to take certain

6    districts and say, "These are going to be higher-risk

7    districts," and it's -- and members of the congressional

8    delegation will fight aggressively amongst themselves about

9    who gets more of what votes.

10     So, it wouldn't surprise me.  I mean, they'd do their

11   best job, but over time, it could change.  It's a balancing

12   act, and I've watched it firsthand in Arizona where there's a

13   lot of give-and-take between members; and to be honest, most

14   members of Congress don't want to give up any of their good

15   votes, and they want to give everyone else the high-risk

16   stuff, and the party has to balance all of that.

17     And sometimes it gets even worse where they actually

18   draw -- where members of the legislature want to run for

19   elected office, so they draw the map so when they run for

20   Congress, they're advantageous to them.  So, it's a very

21   dynamic and interesting process, very political.

22     THE COURT:  Okay.  Thank you.  Any redirect based on

23   my most recent question or defendants' questions.

24     MR. HUEBERT:  No, your Honor.

25     THE COURT:  Okay.  Any re-recross based on my

1    questions?

2              MS. SCHELLER:  No, your Honor.

3              THE COURT:  Okay.  Thank you, Dr. Osborn.

4              THE WITNESS:  Thank you very much.

5              THE COURT:  Safe travels.

6              THE WITNESS:  I'll be in 70 degrees before the day is

7    over.

8              THE COURT:  And I know you didn't say that to curry

9    favor with the trier of fact.

10      (Witness excused.)

11             THE COURT:  So, any other witnesses from the

12   plaintiffs' side?

13             MR. HUEBERT:  No, your Honor.

14             THE COURT:  So, the plaintiffs rest?

15             MR. HUEBERT:  That's correct.

16             THE COURT:  All right.  And what can we expect from

17   the defendants?

18             MS. SCHELLER:  At this point, the defendants are

19   moving for judgment under Rule 50.

20             THE COURT:  Let me make sure you have the right rule.

21   Rule 50 is in a jury trial.

22             MS. SCHELLER:  Then let me check.  Your Honor, we

23   would also move under Rule 52, which might be the appropriate

24   rule under the circumstances because it's a bench trial.

25             THE COURT:  Right.  Well, whether it's -- I know --

1    and I have looked at this before, and I've forgotten what I

2    had determined.  So, whether it's under Rule 50 or Rule 52,

3    I'm going to reserve on the question -- I'm going to decline

4    to grant the motion for judgment on the pleadings, which in

5    practical effect means that I'm going to wait until all the

6    evidence is in to make a decision on who prevails in this

7    bench trial.

8            So -- and what can we -- which witnesses are we going

9    to have from the defendants' side?

10           MS. SCHELLER:  Your Honor, we anticipate calling

11   Andrew Nauman.  We will ask the Court to take judicial notice

12   of some statutes and facts, and then we intend to rest.

13           THE COURT:  Okay.  And Andrew Nauman is the deputy

14   director of campaign disclosure?

15           MS. SCHELLER:  Correct.

16           THE COURT:  Okay.  And I believe that plaintiffs'

17   counsel asked me to take judicial notice of or admit

18   Exhibits 2 through 5.  Is there any objection to that?

19           MS. SCHELLER:  No, your Honor.  And we can do that

20   now as a practical matter, because they did ask to do so

21   before they rested.  The only -- the only caveat that we would

22   raise is I will try to see if we can get official certified

23   copies of the documents that are reflected in 2 through 5,

24   insofar as they're State Board of Election materials, which we

25   can substitute in if available; but otherwise, we have no

1   objection.

2           THE COURT:  That fine.  And I see from the footer

3   that this is from the ISBE's website, so -- and plaintiffs are

4   officers of the Court, so I am 100 percent sure that these

5   figures are authentic.  But if you want to substitute in the

6   certified copies, talk to plaintiffs' counsel about it, and if

7   you all are in agreement, it's fine with me.  But if somehow

8   you can't get the certified copies, I'm pretty confident --

9   I'm more than pretty confident that these figures are accurate

10  for what they're purported to show.

11          All right.  And then do you anticipate plaintiffs

12  having any kind of a rebuttal case after the defendants'

13  witness?

14          MR. HUEBERT:  I don't anticipate it.

15          THE COURT:  All right.  And how long do you think

16  you're going to have Mr. Nauman on the stand?

17          MR. LOVELLETTE:  Less than 20 minutes.

18          THE COURT:  Okay.  All right.  Very good.  Then why

19  don't we resume tomorrow at 9:30.  And we'll probably be done

20  by mid-morning or so, certainly by lunch.  And then we'll talk

21  about where we go from there, whether the parties want to

22  revise their proposed findings of fact and conclusions of law,

23  retrofit them in light of the testimony that's been given, and

24  how you want to go about doing that, and we'll set a schedule.

25  Okay?  All right.  Thank you.

1    MR. LOVELLETTE:  Thank you.

2    MS. SCHELLER:  Your Honor, I have one brief question.

3 At the final pretrial conference, the Court contemplated a

4 question-and-answer session, which we'll be prepared to do

5 tomorrow, assuming the Court still wants to proceed in that

6 direction.

7    THE COURT:  I may.  I may.  I'm going to review my

8 notes.  I'm going to review the proposed findings of fact and

9 conclusions of law again, and I'll -- I mean, if the past is

10 any guide, I'll have some questions for you, but I can't

11 guarantee it.

12    MS. SCHELLER:  Thank you.

13    THE COURT:  Thank you.

14    (Court adjourned, to reconvene 1/26/16 at 9:30 a.m.)

15

16                       CERTIFICATE

17    I certify that the foregoing is a correct transcript from

18 the record of proceedings in the above-entitled matter.

19

20 */s/Charles R. Zandi*                  *January 26, 2016*

21 Charles R. Zandi                    Date
   Official Court Reporter

22

23

24

25