1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3

4   ILLINOIS LIBERTY PAC, a     )
     Political Action Committee  )
5   registered with the Illinois )
     State Board of Elections,    )
6   EDGAR BACHRACH, and KYLE    )
     McCARTER,                    )

7              Plaintiffs,   )

8   -vs-                  )  Case No. 12 C 5811

9   LISA M. MADIGAN, Attorney   )
     General of the State of     )
10  Illinois; WILLIAM McGUFFAGE, )
     Chariman of the Illinois   )
11  State Board of Elections;   )
     JESSE R. SMART,          )
12  Vice-Chairman of the      )
     Illinois State Board of    )
13  Elections; HAROLD D. BYERS, )
     Member of the Illinois State )
14  Board of Elections; BETTY J. )
     COFFRIN, Member of the     )
15  Illinois State Board of    )
     Elections; ERNEST L. GOWEN, )
16  Member of the Illinois State )
     Board of Elections; JUDITH  )
17  C. RICE, Member of the     )
     Illinois State Board of    )
18  Elections;  BRYAN A.      )
     SCHNEIDER, Member of the   )
19  Illinois State Board of    )
     Elections; and CHARLES W.  )
20  SCHOLZ, Member of the      )
     Illinois State Board of    )
21  Elections, all in their    )
     official capacities,      )  Chicago, Illinois
22                      )  January 26, 2016
            Defendants.  )  9:30 a.m.
23

24       TRANSCRIPT OF PROCEEDINGS - Trial
       BEFORE THE HONORABLE GARY FEINERMAN
25

1   APPEARANCES:

2   For the Plaintiffs:      LIBERTY JUSTICE CENTER
                             BY:   MR. JACOB H. HUEBERT
3                                  MR. JEFFREY M. SCHWAB
                                   MR. JAMES McQUAID
4                            190 South LaSalle Street
                             Suite 1630
5                            Chicago, Illinois  60654
                             (312) 263-7668
6

7   For the Defendants:      ILLINOIS ATTORNEY GENERAL'S OFFICE
                             BY:   MS. JESSICA M. SCHELLER
8                                  MR. KEVIN R. LOVELLETTE
                                   MR. T. ANDREW HORVAT
9                            100 West Randolph Street
                             13th Floor
10                           Chicago, Illinois  60601
                             (312) 814-2098
11

12

13

14

15

16

17

18

19

20

21
    Court Reporter:
22
                  CHARLES R. ZANDI, CSR, RPR, FCRR
23                     Official Court Reporter
                     United States District Court
24            219 South Dearborn Street, Suite 2128
                     Chicago, Illinois  60604
25                 Telephone:  (312) 435-5387
              email:  Charles_zandi@ilnd.uscourts.gov

1    (Proceedings heard in open court:)

2          THE COURT:  Good morning.  So, who do we have?

3          MR. HUEBERT:  For the plaintiffs, we have Jacob

4    Huebert with Jeffrey Schwab and James McQuaid.

5          MS. SCHELLER:  Good morning, your Honor.  Assistant

6    Attorneys General Jessica Scheller, Kevin Lovellette, and

7    Andrew Horvat on behalf of the defendants.

8          THE COURT:  Good morning.  So, the plaintiffs have

9    rested, and the defendants were going to call what they

10   anticipate to be their one witness?

11         MR. LOVELLETTE:  It turns out we do have a rebuttal

12   witness really quick who is going to testify second.

13         THE COURT:  And you let the plaintiffs know?

14         MR. LOVELLETTE:  Last night we did, yes.

15         THE COURT:  All right.  And then who are you going to

16   call?

17         MR. LOVELLETTE:  The defendants call Andrew Nauman.

18         THE COURT:  Andrew Nauman.  Okay.  And he's the

19   witness that you --

20         MR. LOVELLETTE:  Disclosed.

21         THE COURT:  Yes.  And who is the witness you didn't

22   disclose?

23         MR. LOVELLETTE:  His name is Steve Sandvoss.  He's

24   the executive director of the Board.

25         THE COURT:  Okay.  All right.

Nauman - direct

193

1          If you could please step up, remain standing, raise

2    your right hand, and state your name.

3          THE WITNESS:  Andy Nauman or Andrew Nauman.

4      (Witness sworn.)

5          THE WITNESS:  Yes.

6          THE COURT:  You've been sworn.  You may be seated.

7    There's a pitcher of water and some cups if you want to pour

8    yourself a glass.

9          THE WITNESS:  Thank you.

10         THE COURT:  And in terms of the microphone, you don't

11   have to get right on top of it.  As long as you're speaking at

12   a moderate tone of voice directionally into the microphone,

13   you'll be fine.

14         THE WITNESS:  Okay.

15         THE COURT:  So, if you can make sure it's in front of

16   you.  Thank you.

17         Go ahead.

18       ANDREW NAUMAN, DEFENDANTS' WITNESS, DULY SWORN.

19                   DIRECT EXAMINATION

20   BY MR. LOVELLETTE:

21   Q.  Will you please state your name and spell your last name.

22   A.  My name is Andrew Nauman, N-A-U-M-A-N, but I go by Andy.

23   Q.  Andy, where are you employed?

24   A.  Illinois State Board of Elections.

25   Q.  What is your title?

Nauman - direct

194

1  A.  Deputy director of the division of campaign disclosure.

2  Q.  How long have you been with the Board of Elections?

3  A.  A little over 15 years.

4  Q.  What is the core function of the State Board of Elections?

5  A.  To monitor the election process and to review political

6  committees, their financial disclosures.

7  Q.  Do you know the purpose of why that is the core function

8  of the Board?

9  A.  Primarily just to oversee the election process to make

10  sure everything runs smoothly.

11  Q.  According to statutes?

12  A.  Yes.

13  Q.  How is the Board structured?  Is there an actual board,

14  like the title suggests?

15  A.  Yes.

16  Q.  How many members?

17  A.  There are eight Board members.

18  Q.  Are they all of one political party?

19  A.  There are currently four Democrats and four Republicans.

20  Q.  Has it always been that way, split 50-50?

21  A.  As far as I know, yes.

22  Q.  What's the general duty of the Board itself?

23  A.  The Board oversees the election process, and basically

24  that's -- they hear matters for campaign disclosure

25  complaints, and they're the electoral board.

Nauman - direct

195

1   Q.  Do they meet on a daily, weekly basis?

2   A.  Typically, they meet monthly; but when we get closer to

3   elections, they have meetings a couple of times a month

4   sometimes.

5   Q.  Do they or does someone else oversee the administrative

6   day-to-day functions of the entity that is the Board of

7   Elections?

8   A.  The executive director of the agency does that.

9   Q.  Who is the current executive director?

10  A.  Steve Sandvoss.

11  Q.  How many employees statewide are with the Board of

12  Elections?

13  A.  Currently, I believe we have 72.

14  Q.  Is the executive director your direct supervisor?

15  A.  No, he's not.

16  Q.  Who's your direct -- what title?  Who do you answer to?

17  A.  I answer to Tom Newman, who is the director of campaign

18  disclosure.

19  Q.  And who's his direct supervisor?

20  A.  Steve Sandvoss.

21  Q.  Are there different departments or divisions within the

22  entity that is the State Board of Elections?

23  A.  Yes.

24  Q.  Will you tell us what they are?

25  A.  Campaign disclosure, which is the division I work in.

1  There's IVRS, and there's election operations.

2  Q.  IDRS?

3  A.  IVRS.

4  Q.  IVRS.  What does that stand for?

5  A.  Illinois Voter Systems.

6  Q.  And what was the last one you mentioned?

7  A.  Election operations.

8  Q.  Campaign disclosure, what is the -- what does it do

9  generally?

10  A.  Basically, what we do is we review reports to make sure

11  they're in compliance with the statute; and we also hear

12  campaign disclosure matters, any violation of the statute,

13  we'll hear those matters.

14  Q.  And IVRS, what does it do?

15  A.  They basically -- they run the voter registration list, so

16  they have the complete database, so they work with all the

17  election authorities with the actual voter registration list.

18  Q.  And sorry if I've forgotten --

19  A.  Election operations.

20  Q.  What do they do?

21  A.  They interact with the public.  They do, like, judges'

22  schools and just general information on the election process.

23  They actually do a lot of the brochures and stuff like that as

24  well, publications.

25  Q.  Not electioneering for any specific candidate or party,

Nauman - direct

197

 1  right?
 2  A.  No, they don't do that.
 3  Q.  In your job, are you familiar with legislative caucus
 4  committees?
 5  A.  Yes.
 6  Q.  Are you familiar with the registration requirements and
 7  the other rules regarding legislative caucus committees?
 8  A.  Yes.
 9  Q.  How about the same rules regarding political action
10  committees?
11  A.  Yes.
12  Q.  And political party committees?
13  A.  Yes.
14  Q.  And candidate committees?
15  A.  Yes.
16  Q.  Is there a difference between a political action committee
17  and a legislative caucus committee?
18  A.  Yes.
19  Q.  What's the difference?
20  A.  A political action committee as per the statute is
21  individuals, trusts, partnerships, corporations, groups of
22  people that basically go together, and they form a -- they go
23  to support or oppose candidates.
24          And for a legislative caucus committee, a legislative
25  caucus committee is a committee that's set up to support

Nauman - direct

1   candidates running for General Assembly, and they're basically

2   made up -- they can be made up in a couple of different ways.

3   The state central political party, the county central

4   political party -- I'm sorry, that's political parties, but --

5   sorry.

6   Q.  That's okay.  Actually, is there a difference between a

7   political party committee and a legislative caucus committee?

8   A.  A legislative caucus committee is a subcategory of a

9   political party committee.

10  Q.  Are there any differences in the rules or regulations

11  between the two?

12  A.  They have the same requirements.

13  Q.  Do you know how many political action committees are

14  currently registered with the Board?

15  A.  I don't have the number currently in front of me.  It's

16  around 60 -- or 3600 to 3700.

17  Q.  Is there something that would refresh your recollection?

18  A.  Yes.

19  Q.  Would that be a printout?

20  A.  Yes, a couple of reports or a report.

21         MR. LOVELLETTE:  I'm going to show what's been marked

22  for identification purposes as Defendant's Group Exhibit 5 to

23  counsel.

24         THE COURT:  Okay.  And the way this will go unless

25  you want to have that admitted into evidence is you'll show

1    that to the witness, ask the witness to review it, take the

2    document away from the witness, and ask the witness whether

3    that document has refreshed his recollection on the subject

4    matter of your question.  And if the answer is no, then you

5    move on.  If the answer is yes, then you can ask him the same

6    substantive question again.  Okay?

7            MR. LOVELLETTE:  May I have just a second to confer

8    with counsel?

9            THE COURT:  Sure.

10           MR. HUEBERT:  I don't think we've received a copy of

11   that.  Do you have an extra copy for us?

12           MR. LOVELLETTE:  I don't have an extra copy.  I'm

13   sorry.

14           MR. HUEBERT:  Can I see what it is?  I just don't --

15    (Discussion between counsel, not within hearing.)

16           MR. LOVELLETTE:  Your Honor, the parties are going to

17   stipulate that Defendants' Group Exhibit 5 be entered into

18   evidence.

19           THE COURT:  Okay.  All right.  That's fine.  Then you

20   could --

21           MR. LOVELLETTE:  May I show it to the witness?

22           THE COURT:  Yes.  And he could read from it if you'd

23   like.

24           MR. LOVELLETTE:  Thank you.

25           THE COURT:  Sure.

1     (Said exhibit admitted in evidence.)

2   BY MR. LOVELLETTE:

3   Q.  Using that exhibit as a reference if you need to, do you

4   know how many political action committees are currently

5   registered with the Board?

6   A.  As of January 15th when this report was ran at 11:22,

7   there were 3,668 committees on file.

8   Q.  How many candidate committees?

9   A.  There were -- as of when the report was ran on

10  January 15th, there were 2,209 candidate committees.

11  Q.  And how many political party committees?

12  A.  As of January 15th, there were 379.

13  Q.  How many ballot initiative committees?

14  A.  As of January 15th, there was 48 ballot initiative

15  committees.

16  Q.  How many independent expenditure committees?

17  A.  As of January 15th, there was 28 independent expenditure

18  committees on file with us.

19  Q.  And as of the date of that report, how many legislative

20  caucus committees were registered?

21  A.  There would have been six.

22  Q.  Do you know as of January 1st of 2012 how many legislative

23  caucus committees were registered in the State of Illinois?

24  A.  There would have been six at that time.

25  Q.  Are they the -- were they the same six or a different six?

1    A.  We've only had six on file currently since the law.

2    Q.  There's never been any more?

3    A.  Correct.

4    Q.  What are the names, if you remember, of the six

5    legislative caucus committees?

6    A.  I would -- don't.

7    Q.  Do you remember the registered officers of any of the six?

8    A.  Not off the top of my head.

9    Q.  Is there something that would refresh your memory?

10   A.  Yes.

11   Q.  What would that be?

12   A.  A spreadsheet that I created that had the committee names

13   on them and the creation date and the officers of those

14   committees.

15          MR. LOVELLETTE:  Your Honor, if I may, I'm going to

16   show to plaintiffs' counsel Defendants' Exhibit 7, which has

17   been marked for identification purposes.

18          THE COURT:  Okay.

19     (Discussion between counsel, not within hearing.)

20          MR. LOVELLETTE:  May I approach the witness, your

21   Honor?

22          THE COURT:  Sure.

23   BY MR. LOVELLETTE:

24   Q.  Have you seen Defendants' Exhibit 7 before?

25   A.  Yes.

1  Q.  What is it?

2  A.  This is an Excel spreadsheet or printout that I produced

3  that I listed the six legislative caucus committees on there,

4  their creation date, and their officers that they had listed

5  on the D-1 statement of organization.

6  Q.  Where did you get the information to put on this

7  spreadsheet?

8  A.  I pulled this out of our internal database.

9  Q.  And by our, who do you mean?

10  A.  The State Board of Elections.

11  Q.  Is it one of the functions of the State Board of Elections

12  to publish data such as this?

13  A.  Yes, this is available -- it's information that's

14  available on our website.

15          MR. LOVELLETTE:  At this point, we would move

16  Defendants' Exhibit 7 into evidence.

17          MR. HUEBERT:  No objection.

18          THE COURT:  Okay.  Defendants' 7 is admitted.

19    (Said exhibit admitted in evidence.)

20  BY MR. LOVELLETTE:

21  Q.  What are the names of the six legislative caucus

22  committees?

23  A.  Downstate Democratic Caucus, House Republican

24  Organization, Republican State Senate Campaign Committee,

25  Senate Democratic Victory Fund, Democratic Majority, and House

1　Republican Leadership Committee.

2　Q.  When a legislative caucus committee registers with the

3　State Board of Elections, do they have to list an officer or

4　officers?

5　A.  Yes.

6　Q.  What -- how many?

7　A.  They have to have a chairman and a treasurer listed, and

8　for legislative caucus committees, they can be the same person

9　if they wanted to.

10　Q.  For each of the six, who were the chairman or -- or who

11　are the chairman and treasurer registered with the State Board

12　of Elections?

13　A.  For the Downstate Democratic Caucus, the chairman is Jerry

14　Costello II, and the treasurer is Larry Walsh, Jr.  For the

15　House Republican Organization, the chairman is Ed Sullivan,

16　Jr.  The treasurer is David Krahn.  I might have mispronounced

17　that.  The Republican State Senate Campaign Committee is

18　Christine Radogno for the chairman, and the treasurer is

19　Patrick T. Phelan.  For the Senate Democratic Victory Fund,

20　the chairman is John Cullerton, and the treasurer is Elizabeth

21　Nicholson.  For the Democratic Majority, Michael Madigan is

22　the chairman, and the treasurer is Timothy D. Mapes.  And the

23　House Republican Leadership Committee, the chairman is David

24　Leitch, and the treasurer is David Krahn.  I may have

25　mispronounced one or two of those.

1  Q.  Understandable.  Let's move on to a different topic.
2  Excuse me.
3         Does the Board of Elections have a random audit
4  process?
5  A.  Yes.
6  Q.  Will you please explain generally how that works?
7  A.  The random audit process is every year, the State Board of
8  Elections randomly selects no more than 3 percent of all
9  political committees that are on file with us, and they have
10 to perform an audit.
11 Q.  Generally, what's involved in the audit?
12 A.  They have to -- basically for the last two years from when
13 the audit is, the two years prior to the audit, they have to
14 go back, and they have to go over all their financial
15 documents and turn that over to, like, a CPA or someone to
16 actually perform the audit to make sure they're within -- you
17 know, everything that -- the receipts are within contribution
18 limits, and to make sure that the expenditures and stuff are
19 within the statute.
20 Q.  At the end of the audit process, is it a possibility that
21 there would be a negative audit finding?
22 A.  Yes, there can be.
23 Q.  Do you know, has there ever been a negative audit finding
24 against any legislative caucus committee in the State of
25 Illinois?

1   A.  There has not been.

2   Q.  Is there another type of audit process that the Board

3   uses?

4   A.  I'll use this kind of loosely, but an audit for cause.

5   Q.  Will you please explain what that is?

6   A.  Basically, if a committee has -- like, when they report

7   one report, they say it ends as of December 31st.  If they

8   start the next report with a different beginning balance, that

9   can be a reason potentially for an audit for cause.

10          If there's money being reported from one committee

11  going into another committee and the committees aren't -- the

12  two committees don't jive, *per se*, so the Committee A reported

13  money going to Committee B, but Committee B didn't report

14  receiving it, we can do it for that.

15          And we can also do it for, say, if they have like

16  investments or debts and obligations that all of a sudden

17  disappeared off the reports, we can actually do an audit for

18  cause for that as well.

19  Q.  At the end of the audit for cause process, is it a

20  possibility to have a negative audit finding?

21  A.  Yes.

22  Q.  Has there ever been a negative audit finding for the audit

23  for cause process against a legislative caucus committee in

24  the State of Illinois?

25  A.  No, there has not.

Nauman - direct

1  Q.  Again, switching gears to talking about election cycles,

2  do you know what an election cycle is?

3  A.  Yes.

4  Q.  And when I'm talking about election cycles, all of my

5  questions are only going to be for the election cycles for a

6  candidate or a candidate committee for Illinois House or

7  Illinois Senate.  Okay?  I don't -- I'm not asking about for

8  judges or any of the other possibilities.  Does that make

9  sense?

10 A.  Yes.

11 Q.  Will you please explain what an election cycle is for a

12 candidate for the Illinois House or Senate.

13 A.  Basically, the election cycle is January 1st following the

14 last general election, and it will go through the general

15 primary date; and then it will begin -- the next cycle will

16 begin the date after the general primary, and it will go

17 through December 31st following the general election.

18 Q.  For -- let's use as an example the years of 2015 and 2016.

19 When would the -- in that time period, when would the earliest

20 election cycle have started?

21 A.  The current election cycle that a candidate would be in

22 would be January 1st of 2015, and it will go through

23 March 15th of 2016, which will be the date of the general

24 primary.

25 Q.  When would the next election cycle begin?

1    A.  It will begin on March 16th of 2016, and it would go

2    through the end of the year, which would be 12-31 of 2016.

3    Q.  So, would it be fair to say that each election cycle has a

4    primary and an election -- I'm sorry, has either a primary or

5    a general election?

6    A.  Yes.

7    Q.  Do you know how much a candidate from a -- I'm sorry, for

8    an Illinois House or Illinois Senate seat can accept from a

9    political action committee during any election cycle?

10   A.  I don't want to give the wrong amount.  I can ballpark it,

11   but I don't want to give the wrong amount.

12   Q.  Is there something that would refresh your memory?

13   A.  The -- we have an election cycle cheat sheet, basically,

14   that we provide on our website, which has the election cycles

15   and the contribution limits which have been adjusted for

16   inflation.

17          MR. LOVELLETTE:  Your Honor, I'm going to show what's

18   been marked as Defendants' Exhibit 6 for identification

19   purposes to counsel.

20          THE COURT:  Sure.

21     (Discussion between counsel, not within hearing.)

22          MR. LOVELLETTE:  Your Honor, the parties are going to

23   stipulate into evidence Defendants' Exhibit 6.

24          MR. HUEBERT:  That's fine.

25          THE COURT:  Okay.  It's admitted.

1    (Said exhibit admitted in evidence.)

2            MR. LOVELLETTE:  May I approach the witness?

3            THE COURT:  Go ahead.

4    BY MR. LOVELLETTE:

5    Q.  Mr. Nauman, with that in hand, can you tell us what the

6    contribution limits for each election cycle from a political

7    action committee is?

8    A.  A candidate can receive from a political action committee

9    $53,900 during an election cycle.

10   Q.  Will you run through the other types of committees and the

11   limits that a candidate can accept from each of them?

12   A.  The other types of committees?  A candidate political

13   committee or a political action committee can give $53,900,

14   and there's no limits from a political party committee except

15   during the primary election.  During the primary election --

16   during the primary election cycle, a political party committee

17   can contribute $215,800 to a candidate for statewide office,

18   $134,900 to a candidate for Senate, Supreme or Appellate Court

19   in Cook County, countywide office in Cook County, and they can

20   give $80,900 to a candidate for House, Supreme or Appellate

21   Court outside of Cook County, countywide office outside of

22   Cook County, and local candidates within Cook County, and

23   $53,900 to any other candidate.

24   Q.  Is there a limit that an individual can give to a

25   candidate for the Illinois House or Senate?

1  A.  It would be $5,400.

2  Q.  And that's for each election cycle?

3  A.  Correct.

4  Q.  So, for example, if a political action committee wanted to

5  give a contribution to a candidate -- a candidate committee

6  for John Smith for both the 2016 election -- primary election

7  and general election, would they be able to give $53,900 for

8  each election?

9  A.  Yes.

10  Q.  Can a candidate accept more than -- contributions from

11  more than one legislative caucus committee during any election

12  cycle?

13  A.  No, they cannot.

14  Q.  Is there any prohibition against a candidate changing what

15  legislative caucus committee they might accept money from

16  during the next election cycle?

17  A.  No, there's not.

18  Q.  There can just be one at a time?

19  A.  Yes.  They can only receive from one legislative caucus

20  committee during an election cycle.

21  Q.  Would it be fair to say that they can accept money from

22  one legislative caucus in the -- committee in the 2016 primary

23  and a different one in the 2016 general election?

24  A.  Yes.

25  Q.  Switching gears one more time, does the Board of Elections

1    have a complaint process?

2    A.  Yes.

3    Q.  Will you please explain what that process is?

4    A.  Typically, what it is is if the State Board of Elections

5    receives an outside complaint or if we were to file the

6    complaint ourselves, basically what would happen is there

7    would be a closed preliminary hearing that would be scheduled.

8    A hearing officer would be assigned to that.  And then during

9    the closed preliminary hearing, the hearing officer would try

10   and determine if the complaint was filed on justifiable

11   grounds, and if so, would corrective actions resolve the

12   matter or what the next step would be, whether it should go to

13   a public hearing or not.

14   Q.  You said the first hearing was closed.  Does that mean

15   it's closed to the public?

16   A.  Correct.  And then after the closed preliminary hearing,

17   the hearing officer basically writes up a recommendation.

18   That is what it is.  It's a recommendation.  Then that

19   recommendation is given to both parties and to the general

20   counsel.  The general counsel can write up their own

21   recommendation or concur with the hearing officer.  And then

22   the matter will go in front of the Board, and the Board makes

23   the final decision on what the next step will be.

24   Q.  At the -- can these complaints be filed by anyone?

25   A.  Yes.

1  Q.  Can they be filed against any type of political committee

2  that the Illinois statute allows for?

3  A.  Yes.

4  Q.  Can they be filed against a candidate committee?

5  A.  Yes, they can.

6  Q.  Can they be filed against an individual donor?

7  A.  Against an individual donor?

8  Q.  Um-hum.

9  A.  They could probably be part of a complaint, depending on

10  what the actual complaint was, because it would have to be --

11  the scope of the complaint would have to be in relation to a

12  violation of the campaign disclosure act.

13  Q.  At the end of this process, is it possible that a negative

14  finding could be made against a party -- I'm sorry, a

15  committee?

16  A.  Yes, there could be.

17  Q.  Do you know what type of committee gets the most

18  complaints?

19  A.  Most complaints are filed against candidate committees.

20  Q.  Is there any prohibition against an individual or a

21  committee from one party filing a complaint against an

22  individual of that same party?

23  A.  There would be no prohibition against that.

24  Q.  If a person knows or suspects there might be wrongdoing or

25  corruption on the part of the legislative -- a legislative

1  caucus committee, would they have a remedy with the Board?

2  A.  If there was a complaint filed against them and it was --

3  the matter that goes in front of the Board was something in

4  the campaign disclosure finance act, the Board could hear the

5  matter.

6  Q.  How many, if any, complaints have been made with the Board

7  against a legislative caucus committee?

8  A.  I personally reviewed our internal list that goes back to

9  1998, and I didn't see any.

10          MR. LOVELLETTE:  May I have a moment, your Honor?

11          THE COURT:  Sure.

12  BY MR. LOVELLETTE:

13  Q.  Mr. Nauman, we were previously talking about negative

14  audit findings.  Are you aware, has there been a negative

15  audit finding for either a political action committee -- I'm

16  sorry, for a political action committee in either an audit for

17  cause or a random audit?  I'm not asking any details.  I'm

18  just asking if you're aware that a negative audit finding has

19  been made.

20  A.  I believe there's been some amendments that were filed in

21  relation to the actual audit, so they would basically clean up

22  the matters prior to the actual audit being completed.

23  Q.  Okay.

24  A.  So, in the process, they cleaned it up.

25  Q.  Has anything like that ever happened with a legislative

1    caucus committee?  Have they ever needed to clean something

2    up?

3    A.  No.

4              MR. LOVELLETTE:  That's all I have.  Thank you.

5              THE COURT:  Thank you.

6              Plaintiffs?

7              MR. HUEBERT:  Could we see Exhibit 5?

8              MR. LOVELLETTE:  Sure.  Actually, he has it.

9              MR. HUEBERT:  I apologize, but if I may just take a

10   moment to review this exhibit, since we didn't have it.

11             THE COURT:  Take whatever time you'd like.

12             MR. HUEBERT:  Thank you.

13             MR. LOVELLETTE:  Your Honor, may I approach the

14   witness just to get the other exhibits?

15             THE COURT:  Sure.

16             MR. LOVELLETTE:  Thank you.

17                        CROSS-EXAMINATION

18   BY MR. HUEBERT:

19   Q.  Good morning, Mr. Nauman.  When you conduct one of the

20   random audits that you referenced in your testimony, what

21   exactly do you do?

22   A.  The State Board of Elections?

23   Q.  Yes.

24   A.  We don't actually perform the audit.  That is done by an

25   individual who the organization or the committee actually

 1    obtains.  They basically put in a -- they let us know who's
 2    going to be that individual.  The Board can approve that
 3    individual.  Then they go out and they do their actual audit.
 4    And then once they're done, they report their audit -- their
 5    audit, they give to us once they're completed.
 6    Q.  Do you know what the person who conducts the audit does in
 7    the auditing process?  Do you know the steps they take?
 8    A.  There's nothing specifically in the statute that really
 9    says, "This is how you do it, Step A, Step B, Step C."  It's
10    just kind of generalization on, you know, they're going to
11    review for all the receipts and expenditures, for all the
12    committee's documents, you know, all their financial records.
13    Q.  If you know, is that review to ensure that the
14    contributions comport with the contribution limits in the
15    election code?
16    A.  Yes, that is one of the things they are supposed to review
17    for.
18    Q.  What are other things they're supposed to review for?
19    A.  Make sure, like, the -- all the receipts that they
20    received during that reporting period have been reported
21    accordingly as per the statute, and information like that,
22    making sure the expenditures are all reported, debts and
23    obligations, CDs, investments, if they have any of that stuff.
24    Q.  Do you know whether auditors make an inquiry as to the
25    motives behind any contribution that a donor made?

1  A.  I can't speculate on whether they would or not.

2  Q.  Do you know whether they conduct interviews of donors to

3  ask them why they gave contributions?

4  A.  I can't say if they do or not.

5          THE COURT:  If you can speak up.

6          THE WITNESS:  I'm sorry.

7          THE COURT:  Yes.

8  BY MR. HUEBERT:

9  Q.  You examine campaign disclosure reports as part of your

10  duties, is that right?

11  A.  Yes.

12  Q.  When you review campaign disclosures, you don't have

13  the -- any way to determine the motive behind any particular

14  contribution, do you?

15  A.  No, I do not.

16  Q.  Is that something you try to figure out?

17  A.  I just basically look over the reports to make sure

18  they're in compliance with the statute, so I don't look for

19  motives or anything like that.

20  Q.  So, if there were an agreement between a donor and a

21  recipient to -- that the recipient would do something for the

22  donor in exchange for the donation, that's not something that

23  would be apparent to you from the disclosure reports that you

24  review?

25  A.  Not necessarily, no.

1   Q.  If a political committee has never been audited, that

2   doesn't necessarily mean that the committee has never done

3   anything wrong with respect to the election code, right?

4   A.  That would be a correct assumption.  I should say I

5   believe that should be a correct assumption.

6   Q.  So, the fact that there's never been a complaint against a

7   legislative caucus committee doesn't mean that a --

8   necessarily mean that the legislative caucus committee has

9   never violated the election code?

10  A.  I can't say if they did or didn't.

11  Q.  You testified that there have never been any complaints

12  filed against any legislative caucus committees.  You don't

13  know why there haven't been any complaints, right?

14  A.  We just haven't received one or we haven't filed one

15  ourselves.

16  Q.  So, you can only speculate as to why there haven't been

17  any complaints?

18  A.  I can't say why there wasn't any complaints filed, but I

19  just can say we haven't received any or we haven't filed any.

20  Q.  You testified that legislative caucus committees are

21  subject to the same rules and regulations as other political

22  party committees, but that's not entirely correct, right?

23  There are some differences in the way the election code treats

24  them?

25  A.  Political party committees -- well, legislative caucus

Nauman - cross

1  committees are a subcategory of political party committees,

2  which have the same contribution limits and that information.

3  There's only one part -- there's only one rule I think that

4  would separate them.

5  Q.  What rule is that?

6  A.  I don't know the rule off -- the actual specific section

7  off the top of my head, but basically, what it is is if -- to

8  have a legislative caucus committee, you can have five members

9  of the Senate of the same caucus or 10 members of the House.

10 And if they fall below that limit, we have in the rules that

11 they would either have to finalize their political committee

12 or they would have to become a political action committee.

13 Q.  But that's not the way any other political party is formed

14 under the code, right?  Other political party committees

15 aren't necessarily formed by five members of the Senate or

16 10 members of the House of Representatives; that's a thing

17 that's unique to legislative caucus committees under the code,

18 right?

19 A.  Yes, I would say that.

20 Q.  And, of course, the state's legislative leaders in the two

21 chambers of the General Assembly, they each get their own

22 legislative caucus committee under the code, right?

23 A.  Yes.

24 Q.  And there's no other type of political party under the

25 code that's set up that way, right?

1  A.  For a political party committee, the only other ones that

2  can have it are the state central committee and the county

3  central committee and a committee formed by a ward or township

4  committee.

5  Q.  You testified that there have been more complaints filed

6  against candidate committees than against any other type of

7  political committee, is that right?

8  A.  Yes, I would believe so.

9  Q.  And, of course, it's also true that there are far more

10  candidate committees than there are of any other type of

11  political committee, is that right?

12  A.  Yes.

13  Q.  In fact, it's more than double the number of political

14  action committees?

15  A.  I don't have the numbers directly in front of me, but it

16  could be.

17  Q.  Is there something that would refresh your memory as to

18  the number of the different types of committees?

19  A.  In one of the exhibits that was already introduced.  I

20  believe it was 5 maybe.

21          MR. HUEBERT:  May I approach?

22          THE COURT:  Sure.

23  BY MR. HUEBERT:

24  Q.  So, how many candidate committees have been registered

25  with the Illinois State Board of Elections?

1   A.  As of January 5th -- or January 15th of 2016, there was

2   2,209.

3   Q.  And how many political action committees were there?

4   A.  As of January 15th, political action committees, there was

5   1,001.

6   Q.  And how many political party committees were there?

7   A.  There were 379 political party committees as of

8   January 15th.

9   Q.  And how many legislative caucus committees were there?

10  A.  There were six.

11          MR. HUEBERT:  I have nothing further.  Thank you.

12          THE COURT:  All right.  Thank you.

13          MR. LOVELLETTE:  Very briefly, your Honor.

14          THE COURT:  Go ahead.

15                  REDIRECT EXAMINATION

16  BY MR. LOVELLETTE:

17  Q.  Mr. Nauman, dealing with -- or speaking as to auditors,

18  one of the -- is one of the things that auditors look at the

19  contribution limits to ensure compliance with the type of

20  committee that is being audited?

21  A.  Yes.

22  Q.  Because the different rule -- different committees have

23  different rules, is that correct?

24  A.  There are different contribution limits for different

25  types of committees.

1  Q.  And then switching gears one final time, are there any
2  other type of political committees that the election code
3  allows to be registered that have statutory requirements on
4  the number of members of elected officials that must be
5  registered in order to register the committee?
6  A.  No.  I believe that only -- the only committee that would
7  have that would be legislative caucus committees.
8          MR. LOVELLETTE:  Nothing further.  Thanks.
9          THE COURT:  Thank you.
10         Anything based on that?
11         MR. HUEBERT:  Nothing further from the plaintiffs.
12         THE COURT:  Okay.  Thank you, Mr. Nauman.  You can
13  step down.
14    (Witness excused.)
15         THE COURT:  If you could hold on before you bring in
16  Mr. Sandvoss.
17         At the first hearing in this case in July of 2012 --
18  and I don't know if any of plaintiffs' counsel was here -- I
19  made a disclosure about having worked in the AG's office and
20  about having represented the Board of Elections in my capacity
21  as Illinois Solicitor General in an appeal, which I lost, in a
22  constitutional challenge to an Illinois campaign finance law.
23  And I was careful to note that general law had won the case in
24  the district court and that I snatched defeat from the jaws of
25  victory upstairs on the 27th Floor.

1    And I said I didn't -- it was years ago, and this was

2  a different statute, different issues.  And I said at the time

3  I did not believe it was a -- even close to a recusable issue,

4  but that if anybody disagreed, I would -- my feelings wouldn't

5  be hurt at all.  Please file a motion.  And nobody did.

6    And I didn't say -- and I almost forgot about it

7  until you mentioned that Steve Sandvoss is going to be a

8  witness, and I just -- for the sake of full disclosure, I

9  believe that when I was handling that case in the Seventh

10  Circuit, I might have communicated directly with Mr. Sandvoss,

11  because I think he probably was -- I recall that he was the --

12  what's his position now?

13    MS. SCHELLER:  Well, he's the executive director now,

14  but he did serve for a period of time as the general counsel.

15    THE COURT:  Okay.  He was the general counsel at that

16  time, and I'm sure -- I'm almost positive that I communicated

17  with him back then.  I have not communicated with him since.

18  I know that I could not pick him out of a lineup.  But -- so,

19  I don't think that, again, this is anywhere near recusable;

20  but given the fact that I do recall having communications with

21  him, I wanted to make that of record.

22    And again, if anybody thinks that that's a problem --

23  I don't think it's a problem; but judges are people, and

24  people don't have perfect self-knowledge, and judges are among

25  those.  If you think it's a problem, please file a motion.

1           But I just wanted to put that of record.  Okay?

2           MR. HUEBERT:  Thank you, your Honor.

3           THE COURT:  So, why don't we call Mr. Sandvoss.

4           MR. LOVELLETTE:  The defendants call Steve Sandvoss.

5           THE COURT:  And I don't think he could pick me out of

6  a lineup, so I didn't mean anything disparaging when I said

7  that.

8           And I -- and what I didn't mention back then in 2012

9  is, yes, I was formerly associated with the Attorney General's

10 Office representing the State Board of Elections.

11          If we could hold off on bringing Mr. Sandvoss in for

12 a moment.

13          MR. HORVAT:  Okay.  Sure, Judge.

14          THE COURT:  I was also formerly associated with

15 Justice Kennedy, who is probably -- has some of the strongest

16 views on the Supreme Court about campaign finance and First

17 Amendment; and I don't think that's a recusable circumstance,

18 either.  But again, if anybody disagrees, you're welcome to

19 file a motion; and again, my feelings won't be hurt.

20          So, why don't we bring in Mr. Sandvoss.

21          MS. SCHELLER:  Your Honor, may I be heard just

22 briefly?

23          THE COURT:  Sure.

24          MS. SCHELLER:  I may be able to propose something

25 which might ease some of these issues.

1          THE COURT:  I don't think there's any issue to be

2    eased.

3          MS. SCHELLER:  Okay.

4          THE COURT:  But go ahead.

5          MS. SCHELLER:  To the extent plaintiffs had a

6    specific objection with this witness based upon the Court's

7    prior communications, if the Court was willing to adjourn,

8    there are other people in between Mr. Nauman and Mr. Sandvoss

9    who could offer the rebuttal testimony that we seek here.  I

10   just don't know when we could get them in.

11         THE COURT:  I don't think it's a problem.

12         MR. HUEBERT:  We don't object on that basis.

13         THE COURT:  Okay.  And he did poke his head in.

14   There was no -- I don't recognize his face, so I think most of

15   our communications or all of our communications were by phone

16   or e-mail, which -- and I'm not concerned at all.  It's just I

17   kind of over-disclose on things like this.

18         But why don't we just bring him in.

19         MS. SCHELLER:  Thank you.

20         THE COURT:  Okay.  Mr. Sandvoss, if you could please

21   step up.

22         THE WITNESS:  Right here?

23         THE COURT:  Yeah, but not quite yet.  If you could

24   raise your right hand, state your name.

25         THE WITNESS:  I, Steve Sandvoss.

 1    (Witness sworn.)

 2              THE WITNESS:  I do.

 3              THE COURT:  You've been sworn.  You may be seated.

 4    If you want to pour yourself a glass of water, there's a

 5    pitcher and some cups.

 6              And as to how the microphone works, you don't have to

 7    get right on top of it; but if you could make sure that you're

 8    speaking directionally towards it, and if you speak in a

 9    moderate tone of voice, it ought to pick up your voice.

10              Go ahead.

11              MR. LOVELLETTE:  Thank you, your Honor.  This witness

12    is being offered for rebuttal on discrete points from

13    Dr. Osborn and Matthew Besler.

14        STEVEN S. SANDVOSS, DEFENDANTS' WITNESS, DULY SWORN.

15                     DIRECT EXAMINATION

16    BY MR. LOVELLETTE:

17    Q.  Will you state your name and spell your last name, please.

18    A.  My name is Steven S. Sandvoss.  That's S-A-N-D-V-O-S-S.

19    Q.  Are you currently employed?

20    A.  Yes, I am.

21    Q.  Where at?

22    A.  The Illinois State Board of Elections.

23    Q.  How long have you been with the Board of Elections?

24    A.  Just a little over 27 years.

25    Q.  What is your current title?

1   A.   Executive director.

2   Q.   How long have you been the executive director?

3   A.   I was appointed in January of 2015, so just a little over

4   a year.

5   Q.   What was your position with the Board directly before your

6   current position?

7   A.   I was general counsel.

8   Q.   How long were you general counsel?

9   A.   Approximately 10 years.

10  Q.   And before that, what was your position?

11  A.   I was an attorney in the division of campaign disclosure

12  for about four years, and before that, I was an election

13  specialist.

14  Q.   Your current title is executive director.  Generally, what

15  are your job duties?

16  A.   I oversee the operations of the State Board of Elections

17  both in Springfield and Chicago.  I ensure that the goals and

18  mission of the agency, as set forth by the Board, is carried

19  out and properly executed.

20  Q.   Are you familiar with the rules and requirements in the

21  election code?

22  A.   Yes.

23  Q.   Are you familiar with the term "committeeman"?

24  A.   Yes, I am.

25  Q.   Will you explain what a committeeman is?

1  A.  There are different types of committeemen in Illinois.

2  There's a state central committeeman.  They're elected by the

3  Democratic Party, and they're also elected by the Republican

4  Party, but done so at their county conventions.

5          There is a ward committeeman, which is elected by

6  ward in the City of Chicago.  There are township committeemen,

7  which are elected by the electors of the townships in Cook

8  County.  And then there are precinct committeemen, which are

9  elected in the various precincts throughout the rest of the

10  state.

11  Q.  Outside of Chicago, would a precinct committeeman be the

12  same thing as a ward committeeman in the City of Chicago?

13  A.  They would -- I guess they would be.  Obviously, they'd be

14  in charge of the party functions within those small area of

15  the county, if you named it a precinct; whereas, the ward

16  committeeman would be in charge of the ward organization.

17  Q.  Can a single individual hold an elected office such as

18  Illinois Senate seat and be an elected committeeman in the

19  State of Illinois?

20  A.  Yes, I believe so.

21  Q.  In your position as an executive director, are you

22  familiar with political action committees and the limitations

23  placed on them?

24  A.  Yes.

25  Q.  Are you also familiar with the rules regarding independent

1  expenditure committees?

2  A.  Yes.

3  Q.  Is an independent expenditure committee different than a

4  political action committee?

5  A.  Yes.

6  Q.  How?

7  A.  Well, independent expenditure committees can receive

8  unlimited funds, but they are also limited to making

9  independent expenditures.  They cannot make direct

10  contributions.

11  Q.  Direct contributions to whom?

12  A.  To any other committee.

13  Q.  Including a candidate committee?

14  A.  That's correct.

15  Q.  Whereas, a PAC, are they limited in who they can -- are

16  they limited in the expenditures, unlike an independent

17  expenditure committee?

18  A.  They're limited in terms of their contributions, yes.  As

19  far as their expenditures, if the expenditure is in the form

20  of, say, an in-kind contribution, then, yes, they would be

21  limited.

22  Q.  Will you explain what an in-kind contribution is?

23  A.  Basically, an in-kind contribution is a contribution of

24  something other than money.

25  Q.  Can an independent expenditure committee in Illinois

1  coordinate with a campaign committee?

2  A.  No.  There can be no coordination between an independent

3  expenditure committee and either a candidate or any other type

4  of political committee.

5  Q.  If an independent expenditure committee wishes to

6  present -- do a mailing or a television ad that directly

7  mentions a candidate, is that prohibited?

8  A.  No, as long as there's no coordination.

9  Q.  If an independent expenditure committee wants to use its

10  money to urge voters to vote for a specific person using that

11  person's name and in any other way, is that prohibited?

12  A.  No.

13  Q.  There just can't be any coordination?

14  A.  Correct.

15  Q.  Can the same officers -- the same individuals register as

16  officers for a political action committee and an independent

17  expenditure committee?

18  A.  There is no prohibition in the statute that would prevent

19  them from doing that.

20  Q.  Is there a limit to how much an independent expenditure

21  committee can spend on their independent expenditures?

22  A.  No.

23  Q.  It doesn't matter if they spend X amount in one election

24  cycle versus another election cycle?

25  A.  They can spend unlimited amounts.

1    Q.   Can a political action committee contribute directly to an

2    independent expenditure committee?

3    A.   Yes, they can.

4    Q.   Are they -- is a PAC, political action committee, allowed

5    to contribute to an independent expenditure committee even if

6    they have reached their cap of $53,900 to donate against a

7    candidate?

8    A.   Yes, they can.

9    Q.   What is the limit that a political action committee can

10   contribute to an independent expenditure committee?

11   A.   There -- a political action committee can contribute an

12   unlimited amount to an independent expenditure committee.

13            MR. LOVELLETTE:  May I have a second, your Honor?

14            THE COURT:  Yes.

15   BY MR. LOVELLETTE:

16   Q.   Director, if a political action committee does not

17   directly coordinate with a candidate or candidate committee,

18   is there a limit on the independent expenditures for that --

19   that that PAC can make?

20   A.   If it's an independent expenditure, meaning no

21   coordination?  I'm not sure on that.  I don't -- I don't know

22   because I -- I think the problem would be that a PAC has

23   limits as to what they can contribute to a candidate

24   committee, for instance.

25            But a -- it would be -- I think it would be difficult

1    to ensure, I guess, that a PAC who's making an independent

2    expenditure to that same candidate is -- it's truly

3    uncoordinated.  I guess it's theoretically possible, but I --

4    I'm not sure we've ever come across that situation, so it's a

5    difficult question to answer.

6    Q.  I need to clarify the question.  I should have said that

7    this would have been in an election cycle where the PAC has

8    not contributed anything to a candidate.  Does that change

9    your answer?

10   A.  Well, if the PAC hasn't contributed anything to the

11   candidate, I know that they can contribute up to, I believe,

12   53,900 to that candidate.  Now, if they were to make -- once

13   they have maxed out on their contribution, I think your

14   question was whether they could make additional expenditures

15   on behalf of the candidate.  I think that could cause

16   problems, because again, that could be considered a

17   contribution, even if there is no coordination with the

18   candidate.

19   Q.  There are other -- are there other avenues that a

20   political action committee can use other than directly

21   donating money to a candidate in order to -- during the

22   election cycle?

23   A.  Well, they could form an independent expenditure

24   committee.

25   Q.  Could they also donate to another existing one?

1  A.  Yes.  Yes, they could.

2  Q.  And could they help fundraise for candidates?

3  A.  You're asking if the PAC can help fundraise?

4  Q.  Yes.

5  A.  They could, yes.

6          MR. LOVELLETTE:  I have no further questions, your

7  Honor.

8          THE COURT:  Okay.  Thank you.

9          MR. LOVELLETTE:  Actually, I might have one further

10  question.  I apologize.

11          THE COURT:  Okay.

12  BY MR. LOVELLETTE:

13  Q.  Director, if a PAC wishes to speak as -- use money to

14  speak as to an issue and not directly against a candidate, is

15  there a limit to the amount of money it can use to speak as to

16  that issue?

17  A.  I believe there's no limit as to what a PAC could spend

18  communicating on an issue.  I do know there are ballot

19  initiative committees that are formed to support, you know,

20  questions of public policy, and I know they can take in

21  unlimited amounts.

22  Q.  So, would it be -- I'm sorry.

23  A.  So, yeah, my -- I guess I would have to answer that as a

24  yes, they can do that.

25  Q.  Could the officers of a political action committee form a

1    ballot initiative committee?

2    A.  There's no prohibition against that.

3            MR. LOVELLETTE:  Okay.  Thank you.  That's now all I

4    have.

5            THE COURT:  Okay.  Thank you.

6            Plaintiffs.

7                         CROSS-EXAMINATION

8    BY MR. HUEBERT:

9    Q.  Good morning, Mr. Sandvoss.  You testified that --

10   regarding PACs coordinating with candidates.  What counts as

11   coordination when you talk about that?

12   A.  I would say communication with the candidate or the

13   candidate's committee.  That could take various forms, in

14   person, over the phone, e-mail.  But I would consider the key

15   being the communication between the PAC and the candidate or

16   the candidate's committee.

17   Q.  So, does giving a contribution through a PAC to a

18   candidate count as coordination in itself?

19   A.  Simply making the contribution?  I would say no, not

20   without any other type of -- again, without any type of

21   communication or coordination.

22   Q.  If a person is the chair of a PAC and through that PAC

23   they do coordinate with a candidate, they do have those

24   communications, so that it counts as coordination, and they

25   give money to that candidate as well, can that same person

1  then use an independent expenditure committee of which he's
2  the chair to support that same candidate after he has
3  coordinated with the candidate through his PAC?
4  A.  I think that would be -- I think that would be
5  problematic.  I think it would depend on the specific facts as
6  to the -- you know, the nature of the communication, maybe
7  when it occurred.

8          But if a chairman, in your example, of a PAC is
9  coordinating with a candidate and then that same officer of
10 the independent expenditure committee were to start making
11 independent expenditures, I think that could raise a red flag.
12 Q.  So, if the chairman of a PAC in this situation wanted to
13 be on the safe side and avoid running afoul of the law, would
14 it be advisable to not make independent expenditures -- not
15 make expenditures through an independent expenditure committee
16 on behalf of a candidate after already coordinating with that
17 candidate through the PAC?
18 A.  Again, you're -- if you're saying that that person, that
19 chairman of the PAC is also the head of the independent
20 expenditure committee?
21 Q.  Yes.
22 A.  If that question were posed to me, yeah, I would advise
23 them not to do that.
24 Q.  You've testified that the law allows unlimited independent
25 expenditures, correct?

1  A.  Yes.

2  Q.  But those -- to be considered independent expenditures

3  that are unlimited, the contributions have to be made through

4  an independent expenditure committee, correct?

5  A.  Well, an independent expenditure committee can make

6  unlimited independent expenditures.  Whether or not a PAC, for

7  instance, is already maxed out on their contributions, whether

8  or not they can make an independent expenditure, that part

9  is -- that's questionable.  I don't know that.

10  Q.  You testified that someone could hold an office like a

11  State Senate seat and be a ward committeeman or township

12  committeeman at the same time, correct?

13  A.  Yes.

14  Q.  But one does not -- if one is a state senator, you're not

15  entitled to be a ward committeeman just because you hold the

16  Senate seat; it's not automatic, right?

17  A.  Correct.

18  Q.  You would have to be separately elected to the office of

19  committeeman?

20  A.  Correct.

21          MR. HUEBERT:  That's all.  Thank you.

22          THE COURT:  Thank you.

23          Anything further from defendants?

24          MR. LOVELLETTE:  Nothing, your Honor.

25          THE COURT:  Okay.  Thank you, Mr. Sandvoss.  You can

1    step down.

2            THE WITNESS:  Okay.  Thank you.

3       (Witness excused.)

4            THE COURT:  Anything else from the defendants?

5            MS. SCHELLER:  With that, your Honor, the defense

6    rests -- I'm sorry.  We've not rested.  We would now move all

7    exhibits into evidence marked as Defendants' 1 through 7 which

8    have not already been admitted.  Exhibits 1 through 3, I

9    believe, are statutes of which the Court may take judicial

10   notice anyway; however, we move to admit them into evidence.

11           THE COURT:  Okay.  And then Exhibit 4 is the

12   legislative history.

13           MS. SCHELLER:  Yes, your Honor.

14           THE COURT:  Okay.  I don't know if it's necessary to

15   admit those into evidence because I do believe that the

16   statutes and the legislative history is subject to judicial

17   notice, but let me ask the plaintiffs for their view.

18           MR. HUEBERT:  We don't think it's necessary to admit

19   it into evidence, and it doesn't quite make sense to admit it

20   into evidence, just like the Court can always cite legislative

21   history, it can always cite law review articles, but those

22   things aren't evidence.  They're used in a different way from

23   evidence.

24           I think that there's a difference between

25   adjudicative facts and legislative facts, and it seems like it

 1  would be more proper for the Court to use the legislative

 2  history in the same way that it always does without an

 3  exhibit, the same way that an Appellate Court could if the

 4  legislative history weren't in the trial record below.

 5          MS. SCHELLER:  On that point, your Honor, plaintiffs

 6  and defendants are in accord.  Provided they have no

 7  objections to our request that the Court take judicial notice

 8  of various other statutes and legislative history, we'll

 9  withdraw Exhibits 1 through 4.

10          THE COURT:  Okay.  And I agree with both of you.  I

11  could -- I'm certainly going to consider the statutes, and I'm

12  going to consider the legislative history, as I said during

13  our pretrial conference, in the same way that courts consider

14  statutes and legislative history when addressing a

15  constitutional challenge to a state or federal or municipal

16  statute.  So, those are withdrawn.

17          And I think Exhibits 5 through 7 were admitted.

18  Okay.  So, with that --

19          MS. SCHELLER:  With that, then, the defense rests.

20          THE COURT:  And any rebuttal case from the

21  plaintiffs?

22          MR. HUEBERT:  No, your Honor.  I would like to

23  clarify one point from yesterday, if I may.

24          THE COURT:  Sure.

25          MR. HUEBERT:  At the end of plaintiffs' case,

1  plaintiffs moved for judicial notice of authenticity of all
2  the plaintiffs' exhibits, the records from the State Board of
3  Elections.  I don't know that we actually said that they would
4  be admitted into evidence, but I hope that was implied and
5  that the Court will consider those.
6             MS. SCHELLER:  We have no objection, your Honor.
7             THE COURT:  Yeah.  No, it's -- no, those -- I'll
8  consider those as admitted into evidence, and the fact that
9  we're clarifying that after the plaintiffs rested is really of
10 no concern to me.
11            MR. HUEBERT:  Thank you.
12            THE COURT:  Okay.  So, any -- so, no rebuttal case
13 from the plaintiffs?
14            MR. HUEBERT:  No, your Honor.
15            THE COURT:  So, why don't we -- I'm going to have
16 some questions for both sides, and let's take a 10-minute
17 break.  But before we do, have the parties given any thought
18 to whether they want to submit revised findings of fact and
19 conclusions of law?  Let me start with the plaintiffs.
20            MR. HUEBERT:  We do, your Honor.
21            THE COURT:  And how about the defendants?
22            MS. SCHELLER:  Yes, your Honor.
23            THE COURT:  And how long do you think you'll need?
24            MR. HUEBERT:  We'd request at least a week.
25            MS. SCHELLER:  The same.

1          THE COURT:  Okay.  So, why don't we say that revised
2   findings of fact and conclusions of law will be filed by
3   February 2nd.
4          And, so, why don't we come back in 10 minutes.
5     (Recess had.)
6          THE COURT:  You maybe seated.
7          Anything before we get started?
8          MR. HUEBERT:  Yes, your Honor, one matter.  Counsel
9   for both sides were talking amongst ourselves, and we agreed
10  that it would be better for all of us if we could have until
11  next Friday, February 5th, to do the proposed findings of fact
12  and conclusions of law.
13         THE COURT:  No problem.
14         MR. HUEBERT:  Thank you.
15         THE COURT:  So, February 5th it is.
16         So, let me first start with standing, and I'll begin
17  with the plaintiffs.  This isn't of record, but I understand
18  that Senator McCarter may not be -- has announced that he will
19  not be seeking re-election to his State Senate seat.  Are you
20  aware of that?
21         MR. HUEBERT:  That's correct.
22         THE COURT:  Does that have any implications for his
23  standing in this case?
24         MR. HUEBERT:  It shouldn't, because he still has his
25  candidate committee that he is maintaining.  He's still

1  accepting contributions into that committee.  He's still able
2  to make expenditures out of that committee.  So, that should
3  not affect his standing.
4  THE COURT:  And he could always change his mind?
5  MR. HUEBERT:  That's true, too.
6  THE COURT:  Any thoughts from the defendants on that?
7  MS. SCHELLER:  At this moment, given his current
8  position as being in office and maintaining a candidate
9  committee, we would agree with the plaintiffs that he has
10  standing now.
11  THE COURT:  Okay.  As to the standing of the other
12  two plaintiffs, the defendants are or are not challenging the
13  standing of Illinois Liberty PAC and Mr. Bachrach?
14  MS. SCHELLER:  Well, I should clarify our agreement
15  with regard to standing as to Senator McCarter.  We agree that
16  Senator McCarter may have standing to the extent he is
17  objecting to the statute based on under-inclusivity.
18  We do not believe that Senator McCarter has standing,
19  nor do any of the other plaintiffs have standing, to object to
20  the statute as it applies to legislative caucus committees
21  under any other theory.
22  THE COURT:  I see.  So, you're not challenging the
23  standing of any of the three plaintiffs to pursue the one
24  issue that is still left on the Court's plate?
25  MS. SCHELLER:  The way that the order on summary

1 judgment was framed was, if I recall, the issue for trial was

2 a comparison of legislative caucus committees to political

3 party committees on the one hand and as to individuals,

4 corporations, and PACs on the other hand.

5     To the extent that was the issue framed for trial, we

6 do believe there's been testimony on those fronts.  I don't

7 believe that there's been a *prima fascie* showing by any

8 plaintiff of a similarity to a legislative caucus committee,

9 so I don't believe any of them have standing in any way to

10 show under-inclusivity.

11     THE COURT:  But what you just said, is that a merits

12 issue, or is that a standing issue?

13     MS. SCHELLER:  Standing is only proper in this case

14 if the plaintiffs are challenging the statute on the basis of

15 under-inclusivity; and if the Court is allowing the

16 plaintiffs, as I believe it is, pursuant to the summary

17 judgment order, to each compare themselves to legislative

18 caucus committee committees, then I think the standing issue

19 is sort of a side point.

20     I don't believe that any of the plaintiffs will be

21 able to show that the statute is under-inclusive because they

22 themselves are similar to a legislative caucus committee, but

23 I do believe that that was the argument that was being

24 advanced.  To the extent plaintiffs Bachrach and the PAC are

25 not advancing that theory, then, no, they don't have standing.

1        THE COURT:  I'm lost.

2        MS. SCHELLER:  So --

3        THE COURT:  Let me articulate what might be the

4   source of my confusion.

5        There's standing, and there's the merits.  And just

6   because a party loses on the merits doesn't mean that that

7   party does not have standing.  In other words, just because

8   what that party says about how a law operates or its validity

9   under the constitution is wrong doesn't mean that that party

10  doesn't have standing under Article III to challenge the law

11  based upon the injury that the party says that it suffers as a

12  result of the law.

13       And I don't -- you're kind of -- you're going back

14  and forth between merits and standing, and I just couldn't

15  follow you.

16       MS. SCHELLER:  Well, let me reframe it using the law,

17  and perhaps that will assist.

18       In order to establish standing, the applicable test

19  is a plaintiff must show:  One, it has suffered an injury in

20  fact that is concrete and particularized is subpart A, actual

21  or imminent, not conjectural or hypothetical; two, that the

22  injury is fairly traceable to the challenged action of the

23  defendant; and three, it is likely as opposed to merely

24  speculative that the injury will be redressed by a favorable

25  decision.

1          So, in terms of our analysis, we don't believe that
2   any of the plaintiffs have standing to directly challenge
3   legislative caucus committees' unrestricted speech under
4   First Amendment precedent.  However, under the standing test
5   which was articulated in *Friends of the Earth versus Laidlaw*
6   *Environmental Services*, 528 U.S. 167 at 180 to 181, and cited
7   positively on this point by the Seventh Circuit in *Wisconsin*
8   *Right to Life versus Barland*, 664 F.3d 139, we don't think any
9   of the plaintiffs have standing to challenge how legislative
10  caucus committees may speak under the First Amendment in terms
11  of campaign contributions unless they are challenging the
12  restrictions based on the fact that they are under-inclusive
13  because those parties each share the same components in terms
14  of characteristics and speech as a legislative caucus
15  committee.
16          THE COURT:  So, in terms of the issue that's now
17  before the Court, you're not challenging the plaintiffs'
18  standing?
19          MS. SCHELLER:  Provided -- we are challenging the
20  standing of Edgar Bachrach.  We do think Senator McCarter
21  would have standing to assert a complaint to the extent any of
22  the parties governed by the campaign finance statute could
23  make a credible under-inclusivity argument in terms of
24  campaign finance restrictions comparatively to a legislative
25  caucus committee.

1          THE COURT:  I mean, the plaintiffs are basically

2    arguing comparative disadvantage under the law.

3          MS. SCHELLER:  Correct.

4          THE COURT:  In all of its aspects.  And they

5    certainly have standing to say, "I'm being treated or the

6    people I want to fund are being treated worse than these other

7    entities that for all practical purposes are the same."

8          MS. SCHELLER:  Correct.  That is what I believe this

9    hearing is limited to.  However, in plaintiffs' proposed

10   conclusions of law, plaintiffs also challenge the tests that

11   are applied, and so --

12         THE COURT:  I don't know what you mean by that.

13         MS. SCHELLER:  So, plaintiffs are challenging strict

14   scrutiny.  They're challenging the *Buckley* standard governing

15   strict scrutiny as opposed to --

16         THE COURT:  That's merits, not standing.

17         MS. SCHELLER:  Right.  So, to the extent we were

18   still dealing with all of those issues, we would challenge

19   their standing.  To the extent that we're just dealing with

20   under-inclusivity principles, we believe they have standing on

21   that limited issue to challenge disparate treatment.

22         THE COURT:  I'm still lost, because you once again

23   veered into the merits lane from the standing lane in talking

24   about the standard of review, the standard of scrutiny.

25   That's merits.  That's whether they're right or not under the

1    First Amendment.  It has nothing to do with -- at least in my

2    view, and I'm happy to be corrected, has nothing to do with

3    whether they have injury, causation, and redressability under

4    the three-part standing test.

5         MS. SCHELLER:  Well, I think -- I think it does

6    affect redressability because the only way to gain redress is

7    to prove that the statute is under-inclusive.  So, you can't

8    say, "My speech is restricted this way, and that speech is

9    restricted that way.  Strike down the way that they can speak

10   because the restrictions against me -- against me would remain

11   intact unless I proved that we were similar speakers who were

12   receiving disparate treatment."

13        So, I believe the plaintiffs' standing is dependent

14   upon the nature of the claims that they're asserting.  For the

15   purposes --

16        THE COURT:  That's true, but it's not dependent on

17   what level of constitutional scrutiny gets applied to a

18   particular challenge.  That's merits.

19        MS. SCHELLER:  Correct.  But I do believe that the

20   plaintiffs are continuing or renewing their challenge to the

21   individual limits applied to them under the campaign finance

22   law at least insofar as those issues are raised in their

23   proposed conclusions of law.

24        So, in the preliminary injunction hearing in this

25   case, the Court determined that the campaign finance

1    restrictions as they applied to individuals or political

2    action committees were appropriate and constitutional under

3    the *Crawford* test.  In plaintiffs' proposed conclusions of

4    law, they challenged those findings, and in our conclusions of

5    law, they dispute those findings and say, "No, this should

6    have been analyzed under strict scrutiny."

7           I don't believe that they have a basis to challenge

8    what the legislative caucus committee has done unless they are

9    talking about under-inclusivity, and that is what we're

10   speaking about here, so I should perhaps be more clear.

11          In terms of the challenge raised here, which is

12   limited only to under-inclusivity --

13          THE COURT:  I've dismissed most of the claims.  We

14   only have one particular issue.  Do we have a standing problem

15   with respect to any of the three plaintiffs as to the

16   particular issue that I have set -- denied summary judgment --

17   denied the motion to dismiss on, denied summary judgment on,

18   and set for trial?

19          MS. SCHELLER:  I do believe there is a standing issue

20   with regard to plaintiff Bachrach.

21          THE COURT:  Okay.  And what is that?

22          MS. SCHELLER:  Plaintiff Bachrach is an individual.

23   There has been absolutely no claim or allegation made that he

24   is a comparative speaker to a legislative caucus committee.

25          THE COURT:  Right.  But he is still injured -- he

1  says that he is injured, and he actually is injured.  Whether
2  it's constitutional or not is another question.  He is injured
3  by the fact that he can contribute only X amount to the PAC,
4  to Illinois Liberty PAC, and he is saying that his injury is
5  caused by the statutory scheme that imposes a comparative
6  disadvantage of PACs vis-a-vis legislative caucus committees.
7  And if I were to invalidate the statute, his injury might get
8  redressed.  So, it seems pretty clear to me that he has
9  standing.

10  Again, whether he's right on the merits or not,
11  that's to be decided; but in terms of Article III standing, I
12  don't see what the issue is.  But tell me why I'm wrong.

13  MS. SCHELLER:  Okay.  So, parties challenging a
14  statute on First Amendment grounds may represent the interests
15  of third parties whose protected expression is prohibited or
16  substantially burdened by the regulation.  That's under
17  *Schultz versus City of Cumberland*.  It's a Seventh Circuit
18  case from 2000, 228 F.3d 831-848.

19  THE COURT:  He's -- but Bachrach is not pursuing a
20  third-party or derivative standing theory.  He's saying that
21  he himself is injured given his inability to give as much
22  money to the PAC as he wants to give.  And he's saying, "If
23  PACs were treated like legislative caucus committees, which
24  they should be, I'd be able to give more and thereby engage in
25  more speech as speech has been understood by the Supreme Court

1   of the United States."

2           MR. HUEBERT:  May I add something, your Honor?

3           THE COURT:  Why don't we -- why don't I exhaust my --

4   well, let me hear -- there's kind of a hanging question, so

5   let me hear from the defendants, and then I'll turn it over

6   to you.

7           MS. SCHELLER:  I think the issue is that the

8   plaintiffs here don't seek to challenge the restrictions

9   placed on legislative caucus committees.  They impermissibly

10  seek to challenge the lack of restrictions on the speech of

11  legislative caucus committees.

12          And as recently as *McCutcheon*, the Supreme Court has

13  said there's no problem with regulating less speech as opposed

14  to more speech.  And so I think the only theory is the

15  comparative analysis that you stated.

16          I don't believe that Mr. Bachrach's original

17  testimony related to his contributions to PACs.  I thought it

18  was related to contributions to individual candidates.

19          THE COURT:  No.  He said he was limited to giving

20  $10,500 to Illinois Liberty PAC and that he would have given

21  more if the statute allowed him to do so.  And that's from

22  2014.

23          MS. SCHELLER:  If that is his testimony, your Honor,

24  I don't know that we can raise a challenge to his standing.

25          MR. HUEBERT:  Your Honor, the plaintiffs' injury --

1   plaintiffs Bachrach and Illinois Liberty PAC's injury is that

2   they are limited in the amounts that they can contribute.  The

3   limits on them are their injury.  And their argument is that

4   those limits aren't justified in light of the act's disparate

5   treatment of legislative caucus committees.

6        So, they are not -- they're not -- their injury isn't

7   the lack of limits on legislative caucus committees in itself.

8   The injury is the limits on themselves with respect to what

9   they can give to candidates and PACs in Edgar Bachrach's case,

10  what they can give to candidates in Illinois Liberty PAC's

11  case.  That's the injury is the limit on them.  That's what

12  they're challenging.  The lack of limits on the legislative

13  caucus committee is just the reason why the limits on them

14  aren't justified.

15       So, there's no -- there's no -- there's no merit to

16  the argument that they lack standing because they're trying to

17  challenge the limits on somebody -- the lack of limits on

18  somebody else.  Their injury is the limit on them with respect

19  to giving contributions to whomever under this scheme.

20            THE COURT:  Okay.  So, let's -- let me turn it back

21  on a merits issue to the defendants.  In the defendants'

22  proposed conclusions of law, they argue that legislative

23  caucus committees are akin to the congressional campaign

24  committees under federal law, the DCCC, the DSCC, the National

25  Republican Congressional Committee, and I don't know what the

1   Republican Senate committee is called, but whatever that is.

2           What's the basis -- and the plaintiffs disputed that

3   by saying -- disputed your analogy by suggesting that federal

4   law, unlike state law, doesn't dictate who's going to be in

5   charge of the federal congressional campaign committees.  And

6   I'm wondering what's your retort to that?

7           MS. SCHELLER:  I think that plaintiffs proffer a

8   distinction without -- or a difference without a legal

9   distinction.

10          The congressional caucus committees are without doubt

11  controlled in some way by the leadership, and the leadership

12  will determine who and under what circumstances different

13  individuals will run those caucus committees.  And I -- I

14  think it's fair to say, based upon plaintiffs' own expert's

15  testimony, that will happen by way of an election, just as the

16  legislative caucus committees' leadership is determined by an

17  election.

18          The statute itself doesn't say, "This legislative

19  caucus committee will be run by the Republican leader of the

20  majority party."  It says, "This caucus committee can be

21  formed by the President of the Senate."  The President of the

22  Senate is elected by his own party after being elected by his

23  electorate.

24          So, naming the identity of the person within --

25  within the caucus by title isn't a real distinction because

1    that person is elected to that position anyway; and certainly,

2    those persons, when electing that person to that position, so,

3    the voters within the caucus who elect that person, recognize

4    that that person will be elected for myriad tasks, including,

5    but not limited to, running the legislative caucus committee.

6         THE COURT:  Well, I think what the plaintiffs are

7    arguing is that the federal statute doesn't say that the head

8    of the -- that the head of the congressional campaign

9    committee is going to be the Speaker of the House, the

10   Minority Leader of the House, the President of the Senate, and

11   the Minority Leader of the Senate.  It leaves it open.  And

12   why -- and I'm wondering whether you think that's a

13   significant distinction; and if not, why not?

14        MR. LOVELLETTE:  Actually, your Honor, the Illinois

15   law does not require the Speaker, the President, or the

16   minority leaders to be the head of their legislative caucus

17   committees.  What it allows is that they can create them.

18   They don't have to be the head of it.

19        And in fact, per Mr. Nauman's testimony this morning,

20   the minority leader of the house is not a registered officer

21   with the legislative caucus committee that he created.  That's

22   James Durkin.

23        So, the Illinois law is not as the plaintiffs have

24   proffered it.  It does not require that these individuals be

25   the number one and be the designor of who will be receiving

1   their expenditures.

2           MS. SCHELLER:  And to add on to that, your Honor, the

3   congressional campaign committee is not the only congressional

4   caucus committee which is treated as a political party, as is

5   the Illinois legislative caucus committees under the Illinois

6   statute.  Several states, including West Virginia under its

7   Code Section 3-8-1(a), subsection 24, defines a legislative

8   caucus committee for the purposes of campaign contributions as

9   a political party committee.

10          Under Maryland election law, Section 13-226,

11  legislative caucus committees are recognized as political

12  party committees for the purposes of campaign contribution

13  law.

14          Under Indiana Code Section 3-5-2-7, legislative

15  caucus committees are treated as political party committees

16  for the purposes of campaign finance law.

17          So, while we certainly have discussed the federal

18  analog, which we do think is appropriate here, there are

19  several other cases -- several other states which have

20  analogous contribution statutes which treat their legislative

21  caucus committees just as they treat political parties.

22          THE COURT:  What do the plaintiffs have to say about

23  this topic?

24          MR. HUEBERT:  Well, it's important that the Illinois

25  legislative caucus committees are inherently under the

1    control, if the leader wants it, of one person, because once

2    that person -- it's true that person must be an elected

3    leader, but once they are an elected leader, that's it.  They

4    have this committee, and they have discretion to direct that

5    committee's funds as they see fit, which means that they can

6    use it to serve their personal ends if they so choose.

7         And that is not inherently the case with these

8    federal committees.  Without question, the Speaker of the

9    House of Representatives exercises a certain amount of

10   influence over the members of his caucus who would constitute

11   such a committee, but it is not under the direct control of

12   one person as it is in Illinois.  It's not one person having

13   discretion to direct contributions to whomever he wants.

14        And Dr. Osborn's testimony supports the point that

15   once a leader is elected, once he is in that leadership

16   position, being there and being able to direct contributions

17   helps the leader maintain himself or herself in that position.

18   It's true that the leader could be elected out of it, but once

19   you have control over that -- those funds, you have a tool to

20   keep yourself in that position.  So, it's a lot of power going

21   to one person in a way that you don't have in the federal

22   system.

23        And regarding the point about other states, in the

24   summary judgment briefing, the plaintiffs spelled out all of

25   the relevant provisions of other states' laws, and there's no

1    other state that gives legislative caucus committees under the
2    control of one person a comparable advantage to what you have
3    in Illinois, except that New Jersey has something that is
4    substantially identical, although I do not recall offhand
5    whether the relevant New Jersey committee is inherently under
6    the control of one person in the way that the Illinois is.
7    But New Jersey is the only state where a legislative caucus
8    committee gets this kind of disproportionately favorable
9    treatment.

10            THE COURT:  If one of the Four Tops is operating his
11   or her caucus committee in a self-aggrandizing manner that is
12   contrary or inconsistent with the interests of the party as a
13   whole, couldn't the caucus vote to remove that individual from
14   his or her position as one of the Four Tops?

15            MR. HUEBERT:  Yes, they theoretically could.  But
16   already being in that position gives the leader a lot of
17   control so that a challenge to that leader is risky, because
18   if you challenge the leader and you fail, he can punish you
19   within the legislature by giving you bad committee
20   assignments, by disfavoring your legislation.  And of course,
21   he could also punish you for that threat by taking away your
22   support from the legislative caucus committee, as happened to
23   Senator McCarter, for example.

24            So, attempting -- they can attempt to do that, but
25   it's very risky.  And the fact that the legislative leader has

1  control over a legislative caucus committee that has such

2  disproportionate influence because of the lack of limits makes

3  challenging leadership harder than it otherwise would be.

4          THE COURT:  It's hard, but it's been done.  And I

5  think we all saw last year what happened to the Speaker of the

6  House of -- of the U.S. House of Representatives.

7          MR. HUEBERT:  But Dr. Osborn actually specifically

8  addressed that example in his testimony, and I don't remember

9  precisely what he said, but there was -- the U.S. Speaker of

10 the House doesn't have a legislative caucus committee that

11 gives him that kind of disproportionate power.  That's not a

12 tool that the Speaker of the U.S. House has to defend himself

13 against that kind of challenge.  It is a tool that the Speaker

14 of the Illinois House of Representatives has to defend himself

15 against a challenge.

16         THE COURT:  But not if the person is no longer

17 Speaker of the House.

18         MR. HUEBERT:  But the Speaker can defend the

19 challenge to himself as Speaker by wielding the power he

20 already has through the legislative caucus committee.  It's a

21 tool of defense against those kind of challenges.  It's a way

22 to keep himself in that position.

23         THE COURT:  Not in a non-election year, and not at

24 most times.  Once the person is ousted from being, let's say,

25 House Minority Leader of the Illinois House, that person no

1  longer has any power of the purse.

2  MR. HUEBERT:  But going into it, the caucus members
3  who might vote the Speaker out, they don't know whether
4  they're going to be successful, and they know if they stick
5  their necks out, they're liable to be punished both, again,
6  internally within the legislature and with respect to the
7  financing that the Speaker, or whatever leader it is, has at
8  his or her disposal.

9  And so it -- the fact that the leader gets this
10  committee once he is speaker, or whatever position he holds,
11  gives him a tool to prevent challenges to his leadership.  And
12  I believe that's spelled out in Dr. Osborn's testimony.

13  MS. SCHELLER:  Your Honor --

14  THE COURT:  In terms of -- go ahead.

15  MS. SCHELLER:  I'm sorry.  May I respond?  And in
16  deference to Senator Radogno, I'm going to make all of my
17  references to the female gender in terms of leadership.

18  But in this particular circumstance, Mr. Nauman
19  listed not one person in charge of any one legislative caucus
20  committee.  There were several officers, including for those
21  caucus committees organized under the auspices of the
22  leadership.  It is not in the hands of one person.

23  And more to the point, plaintiffs' entire theory,
24  which is entirely unsupported by the record, is that every
25  single member of these legislative caucuses acquiesces to some

1  type of corrupt institutional control without voting that
2  person out of office.  And there simply is -- there is an
3  absence of evidence of that in the record.

4       The only evidence in the record is that Senator
5  McCarter challenged leadership; and as Dr. Osborn identified
6  in his testimony, the leader in any body, any legislative
7  body, be it the House of Representatives on Capitol Hill or
8  down in Springfield, has many institutional controls to reward
9  persons within the party whom they think will lead the party
10  into the future; and similarly, any leader in a party has
11  other institutional controls to try to bring people in line if
12  they think they're endangering the party message or otherwise
13  not conforming with the ideals of the party and the
14  electorate.  That's our system of democratic government.

15       We discussed the minority and the majority whip
16  yesterday with Dr. Osborn.  That person's sole job is to bring
17  people into line on votes.

18       Managing caucus committee funds is not the only
19  institutional means by which leaders in any party can exert
20  control; and as we saw with Speaker Boehner, if you don't
21  exert that control in a manner to which the other members of
22  your caucus acquiesce, you will be ousted from your position
23  or you will resign before they do so.

24       So, I don't think there's any meat to the bone of
25  plaintiffs' argument that there's some type of institutional

1   corruption because they've offered evidence of none.  Senator
2   McCarter had to admit while being impeached he had no evidence
3   of anyone's intentions as to why they did or did not fund
4   anyone, including himself.  There is no evidence of this.
5           THE COURT:  So, it's unlikely, wouldn't you think,
6   that the chair of a congressional campaign committee would be
7   an insurgent within his or her own party, because it's an
8   elected position.  I think the DCCC, the chair of the DCCC is
9   the No. 4 or the No. 5-ranked person in the Democratic Party,
10  and it's an election of the caucus itself, right?
11          MR. HUEBERT:  Yes, that's right.  That makes sense.
12          THE COURT:  So, you need to have broad-based support
13  of the caucus in order to become the head of a congressional
14  campaign committee.
15          MR. HUEBERT:  Yes, that's right.
16          THE COURT:  The same as how you become Speaker or
17  minority leader or President or minority leader.
18          MR. HUEBERT:  That's right.
19          THE COURT:  So, is there really that much of a
20  difference between how Illinois law sets up the legislative
21  caucus committees and how the congressional campaign
22  committees operate in practice?
23          MR. HUEBERT:  Yes, there is, because there's no
24  reason to think that the people who are running a
25  congressional campaign committee are pursuing their personal

1  interests or particularly could use that committee to pursue
2  their personal interests.  Their personal --
3          THE COURT:  Why not?
4          MR. HUEBERT:  Well, we don't have evidence in the
5  record of exactly how these things are structured, but the
6  committee is -- there's no evidence particularly that the
7  committee is under -- those committees are under the control
8  of one person or that the decisions for those committees are
9  able to be made by just one person.
10         And in any event, Dr. Osborn testified that the
11 Illinois legislative caucus committee, because it is under the
12 control of one person, assuming they choose to exercise it, is
13 in a position -- is more like a leadership PAC where a federal
14 legislator has control over a PAC that they can use to serve
15 party interests, as they often do, but also their personal
16 interests.
17         THE COURT:  And if the head -- the elected head of a
18 congressional campaign committee is pursuing his or her own
19 personal interests as opposed to the interests of the party,
20 the membership can vote that person out?
21         MR. HUEBERT:  I assume that's true.  I don't know
22 whether that would first be internally within the committee,
23 as opposed to the entire caucus.  I couldn't say that.
24         THE COURT:  All right.  So, the plaintiffs focus
25 mostly on the Illinois House Democrats, so I'm going to gear

1    my question towards the Illinois House Democrats.

2              So, right now, the Speaker of the House is Speaker

3    Madigan, Mike Madigan; and, therefore, he formed one of the

4    legislative caucus committees, and he's actually, I believe,

5    the chair of the Democratic -- is it the Democratic Victory

6    Fund?  I can't remember what it is.

7              MS. SCHELLER:  It's the Democratic Majority, your

8    Honor.

9              THE COURT:  Okay.  The Democratic Majority.  But he's

10   also the chair of the Illinois Democratic Party, which is a

11   political party committee, right?

12             MR. HUEBERT:  That's correct.

13             THE COURT:  And he's also the 13th Ward Democratic

14   committeeman, is that right?

15             MR. HUEBERT:  That sounds right.

16             THE COURT:  And that's its own political party

17   committee, right?

18             MR. HUEBERT:  Yes.

19             THE COURT:  So, does he even need -- let's say he

20   wants to exercise control for personal purposes.  Does he

21   even need the legislative caucus committee; or even if there

22   was no such thing as a legislative caucus committee, could he

23   do the same thing, if he were so inclined to do it, through

24   the other committees of which he is the chair?

25             MR. HUEBERT:  Well, certainly, having the legislative

1   caucus committee gives him the opportunity to do it more,

2   because the state Democratic Party is limited in what it can

3   accept from any given PAC, individual, et cetera, and so is

4   the legislative caucus committee.  So, by having both of those

5   committees, he can get double contributions from, say, a given

6   PAC, who could give to both the state Democratic Party and the

7   legislative caucus committee, and so you could take in double.

8   And so that actually does give him a lot -- potentially a lot

9   more money that he can control and a lot more that he can use

10  to influence candidates.

11          Now, it is an unusual situation where you have the

12  same individual who is the Speaker of the House of

13  Representatives and the chair of the state's Democratic Party.

14  That's not necessarily the case.  That's not an inherent

15  feature.  I don't know if we have anything in the record on

16  this, but it's not an inherent feature of state political

17  party that it would be under the control of the legislative

18  leader.  It just happens that Illinois politics has played out

19  that way.

20          And the state political party is not automatically

21  assigned to a given officeholder.  There's a different method

22  by which the selection of the head of the state party comes

23  about.

24          THE COURT:  Any thought from the defendants on that?

25          MS. SCHELLER:  Well, your Honor, I would like to

1 first correct a misstatement by counsel which I think keeps
2 repeating itself throughout the case.  A legislative caucus
3 committee is formed by these leadership persons, but plaintiff
4 has not put forth any evidence that it continues to be
5 controlled by these persons.

6 And so I just want to correct, for the record, that
7 there is a repeated reference to control where that is not
8 what the statute says.  Plaintiffs' expert did not even
9 testify who controlled any of these committees.  And the
10 evidence that we've heard from Mr. Nauman is that some of them
11 are controlled by party leadership.  Some of them have been
12 turned over to other persons.  But all of them have at least
13 two officers.

14 So, I don't think that there's any support for
15 plaintiffs' argument that the evidence has shown this Court
16 that there is exclusive control by one person over any
17 legislative caucus committee.

18 But going beyond that, I think it's indicative of a
19 lack of corruption on the part of the Speaker of the House
20 that he is, in fact, the chair of so many other elected
21 positions within the political party within the State of
22 Illinois.  He was not just elected by his legislative caucus
23 to serve as the Speaker of the House.  He was elected by the
24 party to be the chair of the state party committee.  He was
25 elected by the persons who have a vote within his ward.

1          And so I think rather than demonstrating plaintiffs'
2  point that it's just one more mechanism in control, it rather
3  demonstrates the point that this Speaker, at least insofar as
4  his position as Speaker and the person who formed this
5  legislative caucus committee, has broad-based support among
6  his political party.

7          MR. HUEBERT:  Well, I mean, that's called
8  consolidating a lot of political power.  There's lots of ways
9  that one could go about doing that, and it's -- there's lots
10  of ways one could get that kind of control; and I don't know
11  that -- without evidence, we can't say why he was able to get
12  control of these other parties.

13          But we know why he's in control -- and it is control,
14  because if you -- it's obvious that if you're chair of a
15  legislative caucus committee, you, and not the treasurer who
16  you have retained to keep the books, is making the decisions
17  for that committee.

18          MS. SCHELLER:  I think that plaintiff is making
19  several arguments, none of which are supported by any evidence
20  that have been offered -- that has been offered in this case.
21  He had a political consultant and a political expert who was
22  up on the stand who didn't talk at all about consolidating
23  power and control.  That was not any opinion offered in this
24  case.  It wasn't anything that he opined upon in terms of
25  controlling various political party committees and

1    consolidating power, which would thereby lead to quid pro quo
2    corruption or corruption of some other kind.

3         And that is the -- that is the inquiry here.  Can the
4    plaintiffs show that the government's interest in avoiding
5    quid pro quo corruption is somehow undermined by legislative
6    caucus committees being treated as political parties?

7         And I think the undisputed evidence that we have
8    reviewed in this case, including from plaintiffs' expert, is
9    that PACs are nothing like legislative caucus committees.  The
10   leader of a PAC need not be elected.  They cannot be removed.
11   They tend to be focused on single-issue-driven policies.  And
12   the same is true of any other individual contributor or
13   corporation.

14        The inquiry in this case is not:  Do we dislike
15   Speaker Madigan and has he consolidated power?  Rather, it is:
16   Is the campaign finance statute under-inclusive because
17   legislative caucus committees are really more like PACs than
18   they are like political committees?  I think there's been no
19   such showing.  I think all of the evidence has demonstrated
20   that legislative caucus committees function in the manner of a
21   political party committee; and, therefore, the statute is not
22   under-inclusive.

23        MR. HUEBERT:  I should be clear about something here.
24   The argument isn't based on Speaker Madigan in particular.
25        THE COURT:  That was how I framed the question, so of

1     course you --

2          MR. HUEBERT:  I just want to be clear that we're not

3     depending on anything pertaining to him in particular to make

4     the argument about the opportunities for corruption that this

5     structure creates, because obviously, this structure will

6     presumably outlive him if it's not struck down or appealed,

7     and the same arguments would still apply.

8          THE COURT:  Even -- let me switch to a different

9     topic.  Even if a seat, a legislative seat is relatively safe

10    for one party or the other, isn't it possible for that seat to

11    become unsafe if that party nominates a non-ideal candidate?

12         MR. HUEBERT:  Yes.  And I -- and I don't think

13    Dr. Osborn disputes that one bit.

14         THE COURT:  So, wouldn't that -- wouldn't that --

15    doesn't that mean that even if you have an electoral expansion

16    strategy, that could lead you, in certain circumstances, to

17    get involved in a primary election to make sure that the right

18    candidate wins the primary so your -- what you think is a safe

19    seat doesn't turn into an at-risk or unsafe seat?

20         MR. HUEBERT:  Dr. Osborn doesn't dispute that, and

21    neither do we.  I think there may be excessive focus -- have

22    been excessive focus in this case on the examples Dr. Osborn

23    highlighted, and that may well be our fault, the examples that

24    Dr. Osborn highlighted that he said appeared to be

25    inconsistent with a party expansion strategy.

1    The point there was this illustrates what you would
2   expect to see if they were not following a party expansion
3   strategy.  It doesn't prove that they're not following a party
4   expansion strategy.  It's just consistent with what you would
5   expect to see if they weren't.

6    But his conclusions about the structure and the
7   opportunities for corruption that it creates don't depend on
8   those examples.  He analyzes the structure.  He talks about
9   the opportunities for corruption it creates.  And then
10   incidentally, he illustrates with a couple of examples of
11   what it could look like if they weren't pursuing a party
12   expansion strategy.

13    But his opinion is not that they definitely weren't
14   pursuing a party expansion strategy with those contributions.
15   It's just that that's what it might look like, and that's all
16   it is.  We're not offering those examples for anything more
17   than that.

18    The core of Dr. Argument -- excuse me, the core of
19   Dr. Osborn's argument is the analysis of the structure.  That
20   came first, and the other is just, "Then I took a look at
21   these things, and it looks like there's some things that I
22   would expect to see if he weren't pursuing a pure party
23   expansion strategy."

24    THE COURT:  Any thoughts?

25    MS. SCHELLER:  Several.  I'll begin with Dr. Osborn's

1  analysis of the structure, which is while he offered an

2  analysis of the structure to the Court, I think the Court can

3  give it zero weight if it so elects because his analysis he

4  said was based upon a qualitative analysis, which you would

5  expect to comprise, according to him, interviews, review of

6  literature, a study of the actual structure.

7       And yet Dr. Osborn admitted he interviewed nobody.

8  He read nothing about Illinois legislative caucus committees.

9  He read nothing particular to Illinois law, and he reviewed no

10  literature which had been written after the formation of the

11  Illinois legislative caucus committees.

12       So, how he could portend to be an expert as to the

13  structure and behavior of an organization when he read nothing

14  which was dated after this organization was created, nothing

15  specific to Illinois law, and spoke with no one about how it

16  actually functions or operates?  I think his opinions are

17  inherently suspect and should be given no weight.

18       But turning to the next point, it's -- I'm quoting

19  the Supreme Court in *Williams-Yulee versus Florida Bar*,

20  135 S. Ct. 1656 at page 1668.  "It is always somewhat

21  counterintuitive to argue that a law violates the First

22  Amendment by abridging too little speech."  And that's

23  essentially what plaintiffs are arguing here.

24       The only thing that is at issue in this case is

25  whether the law is under-inclusive because legislative caucus

1    committees are closer to PACs, individuals, and corporations

2    than to political party committees.  And I don't think

3    Dr. Osborn offered any evidence which suggested that that was

4    the case.

5            Instead, he affirmatively testified that PACs are

6    special interest groups.  They can focus on one particularized

7    issue; whereas, members of a legislative caucus would be

8    required to focus on every issue that presents itself before

9    the electorate.

10           He told us that members of PACs and individuals with

11   funds to contribute cannot be removed by the electorate if, in

12   fact, they're advancing speech and influencing elections in a

13   way that does not comport with what the democracy and people

14   in that jurisdiction want.

15           He did not offer any evidence, none whatsoever, that

16   a PAC is a similar structure and behaves in a similar way to a

17   legislative caucus committee.

18           So, if we're focusing on what his opinion actually

19   offered, it offered nothing on that point; and his

20   particularized examples offered in support of a, quote,

21   unquote, "corruption model," were not borne out through his

22   testimony when challenged.

23           I don't believe that Dr. Osborn has done anything to

24   support the plaintiffs' claim of a First Amendment violation.

25           THE COURT:  Okay.

1        MR. HUEBERT:  May I respond to some of that?

2        THE COURT:  Of course.

3        MR. HUEBERT:  With respect to Dr. Osborn's

4   methodology, the parties have briefed that issue extensively,

5   so I won't address it further here unless the Court has

6   further questions on it.

7        THE COURT:  That's fine.

8        MR. HUEBERT:  And with respect to the *Williams-Yulee*

9   case and the idea of restricting too little speech, when we're

10  talking about a scheme of campaign contribution limits, it's

11  kind of an unusual situation because you have the political

12  playing field and all of these players on it competing to

13  achieve their political goals.  And the Supreme Court has said

14  that the First Amendment is a forum -- is intended to create a

15  forum where individuals can pursue their political goals

16  without hindrance or aid from the government.

17       So, you have here a specific situation where you have

18  competitors on a playing field, and so when you restrict one

19  and not others, when you restrict some people greater than

20  others, that presents a different issue than other situations

21  where one might argue that the government didn't restrict

22  enough speech, because you're creating an unfairness with

23  people who are going potentially directly against each other.

24       As Senator McCarter testified, he goes -- he goes

25  directly -- he may go directly against someone supported by a

1    legislative caucus committee.  Matthew Besler definitely

2    testified that he participates in elections where the other

3    side is supported by these committees.  So, it's a situation

4    where the difference in treatment, where not restricting one

5    person can have very serious consequences that implicate

6    fundamental First Amendment interests.

7            And there was a suggestion that legislative caucus

8    committees, unlike PACs, would have to be trying to influence

9    legislators on every issue.  I don't think that's the case.  I

10   think it would be correct to assume that often, Democrats

11   would all be on the same page with respect to important

12   issues, issues that one associates with the Democratic Party.

13   It's on the margins where you might have these differences

14   with respect to things that may not be the kinds of issues

15   that there's broad agreement on in a political party.

16           And that's where you find the difference, and that's

17   true with all kinds of corruption that goes on from

18   contributions.  Oftentimes, contributions were made by a donor

19   to a candidate, and they may well agree on the broad run of

20   issues.  It's those instances -- it's the opportunity for

21   instances where a candidate doesn't have a pre-existing

22   ideological commitment where the opportunity for corruption

23   really comes in on the more transactional-type matters that

24   aren't -- that candidates don't have pre-existing positions

25   on, you know, whether to build such-and-such project or

1  whatever.  That's where the potential for corruption comes in
2  with respect to any type of donor's contributions.
3       THE COURT:  Okay.  All right.  Well, that's all I
4  have.  I really appreciate the efforts of both sides.  This
5  was a very -- this is -- was and remains a very interesting
6  case.  And I'll look forward to getting your proposed findings
7  of fact and conclusions of law, and I'll issue a decision
8  shortly thereafter, within -- within a matter of weeks after
9  getting the proposed findings and conclusions.
10      Anything else you'd like to address?
11      MR. HUEBERT:  We can make a closing argument if you'd
12  like one.
13      MS. SCHELLER:  I have one quick question.
14      THE COURT:  Go ahead.
15      MS. SCHELLER:  Shall we assume that we are to comply
16  with the Court's standing order concerning exchange of
17  findings of fact and conclusions of law for our submissions
18  next week?
19      THE COURT:  In terms of getting admissions or
20  denials?  You don't have to do that.
21      MS. SCHELLER:  Okay.
22      THE COURT:  You don't have to do that.
23      I mean, if you would like to make a closing argument.
24  I don't know if both sides were anticipating closing
25  arguments.

1           MS. SCHELLER:  Your Honor, we'd be happy to make our

2    closing argument through proposed findings of fact and

3    conclusions of law.  I'm also happy to present in the event

4    that Mr. Huebert would like to present a closing argument.

5           MR. HUEBERT:  I'll go ahead and present it, if you

6    think it's a good use of the Court's time.

7           THE COURT:  No, it's -- of course it is.  How long do

8    you think you'll have?

9           MR. HUEBERT:  Not long.

10           THE COURT:  Okay.

11           MR. HUEBERT:  A few minutes.

12           THE COURT:  All right.  Go ahead.

13           MR. HUEBERT:  Thank you, your Honor.  This case is

14    about whether Illinois' campaign contribution limits, which

15    discriminate against the plaintiffs and in favor of the

16    state's legislative leaders, are narrowly tailored to limit

17    corruption.  In the trial, the plaintiffs presented an expert

18    witness, Dr. Marcus Osborn, who explained that from an

19    anti-corruption perspective, the act's discrimination doesn't

20    make sense.

21           Dr. Osborn testified that a legislative leader's

22    ability to give campaign contributions, through whatever kind

23    of committee a legislative leader might have, gives rise to

24    opportunities for corruption.  A legislative leader who gives

25    contributions to candidates is in a position to make quid pro

1   quo demands.  "If I -- I'll give you money if you support me

2   as leader.  I'll give you money if you vote for my bill.  I

3   won't give you money if you don't vote for my bill."

4         That much is obvious even without Dr. Osborn's

5   opinion.  A legislative leader who has discretion over how to

6   direct campaign funds is in a position to demand a quid pro

7   quo from a person to whom he or she gives money.

8         Dr. Osborn further testified that the potential for

9   corruption in legislative leaders' contributions is increased

10   in Illinois because the legislative leaders can use these --

11   their legislative caucus committees to give much more than

12   others are allowed to give.  And of course, the person who is

13   in a position to give the most money is in an unusually strong

14   position to make quid pro quo demands.

15         After all, campaign contribution limits are premised

16   on the idea or premised on the concern that legislators or

17   other public officials might be up for sale to the highest

18   bidder.  And if the legislative leader is the person who can

19   give the most money, then the legislative leader is in a

20   position to be the highest bidder; and, therefore, a

21   legislative leader's contributions give rise to the potential

22   for actual or apparent corruption and do so more than you

23   would expect from other political contributors under the

24   circumstances in Illinois where they're limited less.

25         Dr. Osborn also testified that the potential for

1   corruption in legislative leaders' contributions is further
2   enhanced by the exclusivity feature in the law, the rule that
3   candidates can only take contributions from one legislative
4   caucus committee, because that lets the leaders freeze out
5   other legislative caucus committees and then make candidates
6   dependent on them for support, which, of course, puts them in
7   a stronger position to make quid pro quo demands if they're so
8   inclined.

9           Also -- so, defendants haven't refuted Dr. Osborn's
10  testimony on any of those points, and they really can't do so
11  because it only makes sense.

12          Also, in general, the statute appears to reflect the
13  view that contributions from one legislator to another can
14  give rise to corruption or the appearance of corruption.  If
15  Senator McCarter wants to contribute from his candidate
16  committee to another legislator or another legislative
17  candidate, he's limited to giving them $50,000, and that
18  apparently reflects a legislative judgment that more than that
19  would give rise to corruption or the appearance of corruption.

20          And with a contribution from one legislator to
21  another legislative candidate, what would the potential quid
22  pro quo be?  "I'll give you money if you vote for my bill.
23  I'll give you money if you vote for me to be the new
24  legislative leader."  These are exactly the same kinds of
25  quid pro quo demands that a legislative leader could make for

1    legislative caucus committee contributions.

2            An ordinary legislator can also have a political

3    action committee, as Senator McCarter does, which allows him

4    to give an additional $50,000 to the candidate he supports.

5    And I'm using the non-adjusted amounts, of course.

6            So, the state apparently has taken a position in its

7    scheme of campaign contribution limits that allowing an

8    ordinary legislator to give more than $100,000 from the

9    committees that he controls would create an intolerably high

10   risk of actual or apparent quid pro quo corruption.  That must

11   be the case, because that's the only way they could justify

12   placing these limits on ordinary legislators.

13           But yet at the same time, the law also apparently

14   reflects the view that a legislative leader can max out his

15   candidate committee, max out his PAC, and then give unlimited

16   contributions to a fellow legislator without creating any

17   undue threat of corruption.  And that makes no sense at all.

18           If anything, for the reasons we've gone over, a

19   legislative leader's contributions have a greater potential to

20   corrupt than ordinary legislators' contributions.  So, if

21   someone's going to be limited more, it should be the leader,

22   not the less powerful, ordinary member of the legislature.

23   It's because the law is inconsistent in this way it cannot

24   possibly be narrowly tailored to limit corruption.

25           And what have the defendants presented to refute any

1    of this?  What have defendants presented to explain why an

2    ordinary leader -- excuse me, an ordinary legislator like Kyle

3    McCarter would pose a threat of corruption if he could give a

4    fellow legislator more than $100,000 from the candidates --

5    from the committees that he controls, but a legislative leader

6    doesn't pose the threat of corruption when he directs

7    unlimited amounts to fellow legislators through the committees

8    that he's able to control?

9            The defendants haven't presented any evidence to

10   explain this.  They haven't presented an expert to refute

11   Dr. Osborn's testimony or anything else, even though they bear

12   the burden of proof to show that the limits are narrowly

13   tailored to prevent corruption.

14           In their opening statement, defendants seemed to take

15   the position that the plaintiffs have to put on evidence to

16   show a specific instance of this kind of quid pro quo

17   corruption actually occurring to make their case, but that's

18   simply wrong.  First, nothing in the Supreme Court requires

19   evidence of an actual instance of a particular type of quid

20   pro quo corruption to demonstrate that that particular type of

21   campaign contribution can give rise to actual or apparent

22   corruption.  I mean, it hasn't required the government to do

23   that when it's justifying its limits, so it doesn't make sense

24   that the plaintiffs would have to show that in this case.

25           And the case law doesn't require that kind of

1    evidence to show under-inclusiveness.  That's not a holding or

2    even an implication of the *Williams-Yulee versus Florida Bar*

3    case, and we'll elaborate on that point in revising our

4    proposed conclusions of law.

5            And second, the defendants get the burden of proof

6    wrong.  All the plaintiffs had to prove in this case was that

7    the limits restricted their ability to engage in political

8    speech.  Once they've done that, the burden of proof is on the

9    defendants to show that the limits are narrowly tailored.

10   They're required to prove that with evidence.

11           The defendants seem to be arguing for something like

12   rational basis review where the plaintiffs would bear the

13   burden of proof to show that the law is unconstitutional.  But

14   of course, this isn't a rational basis case.  It's a First

15   Amendment case.  And the Supreme Court made clear in the

16   *McCutcheon versus FEC* decision that the defendants' burden in

17   this kind of case is not a light one.

18           So, the defendants haven't met their burden, and the

19   plaintiffs, therefore, respectfully ask the Court to enter

20   judgment in their favor.

21           THE COURT:  Okay.  Thank you.

22           Are you able to respond on the fly to that?

23           MS. SCHELLER:  I am, your Honor, if you'd just give

24   me one quick moment.

25           THE COURT:  Okay.

1          MS. SCHELLER:  So, to begin, I believe that

2    plaintiffs have misunderstood the *McCutcheon* case and how it

3    applies here.  *McCutcheon* was a case which dealt with

4    aggregate expenditures insofar as a donor contributed to

5    individual candidates for office pursuant to the applicable

6    contribution limitations, but there was an aggregate limit on

7    the number of candidates that could be supported.

8          The Supreme Court determined that that was not

9    actually a political contribution, but rather a political

10   expenditure, thus subject to strict scrutiny and, therefore,

11   was under a different test than the test that we are

12   discussing here today.  Today, we are discussing campaign

13   contributions.  The State does have a burden to show that

14   there is a closely-drawn interest.

15         So, the way that we interpret the burden, to clarify

16   from our conversations yesterday, is that the plaintiff has a

17   burden to come in to court and say, "My speech has been

18   restricted."  There is no dispute that the plaintiff has come

19   in to court and said their speech was restricted and that, in

20   fact, plaintiffs' speech is restricted.

21         The burden then shifts to the government, at which

22   point we must demonstrate a closely-drawn interest.  And

23   consistent with Supreme Court precedent, we have advanced the

24   only closely-drawn interest which has been recognized, which

25   is that plaintiffs' speech is, in fact, restricted with regard

1   to campaign contributions to avoid quid pro quo corruption.

2          Thus far, we are in accord.  The question that the

3   Court posed, which I think is an interesting one, is:  Then

4   who bears the burden to discuss under-inclusivity?  Once the

5   government has said and established there is a closely-drawn

6   interest to avoid quid pro quo corruption, does the plaintiff

7   have to prove that they are closer, in terms of this

8   situation, to legislative caucus committees, or does the

9   government then bear the burden of proof to show, "No, you are

10  not the same"?

11         And that issue, insofar as we can determine, does

12  appear to be unresolved in constitutional law.  We believe it

13  is the plaintiffs' burden to show that they are similarly

14  situated to another party; however, in this case, even if it

15  was our burden, we believe that we have met it.

16         In this case, plaintiffs' expert and their witnesses

17  all testified that they are not elected officials within this

18  state.  Each member of a legislative caucus committee, whether

19  it is the person in control or the person who votes for the

20  Speaker of the House, is an elected member of a legislative

21  body within this state.  And, therefore, the dangers of

22  corruption are far less and the institutional similarities

23  are few.

24         There is absolutely no constitutional obligation to

25  limit contributions at all, and if any legislative body

1 concludes that allowing contributions of a certain amount does

2 not create an undue risk of corruption or the appearance of

3 corruption, a candidate who wishes to restrict an opponent's

4 fundraising cannot argue that the constitution demands that

5 contributions be regulated more strictly. That's from

6 *Davis versus FEC*. It is a Supreme Court decision,

7 128 S. Ct. 2759.

8       What's happening here is that plaintiffs are refusing

9 and, in fact, focusing on things other than the matter at

10 hand. The matter at hand is: Are political action committees

11 the same as legislative caucus committees or not? We have

12 affirmatively demonstrated on behalf of the State that they

13 are not. They do not slate candidates. They do not shape the

14 goals of the party. They do not appoint people to committees.

15 They do not determine what issues are voted upon in any

16 particular election cycle.

17       Political action committees simply do not act in the

18 same way as political parties do, and that has been recognized

19 by our Supreme Court in *McConnell*. It's been recognized in

20 other cases. And, in fact, plaintiffs' expert and each of

21 their witnesses conceded that they do not engage in the same

22 conduct as political party committees do.

23       They said that they do not select slates of

24 candidates. They do not determine who will serve on

25 committees. They don't elect congressional leadership. They

1  don't organize caucuses.  And plaintiffs' expert, Dr. Osborn,

2  admitted that political parties have influence and power in

3  the legislature that vastly exceeds that of any interest

4  group.  That is the design of our political system.

5           What plaintiffs seek to do here is say, "Yes, we are

6  different, but we should be treated the same because they can

7  be corrupt also," and that is not an appropriate First

8  Amendment test.  The appropriate test is whether a legislative

9  determination as to the need for prophylactic measures where

10 corruption is the evil feared is based on different structures

11 and purposes of different entities; therefore, the difference

12 in the contributions or the restrictions may require different

13 forms of regulation in order to protect the integrity of the

14 electoral process.  That's from *Federal Election Commission*

15 *versus National Right to Work*.

16          That's the test.  Do the differing structures and

17 purposes of the entities discussed by the Illinois campaign

18 finance statute warrant different regulation?  And we have

19 affirmatively proved that they have.

20          Dr. Osborn testified a PAC is a special interest

21 group.  Mr. Besler testified, "Our special interest group is

22 free market principles.  We don't care who the committee -- we

23 don't care who the candidate is.  We don't care what party

24 they're affiliated with.  This is our focus."

25          The danger of corruption with a special interest

1   group is greater than it is with a political party because the
2   political party only thrives if they are supported by a
3   majority of like-minded thinkers.

4           Now, when we look at the actual parameters for
5   forming a non-leadership legislative caucus, which Mr. Huebert
6   touched upon in his argument, it requires more than a speaker
7   of one because it is again consistent with the idea that you
8   need at least five or 10 elected officials of like mind and
9   like ideology to exert such a great amount of influence over
10  whom a party may slate, not over who wins an election, whom a
11  party may slate and support in an election, and I think that's
12  an important distinction.

13          And we've been talking a lot about the potential for
14  corruption and the control of leadership, but spending large
15  sums of money in connection with elections but not in
16  connection with an effort to control the exercise of an
17  officeholder's official duties does not rise to the level of
18  quid pro quo corruption.

19          We have heard no evidence, absolutely none, that
20  these legislative caucus committees receive unprecedented
21  amount of funds which we then -- which are then used to either
22  control the exercise of the officeholder's duties within the
23  caucus or to control their own duties.  That's the type of
24  quid pro quo corruption that may be regulated.  Plaintiffs not
25  only offer no evidence of that corruption, but they say,

1   "Well, they should be regulated just in case."  The First

2   Amendment doesn't support that interpretation.

3         The issue here is whether political action committees

4   are like political party committees and legislative caucus

5   committees, and they simply are not.  And so it doesn't matter

6   what *McCutcheon* says about the strict scrutiny test for

7   political expenditures.  What matters is in order to test

8   under-inclusivity, you have to show an actual problem with

9   corruption or evidence that such a problem may exist.

10        And in that regard, we have shown that there is no

11  such problem, demonstrating that leadership is elected, and

12  plaintiffs have not offered anything to rebut that point.  So,

13  to the extent plaintiffs bear the burden, they have failed.

14  To the extent we bear the burden, we have put forth unrebutted

15  evidence on that point.

16        Finally, the most recent Supreme Court opinion

17  governing under-inclusivity, which is our -- the specter of

18  our discussion here, *Williams-Yulee versus Florida Bar*, first

19  says, "It is always somewhat counterintuitive to argue that a

20  law violates the First Amendment by abridging too little

21  speech."  And we contend the plaintiffs' argument here, too,

22  is counterintuitive.

23        Furthermore, the court says, "Although a law's

24  under-inclusivity raises a red flag, the First Amendment

25  imposes no freestanding under-inclusiveness limitation,"

1    citing to *R.A.V. versus St. Paul* 505 U.S. 377 at 387.

2            "A state need not address all aspects of a problem in

3    one fell swoop.  Policy-makers may focus on their most

4    pressing concerns.  We have accordingly upheld laws even under

5    strict scrutiny that conceivably could have restricted even

6    greater amounts of speech in service of their stated

7    interests."

8            And we believe that plaintiffs' position here is

9    contrary to that stated principle of law.  Plaintiffs are

10   saying, "We're just like legislative caucus committees; but to

11   the extent we aren't, their speech should be regulated in

12   service of the interests of avoiding quid pro quo corruption."

13   But that is not consistent with the precedent.  That is not

14   the vantage point that the Supreme Court holds in terms of

15   interpreting the First Amendment, and we suggest that judgment

16   should be entered against the plaintiffs.

17           THE COURT:  Okay.  Thank you.

18           MS. SCHELLER:  Thank you.

19           THE COURT:  Any final thoughts from the plaintiffs,

20   if you would like?  You're under no obligation to do so.

21           MR. HUEBERT:  We'll put our responses to those points

22   in writing.

23           THE COURT:  Okay.  That sounds good.  Well, again,

24   thank you very much for your excellent presentations, both in

25   writing and in examination the witnesses.  And again, I look

closing - defendants

1    forward to getting your proposed findings and conclusions.

2         MR. HUEBERT:  Thank you.

3         THE COURT:  Thank you.

4         MR. LOVELLETTE:  At the same time, your Honor, would

5    you like us to file the exhibits?

6         THE COURT:  Yeah, that will -- you know what --

7         MR. LOVELLETTE:  Or should we just deliver copies to

8    the Court?

9         THE COURT:  I would just deliver copies to the Court,

10   and we'll have them in case the Seventh Circuit needs them.

11   Okay?  Thank you.

12        MS. SCHELLER:  Thank you.

13     (Which were all the proceedings heard.)

14                          CERTIFICATE

15     I certify that the foregoing is a correct transcript from

16   the record of proceedings in the above-entitled matter.

17

18   */s/Charles R. Zandi*              *January 27, 2016*

19   Charles R. Zandi                   Date
     Official Court Reporter

20

21

22

23

24

25