UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS LIBERTY PAC, EDGAR BACHRACH, and KYLE McCARTER, | ) ) | |
| | ) | 12 C 5811 |
| Plaintiffs, | ) | |
| | ) | Judge Gary Feinerman |
| vs. | ) | |
| | ) | |
| LISA M. MADIGAN, Attorney General of Illinois, WILLIAM McGUFFAGE, Chairman of the Illinois State Board of Elections, JESSE R. SMART, Vice-Chairman of the Illinois State Board of Elections, HAROLD D. BYERS, Member of the Illinois State Board of Elections, BETTY J. COFFRIN, Member of the Illinois State Board of Elections, ERNEST L. GOWEN, Member of the Illinois State Board of Elections, JUDITH C. RICE, Member of the Illinois State Board of Elections, BRYAN A. SCHNEIDER, Member of the Illinois State Board of Elections, and CHARLES W. SCHOLZ, Member of the Illinois State Board of Elections, all in their official capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

### Memorandum Opinion and Order

Illinois Liberty PAC, Edgar Bachrach, and Kyle McCarter brought this declaratory

judgment action under 42 U.S.C. § 1983 against the Attorney General of Illinois and the

Chairman, Vice-Chairman, and other members of the Illinois State Board of Elections, all in

their official capacities, alleging that certain contribution limits imposed by the Illinois Election

Code violate the First Amendment and the Fourteenth Amendment's Equal Protection Clause.

Doc. 65. Early in the litigation, the court denied Plaintiffs' motion for a preliminary injunction

due to a low likelihood of success on the merits. Docs. 43-44 (reported at 902 F. Supp. 2d 1113

(N.D. Ill. 2012)). The Seventh Circuit summarily affirmed, stating: "We agree with the district

court that [Plaintiffs] have not shown that they are likely to succeed on the merits of their

challenge to contribution limits in 10 ILCS 5/9-8.5." 2012 WL 5259036 (7th Cir. Oct. 24, 2012). This court then dismissed most of Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6), except for the claim—which Plaintiffs added after preliminary injunctive relief was denied—that the Illinois Election Code is unconstitutional to the extent it classifies legislative caucus committees as political party committees and thereby treats them more favorably than political action committees ("PACs"), corporations, and individuals. Docs. 95-96 (reported at 2014 WL 859325 (N.D. Ill. Mar. 3, 2014)). After discovery devoted to that claim, the court denied the parties' cross-motions for summary judgment and Defendants' motion to bar the expert opinions of Plaintiffs' expert, Dr. Marcus Osborn. Docs. 162-163 (reported at 2015 WL 5589630 (N.D. Ill. Sept. 21, 2015)). The court held a bench trial on that claim. Docs. 182-183.

Pursuant to Federal Rule of Civil Procedure 52(a), the court enters the following findings of fact, which are found by a preponderance of the evidence, and conclusions of law. To the extent that any findings of fact may be considered conclusions of law, they shall be deemed conclusions of law, and to the extent that any conclusions of law may be considered findings of fact, they shall be deemed findings of fact. After considering the admissible evidence and the parties' stipulations, and upon assessing the witnesses' credibility, the court finds that the Code's contribution limits do not violate the First Amendment or the Equal Protection Clause.

## Findings of Fact

### A. Illinois Campaign Finance Law

1.      The Illinois Disclosure and Regulation of Campaign Contributions and Expenditures Act ("the Act"), 10 ILCS 5/9-1 *et seq.*, which is codified as part of the Illinois Election Code, recognizes three classes of political contributors: (1) individuals; (2) political committees; and (3) corporations, labor unions, and other associations. 10 ILCS 5/9-8.5(b).

2.      There are several different types of political committees, including candidate political committees, political party committees, and PACs.  10 ILCS 5/9-1.8(a).

3.      Individuals may contribute $5,000 to a candidate in a given election cycle.  10 ILCS 5/9-8.5(b).

4.      Individuals may contribute $10,000 to a PAC per election cycle; the same limit applies to an individual's contributions to a political party committee per election cycle.  10 ILCS 5/9-8.5(c)-(d).

5.      A PAC, defined as a group of people or an organization "that accepts contributions or makes expenditures during any 12-month period in an aggregate amount exceeding $5,000 on behalf of or in opposition to a candidate," 10 ILCS 5/9-1.8(d), may contribute $50,000 to a candidate during an election cycle.  10 ILCS 5/9-8.5(b).

6.      A political party committee is the state, county, or ward/township committee of a political party, or a legislative caucus committee.  10 ILCS 5/9-1.8(c).

7.      In contrast to individuals and PACs, political party committees may contribute unlimited amounts to a candidate during a general election.  10 ILCS 5/9-8.5(b).

8.      During a primary election, political party committees are subject to a $200,000 contribution limit to a candidate for statewide office; a $125,000 limit for state senate elections and certain judicial and county elections; a $75,000 limit for state representative elections and certain judicial and county elections; and $50,000 for all other elections.  *Ibid*.

9.      Political party committees may contribute $20,000 to a PAC in a given election cycle.  10 ILCS 5/9-8.5(d).

10.     The foregoing amounts are adjusted regularly for inflation.  10 ILCS 5/9-8.5(g).

11. It is a Class A misdemeanor for a candidate to accept a contribution exceeding the applicable limit. 10 ILCS 5/9-25.2.

12. As noted, one type of political party committee is a legislative caucus committee. 10 ILCS 5/9-1.8(c).

13. A legislative caucus committee is "a committee established for the purpose of electing candidates to the General Assembly." *Ibid*.

14. A legislative caucus committee may be formed by each of the majority and minority leaders of the state House and Senate—*i.e.*, the Speaker and Minority Leader of the House, and the President and Minority Leader of the Senate—or by a committee of five state senators or ten state representatives of the same caucus. *Ibid*.

15. The contribution limits on legislative caucus committees are the same as those imposed on other political party committees. 10 ILCS 5/9-8.5(b). A candidate may accept contributions from only one legislative caucus committee per election cycle. *Ibid*. There is no similar limitation on a candidate's receipt of contributions from other political party committees.

16. An "election cycle" consists of either a primary election or a general election. 1/26/16 Tr. at 207:3-6. Therefore, a political candidate may receive contributions from one legislative caucus committee during the primary election and from another legislative caucus committee in the general election. *Id*. at 209:21-24.

17. For ease of reference, the court uses the term "political party" to refer to a political party and its affiliated committees other than a legislative caucus committee, and the term "candidate" to refer to a candidate and his or her affiliated campaign committee.

18. Plaintiffs claim that the Act's treatment of legislative caucus committees as political party committees, and its favorable treatment of legislative caucus committees as

compared to PACs, individuals, and corporations, are unconstitutional. 1/25/16 Tr. at 7:17-24. They argue that legislative caucus committees, though regulated as political parties, actually have little in common with political parties and are far more similar to PACs. *Id*. at 9:11-22; *see also* Pl. Exh. 1 at 13 ("The benefits provided to Legislative Caucus Committees are unwarranted because they operate more like political action committees than party committees."). Because legislative caucus committees have the potential to corrupt, the argument goes, their classification as political parties undermines the Act's anti-corruption justification for limiting contributions from individuals and PACs and renders the law fatally underinclusive. 1/25/16 Tr. at 11:3-9.

### B. Illinois Liberty PAC

19.     Illinois Liberty PAC is a political action committee that donates funds to candidates running for election to the Illinois General Assembly. Doc. 178 at p. 17, ¶ 1; 1/25/16 Tr. at 51:14-21. The PAC provides financial contributions to candidates who support free market principles. 1/25/16 Tr. at 51:14-17.

20.     Illinois Liberty PAC wishes to contribute larger amounts of money to candidates for state office than the Illinois Election Code currently allows. *Id*. at 54:12-15.

21.     If there were no contribution limits (or, presumably, if there were more generous ones), Illinois Liberty PAC would adopt a different contribution strategy. *Id*. at 56:6-9.

22.     Illinois Liberty PAC is not aligned with any political party and would support any candidate that subscribed to a free market philosophy. *Id*. at 59:13-17.

23.     Illinois Liberty PAC does not advocate for a slate of candidates, and nor does it determine who sits on legislative committees or who obtains legislative leadership positions. *Id*. at 59:18-60:20.

24.     As a PAC, Illinois Liberty PAC is not beholden to the electorate and may not be voted into or out of office.  *Id*. at 60:21-25.

25.     The contribution limits placed on Illinois Liberty PAC apply regardless of its viewpoint or the candidates to whom it contributes.  *Id*. at 61:1-25.

### C.     Edgar Bachrach

26.     Edgar Bachrach is an individual who makes contributions to PACs and political candidates.  Doc. 178 at p. 17, ¶ 2; 1/25/16 Tr. at 19:15-21:19.

27.     In the 2012 election cycle, Bachrach contributed $5,000 to Citizens for Babcock, a campaign committee for Michael Babcock, but he would have contributed more had the Act not prevented him from doing so.  1/25/16 Tr. at 19:18-21:8.

28.     In the 2014 election cycle, Bachrach contributed $10,500 to Illinois Liberty PAC, but he would have contributed more if not for the Act's limits.  *Id*. at 21:15-22:3.

29.     In the current election cycle, Bachrach wants to contribute larger amounts to Illinois Liberty PAC and to Jeanne Ives, a candidate for the Illinois House of Representatives, than the Act allows.  *Id*. at 22:4-23:1.

30.     Bachrach is not a "straight ticket voter"—that is, he contributes to candidates based on the issues they champion, not because he is supporting a particular political party or because he intends to speak on behalf of a political party.  *Id*. at 23:13-24:3.

31.     Bachrach does not (1) select slates of candidates, (2) determine who sits on legislative committees, (3) advocate for a particular slate of candidates, or (4) advocate for any particular candidate to be designated as a legislative leader.  *Id*. at 24:9-25:11.

32.     As a private donor, Bachrach is not voted into or out of office and is not beholden to the electorate.  *Id*. at 25:17-20.

33.     The contribution limits placed on Bachrach are the same regardless of his political affiliation, the political affiliation(s) of the candidate(s) to whom he contributes, or the issue(s) for which he advocates.  *Id*. at 26:5-27:3.

### D.     Kyle McCarter

34.     Kyle McCarter is an Illinois state senator who runs for elected office as a Republican, fundraises for his campaigns, and spends the contributions he receives to support his candidacy.  Doc. 178 at p. 17, ¶ 3; 1/25/16 Tr. at 29:16-19, 39:24-40:25.

35.     In the 2010, 2012, and 2014 election cycles, McCarter received contributions from both individuals and PACs, but he would have sought greater contributions from them had the Act allowed.  *Id*. at 30:6-32:1.

36.     If permitted, McCarter's current campaign committee would accept contributions from individuals and PACs in amounts above the current limits.  *Id*. at 32:2-9.

37.     McCarter is the chair of the Common Sense Caucus PAC.  *Id*. at 32:10-17.

38.     McCarter initially testified that he wanted to establish his PAC as a legislative caucus committee, but that he "could not meet the qualifications" and therefore a legislative caucus committee "could not be put together."  *Id*. at 43:23-44:8.  He then testified that he simply elected "not to form [his PAC] as a legislative caucus committee."  *Id*. at 44:9-45:13.

39.     McCarter testified at trial that he believes that he stopped receiving campaign contributions from the Republican Illinois Senate leaders (through their legislative caucus committees) because he opposed them on certain issues.  *Id*. at 39:17-42:1.  At his deposition, McCarter admitted that he could not judge the intentions of the legislative leaders' actions.  *Id*. at 42:7-43:5.

40.     McCarter was not aware of any instance in which the Senate leadership used a legislative caucus committee to fund a senator's primary opponent because that senator had previously opposed the leadership.  *Id*. at 48:10-49:16.

41.     McCarter agreed that if an Illinois legislator's constituents do not approve of who contributes to him or her, they can vote that legislator out of office.  *Id*. at 35:10-13.  But if McCarter were ever voted out of office, he would retain his position as chair of the Common Sense Caucus PAC because voters cannot vote him out of his PAC.  *Id*. at 35:16-21.

42.     McCarter characterized a legislative caucus committee as "essentially a PAC" composed of state legislators.  *Id*. at 33:17-18.  For the reasons provided below, the court does not agree with that assertion.

### E.     Illinois Legislative Leaders

43.     The House Speaker, House Minority Leader, Senate President, and Senate Majority Leader are elected by members of their respective caucuses.  Ill. Const. art. IV, §§ 6(b)-(d); 1/25/16 at 147:15-24.  They may be removed from their leadership positions by members of their caucus, or be removed from office by the electorate.  *Id*. at 148:3-149:2.

### F.     Dr. Marcus Osborn

44.     Dr. Marcus Osborn, Plaintiffs' expert witness, provides government relations services through the law firm Kutak Rock.  *Id*. at 69:2-70:7.

45.     Dr. Osborn represents clients before legislative bodies, assists them in developing political policy strategies, drafts and reviews legislation, and provides policy expertise.  *Id*. at 69:4-11.

46.     Dr. Osborn has worked in this field since the early 1990s after receiving a master's degree and a Ph.D. in public administration from Arizona State University.  *Id*. at 73:14-18; Pl. Exh. 1 at 15.

47.     Dr. Osborn's dissertation focused on interest groups and how they achieve influence through campaign contributions.  1/25/16 Tr. at 74:9-15.

48.     Through writing his dissertation, Dr. Osborn became familiar with an extensive body of academic literature pertaining to interest groups and state legislative and political operations.  *Id*. at 74:16-25.

49.     Dr. Osborn has served as an expert witness in two cases concerning Arizona campaign finance law, *Arizona Free Enterprise Club v. Bennett* and *Citizens Clean Elections Commission v. Bennett*.  *Id*. at 70:12-71:4, 76:5-25; Pl. Exh. 1 at 15.

50.     Dr. Osborn's analysis in this case relied principally on themes and trends in the academic literature.  1/25/16 Tr. at 127:5-19.

51.     Dr. Osborn's expert report and testimony do not address any conduct of political party committees (other than legislative caucus committees) at the state, county, or township level, including how leaders are selected within those committees or how they contribute to candidates.  *Id*. at 141:19-146:10.  He examined only the legislative caucus committees of the majority party in Illinois (the Democratic Party) and only those formed by Democratic legislative leaders (the House Speaker and the Senate President).  *Id*. at 182:7-10.

52.     Dr. Osborn offered three main reasons why classifying legislative caucus committees as political parties, and not as PACs, is inappropriate: (1) the structure of legislative caucus committees, unlike that of political parties, amplifies the risk of *quid pro quo* corruption in the Illinois legislature; (2) legislative caucus committees employ different candidate financing

strategies than do political parties; and (3) legislative caucus committees are more susceptible to interest-group influence than political parties because the donors who contribute to legislative caucus committees are concentrated more heavily in certain industries than are those who donate to political parties. For the reasons discussed below, the court finds these points unpersuasive.

### G. Dr. Osborn's Testimony Regarding the Structure of Legislative Caucus Committees

53. Dr. Osborn opined that legislative caucus committees create new opportunities for corruption because they are "structured to manage the operations of a legislative body." Pl. Exh. 1 at 2; *see also* 1/25/16 Tr. at 89:22-90:16.

54. Osborn opined that this design "enhances the potential for corruption because it links a policy-making authority directly with a fundraising system." 1/25/16 Tr. at 78:3-8. He claimed that, even if there were no evidence that legislative caucus committees actually allowed for corruption, he would still believe that they were dangerous because "it's the structure that is the problem." *Id*. at 124:23-125:7.

55. Dr. Osborn opined that, by contrast to legislative caucus committees, political parties are "one step removed from the policy-making process, meaning … they are … not actively involved in the day-to-day legislating or policy-making as a legislator or a governor would be." *Id*. at 84:25-85:4.

56. Dr. Osborn testified that the legislative leaders have "carrots and sticks" that enable them to maintain their positions, such as providing caucus members with "plum committee assignments" or fast-tracking their legislation. *Id*. at 96:19-25. In his view, legislative caucus committees provide an additional carrot by allowing legislative leaders to use campaign contributions to advance their own policy agendas. *Id*. at 97:18-25.

57.     Dr. Osborn opined that this structure creates opportunities for *quid pro quo* corruption, as a legislative leader theoretically could say, "Unless you vote for this bill, you will not receive contributions."  *Id*. at 98:1-15.  Therefore, by combining the policy-making function of the legislative leaders with the extraordinary fundraising power of the legislative caucus committees, Illinois has created novel opportunities for corruption.  *Id*. at 101:9-14.

58.     The court does not find persuasive Dr. Osborn's testimony that legislative caucus committees are materially closer to the policymaking process than are political parties.  It is naïve to think that political parties do not wield significant influence over legislative agendas— in fact, that is a principal purpose of political parties.  *See FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 476 (2001) (Thomas, J., dissenting) ("The very aim of a political party is to influence its candidate's stance on issues and, if the candidate takes office or is reelected, his votes.") (internal quotation marks omitted); *id*. at 477 (Thomas, J., dissenting) ("[A party's influence with candidates] is simply the essence of our Nation's party system of government.  One can speak of an individual citizen or a political action committee corrupting or coercing a candidate, but [w]hat could it mean for a party to 'corrupt' its candidate or to exercise 'coercive' influence over him?") (internal quotation marks omitted).  Even Dr. Osborn admitted that political parties seek to shape policy, albeit only at "a very high level."  1/25/16 Tr. at 161:11-18.  As a practical matter, there is often overlap between state party officials and legislative leaders.  For example, Michael Madigan serves as Speaker of the House, chair of the Democratic Majority legislative caucus committee, and chair of the Illinois Democratic Party. 1/26/16 Tr. at 259:2-12.  This fact further undermines Dr. Osborn's assertion that legislative caucus committees are materially different from political parties because they are "closer" to the legislative process.

59.     The court further finds that the features of legislative caucus committees do not create enhanced opportunities for corruption.  Unlike PACs and individuals, legislative leaders owe their legislative seats to the primary and general electorates and their legislative leadership positions to their respective caucuses.  If they abused their positions as legislative caucus committee chairs by pursuing personal policy agendas—as opposed to agendas favored by their constituents and/or their respective parties—or by financially coercing legislators for votes, they could be removed from their leadership positions by their caucuses or from their seats by the electorate.  1/25/16 Tr. at 97:1-5 (Dr. Osborn testifying that a leader's "carrots and sticks … have to be judiciously handled to make sure that the caucus as a whole is content with their leadership").  Plaintiffs agree that a legislative leader who behaves in a self-aggrandizing manner inconsistent with the party's interests could be removed from his or her post, but claim that "already being in that position gives the leader a lot of control so that a challenge to that leader is risky, because if you challenge the leader and you fail, he can punish you … by giving you bad committee assignments [or] by disfavoring your legislation."  *Id*. at 253:15-20.  This concern is greatly overstated.  As Osborn admitted, even without the legislative caucus committees, majority and minority leaders in the Illinois General Assembly have access to numerous institutional controls to keep their caucus in check, including other means of fundraising assistance.  *Id*. at 158:6-159:11.  For these reasons, it is difficult to imagine that heading a legislative caucus committee would give legislative leaders materially *more* power over their respective caucuses than they already have by virtue of their legislative leadership positions.

60.     Dr. Osborn also opined that the potential for corruption is further enhanced because the Act allows a candidate to receive contributions from only one legislative caucus committee per election cycle.  *Id*. at 101:19-102:6.  According to Dr. Osborn, this could lead a

candidate to be exclusively dependent on a legislative caucus committee for campaign contributions. *Id*. at 102:7-103:10.

61.    This testimony is unpersuasive. Legislative caucus committees are far from a candidate's only source of campaign funds; for example, candidates may accept large contributions from political party committees during a primary election and unlimited contributions from such committees during a general election. 10 ILCS 5/9-8.5(b). Thus, it is highly unlikely that a candidate would be exclusively dependent on a legislative caucus committee for campaign contributions; in fact, Dr. Osborne pointed to no such instances.

### H.    Dr. Osborn's Testimony Regarding Legislative Caucus Committees' Contribution Strategies

62.    Dr. Osborn opined that political parties and legislative caucus committees employ different contribution strategies and that, because of these differences, legislative caucus committees are more susceptible to corruption than political parties.

63.    According to Dr. Osborn, political parties typically pursue "an expansion strategy," meaning that their "primary and overwhelming goal" of making financial contributions is to "enhance their numbers, either their numbers of registered voters or the number of officeholders that they can get elected." 1/25/16 Tr. at 83:11-84:5.

64.    Also according to Dr. Osborn, the goal of a PAC, by contrast to the goal of a political party, "is to help set the environment so that [the PAC] can influence a public policy decision." *Id*. at 86:1-3. As such, PACs generally pursue an "access strategy where they're trying to supplement their on-the-ground lobbying or influence strategies on public policy with campaign contributions." *Id*. at 86:4-11.

65.    Dr. Osborn's views pertaining to the strategies of political parties and PACs are "generalizations" based on "trends and themes" in the academic literature. *Id*. at 88:4-89:21.

66.     Dr. Osborn testified that, like political parties, legislative caucus committees have an electoral interest in maintaining a political party's numbers in the legislature. *Id*. at 93:15-22. But he added that legislative caucus committees have a secondary interest in "managing the legislative operations on a partisan basis." *Ibid*. That secondary interest, according to Dr. Osborn, can result in "protectionist behavior by a legislative leader [who is] endowed with certain fundraising advantages and the ability to exclusively finance campaigns." Pl. Exh. 1 at 5.

67.     To buttress his argument, Dr. Osborn examined the contribution strategies for the 2012 election cycle of two legislative caucus committees: the Senate Democratic Victory Fund, which is led by the Senate President; and the Democratic Majority committee, which is led by the House Speaker. *Id*. at 116:8-19. The Liberty Justice Center, the legal organization that represents Plaintiffs in this case, compiled the data for his analysis. *Id*. at 116:20-117:10. Dr. Osborn chose to examine only those two legislative caucus committees because, as the majority party, Democrats retain institutional control over the House and the Senate. *Id*. at 117:14-21.

68.     Dr. Osborn opined that the Senate Democratic Victory Fund's contributions were entirely consistent with an expansion strategy because the largest contributions were made to candidates in close electoral races (as determined by Dr. Osborn based on the ultimate margin of victory). *Id*. at 118:13-22.

69.     But the Democratic Majority committee, according to Osborn, engaged in both an electoral expansion strategy and a "strategy designed to enhance the legislative influence of the Caucus Committee operators." Pl. Exh. 1 at 6. Dr. Osborne arrived at this conclusion for two reasons, neither of which is persuasive.

70.     First, the Democratic Majority committee made financial contributions to candidates during the primary election cycle, some of whom went on to win the general election

by wide margins.  1/25/16 Tr. at 119:6-120:8.  Dr. Osborn testified that those contributions would not have been made if the committee's sole concern was increasing the number of Democrats in the Illinois legislature; rather, the contributions indicate that the legislative leader, through his legislative caucus committee, was "trying to hand-select" a particular Democratic candidate for the general election.  *Id*. at 120:9-16.  Dr. Osborn's theory is that this financial support is designed to enhance the influence of the legislative leader over the candidate once the candidate takes her seat in the legislature.  Pl. Exh. 1 at 5.  The problem with this theory is that supporting a particular candidate in a primary election is entirely consistent with an expansion strategy.  If the favored candidate's primary opponent is likely to turn off a majority of the general electorate—for example, by being too far "Left" or "Right"—or is simply an unpredictable loose cannon, the party's chances of winning the seat would be enhanced by defeating the opponent.  The fact that the favored candidate went on to win the general election by a wide margin does not mean that the primary opponent would have done the same.  Indeed, Dr. Osborn agreed that the electability of a Democratic candidate in a primary election differs from his or her electability in a general election because "electability in the general election also frequently depends upon either candidate being able to pull voters from the middle, independent voters, centrist voters, left-leaning Republicans, right-leaning Democrats."  *Id*. at 138:6-15.

71.     Second, Dr. Osborn explained that the Democratic Majority committee contributed to candidates in the general election who ultimately won with margins of victory greater than five percentage points.  *Id*. at 121:21-122:5.  Because those elections were obvious wins, according to Osborn, contributions to those candidates did not further an expansion strategy, as those Democrats were not "electorally vulnerable."  *Id*. at 122:16-123:2; *see also ibid*. ("If you're pursuing a more expansion strategy, you would dedicate high resources into

either high-risk districts or districts in which you … have the ability to pick up a seat."). Essentially, Dr. Osborn asserted that the Democratic Majority did not engage in an expansion strategy because candidates who won the general election by more than five percentage points were "safe" and therefore did not need contributions. That assertion is highly unpersuasive. It is easy to say *ex post*, with the benefit of hindsight, that those candidates may not have needed financial support in the general election. But dark horses win elections on occasion, and pre-election polls have significant margins of error. When pressed, Dr. Osborn essentially conceded this point. He was asked if, according to his analytic methods, Senator McCain's fourteen-percentage-point defeat by then-Senator Obama in Wisconsin in 2008 meant "that all the money that Senator Obama and the National Democratic Party spent in Wisconsin on the presidential campaign was wasted money?" *Id*. at 168:19-169:7. Dr. Osborn responded that pre-election information probably indicated that the Wisconsin race was going to be close but that, in hindsight, the party realized that its candidate could have won without additional spending. *Id*. at 170:7-18.

72. In an effort to buttress his position, Dr. Osborn later discussed how legislative leaders would likely draw districts to prevent close elections for their party's candidates—thereby providing another reason why the Democratic Majority should have known that those candidates did not need contributions to win their general elections. *Id*. at 174:5-14.

73. This submission also crumbled on further examination. When asked if the fact that the Republicans took two United States House seats in Illinois away from the Democrats in the 2014 elections suggested to him "that just because you draw the lines doesn't mean that you know how it's going to come out, and you haven't really rigged it completely in your favor," Dr. Osborn said it would not surprise him if that occurred. *Id*. at 184:15-185:21.

74.     There is another defect in Dr. Osborn's analysis: He never investigated whether the state's political parties *actually* followed an expansionist strategy.  Doing so would have been prudent for at least two reasons.  First, it is not at all clear that political parties abide by a *pure* expansionist strategy.  Defendants claim that political parties "do not blindly pursue maximization of the representation in the General Assembly; rather, they seek and promote candidates who, as a general matter, will advance their goals and be loyal team players."  Doc. 178 at p. 46, ¶ 10.  This comports with the understanding set forth by the plurality in *Randall v. Sorrell*, 548 U.S. 230 (2006), which explained that the "basic object" of a political party is to "help elect whichever candidates the party believes would best advance its ideals and interests." *Id*. at 257-58 (plurality opinion).  To be sure, securing and maintaining a majority in a legislative body is an important step in advancing a political party's interests.  But widening a majority provides little value if the additional legislators do not actually subscribe to the party's policy agenda.  Dr. Osborn did not explore whether Illinois political party expenditures were consistent with a pure expansionist strategy, and therefore did not test this premise of his opinion.  Second, and more importantly, because he failed to examine how the Illinois Democratic Party contributed to candidates, Dr. Osborn could not compare the contributions of legislative caucus committees to those of political parties to determine the respective degrees to which those entities pursued an expansionist strategy.  Dr. Osborn's main argument is that because the Democratic Majority financed candidates in primary elections, and because it financed general election candidates who were not vulnerable, the legislative caucus committee was not behaving as would a political party.  But Dr. Osborn never examined whether the Illinois Democratic Party also contributed to primary candidates and to "safe" general election candidates.  If the party made such contributions, that fact would undermine Dr. Osborn's position regarding the

distinction between parties and legislative caucus committees. The fact that Dr. Osborn opted not to make this obvious comparison suggests that, if he had, the results would be inconsistent with his theory; at a minimum, it severely detracts from the persuasiveness of his opinions.

**I.      Osborn's Testimony Regarding Donors to Legislative Caucus Committees**

75.      Dr. Osborn next discussed the campaign finance reports of the Democratic Majority and the Senate Victory Fund from the 2014 election cycle. 1/25/16 Tr. at 114:2-19.

76.      Dr. Osborn determined that both legislative caucus committees have "a very high reliance on PAC contributions and corporate contributions." *Id.* at 114:20-115:7; *see also* Pl. Exh. 1 at 10 (Osborn's expert report stating that donations to legislative caucus committees come from "a concentrated group of special interests … by PACs associated with organized labor and business trade associations").

77.      In Dr. Osborn's view, this means that legislative caucus committees have greater potential for corruption because they "are access-seeking organizations, and they're looking to influence the public policy process, and so heavy reliance on those contributions kind of mirrors the policy-making process along with the electoral process." 1/25/16 Tr. at 115:8-25. He opined that this is dangerous because "[t]hese are the very interests that are the most likely to have issues before the Legislature," Pl. Exh. 1 at 10, and that the increased opportunities for corruption derive from the "cozy relationship" between "the donors, the interest groups, [and] the legislative caucus committee," 1/25/16 Tr. at 116:2-6.

78.      Dr. Osborn contrasted those donors with the donors who donate to political parties.

79.      Based on his review of the academic literature, Dr. Osborn testified that political parties tend to receive contributions from a broad cross section of donors. Pl. Exh. 1 at 4. He

claimed that donor-base composition provides another distinction between legislative caucus committees and political parties. Dr. Osborn testified that receiving donations from a "broad cross section of donors" mitigates the danger of corruption from political parties because the contributions are not "from one select group of industries or one select group of interests." 1/25/16 at 84:6-24; *see also* Pl. Exh. 1 at 4 (Osborn opining that political parties are less likely to be an agent or principal of corruption because "subclasses of the political party donors are unable to amass a concentration of the contributions to create undue influence over the party").

80. This point is unpersuasive. First, it is not apparent that having a "less diversified" donor portfolio makes legislative caucus committees more likely to exert undue financial influence on legislators, or why that would be so. It is incumbent on the expert to establish why that would be the case, and Dr. Osborn failed to do so here. Second, Dr. Osborn once again compared the *actual* donor profile of legislative caucus committees only to a *theoretical* donor profile of political parties. The identity of donors to the Illinois Democratic Party is publically available on the same website from which Plaintiffs obtained the information on the Senate Victory Fund and the Democratic Majority. *See* https://www.elections.il.gov/campaigndisclosure/contributionssearchbycommittees.aspx ("Democratic Party of Illinois" in the "Committee Name" field). A cursory review of this data reveals that many corporations and PACs contribute to the Illinois Democratic Party. Yet Dr. Osborn chose not to examine who actually contributed to the state political parties, and instead relied on a generalized, academic concept when concluding that legislative caucus committees and political parties receive contributions from different types of donors. This again suggests that, if Dr. Osborn had made the appropriate comparison, the results would have undermined his theory.

### J.    Testimony of Andrew Nauman

81.    Andrew Nauman is the Deputy Director of the Division of Campaign Disclosure at the Illinois State Board of Elections.  1/26/16 Tr. at 193:22-194:1.

82.    The State Board of Elections reviews political committees' financial disclosures to ensure that the state's contribution limits are followed.  *Id*. at 194:4-6.  The Board consists of four Democrats and four Republicans.  *Id*. at 194:19-21.

83.    Nauman testified that the Board has never made a negative audit finding against any legislative caucus committee.  *Id*. at 204:23-205:25.  He could not say whether the audit process analyzes the motives behind any contribution that any donor made.  *Id*. at 214:24-215:4.

### Conclusions of Law

"The free flow of political speech 'is central to the meaning and purpose of the First Amendment.'"  *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 152 (7th Cir. 2011) ("*WRTL*") (quoting *Citizens United v. FEC*, 558 U.S. 310, 329 (2010)).  Given the integral role political speech plays in a democratic society, most laws that burden political speech "are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  *Citizens United*, 558 U.S. at 340 (internal quotation marks omitted).  But the Supreme Court has held that, because campaign contribution limits do not burden political expression and political association rights to the same degree as other speech restrictions, "this kind of campaign-finance regulation need only satisfy a form of intermediate scrutiny."  *WRTL*, 664 F.3d at 152 (citing *Buckley v. Valeo*, 424 U.S. 1, 23-25 (1976)).  As such, "contribution limits are generally permissible if the government can establish that they are 'closely drawn' to serve a 'sufficiently important interest.'"  *Ibid*. (quoting *Buckley*, 424 U.S. at 25); *see also Ariz. Free Enter. Club's Freedom Club PAC v.*

20

*Bennett*, 564 U.S. 721, 735 (2011); *Davis v. FEC*, 554 U.S. 724, 737 (2008); *Randall*, 548 U.S. at 247. Settled precedent holds that one such "sufficiently important interest" is the State's interest in preventing *quid pro quo* corruption or its appearance. *See Citizens United*, 558 U.S. at 357; *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 390-93, 397 (2000); *WRTL*, 664 F.3d at 152.

As noted, only one of Plaintiffs' claims has survived dismissal—the claim that the Act impermissibly treats legislative caucus committees like political party committees and more favorably than PACs, individuals, and corporations. To place that claim in context, it is instructive to review Plaintiffs' arguments over the course of this suit. In seeking a preliminary injunction at the outset of this suit, Plaintiffs argued that the Act was not "closely drawn" to the State's anti-corruption rationale because the law "exempt[ed] political parties, but not individuals and PACs, from the limits on contributions to candidates." 902 F. Supp. 2d at 1120. This court recognized that "[s]peech restrictions that are valid when considered in isolation may nonetheless be found unconstitutional if they impermissibly disfavor certain content, viewpoints, or speakers," and that "exemptions from a speech restriction can render it fatally underinclusive and … cast doubt on the government's justification therefor." *Id.* at 1120-21. Nonetheless, the court ruled that prevailing campaign finance precedents defeated Plaintiffs' submission that the Act's favorable treatment of political parties rendered the law invalid. *Id.* at 1121-25 (holding that "there are at most two schools of thought on the Supreme Court"—one that "the First Amendment *requires* that political parties be treated more favorably than non-party contributors," and the other "that the First Amendment *allows but does not require* jurisdictions with contribution limits to treat parties more favorably than non-party contributors").

With the court having held at the preliminary injunction stage that the Constitution allows Illinois to favor political parties, Plaintiffs amended their complaint to add a claim that the Act is

unconstitutional because it defines political party committees to include "legislative caucus committees." Doc. 65 at ¶¶ 31-37, 51-54, 66. As noted, a legislative caucus committee is "a committee established for the purpose of electing candidates to the General Assembly" that may be formed by each of the majority and minority leader of the state House and Senate or by a committee of five state senators or ten state representatives of the same caucus. 10 ILCS 5/9-1.8(c). In a general election, legislative caucus committees (like political parties) can contribute unlimited amounts to candidates. 10 ILCS 5/9-8.5(b). Plaintiffs submit that legislative caucus committees more closely resemble PACs than political parties and that, regardless of how similar they are to any other regulated campaign entity, legislative caucus committees have the potential to engage in corruption. If Plaintiffs were right, the contribution limits imposed on Plaintiffs, and particularly on Illinois Liberty PAC, could hardly be considered "closely drawn" to the interest of preventing corruption, and the State would effectively be favoring certain political speakers (legislative leaders) over others (PACs, individuals, and corporations) without any adequate justification for doing so. Because the First Amendment does not tolerate such preferential treatment, *see First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 793 (1978), the contribution limits on Plaintiffs would be invalid.

As a threshold matter, the parties dispute which side bears the burden of proof. Plaintiffs submit that it is Defendants' burden to show that the limits are closely drawn to a sufficiently important government interest. 1/26/16 Tr. at 276:5-10. Defendants respond that they need only offer a sufficiently important interest to justify the law's contribution limits and that Plaintiffs must establish that the law is underinclusive. *Id*. at 278:2-15. Plaintiffs are correct. *See Nixon*, 528 U.S. at 387-88 ("[U]nder *Buckley*'s standard of scrutiny, a contribution limit … could survive *if the Government demonstrated* that contribution regulation was 'closely drawn' to

match a 'sufficiently important interest.'") (emphasis added); *WRTL*, 664 F.3d at 152

("Campaign contribution limits are generally permissible if the *government can establish* that

they are 'closely drawn' to serve a 'sufficiently important interest.'") (emphasis added); *Riddle v.

Hickenlooper*, 742 F.3d 922, 928 (10th Cir. 2014) ("Even under [*Buckley*'s] form of intermediate

scrutiny … state officials … bear the burden of proof."). Still, Defendants have satisfied their

burden of showing that contribution limits challenged by Plaintiffs are closely drawn to the

interest of preventing *quid pro quo* corruption (or the appearance thereof).

Plaintiffs raise three main arguments for why legislative caucus committees more closely

resemble PACs than political parties, all based on Dr. Osborn's testimony. First, they assert that

legislative caucus committees contribute to election campaigns in a different manner than do

political parties. Dr. Osborn testified that political parties theoretically make expenditures to

further an expansion strategy while interest groups pursue an access-seeking strategy. Findings

of Fact ("FOF") ¶¶ 63-64. After analyzing the campaign contributions of only two legislative

caucus committees, the Senate Victory Fund and the Democratic Majority, he determined that

both of them pursued an expansion strategy—just like political parties. FOF ¶¶ 67-69. But he

also found that the Democratic Majority exhibited some behavior inconsistent with an expansion

strategy. FOF ¶ 69. For the reasons discussed above, the court is not persuaded that those

expenditures are indicative of anything other than an expansion strategy. FOF ¶¶ 70-74. And

even if they were, Dr. Osborn never showed how that strategy makes legislative caucus

committees more like PACs. After all, what would it even mean for a legislative leader—to

whom *others* seek access—to *pursue* an access-seeking strategy?

Second, Plaintiffs argue that the types of donors who contribute to legislative caucus

committees are substantially different from those who donate to political parties. This

difference, according to Plaintiffs, creates an elevated risk that legislative caucus committees will engage in *quid pro quo* corruption. Based on his review of academic literature, Dr. Osborn posited that political parties receive contributions from a broad cross section of donors, and that because of this they are less susceptible to corruption. FOF ¶ 79. His examination of *actual* contributions to legislative caucus committees, by contrast, revealed that the overwhelming majority of donations came from political action committees and corporations. FOF ¶ 76. But, as discussed above, Osborn never explained why this matters. FOF ¶ 80. He testified that receiving donations from "a concentrated group of special interests" is dangerous because "[t]hese are the very interests that are the most likely to have issues before the Legislature." FOF ¶ 77. But virtually any interest could come before a legislature. And in any event, as explained above, Dr. Osborn does not show how accepting donations from PACs and corporations makes legislative caucus committees more likely to be corrupt than political parties, which accept donations from the same sources. FOF ¶ 79.

Third, Plaintiffs argue that the structure of legislative caucus committees is dangerous because it directly connects a policymaking body with a source of significant campaign funding. Osborn focused on two aspects of legislative caucus committees: (1) that legislative leaders, who have significant policymaking authority, can singlehandedly create their own legislative caucus committees; and (2) that candidates can receive contributions from only one legislative caucus committee per election cycle, potentially making legislators financially dependent on them and thus easier to corrupt. FOF ¶¶ 56-57, 60. He opined that this design flaw is unique to legislative caucus committees because political parties are further removed from the policymaking process. FOF ¶ 55. For the reasons set out above, the court disagrees that these features of legislative

caucus committees create enhanced opportunities for corruption or that it makes them materially different than political parties.  FOF ¶¶ 58-59, 61.

Contrary to Plaintiffs' position, legislative caucus committees are most akin to political parties.  In *McConnell v. FEC*, 540 U.S. 93 (2003), *overruled on other grounds by Citizens United*, 558 U.S. 310, the Supreme Court highlighted the differences between interest groups and political parties: "Interest groups do not select slates of candidates for elections.  Interest groups do not determine who will serve on legislative committees, elect congressional leadership, or organize legislative caucuses."  540 U.S. at 188.  Although the Court drew those distinctions in discussing whether political parties could be treated *less favorably* than interest groups, the takeaway remains the same: legislatures are "fully entitled to consider the real-world differences between political parties and interest groups when crafting a system of campaign finance regulation."  *Ibid*.  Here, the record shows that neither private individuals nor PACs select slates of candidates for elections, serve on legislative committees, elect legislative leadership, or organize legislative caucuses.  FOF ¶¶ 22-24, 31-32.  The legislative leaders and groups of legislators empowered to form legislative caucus committees, by contrast, do participate in caucus, committee, and legislative activities.  By their nature, then, legislative caucus committees more closely resemble political parties than do PACs because they are organized around and created by legislative leaders, who are chosen by their respective caucuses, or by groups of legislators from the same caucus.

Like Illinois law, federal law treats congressional campaign committees, the federal analog to legislative caucus committees, as political parties.  *See* 52 U.S.C. § 30116(d)(4)(B) (imposing on "all congressional campaign committees" the same expenditure limitations imposed on "political committees established and maintained by a national political party"); 52

U.S.C. § 30125 (same for soft money restrictions); 52 U.S.C. § 30104(e) (same for reporting requirements). The Supreme Court has recognized that congressional campaign committees have structural ties to their respective parties. *See FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 40 n.20 (1981) (noting that "senatorial campaign committees are identifiable as part of their respective party"). Plaintiffs submit that federal congressional campaign committees are unlike Illinois legislative caucus committees because "no federal law places any congressional campaign committee under the control of one person, let alone under the control of the parties' leaders within the two houses of Congress." Doc. 178 at p. 60, ¶ 27. Given this distinction, according to Plaintiffs, "there is no reason to expect Congressional campaign committees to pursue the personal interests of any particular legislator as there is with Illinois legislative caucus committees." *Ibid*. This argument is unpersuasive. Whether a committee is controlled by a single legislative leader or a group of several likeminded legislators, it could still (under Plaintiffs' theory) use its superior fundraising position to make *quid pro quo* demands. The Supreme Court's observation that federal campaign committees "are identifiable as part of their respective party" applies with equal force to legislative caucus committees and their respective state parties—and because the Supreme Court has cast no suspicion on the constitutional validity of treating federal campaign committees like political parties, the same holds for legislative caucus committees and state parties.

For these reasons, the court rejects the proposition that legislative caucus committees are essentially PACs in disguise or that they resemble PACs more than political parties. To the contrary, legislative caucus committees are quite similar to political parties, and to the extent the two are different, those differences do not materially affect legislative caucus committees' potential to engage in *quid pro quo* corruption. Accordingly, Defendants have shown that

treating legislative caucus committees as political parties, thereby exempting legislative caucus committees from the restrictions on other political contributors, does not cast doubt on Illinois's justification for limiting contributions from PACs and other contributors.

This outcome finds support in recent precedent expounding on the nature of the underinclusiveness inquiry. In *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015), a candidate for state judicial office challenged an ethics canon prohibiting her from personally soliciting campaign contributions. Although the State had a compelling interest in "protecting the integrity of the judiciary" and "maintaining the public's confidence in an impartial judiciary," the challenger claimed the law was underinclusive because the State "fail[ed] to restrict other speech equally damaging to judicial integrity and its appearance." *Id*. at 1666, 1668. More specifically, the challenger claimed the canon was not narrowly tailored because it still allowed judges' campaign committees to solicit money on the judges' behalf and permitted judges to send thank you letters to campaign donors. *Id*. at 1668. In assessing whether the law survived strict scrutiny under the First Amendment—a more demanding standard than *Buckley*'s "closely drawn" test—the Court explained:

> It is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging too little speech. We have recognized, however, that underinclusiveness can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.
>
> …
>
> Underinclusiveness can also reveal that a law does not actually advance a compelling interest.
>
> …
>
> Although a law's underinclusivity raises a red flag, the First Amendment imposes no freestanding "underinclusiveness limitation." A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns. We have accordingly upheld laws—even under

> strict scrutiny—that conceivably could have restricted even greater amounts
> of speech in service of their stated interests.

*Id*. at 1668 (citation omitted) (internal quotation marks omitted).  The Court held that Florida had

"reasonably concluded that solicitation by the candidate personally creates a categorically

different and more severe risk of undermining public confidence than does solicitation by a

campaign committee."  *Id*. at 1669.  Accordingly "Florida's choice to allow solicitation by

campaign committees does not undermine its decision to ban solicitation by judges."  *Ibid*.

At the same result obtains here.  Plaintiffs have challenged the contribution limits placed on

individuals and PACs.  It is beyond dispute that contribution limits may be imposed on these

entities to further the government's anti-corruption interest.  Yet Plaintiffs argue that because

legislative caucus committees—which they believe create a serious risk of corruption—are less

strictly regulated, Illinois in fact is not concerned about corruption in politics, but instead is

trying to selectively silence individuals and PACs.  As in *Williams-Yulee*, the fact that Illinois

chose not to place similar contribution limits on legislative caucus committees *could* raise a red

flag.  But for all the reasons provided above, legislative caucus committees have very little in

common with PACs or individual contributors, and function largely as political parties do.

Therefore, there is no basis to conclude that the Act's true purpose is to provide preferential

treatment to certain political speakers.

Again, *Williams-Yulee* explains that a "State need not address all aspects of a problem in

one fell swoop; policymakers may focus on their most pressing concerns," adding that a law

could still be considered narrowly tailored even if it "conceivably could have restricted even

greater amounts of speech in service of [its] stated interests."  *Id*. at 1668.  That is especially true

here, where the quality and degree of potential corruption arising from contributions by

individuals and PACs, on one hand, and by legislative caucus committees, on the other, are so

different.  Illinois reasonably concluded that corruption (or the appearance thereof) by private individuals and non-legislative entities poses a far more serious risk to the democratic process than does a legislative leader contributing to another legislator or electoral candidate in that leader's own caucus.  Accordingly, the Act's contribution limits do not run afoul of the First Amendment.

Plaintiffs also argue that the Act violates the Equal Protection Clause.  Doc. 65 at ¶ 63.  But as the court previously held in this case, "whether a challenge to the disparate treatment of speakers or speech is framed under the First Amendment or the Equal Protection Clause," the same standard applies.  902 F. Supp. 2d at 1125-26.  As such, Plaintiffs' equal protection challenge fails for the same reasons as their First Amendment challenge.

### Conclusion

For the foregoing reasons, the Illinois Disclosure and Regulation of Campaign Contributions and Expenditures Act does not violate the Constitution in in subjecting PACS, corporations, and individuals to contribution limits from which legislative caucus committees are exempt.  With all claims resolved, judgment will be entered in favor of Defendants and against Plaintiffs.

September 7, 2016

_____
United States District Judge